## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

CHANDAR RATNAM, ASHA CHANDAR,
and CHANS FOODS, INC.,

                Plaintiffs,

v.

BLIMPIE ASSOCIATES LTD., 2001 B.A.
REALTY, INC., D.C.B.G., INC., and H
STREET COMMUNITY DEVELOPMENT
CORPORATION, INC.,

                Defendants.

CIVIL ACTION NO. _____

## NOTICE OF REMOVAL

To:    Civil Clerk's Office, United States District Court for the District of Columbia, 333
        Constitution Ave., NW, Washington, DC 20001; and

        Superior Court Clerk, Superior Court of the District of Columbia, 500 Indiana Avenue
        N.W., Washington, DC 20001

        Pursuant to 28 U.S.C. §§ 1441 and 1446, defendants Blimpie Associates Ltd.

("Blimpie"), 2001 B.A. Realty, Inc. ("BA Realty"), and D.C.B.G., Inc. ("DCBG") (collectively,

the "Removing Defendants") hereby file this Notice of Removal of Civil Action No. 06ca618,

which was filed in the Superior Court of the District of Columbia, Civil Division, on January 31,

2006, under the same caption as set forth above (the "State Action").

        As grounds for this removal, the Removing Defendants state as follows:

        1.      On February 1, 2006, defendants Blimpie, BA Realty, and DCBG received a copy

of the Complaint filed in the State Action by facsimile. As of the date of this Notice of Removal,

the Removing Defendants have not been served in the State Action. As of the date of this Notice

W706186.3

of Removal, on information and belief, defendant H Street Community Development Corporation, Inc. ("HSCDC") has not received notice of the State Action. A true and accurate copy of the Complaint and docket entries in the State Action are attached hereto as Exhibits 1 and 1A.

2.     This action is removed within 30 days of any Removing Defendant's receipt of the initial pleading setting forth the claim for relief in this matter, pursuant to 28 U.S.C. § 1446(b).

3.     Plaintiff Chans Foods, Inc. ("Chans Foods") is a District of Columbia for-profit corporation with its principal place of business at 8th and H Streets, N.E., Washington, D.C. 20002 (the "Premises"). (Complaint, ¶¶ 1, 16, 31.)

4.     Defendant Blimpie is a New York corporation with its principal place of business in New York.

5.     Defendant BA Realty is a New York corporation with its principal place of business in New York.

6.     Defendant DCBG is a Delaware corporation with its principal place of business in Virginia.

7.     Citizenship of Defendant HSCDC need not be considered in connection with this Notice of Removal for purposes of determining diversity of the parties because HSCDC was fraudulently joined in the Complaint solely to defeat diversity jurisdiction, as further described below.

8.     Citizenship of Plaintiffs Chandar Ratnam ("Ratnam") and Asha Chandar ("Asha") need not be considered in connection with this Notice of Removal for purposes of determining diversity of the parties because the Complaint fails to state a claim upon which relief may be

granted to those plaintiffs, and plaintiffs Ratnam and Chandar were fraudulently joined in the Complaint solely to defeat diversity jurisdiction, as further described herein.

9.　　This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between all properly named plaintiffs and defendants and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

### Defendant HSCDC Is Fraudulently Joined

10.　　The citizenship of defendant HSCDC must be disregarded because it has been fraudulently joined.

11.　　To establish fraudulent joinder, Removing Defendants must demonstrate either that: (1) no possibility exists that the fraudulently joined plaintiffs can establish a cause of action against the in-state defendant in state court; or (2) there has been outright fraud in the plaintiffs' pleading of jurisdictional facts. *Brown v. Brown & Williamson Tobacco Corp.*, 26 F. Supp.2d 74, 76-77 (D.D.C. 1998); *Newman v. Brent*, CA No. 97-1647(TFH), 1998 U.S. Dist. LEXIS 10476, at *7 (D.D.C. July 8, 1998).

12.　　Pursuant to the Complaint, HSCDC leased the Premises to defendant BA Realty on August 26, 2002, which then subleased the Premises to Munni Enterprises, Inc. ("Munni"), a non-party. (Complaint, ¶ 22.) Approximately two years later, in April 2004, plaintiff Chans Foods purchased Munni's interest in the Premises and entered into a sublease with defendant BA Realty (the "Sublease"). (Complaint, ¶ 31.) Chans Food then entered into a Franchise Agreement with defendant Blimpie to open and operate a Blimpie franchise at the Premises. (*Id.*) At no time did Chans Foods or any other plaintiff enter into a lease or sublease with HSCDC.

13.    The Complaint asserts no cause of action addressed to HSCDC and alleges no common law duty or contractual relationship between plaintiffs and HSCDC.  Indeed, the Complaint itself provides that "[E]ssentially, Defendants sold Plaintiffs a fast food restaurant franchise...." (Complaint, Introductory paragraph entitled *Nature of the Action*).   While the Complaint alleges that Removing Defendants Blimpie and DCBG, and Blimpie's affiliate BA Realty, collectively "sold Plaintiffs a fast food restaurant franchise," the Complaint merely alleges as to HSCDC that it  constructed the building that was to include the Premises and entered into a lease with BA Realty.  (Complaint, ¶¶ 16, 23.)

14.    Count I of the Complaint alleges a violation of the D.C. Consumer Protection Procedures Act (the "Act") based on defendants' collective alleged failure to notify plaintiffs that the Premises was not zoned for use as a fast food restaurant and that there was neighborhood opposition to the use of the Premises as a fast food restaurant.  Plaintiffs further allege that Blimpie represented to them that it would perform a site analysis on the Premises and failed to do so.  (Complaint, ¶ 56.)  Because HSCDC had no duty under the Act, or by contract or otherwise, to warn plaintiffs, it cannot be liable to plaintiffs for violating the Act.

15.    Count II of the Complaint alleges common law fraud based on defendants' collective allegedly false statements and material omissions with respect to the Franchise Agreement and Sublease entered by plaintiff Chan Foods in April 2004 (Complaint, ¶ 60).  Because plaintiffs fail to allege that HSCDC made any statements to them or owed them any contractual or common law duty, HSCDC cannot be liable for fraud upon plaintiffs.

16.    Count III of the Complaint alleges negligent misrepresentation based on defendants' collective failure "to use reasonable care in making representations and statements to prospective and new franchisees and to take reasonable care to ensure that such statements and

representations were not false or misleading". (Complaint, ¶ 65). For the same reasons set forth above with respect to Count II, HSCDC cannot be liable for any negligent misrepresentation to plaintiffs.

17.    Count IV of the Complaint alleges breach of contract and breach of an implied covenant of good faith and fair dealing based upon defendants' collective alleged "breach [of] their express contractual duties and the implied covenant of good faith and fair dealing to Plaintiffs by violating the terms of the parties' agreements, and Plaintiffs' reasonable expectations of Defendant's [sic] performance, support, and assistance as prescribed under the Franchise Agreement and as described more fully above." (Complaint, ¶ 71.) Because plaintiffs fail to allege that HSCDC was a party to any alleged contract with plaintiffs (which they cannot), HSCDC cannot be liable for breach of contract or breach of the implied covenant of good faith and fair dealing.

18.    Count V of the Complaint alleges that defendants were unjustly enriched by collecting rent payments and franchise fees from plaintiffs. (Complaint, ¶ 74.) Because plaintiffs' allegations of unjust enrichment are based on their execution of the Franchise Agreement and Sublease, and because HSCDC is not a party to either of those agreements, HSCDC cannot be liable to plaintiffs for unjust enrichment.

19.    Accordingly, plaintiffs do not allege that Defendant HSCDC engaged in any activity which could be the basis of any independent claim against HSCDC, and therefore HSCDC has been improperly named in the Complaint solely for the purpose of defeating diversity jurisdiction.

**Plaintiffs Ratnam and Asha Are Fraudulently Joined**

20.    The citizenship of plaintiffs Ratnam and Asha must be disregarded for the purpose of determining the court's diversity jurisdiction because they have been fraudulently joined.

21.    The doctrine of fraudulent joinder is applicable to both plaintiffs and defendants. *Guillot v. Credit Suisse Boston, L.L.C.*, CA No. 03-0797 Sect. T(5), 2005 U.S. Dist. LEXIS 17808 (E.D. La. July 21, 2005); *Elk Corp. v. Valmet Sandy-Hill, Inc.*, CA No. 3:99-cv-2298-G, 2000 U.S. Dist. LEXIS 3586 (N.D. Tex. Mar. 23, 2000); *Lerma v. Univision Comms., Inc.*, 52 F. Supp.2d 1011 (E.D. Wisc. 1999); *Nelson v. St. Paul Fire & Marine Ins. Co.*, 897 F. Sup. 328, (S.D. Tex. 1995). To establish that a plaintiff has been fraudulently joined, the removing defendants must show that no possibility exists that the plaintiff has stated a claim against the in-state defendant. *Rodriguez v. Sabatino*, 120 F.3d 589, 591 (5th Cir. 1997).

22.    Plaintiffs Ratnam and Asha, who are Virginia citizens, have failed to allege facts sufficient to state a claim against the only Virginia defendant, DCBG, or, for that matter, any other Removing Defendants.

23.    Plaintiffs Ratnam and Asha are shareholders of plaintiff Chans Foods. Chans Foods is the only plaintiff-party that executed the Franchise Agreement with Blimpie and the Sublease with BA Realty. (Complaint, ¶ 31.) Because each cause of action in the Complaint concerns alleged breaches and misrepresentations based on the Franchise Agreement and Sublease, Ratnam and Asha cannot state a claim against any defendant.

24.    Accordingly, plaintiffs Ratnam and Asha have been improperly named in the Complaint solely for the purpose of defeating diversity jurisdiction.

**Conclusion**

25.    This Court has subject matter jurisdiction over the State Action pursuant to

28 U.S.C. § 1332 because:  (1) the amount in controversy exceeds $75,000, exclusive of interest

and costs; and (2) complete diversity of citizenship exists among all properly joined plaintiffs

and defendants.  Removal of this action is, therefore, proper pursuant to 28 U.S.C. § 1441.

WHEREFORE,  Removing Defendants request that the State Action be removed from

the Superior Court of the District of Columbia, Civil Division, to the United States District Court

for the District of Columbia.

Respectfully submitted,

**BLIMPIE ASSOCIATES, LTD., and
2001 B.A. REALTY, INC.,**
By their attorneys,

_____
Leslie P. Machado (Bar No. 472395)
Arthur L. Pressman
Christopher J. Wallace
NIXON PEABODY LLP
401 9th Street, N.W., Suite 900
Washington, D.C. 20004
(202) 585-8080

**D.C.B.G., INC.,**
By their attorneys,

_____
Tarrant H. Lomax (Bar No. 961409)
TARRANT H. LOMAX, ESQ., P.C.
4530 Wisconsin Avenue, N.W., #200
Washington, D.C. 20016
(202) 537-7320

Dated:  March 2, 2006

## CERTIFICATE OF SERVICE

     I, Christopher J. Wallace, do hereby certify that a true copy of the above document was served by first class mail upon counsel for Plaintiff, this 2nd day of March 2006 at the following address:

        William S. Fulton, Jr.
        DADY & GARNER, P.A.
        4000 IDS Center
        80 South Eighth Street
        Minneapolis, MN 55402

                        Christopher J. Wallace

## EXHIBIT 1

**Complaint**

# ARCHIVE

## Washington City Paper

## District Line

### From the June 21, 2002 issue.

## Sub Par

### Is H Street too good for Blimpie?

## By Annys Shin

CityPaper  Is H Street too good for Blimpie?

Illustration by Chad Martin

**June 21, 2002**

**1559 words.**

At the southwest corner of 8th and H Streets NE, there's a fenced-in vacant lot, lightly covered in rubble, with a few weeds poking out. It's an eyesore, but neighborhood residents and business owners say there's something worse coming to the site: a Blimpie sub shop.

The news of the sandwich chain's arrival is being met with the kind of ire usually reserved for halfway houses and adult-video parlors. At a June 4 D.C. Council hearing, Ward 6 Councilmember Sharon Ambrose introduced emergency legislation to stop the planned shopping development, which is also supposed to include a Foot Locker and a Shoe City.

Armed with a packet of constituent letters, Ambrose denounced the project as a misuse of public funds and a betrayal of community-planning priorities. When At-Large Councilmember Harold Brazil led a successful counterattack defending the chain, the anti-Blimpites dubbed him "Harold 'Blimpie's' Brazil" and accused him of being bought by the meatball-sub lobby.

"It is hardly the kind of place that you'd take your parents to dinner," sniffs resident Richard Layman.

All that the founders of Blimpie wanted to evoke was airships, according



EXHIBIT
A

to the company's Web site. Back in 1964, the story goes, high school pals Tony Conza, Peter DeCarlo, and Angelo Baldassare decided that the thickly stuffed sandwiches they were selling in Hoboken, N.J., looked like blimps, and the brand was born.

A brand identity, though, is a tricky thing to control. McDonald's has seen its "Mc-" prefix come to connote soulless prefabrication. Wal-Mart's name has become linked not only with a smile and a bargain but with all-consuming sprawl.

And Blimpie--with its wallpaper depicting schlubby customers and its penchant for mixing guacamole and mustard--has come to seem decidedly downscale. In a neighborhood where commercial development hasn't kept pace with the influx of affluent homesteaders, that's too much for some residents to bear.

As upwardly mobile H Streeters see it, the thoroughfare already has too many fast-food establishments. A McDonald's sits near the corner of 8th and H, as do two locally owned carryouts that sell subs and Chinese food. It's also true that sneakers are easy to come by in the area: A Sports Zone already occupies another corner of 8th and H Streets NE, and down the street is a Downtown Locker Room. But Blimpie, more than Foot Locker or Shoe City, has borne the brunt of the attacks.

Adding the sub shop and shoe stores to the intersection "will not add prestige to the street," says Shannon Salb, who's lived on G Street NE for the past six years. Nor, he says, will it attract other new businesses.

When he talks about putting something else on the site, though, he doesn't mention replacing Shoe City with Kenneth Cole. Instead, he focuses on eating and drinking, on the prospect of "a high-end chain like Starbucks or Xando." A coffee shop, he adds, would go nicely with the newly opened H Street Playhouse and the soon-to-be renovated Atlas Theater.

Anwar Saleem, president of the H Street Merchants Association, says he, too, would prefer a Starbucks, which he says offers "a better name brand" than Blimpie and "better food."

"Blimpie's doesn't even rate against Subway," he says.

So Saleem and Ambrose met with Starbucks executives earlier this month, hoping to woo them to the neighborhood. "I think having a Starbucks would make a statement about H Street," Ambrose says.

Unfortunately, that statement wouldn't be true. As far as the lords of the

latte are concerned, H Street is not a Starbucks kind of place. In their meeting with Ambrose and Saleem, Saleem says, company reps said that H Street needs "more work on infrastructure and streetscaping and a better mix of businesses." According to other officials at the meeting, Starbucks also thought the street was too dirty and unsafe.

Given the history of the site, it's hard to see why H Street boosters are being so choosy. Neighboring businesses include Super Nails, Check N Go, and the J&V Pawn Shop. For years, the corner was occupied by a collection of dilapidated buildings. In 1997, the city gave the H Street Community Development Corporation (CDC) federal funds to buy the land and then demolish the buildings, over the protests of historic-preservation-minded residents. Two million dollars later, it was a vacant lot.

After the mayor's office in April designated H Street part of its Main Streets revitalization program, the locals started dreaming of better things; instead, the CDC unveiled plans for two shoe stores and a Blimpie.

To the uplift-H Street crowd, the city seems to be working at cross purposes, lending them support with one hand and undermining them with the other. "This is not about Blimpie," Ambrose says, referring to the current controversy. "It's about the appropriateness of any fast-food place--Blimpie, Subway, McDonald's, whatever--on that corner, anywhere on the street, given the goals of the Main Streets program and the kind of planning that has been going on."

But is food served fast really the problem? It's hard to picture anyone kicking up a similar fuss over the arrival of a fancy fast-food chain such as Chipotle or Panera. Substantively speaking, Blimpie Director of Marketing Ron Feigenbaum points out, even a Starbucks is basically a Blimpie with cocoa sifters.

"We are in the quick-serve restaurant category, as is Starbucks," Feigenbaum says. "It's perception, not reality. It's like Tiffany's and Zales: Both are selling diamonds."

But perception--"brand prejudice," Feigenbaum calls it--rules. Audrey Hepburn didn't go to Zales. Blimpie's slogan may be "the freshest of everything," and it may tout Mediterranean flatbread and dolphin-safe tuna, but it still conjures images of rest stops and shopping-mall food courts.

Its far bigger rival, Subway, has managed to reinvent itself as a wholesome dining experience, thanks to a national TV campaign

featuring formerly overweight student pitchman Jared Fogle. Subway, though, has the financial muscle that comes with having 16,000 franchises worldwide; Blimpie has only 2,500. And it's not so easy to pitch healthy eating when you're named "Blimpie."

So on June 13, in a hands-on bit of image maintenance, Blimpie co-founder and CEO DeCarlo rushed down from New York for a neighborhood zoning meeting, bearing two trays of freshly made subs. Blimpie franchises, DeCarlo told the crowd, boast addresses in "prestigious office buildings" and "affluent suburbs." Only the best materials, he said, go into building each Blimpie: "marble floors, beautiful laminates, and custom-printed vinyls."

Blimpie foes were unimpressed. They barely picked at the subs (though they did make a big dent in DeCarlo's supply of baked potato chips and Doritos), as the Blimpie discussion stretched on for two-and-a-half hours. And they didn't much warm to the idea of the new sub shop.

"How did your market research justify another carryout on H Street?" demanded resident Leslie Thompson.

"I go where we can succeed," DeCarlo replied, "where I don't see 15 brand-name stores competing for your fast-food dollar."

"We don't want to see our H Street be a fast-food strip," Thompson retorted.

The choice confronting the neighborhood, though, isn't between a fast-food strip and an upscale shopping district: It's between a fast-food strip and a strip full of nothing. Given those options, the H Street CDC is going for Blimpie, even if the neighbors think it isn't classy enough.

Some residents can't get over that symbolism. "I'd like to see a better mix of retailers," Saleem complains, "something that's right for the neighborhood 10 or 15 years from now. What message are we sending our kids--that our neighborhood is all about athletic footwear, beauty products, and carryouts?"

The message, in fact, would be that the neighborhood isn't dead to commerce. So there's no Starbucks mermaid smiling down on H Street NE, the way there is on U Street NW, Connecticut Avenue NW, and Wisconsin Avenue NW. Unlike Starbucks, Blimpie is planning to franchise to a D.C. resident, keeping profits in the neighborhood.

A gourmet-coffee outlet wouldn't bring prosperity, only the appearance of prosperity. Blimpie foes seem to believe that the sound of steam

rushing out of an espresso machine will be a siren call to consumers and investors alike.

Actually, the opposite is true: In D.C., chain coffee stores aren't pioneers of urban renewal; they tend to follow development rather than spark it. Starbucks agreed to enter Columbia Heights only recently, with the development of the Tivoli Theatre. Starbucks is also planning to open a store in a strip mall on upper Georgia Avenue NW, according to news reports. The chain became more interested in the blighted corridor once Discovery Communications began building a headquarters just over the District line in Silver Spring.

Starbucks suits have their own philosophy about location selection. They like to pick spots they call "third places"--the "first" being home, the "second" being work, and the "third" being some comfortable place in between. H Street, as far as Starbucks executives are concerned, ranks fourth or lower.

But Blimpie wants to be there. Who cares if it brings cachet to go with its cappicola subs? If it makes it, more brand-name outlets may follow. Ultimately, the place may be more welcoming for the sorts of retailers that the anti-Blimpites want.

"Having a value-oriented business doesn't blight a neighborhood," Feigenbaum says. "I don't think there's a neighborhood we can't fit into—brand prejudice aside." **CP**

Art accompanying story in the printed newspaper is not available in this archive: Illustration by Chad Martin.

*Archive Comments?* *Send them here.*

**CityPaper**

- Classifieds
- Employment
- Personals
- Restaurants
- Showtimes
- Music, Arts & Events Listings

- City Lights
- Cover Story
- Loose Lips
- Dept. of Media
- inD.C.
- Back Issues

Copyright © 2005 Washington Free Weekly Inc.



## SUBLEASE

AGREEMENT OF SUBLEASE dated April _28_, 2004, made between 2001 B.A. REALTY INC., a New York corporation with offices c/o Blimpie Associates, Ltd., Seven Penn Plaza, 17th Floor, New York, New York 10001 as landlord (hereinafter "Landlord") and CHANS FOODS INC., a District of Columbia corporation with an address at 14110 Gabrielle Way, Centreville, Virginia 20121 as tenant (hereinafter "Tenant").

## W I T N E S S E T H

Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the premises known as Retail Center, 8th and H Streets, N.E., Washington, D.C. 20002 ("Premises"), as more particularly described in the lease dated August 26, 2002, made between H Street Community Development Corporation, Inc., as landlords, and Landlord, as tenant (hereinafter referred to as the "Major Lease"), for a term of years, commencing on the date hereof and terminating, as set forth in Section 2 hereof, upon the payment of all the sums required to be paid under the Major Lease and hereunder, all without any offset or deduction whatsoever.

NOW, THEREFORE, it is agreed:

1. The interest of the Landlord in the Premises is as the Tenant under the Major Lease. This Sublease and the leasehold created hereby are subject and subordinate to the terms, covenants and conditions of the Major Lease. Tenant agrees to pay to the Landlord under the Major Lease all rentals and additional rentals provided for therein, as more particularly described and provided for in the Major Lease, at the office of Landlord or at such place or to such agent as the Landlord may designate, subject to the terms of this Sublease.

2. Each and every term of the Major Lease is hereby incorporated into this Sublease with like effect as if herein set forth in full, except to the extent inconsistent with the terms of this Sublease, and as so incorporated the words "landlord" and "tenant" contained in the Major Lease shall be deemed to apply to Landlord and Tenant under this Sublease. This Sublease shall terminate one (1) day prior to the expiration of the Major Lease, including any extensions thereof, unless sooner terminated as provided herein.

3. Tenant may only use and occupy the Premises as a franchised Blimpie sandwich restaurant and for no other purpose. Tenant may only offer for sale Blimpie authorized products, and any other items that may be authorized in writing by the Landlord. Tenant may only install equipment in the Premises approved and authorized in writing by Landlord.

1



4.    Upon default by the Tenant herein (a) in the payment on their due date of any of the rentals and additional rentals payable under this Sublease, including, without limitation, any and all rentals and additional rentals payable pursuant to the Major Lease, or in the performance of any of the terms, covenants or conditions of the Major Lease and/or this Sublease, and the continuance of any such default beyond the expiration of any grace period provided under the Major Lease; or (b) of any term, covenant, or condition of the Blimpie Franchise Agreement hereinafter described, beyond cure period provided therein, the Landlord herein shall have the right and privilege of canceling this Sublease on ten (10) days notice, in writing to the Tenant, by certified mail, addressed to Tenant at the Premises. Upon the expiration of such ten (10) day period, the term of this Sublease shall cease in the same manner as if such date were herein expressly specified for the termination of the demised term, and the Landlord herein shall have the right to recover immediate possession of the Premises by summary proceedings or otherwise, the said Tenant in such event being, and being deemed to be, a holdover tenant.

5.    Notwithstanding any provision of the Major Lease to the contrary, Tenant shall not have the right to assign this Sublease or to sublet the Premises or any part thereof, or to license or permit the use of any part thereof by others, whether by operation of law or otherwise, without the prior written consent of Landlord. Any transfer of the corporate stock of Tenant shall be deemed an assignment of this Sublease requiring the Landlord's consent, as contained in this Section.

6.    Notwithstanding anything to the contrary contained in this Sublease, Landlord shall not be liable to Tenant, its permitted successors, assigns or subtenants, with respect to any of the affirmative covenants to be performed by Landlord under this Sublease by reason of the incorporated provisions of the Major Lease, or otherwise.

7.    Tenant agrees that, notwithstanding anything contained in this Sublease to the contrary, it will look solely to the estate and property of the Landlord in the land and building of which the Premises are a part for the satisfaction of Tenant's remedies for the collection of a judgment or other judicial process requiring the payment of money by Landlord, in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Sublease to be observed and/or performed by Landlord, if any, and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies, if any, and any principal or principals, disclosed or undisclosed, and all of the officers, directors and stockholders of the Landlord, in their individual capacity, and the Landlord, its successors and assigns, are hereby released from any liability pursuant to this Sublease, except Landlord's obligations to deliver possession of the Premises, as provided hereunder, and not to commit a breach under the Major Lease.

8.    Tenant does hereby assume the prompt and punctual payment of all rents and additional rentals payable pursuant to the terms of the Major Lease and does hereby further assume and agree to perform all the terms, covenants and conditions of the Major Lease, and hereby agrees to defend and indemnify and save Landlord, Landlord's agents, the landlord under the Major Lease and the landlord under any underlying lease harmless, burdened from all loss, cost, liability, claims, damage and expenses, including without limitation, reasonable attorneys' fees, penalties and fines, incurred in connection with or arising from (a) any default by Tenant in

2

the observance or performance of any of the terms, covenants or conditions of this Sublease and/or the Major Lease on Tenant's part to be observed or performed, and (b) the use or occupancy or manner of use or occupancy of the Premises by the Tenant or persons claiming through or under Tenant, and (c) any acts, omissions, or negligence of Tenant or any such person, or of contractors, agents, servants, employees, visitors or licensee's of Tenant, or any such person, in or about the Premises. This covenant shall survive the termination of this Sublease.

9.    Tenant agrees, and nothing contained herein shall authorize the Tenant, to attorn to the landlord under the Major Lease, or to execute any agreement which shall modify, cancel or terminate the Major Lease.

10.    If Tenant shall default in the performance of any of Tenant's obligations hereunder, Landlord, without thereby waiving such default, may, at Landlord's option, without notice to Tenant, perform the same for the account of Tenant. Landlord may enter the Premises at any time to cure any default. If Landlord makes any expenditures or incurs any obligations for the payment of money, including reasonable attorneys' fees, in instituting or prosecuting or defending any action or proceeding, by reason of any default of Tenant hereunder, such sum paid or obligations incurred shall be deemed to be additional rent and shall be paid by Tenant to Landlord, together with interest at the maximum legal rate, within ten (10) days of rendition of bill to Tenant therefore.

11.    Tenant acknowledges that it has read and is fully familiar with the Major Lease. Tenant agrees that it will not take any action (or fail to take any action) which will cause Landlord to be in violation of any term, covenant or agreement contained in the Major Lease.

12.    Tenant is hereby authorized and directed and hereby agrees to pay directly to the landlord under the Major Lease the security deposit, rentals and additional rentals provided for in the Major Lease, however, only as the agent for the Landlord. This right shall immediately cease upon Tenant's default in the performance of any term, covenant or condition of this Sublease or upon the written request of Landlord.

13.    In the event of any default on the part of Tenant under any of the terms, covenants, provisions or agreements of this Sublease or the Major Lease or any other underlying lease, Landlord shall have the same rights and remedies against Tenant under this Sublease as are available to the landlord under the Major Lease or any other landlord against Landlord under the Major Lease or any of the provisions of any underlying lease. Such rights shall not be exclusive of each other, but inclusive, at the option of Landlord.

14.    Whenever Landlord is, in accordance with the provisions of the Major Lease, required to render performance or to give notice to landlord under the Major Lease within a specified time, the period during which Tenant must render such performance or give notice shall, for the purpose of this Sublease, be five (5) days less than such time. However, where such period of time is five (5) days or less pursuant to the Major Lease, Tenant shall render such performance or give such notice as promptly as is possible.

3

19.    If the Major Lease becomes null and void, or is replaced by a new or substituted lease from the landlord under the Major Lease, its successors and assigns, whereby the Tenant assumes or obtains the interest of the tenant under such new or substituted lease, Tenant herein agrees to assign and hereby assigns to Landlord any such new lease procured by it and hereby appoints Landlord, its successors and assigns, as the Tenant's true and lawful attorney in fact, to execute and deliver any and all necessary papers and documents to effectuate the intent of this Paragraph.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement of Sublease, as of the day and year first above written.


LANDLORD:                                       TENANT:

2001 B.A. REALTY INC.                           CHANS FOODS INC.


By: _____        By: _____
NICHOLAS LAGANO, JR.                            CHANDAR RATNAM
President                                       President



## BLIMPIE ASSOCIATES, LTD.

## TRADITIONAL LOCATION FRANCHISE AGREEMENT

*between*

## BLIMPIE ASSOCIATES, LTD.

*and*

## CHANS FOODS INC.

### TABLE OF CONTENTS

| ARTICLE | TITLE | PAGE |
|---|---|---|
| 1 | Franchise Right Granted, Location | 3 |
| 2 | Installation And Commencement Of Business | 4 |
| 3 | Training | 5 |
| 4 | Manuals And Standards Of Operator Quality, Cleanliness And Service | 6 |
| 5 | Menus, Uniforms, Inspections, Signs | 7 |
| 6 | Advertising And Co-Ops | 10 |
| 7 | Company Marks And Additional Marks | 11 |
| 8 | Distribution And Purchase Of Equipment, Supplies, And Other Products | 12 |
| 9 | Continuing Franchise Fees, Reports, Books And Records | 15 |
| 10 | Covenant Regarding Other Business Interests | 18 |
| 11 | Interference With Employment Relations | 18 |
| 12 | Subfranchisors, Salesmen | 19 |
| 13 | Marketing Manual | 19 |
| 14 | Nature Of Interest, And Transfer | 19 |
| 15 | Term, Default And Termination | 21 |
| 16 | Rights And Obligations Upon Termination | 24 |
| 17 | Insurance | 25 |
| 18 | Sole Obligations Of Franchisor | 26 |
| 19 | Point Of Sale System, Collection Of Data | 27 |
| 20 | Relationship Of Parties, Disclosure | 28 |
| 21 | Legal Proceedings: Jurisdiction, Construction And Interpretation | 29 |
| 22 | Execution, Requests, Consents And Waivers | 30 |
| 23 | Miscellaneous Provisions | 31 |



EXHIBIT
C

INITIALS 

1

2004 UFOC

## TRADITIONAL LOCATION FRANCHISE AGREEMENT

**THIS AGREEMENT** made this 28TH day of *April*      , 2004, by and between BLIMPIE ASSOCIATES, LTD., a New York corporation with offices at 7 Penn Plaza, 17th Floor, New York, New York 10001 (the "Franchisor") and CHANS FOODS INC., a District of Columbia corporation with an address at 14110 Gabrielle Way, Centreville, Virginia 20121 (the "Operator").

Definitions.

In this Agreement the following capitalized terms shall have the meanings set forth below, unless the context otherwise requires:

(i)     A Blimpie Branded Product is any product now existing or developed in the future that bears Franchisor's Marks and is sold by some or all Blimpie franchisees or Franchisor or other entities such as supermarkets, grocery stores, convenience stores.

(ii)    A Blimpie Distribution Point or Distribution Point is any system other than a Blimpie Restaurant, where Authorized Blimpie Products using Franchisor's Marks are sold, such as carts, kiosks, vending machines and any other product distribution systems developed in the future and authorized by Franchisor.

(iii)   A Blimpie Restaurant is a restaurant or other outlet, whether a Traditional Restaurant or a Non-Traditional Restaurant, that specializes in the sale of Authorized Blimpie Products, as defined below, is operated under Franchisor's Marks, as defined below, and is authorized by a Franchise or License Agreement made or approved by Franchisor.

(iv)    A Non-Traditional Restaurant is a Blimpie Restaurant located within another primary business or in conjunction with other businesses, some of which may be other fast-food type operations. A Non-Traditional Blimpie Restaurant will likely be installed within other primary businesses or within a multi-branded facility where other branded or nonbranded restaurants share common space.

(v)     A Traditional Restaurant is a business premises that exists primarily as a Blimpie Restaurant, however, such Traditional Restaurant may also have other types of businesses located in it, but in such case the Blimpie Restaurant is the primary business.

(vi)    A "System Restaurant" is defined as only the operation of a Blimpie Restaurant from which Blimpie Authorized Products are sold for on-premises and off-premises consumption and from which Authorized Blimpie Products may be delivered for off-premises consumption.

(vii)   Authorized Products or Blimpie Authorized Products are defined as products approved or authorized by Franchisor in accordance with Article 5 or 8 of this Agreement.

WHEREAS, Franchisor is a licensee and distributor of the trademark "Blimpie" and "Blimpie Subs & Salads", which have been registered with the United States Patent and Trademark Office of the United States of America including logos and designs, related to Franchisor's Marks (referred to in this Agreement as "Franchisor's Marks");

WHEREAS, Franchisor has developed and continues to develop a system for merchandising Blimpie authorized products, which system includes distinctive signs, food recipes, uniforms, and various trade secrets and other confidential information, and in some cases also includes architectural designs, equipment specifications, layout plans, inventory, record-keeping and marketing techniques (the "System") which are materially reflected in Franchisor's Operations Manual and Construction Manual (collectively, the "Manuals"). Franchisor identifies the System by Franchisor's Marks, and such other Trademarks, service marks, tradenames, logos and designs as may be designated by Franchisor in writing as being authorized for use in the System. Franchisor's Marks identify for the public the source of the services rendered in accordance with the standards and specifications established by Franchisor;

WHEREAS, the System as used in existing Traditional and Non-Traditional Blimpie Restaurants and Blimpie Distribution Points have established a reputation for quality, cleanliness, appearance and service, and through such operations and continued marketing and advertising efforts, have created demand and goodwill for the authorized Blimpie food products sold as a result of which the System has acquired valuable goodwill and a favorable reputation;

WHEREAS, Operator desires to enjoy the benefits of (i) operating under the System and using Franchisor's Marks, and (ii) being authorized and licensed to operate one System Restaurant as set forth below within the System in strict accordance with the standards and specifications established by Franchisor ; and

WHEREAS, Franchisor is willing to grant Operator a license under Franchisor's Marks and the System, subject to Operator's strict compliance with the terms and conditions of this Agreement.

NOW, THEREFORE, the parties agree as follows:

## ARTICLE 1.
## FRANCHISE RIGHT GRANTED, LOCATION

1.1.    GRANT

In consideration of the issuance of the franchise granted herein, Operator shall pay to Franchisor the non-refundable sum of One ($1.00) Dollar (the "Initial Fee"). In exchange, Franchisor hereby awards Operator the exclusive right to open and operate, under the terms of this Agreement, one System Restaurant specializing in selling high quality limited and specific food items as specified by Franchisor in Franchisor's Operations Manual, or subsequently added in accordance with Operations Manual amendments, under the name "Blimpie" or "Blimpie Subs & Salads" at a location to be mutually agreed upon by both parties. The Initial Fee shall be deemed fully earned by Franchisor upon the execution of this Agreement by Franchisor and Operator and shall not be refunded, in whole or in part, upon any termination of this Agreement, or at any other time or under any other circumstances.

## 1.2.   LICENSE

Franchisor hereby grants and awards to Operator, for the term set forth in this Agreement, and any renewal term, beginning on the date of this Agreement, the non-exclusive right and license, and Operator hereby undertakes the obligation, to operate the business described in this Agreement under Franchisor's Marks and such other of Franchisor's Marks as may be designated by Franchisor, to operate such business solely in accordance with the System, and only at the specific location to be agreed upon by Franchisor and Operator (the "Location").

Operator is not hereby granted any territorial exclusivity. Franchisor reserves to itself the right: (i) to grant additional franchises, whether similar or dissimilar to the franchise granted hereby; (ii) to engage fully and freely and without limitation in each and every aspect of the business of selling food products; and (iii) to offer to the public-at-large, products of every type and kind, and to employ and exploit trademarks, tradenames and copyrighted materials of Franchisor in connection therewith.

## 1.3.   LOCATION

No location has been agreed upon at the time of the execution of this Agreement. Upon the leasing of the Location, Operator agrees to sublet the Location from an independent corporation designated by Franchisor, on the approved sublease form annexed to Franchisor's Uniform Franchise Offering Circular (the "UFOC"). Any material violation of the sublease that is not cured after notice is given and within the applicable grace periods, as required by the terms of the sublease for the Location, is a violation of this Agreement. The signing of the sublease for the Location, or Operator's or any of its principle stockholder's or officer's written approval of the master lease for the Location, shall constitute Operator's approval of the Location. Operator shall engage only in the business of operating a System Restaurant at the Location and no other, except with Franchisor's prior written consent. Operator acknowledges its sole responsibility for finding the Location and that Franchisor is not obligated to directly or indirectly obtain an approved location for Operator. Franchisor's area subfranchisor, as identified herein, however, may voluntarily (without obligation) assist Operator in obtaining an approved location, as well as other approved locations for other System Restaurant operators who have executed existing franchise agreements.

## 1.4.   SCHEDULE

You must have selected your Premises, obtained our approval of the Premises and signed the Sublease, no later than 180 days after the Effective Date. If factors beyond your reasonable control have prevented you from doing so, and you have made reasonable and continuing efforts to locate Premises, obtain our approval and Sign a Sublease, we will grant one 90 day extension. If you have not selected Premises approved by us and signed the Sublease within 180 days of the Effective Date (plus the 90 day extension if applicable), we may terminate this Agreement upon notice to you, in which case we will retain your full Initial Fee.

## ARTICLE 2.
## INSTALLATION AND COMMENCEMENT OF BUSINESS

Operator, at its own expense, shall (i) renovate the Location into a System Restaurant; (ii) obtain all necessary governmental permits and licenses prior to beginning the renovation of its Location

into a System Restaurant and Operator shall fully complete the renovation, construction and equipping within a reasonable time thereafter. Operator shall commence operation of each System Restaurant no later than thirty (30) days following substantial completion of the renovation and equipment installation at the Location, and shall give Franchisor ten (10) days written notice prior to commencing operations. In no event shall Operator construct or remodel the interior or exterior of any System Restaurant or make any improvements which vary from the then-current standards, plans, and specifications approved by Franchisor, without first obtaining Franchisor's prior written approval. Operator, at its own expense, shall obtain all municipal and state licenses necessary to operate Operator's System Restaurant prior to commencing business at its System Restaurant and shall maintain all licenses in full force and effect during the term of this Agreement.

## ARTICLE 3.
## TRAINING

3.1.    Operator will designate individuals (up to 2 persons) as trainee(s) to attend Franchisor's training school in New York, New York (the "Blimpie Training School") or at another training location selected by Franchisor. Franchisor will offer initial training programs for Operator and its management employees at times selected by Franchisor. Franchisor will bear the costs of providing training programs, including the overhead costs of training, staff salaries, materials, and all technical training tools. Operator shall pay all traveling, living, compensation, and other expenses incurred by Operator and/or Operator's employees in connection with attendance at training programs. The training program and manner of conducting such program shall be at Franchisor's sole discretion and control. The training course will be structured to provide practical training in the implementation and operation of a System Restaurant.

3.2.    Operator will not allow any System Restaurant to be opened or managed by any person who has not attended and successfully completed the management training course designated by Franchisor. If Operator is an individual, and does not manage its System Restaurant on a day-to-day basis, and in the event its designated System Restaurant manager resigns or is terminated, Operator must arrange to have the successor restaurant manager (i) begin the required training course within forty-five (45) days of first assuming the duties of a restaurant manager and (ii) successfully complete the course. The required training course conducted at Franchisor's facilities will not extend beyond two (2) weeks. In addition to the course conducted at Franchisor's facilities, training includes an additional 80 hours of operational training in a Franchisor approved System Restaurant. Re-training of new management personnel of Operator necessitated hereunder shall carry a training fee of $1,500.00.

3.3.    If at any time the trainee voluntarily withdraws from, or is unable to complete its training, or fails to demonstrate an aptitude, spirit or ability to comprehend and carry out the course of study to the reasonable satisfaction of Franchisor, then Franchisor shall have the right to require Operator's trainee to attend other training class(es) or to perform additional operational training until Franchisor is reasonably satisfied that Operator's trainee has satisfactorily completed the training course. Operator may not open its System Restaurant until training is completed to Franchisor's reasonable satisfaction.

3.4.    In the event of a sale to a third party of Operator's System Restaurant after opening, the transferee must be trained in the Blimpie Training School as a condition of Franchisor's consent to such transfer. All tuition costs for such training shall be deemed paid upon receipt by Franchisor of five percent (5%) of the sales price of operator's System Restaurant due in accordance with Article 14

INITIALS [signature]                    5

herein. In the event of an approved non-sale management transfer to a third party of Operator's System Restaurant, the transferee shall attend the Blimpie Training School and pay to Franchisor the then-current training fee, which fee is $1,000, however, shall not exceed $1,500. No System Restaurant shall open or re-open until the Blimpie Training School certifies that the transferee is approved to operate the respective System Restaurant.

## ARTICLE 4.
## MANUALS AND STANDARDS OF OPERATOR QUALITY, CLEANLINESS AND SERVICE

### 4.1.    STANDARDS

In order to promote the value and goodwill of Franchisor's Marks and the System and to protect Franchisor's Marks and the other Blimpie operators who comprise the Blimpie franchise system, Operator agrees to conduct its business in accordance with the standards promulgated by Franchisor as follows:

### 4.2.    MANUALS

4.6.1.  In the Manuals and other publications, Franchisor will list authorized products to be sold by Operator, and promulgate standards of operation for System Restaurants, including standards of quality, cleanliness, and service for all food, beverages, furnishings, interior and exterior decor, supplies, fixtures, and equipment used in connection with each System Restaurant. Operator agrees to operate its System Restaurant in accordance with the standards, specifications and procedures set forth in the Manuals, this Agreement and the sublease for the Location. Operator further agrees that changes in the menu, or the standards, specifications and procedures may become necessary from time to time and agrees to accept as reasonable all modifications, revisions and additions to the Manuals as authorized by Franchisor. The sale of any product or service at the Operator's Location, without Franchisor's prior written approval shall constitute a material violation of this Agreement.

4.6.2.  The Manuals and all amendments to the Manuals (and copies thereof) are copyrighted and remain Franchisor's property. They are loaned to Operator for the term of the Agreement, and must be returned to Franchisor upon the Agreement's termination, expiration or nonrenewal. The Manuals are highly confidential documents which contain certain trade secrets of Franchisor, and Operator shall never reveal, and shall take all reasonable precautions, both during and after the term of this Agreement, to assure that its employees or any other party under Operator's control, shall never reveal any of the contents of the Manuals or any other publication, recipe or secret provided by Franchisor, except as is necessary for the operation of Operator's System Restaurant.

### 4.3.    HOURS

Franchisor and Operator agree that the hours of operation of Operator's System Restaurant are at a minimum, 7:00 am. to 10:00 p.m., seven (7) days per week, and Operator agrees to operate its System Restaurant during such hours. If the Location is in a mall or shopping center, the hours of the mall or shopping center shall control. Operator shall diligently and efficiently exercise its best efforts to achieve the maximum gross sales possible from its location, and will be open for business not less than fourteen (14) hours per day, seven (7) days per week, unless additional opening hours are reasonably required to maximize operations and sales. If such hours are incorrect in relation to the

INITIALS _____

6

sales potential of Operator's System Restaurant, then Franchisor and Operator shall reasonably adjust such hours by jointly establishing new hours of operation. It is acknowledged that the hours of other operators will vary in relation to each respective location, and local legal restrictions, if any.

### 4.4.  APPEARANCE

From time to time, Operator's System Restaurant may need a cosmetic improvement or equipment change or addition in order to comply with the Manuals and/or to maintain proper operations and an aesthetic appearance and professional image. Accordingly, Franchisor may require remodeling and renovation, and modifications to existing equipment and improvements as is reasonably necessary. Franchisor shall not require any such work at a particular System Restaurant less than three (3) years after the opening of the System Restaurant except: (i) for additional equipment if new food preparation methods or products are developed and authorized by Franchisor; (ii) if repairs or repainting are necessary to maintain the appearance of the interior and exterior of the Location in a clean and orderly condition satisfactory to Franchisor; or (iii) upon the sale of the Operator's System Restaurant. Within ninety (90) days after receipt of written notice, Operator shall fully implement and complete such changes to its System Restaurant operating under this Agreement.

### 4.5.  PRODUCT LINE AND SERVICE.

Operator agrees to only serve the approved limited product line items specified by Franchisor in this Agreement or in the Manuals and to follow all specifications and formulas of Franchisor as to specifications, contents, weight and quality of products served to its customers from Operator's System Restaurant.

### 4.6.  CONTAINERS, FIXTURES AND OTHER GOODS

4.6.1.  Operator agrees that all food and drink items will be served in containers bearing accurate reproductions of Franchisor's Marks. All containers, napkins, bags, cups, matches, menus and other packaging and like articles used in connection with Operator's System Restaurant shall conform to Franchisor's specifications, shall be imprinted with Franchisor's Marks and shall be purchased by Operator from a distributor or manufacturer approved in writing by Franchisor, as provided in Article 8, which approval will not be unreasonably withheld.

4.6.2.  No item of merchandise, furnishings, interior and exterior decor items, supplies, fixtures, equipment or utensils bearing any of Franchisor's Marks shall be used in or upon any System Restaurant unless the same shall have been first submitted to and approved in writing by Franchisor.

## ARTICLE 5.
## MENUS, UNIFORMS, INSPECTIONS, SIGNS

### 5.1.  MENUS

5.6.1.  Operator shall not manufacture, advertise for sale, sell or give away any product unless such product has been approved in the Manuals as an authorized product for sale in Operator's System Restaurant and not thereafter disapproved in writing by Franchisor. All approved products shall be distributed under the specific name designated by Franchisor. Operator shall establish all menu prices in its sole discretion. Operator shall offer for sale in its System Restaurant

only those food products which Franchisor designates as "approved and authorized" or which Franchisor has made available as a "regionalized" menu or has otherwise specifically approved in writing (each an "Authorized Product"). No standard product will be removed from the menu unless Operator is so instructed by Franchisor.

5.6.2. Such Authorized Products shall be marketed by approved menu formats to be utilized in Operator's System Restaurant. The approved and authorized menu and menu format(s) may include, in Franchisor's discretion, requirements concerning organization, graphics, product descriptions, illustrations, and any other matters (except prices) related to the menu, whether or not similar to those listed. In Franchisor's discretion, the menu and/or menu format(s) may vary depending upon region, market size, and other factors. Franchisor may change the menu and/or menu format(s) from time to time or region to region or authorize tests from region to region or authorize non-uniform regions or System Restaurants within regions, in which case Operator will be given a reasonable time (not longer than sixty (60) days) to discontinue use of any old menu format(s) and implement use of the new menu format(s).

5.6.3. Operator shall, upon receipt of notice from Franchisor, add any Authorized Product to its menu according to the instructions contained in the notice. Operator shall have a minimum of thirty (30) days after receipt of written notice in which to fully implement any such change. Operator shall cease selling any previously approved product within thirty (30) days after receipt of notice that the product is no longer approved.

5.6.4. The Authorized Products sold by Operator shall be of the highest quality, and the ingredients, composition, specifications, and preparation of such food products shall comply with the instructions and recipes provided by Franchisor or contained in Franchisor's Operations Manual, and with the further requirements of Franchisor as they are communicated to Operator from time to time.

5.2.   COMPLIANCE

Operator shall operate each of its System Restaurants as a clean, orderly, legal and respectable place of business in accordance with Franchisor's business standards and merchandising policies, and shall comply with all applicable ordinances, laws, statutes and regulations governing the operation of such premises, including all disability, food and drug laws and regulations. Operator shall not allow any Location or part of a Location to be used for any immoral or illegal purpose.

5.3.   SIGNS, DESIGNS AND FORMS OF PUBLICITY

5.6.1. Operator shall maintain a suitable sign or awning at, on, or near the front of the Location, identifying the Location as a "Blimpie Restaurant." Such sign shall conform in all respects to Franchisor's requirements and in accordance with the layout and design plan approved for the Location, except to the extent prohibited by local legal restrictions.

5.6.2. No exterior or interior sign or any design, advertisement, internet address or "web-page" or world wide web home page , sign, or form of publicity, including form, color, number, location, and size, shall be used by Operator or any Association (as defined below) unless first submitted to Franchisor and approved in writing (except with respect to prices). Any request by Operator for such approval shall be properly submitted in duplicate to: (i) Franchisor's Construction Department, at 7 Penn Plaza, 17th Floor, New York, New York 10001; (ii) Franchisor's Legal

INITIALS _____    8    2004 UFOC

Department, Attention: General Counsel, 7 Penn Plaza, 17th Floor, New York, New York 10001. Franchisor shall respond to such request within thirty (30) days of its receipt. Whenever Operator elects to utilize, in the form supplied, advertising supplied by Franchisor or any promotional item specifically approved by Franchisor, no further approval for use of such material is required. Upon written notice from Franchisor, Operator shall discontinue and/or remove any objectionable advertising materials.

### 5.4.   UNIFORMS AND EMPLOYEE APPEARANCE

Operator shall cause all employees, while working in System Restaurants, to: (i) wear uniforms of such color, design, and other specifications as Franchisor may designate from time to time, and (ii) present a neat and clean appearance. If the type of uniform utilized by Operator is removed from the list of approved uniforms, Operator shall have sixty (60) days from receipt of written notice of such removal to discontinue use of its existing inventory of uniforms and implement the approved type of uniform.

### 5.5.   VENDING OR OTHER MACHINES

Operator shall not permit vending or game machines or any other mechanical device to be installed or maintained in its Location without Franchisor's prior written approval.

### 5.6.   INSPECTION

5.6.1.   Franchisor's authorized representatives shall have the right to enter upon the entire main floor and basement of Operator's System Restaurant during business hours, without disrupting Operator's business operations, for the purposes of examining same, conferring with Operator's employees, inspecting and checking operations, food, beverages, furnishings, interior and exterior decor, supplies, fixtures, and equipment, and determining whether the business is being conducted in accordance with this Agreement, the System and the Manuals.

5.6.2.   In the event any such inspection indicates any deficiency or unsatisfactory condition with respect to any matter required under this Agreement or the Manuals, including but not limited to quality, cleanliness, service, health and authorized product line, Franchisor will notify Operator in writing of Operator's non-compliance with the Manuals, the System, or this Agreement. Operator shall have twenty-four (24) hours after receipt of such notice, or such other greater time period as Franchisor in its sole discretion may provide, to correct or repair such deficiency or unsatisfactory condition, if it can be corrected or repaired within such period of time. If not, Operator shall within such time period commence such correction or repair and thereafter diligently pursue it to completion. In addition, if the deficiency or unsatisfactory condition (in the reasonable opinion of Franchisor's authorized representative) constitutes an imminent danger to the public health or poses a significant risk of significant and immediate damage to the value of Franchisor's trademarks, Operator shall immediately cease business operations of the System Restaurant until Franchisor's authorized representative agrees that the deficiency or unsatisfactory condition has been corrected. Operator's failure to comply with the foregoing obligations to make corrections constitutes a material default under this Agreement.

## ARTICLE 6.
## ADVERTISING AND CO-OPS

6.1.    Operator and Franchisor acknowledge the value of advertising and accordingly Operator agrees to pay 3% of its Gross Sales as defined in Article 9 for each and every week of its operations to Franchisor (the "Advertising Fee"). These funds will be deposited, at Franchisor's sole discretion, into a segregated advertising account (with other advertising collections) controlled by Franchisor or to a regional advertising cooperative covering Operator's System Restaurant. Advertising payments will then be spent for advertising to benefit Operator and all operators of System Restaurants. The Advertising Fee shall be paid in accordance with the procedure described in Article 9.

Operator acknowledges and agrees that in the event Franchisor shall determine to participate in a national advertising program in conjunction with Blimpie International, Inc., (Blimpie International, Inc. is also a franchisor of the Blimpie trademarks in domestic territories in which your franchisor does not offer franchises) the Advertising Fee payable pursuant to this Agreement shall be four percent (4%) of Gross Sales instead of three percent (3%) of Gross Sales. In such event, no less than one-half (1/2) of the Advertising Fees paid by Operator shall be remitted to the Association (described below) for local advertising purposes. Operator hereby acknowledges the benefit of national visibility of Franchisor's trademarks for Operator's business and System Restaurants generally.

6.2.    Franchisor, at its sole discretion, may spend the collected fees directly, or may authorize payment of the advertising collections for media time, production of media materials, whether for radio, television, newspapers or store level materials such as flyers, or posters, or for any other type of advertising or marketing use. Franchisor is not, under any circumstances, obligated to contribute to any national or local advertising fund, program, Association, or other organization any advertising fees or contributions.

6.3.    Franchisor encourages the formation and operation of voluntary Operator Cooperative Advertising Associations (each an "Association"). Each Association shall function for the purpose of creating a cohesive team to coordinate advertising, marketing efforts and programs and maximizing the efficient use of local advertising media. If an Association is formed for Operator's region, each Operator must participate in the Association or lose its right to vote as to decisions regarding advertising and marketing efforts and programs.

6.4.    If requested, Franchisor will assist in establishing an Association or otherwise assist in deciding how to allocate all or part of the advertising funds paid by Franchisor to the Association (such funds will be paid to each Association at the Franchisor's sole discretion, who is entitled to expend the funds at its sole discretion in accordance with the provisions of this Agreement). If Franchisor elects to pay all or a portion of the advertising collections to an Association and if one of the following events occurs and is not resolved by the Association, then Franchisor reserves the right to exercise sole decision-making power over the advertising funds: (i) an Association ceases functioning; (ii) an impasse arises because of the inability or failure of the Association members to resolve any issue affecting the establishment or effective functioning of an individual Association; (iii) an Association fails to function in a productive or harmonious manner; or (iv) an Association is unable to approve any advertising program within a reasonable time not to exceed thirty (30) days. Franchisor reserves the right to establish general standards concerning the operation of all

Associations, advertising agencies retained by Associations, and advertising programs conducted by Associations. No decisions will be made or advertising funds spent without Franchisor's prior written approval.

6.5.    Operator acknowledges receipt of Franchisor's Offering Circular which refers to (a) Blimpie Marketing Productions, Inc. ("BMPI"); and (b) Grand Opening Advertising.

6.5.1.    BMPI is the non-profit entity authorized to receive marketing allowances and payments from Blimpie distributors, manufacturers and other entities that are associated in business, directly or indirectly, with Franchisor or the System or its operators or any part thereof. The activities of BMPI are controlled by representatives of Franchisor. By this Agreement, Operator consents to the receipt of such funds by BPMI or its successors, as well as the expenditure thereof for advertising and marketing expenses. These expenses may include costs for personnel, management fees, advertising agencies, operating expenses, matching fund programs, research and development, administrative expenses, production of educational or training materials, production of commercials, focus groups or other studies, and the purchase of television or radio or other media time, print advertising and such other marketing and advertising uses as may be authorized by Franchisor. BMPI shall expend no sums for purposes related to the sale of Blimpie franchises, but rather, shall dedicate its purpose to the promotion of increased sales and improved information concerning products and operations at the System Restaurant level.

6.5.2.    In addition to the Advertising Fee, Operator agrees to spend a minimum of $2,000 for its Grand Opening promotion as designated by Franchisor. The "Grand Opening" is required for all operators and functions to introduce Operator's System Restaurant to the public. The application and use of the Grand Opening funds shall be in the discretion of Operator so long as of an appropriate and reasonable advertising and marketing nature. Documentation of Operator's expenditure of Grand Opening Advertising monies (paid invoices) shall be submitted to Franchisor no later than ninety (90) days from the date on which Operator commences to do business.

6.5.3.    At the time of the purchase of the Blimpie Franchise, Operator agrees to purchase from Franchisor a Grand Opening Kit, containing materials required to implement a Grand Opening Advertising program. The Grand Opening Kit shall not cost more than $1,000.

## ARTICLE 7.
## COMPANY MARKS AND ADDITIONAL MARKS

7.1.    The license and related rights to use the System, the Manuals, Franchisor's Marks and any other proprietary products granted by this Agreement are applicable only with respect to Operator's System Restaurant at the Location, and not elsewhere, except in the event of a relocation approved in writing by Franchisor. This Agreement does not authorize the use of mobile vending vehicles, carts, kiosks or any other non-traditional delivery systems.

7.2.    Operator shall not interfere in any manner with, or attempt to prohibit, the use of Franchisor's Marks by any other Operator of Franchisor or in connection with Non-Traditional Blimpie Restaurants, distribution points or any other system used to distribute Blimpie authorized products.

7.3.     Franchisor may, from time to time, in Franchisor's sole discretion, obtain additional trademark and/or service mark rights in words and/or designs.   In the event of any of these occurrences, Franchisor may license Operator to use those trademarks or service marks by giving written notification to Operator that such marks now form part of Franchisor's Marks.  The term of such license will be coextensive with the term of this Agreement or as otherwise established by Franchisor, and will be subject to all restrictions with respect to the use of those rights as set forth in this Agreement and in the notice granting Operator the license.

## ARTICLE 8.
## DISTRIBUTION AND PURCHASE OF EQUIPMENT,
## SUPPLIES, AND OTHER PRODUCTS

8.1.     Operator agrees to use only Franchisor's approved products and portion control formulas in the preparation of Authorized Products.   Operator further agrees to only buy Raw Materials, as defined below, manufactured in accordance with Franchisor's specifications from approved manufacturers, distributed by approved distributors, and sold to Operator as follows:

8.1.1.   You must complete the build-out of the Restaurant, have it approved by us and open for business no later than 120 days after signing the Sublease, or such longer time as we approve if we determine that there have been excusable and unavoidable delays due to completion of landlord's obligation, labor stoppage, material shortages or events of force majeure.

8.1.2.   Operator agrees that within ten (10) days of the last to occur of (i) Operator's execution of this Agreement, or (ii) Operator's selection of a location and execution of a Sublease for such location, Operator shall submit to B.A.L. Equipment Sales, Inc., or its designee, a completed order for all Blimpie equipment required for Operator's Blimpie System restaurant and shall pay the entire purchase price for such equipment.  In the event Operator elects to purchase all or any portion of non-proprietary equipment items from any other vendor, Operator shall submit to Blimpie evidence of the placement and payment of the order(s) for such equipment (and evidence that such equipment is from the manufacturer and model designated) within said ten (10) day period.

8.2.   <u>DISTRIBUTORS AND MANUFACTURERS</u>

8.2.1.   For the purpose of this Agreement, "distributor" is defined as any entity, except a manufacturer, that directly or indirectly delivers raw materials to the Operator.  A "manufacturer" is defined as the entity that manufactures and/or sells the Raw Materials to a distributor. Raw Materials means all of the products purchased from distributors, and/or manufactured or sold by manufacturers or production entities which are used in the creation of Authorized Products.  Raw Materials include, but are not limited to printed paper goods, meats, cheeses, produce, frozen dough and/or freeze/thaw, frozen and prepared bakery products (collectively, the "Raw Materials").   "Authorized" means approved by Franchisor in accordance with the procedures established in this Agreement.

8.2.2.   Operator acknowledges that it is generally unrealistic from a cost and service basis to have more than one distributor in the market area of Operator's System Restaurant, and that to obtain the lowest distribution costs, all regional operators should only purchase from one authorized Blimpie distributor.  Operator agrees to only purchase all equipment, supplies, Raw Materials and other products and materials necessary for the operation of its System Restaurant solely from Authorized distributors, and other authorized sources who demonstrate, to the continuing reasonable

satisfaction of Franchisor, the ability to meet Franchisor's then-current standards and specifications for such items; who possess adequate quality controls and capacity to supply Operator and all other System operators needs promptly and reliably; who demonstrate the ability and willingness to work with Franchisor to provide the assistance needed by the those operators in the region and all other System Operators; who agree to distribute all authorized Blimpie products; who comply with Franchisor's reasonable requirements; and who have been approved in writing by Franchisor and not thereafter disapproved.

8.2.3.   If Operator desires to purchase any items from an unapproved distributor, whom Operator desires to become an Authorized distributor, Operator shall first submit a written request, in duplicate, for such approval to Franchisor, addressed to (i) President, 7 Penn Plaza, 17th Floor, New York, New York 10001 and (ii) General Counsel, 7 Penn Plaza, 17th Floor, New York, New York 10001 accompanied by a similar written request for approval from the proposed distributor. Franchisor shall have the right to require that the proposed distributor provide reasonable financial, operational and economic information regarding its business and that Franchisor's representatives be permitted to inspect the proposed distributor's facilities and establish economic terms, delivery, service and other requirements consistent with other distribution relationships for other system restaurants.   The proposed distributor shall pay to Franchisor in advance all of Franchisor's reasonable costs in review of the application of the distributor to service the Operator as well as all current and future reasonable costs related to inspecting and reinspecting the distributor's facilities, equipment, Raw Materials in the distributor's possession at any time.   Franchisor may revoke its approval upon the distributor's failure to continue to meet any of Franchisor's criteria.   Nothing in this article shall require Franchisor to approve any distributor.   Upon the receipt by Franchisor of Operator and the proposed distributor's request for approval in full compliance of this article, Franchisor will notify Operator of its decision within ninety (90) days after receipt thereof.   In the event an alternate approved distributor to the recommended distributor is used by Operator, as a condition thereof Operator and all other operators shall authorize the alternate distributor to provide to Franchisor duplicate purchase invoices for Franchisor's records and inspection purposes and to otherwise comply with Franchisor's reasonable requests.

8.3.   **MANUFACTURERS:**

The parties agree that Franchisor's product specifications and portion control system are highly confidential information and are trade secrets of Franchisor.   In order to (i) achieve appropriate pricing, (ii) obtain the specially formulated Blimpie authorized Raw Materials for Operator and all of Franchisor's System Restaurants, and (iii) establish consistent uniformity of Blimpie products, Operator acknowledges that purchasing by all System or regional operators from approved manufacturers is a necessity.   Because of the importance of quality and uniformity of product and the significance of product specifications and portion control in the preparation of Authorized Products to achieve and maintain such quality and uniformity, it is to the mutual benefit of the parties that Franchisor closely control the production and distribution of the Raw Materials used to produce authorized products sold by Operator.   Similar considerations may also apply to other products which Franchisor may develop in the future.   Operator therefore agrees to purchase only Raw Materials manufactured in accordance with Franchisor's specifications and quality standards by approved manufacturers who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then-current standards and specifications for such items; who possess adequate quality controls and capacity to meet the needs of Operator and all other System Operators in a given region or territory promptly and reliably; who demonstrate the ability

INITIALS _____

13

and willingness to work with Franchisor and to provide the assistance needed by the Blimpie System and who have been approved in writing by Franchisor and not thereafter disapproved. If Operator desires to purchase any items from an unapproved manufacturer, who Operator desires to become an Authorized manufacturer, Operator (i) shall first submit a written request, in duplicate, for such approval to Franchisor, addressed to (i) President, 7 Penn Plaza, 17th Floor, New York, New York 10001 and (ii) to Corporate Counsel, 7 Penn Plaza, 17th Floor, New York, New York 10001 accompanied by a similar written request for approval from the proposed manufacturer. Franchisor shall have the right to require that the proposed manufacturer provide reasonable financial, operational and economic information regarding its business and that Franchisor's representatives be permitted to inspect the proposed distributor's facilities and establish economic terms, delivery, service and other requirements consistent with other with other manufacturing relationships for other system restaurants. The proposed manufacturer shall pay to Franchisor in advance all of Franchisor's reasonable costs in review of the application of the manufacturer to service the Operator as well as all current and future reasonable costs related to inspecting and reinspecting the manufacturer's facilities, equipment and Raw Materials at any time. Franchisor may revoke its approval upon the manufacturer's failure to continue to meet any of Franchisor's criteria. Nothing in this article shall require Franchisor to approve any manufacturer. Upon the receipt by Franchisor of Operator and the proposed manufacturer's request for approval in full compliance of this article and the completion of all of the inspections needed by Franchisor to evaluate the manufacturer, Franchisor will notify Operator of its decision within ninety (90) days after completion of such application and inspections. If an alternate approved manufacturer to the recommended manufacturer is used by Operator, as a condition thereof Operator and all other operators shall authorize the alternate manufacturer to provide to Franchisor duplicate purchase invoices for Franchisor's records and inspection purposes and to otherwise comply with Franchisor's reasonable requests.

8.4.    PURCHASE OBLIGATIONS:

Operator agrees to purchase the following items from the approved distributor and manufacturer designated by Franchisor:

8.4.1.    All frozen dough raw materials (for a System Restaurant not supplied by Blimpie's authorized bakery(ies)). Operator acknowledges that all Blimpie bread and other baked products must be baked in the Blimpie oven described and approved in the Construction Manual.

8.4.2.    All Branded Blimpie Products that bear Franchisor's Mark. Franchisor has a long term strategic plan to create another profit center for Operator and itself by the sale of Blimpie branded products in System Restaurants, supermarkets, grocery stores, etc. To accomplish this goal, Franchisor intends to develop such products. To effectuate this long term strategy, Operator agrees to cooperate with Franchisor with respect to the purchase, display and sale of any Branded Products authorized for sale by Franchisor.

8.4.3.    Certain Blimpie standard exterior and interior signs require the prior fabrication of sign molds. The sign molds are an expensive investment by the approved sign manufacturer and in order to induce the production of the sign molds and to establish of uniform prices for the signs, Franchisor has entered into an agreement with the approved sign manufacturer, granting the exclusive right to use Franchisor's Marks in connection with the signs and to sell such signs to Blimpie operators. Operator agrees to purchase its signs from the exclusive sign manufacturer.

INITIALS                     14

8.4.4. Franchisor has entered into a seven (7) year agreement with the Coca-Cola Company to be the only approved fountain service beverage supplier to the Blimpie System after extensive negotiations with Pepsi Co, Inc. The Coca-Cola Company offered the best economic terms available for the Blimpie franchise system. Operator agrees to only use the fountain service Coca-Cola products authorized by Franchisor and no other beverages unless approved in writing by Franchisor.

8.4.5. Operator agrees that at such times that Franchisor establishes a regional or national purchasing program for any of the Raw Materials, which may benefit Operator by reduced price, lower labor costs, production of improved Authorized Product(s), increased reliability in supply, improved distribution, Raw Material cost control (establishment of consistent pricing for reasonable periods to avoid market fluctuations), improved operations by Operator or other tangible benefits to Operator, Operator will participate in such purchasing program in accordance with the terms of such program.

8.4.6. Franchisor has the absolute right to remove all non-conforming goods, products, materials, etc. from Operator's System Restaurant.

8.5.    RENOVATION AND REPAIRS

You must renovate the Restaurant (in addition to regular maintenance and repair), within 30 days after we give you notice requiring you to do so. We may require you to renovate in order to maintain or improve the appearance and efficient operation of the Restaurant, increase its sales potential or to comply with System Standards. Renovations may include: (i) replacement or worn out or obsolete equipment, fixtures, furniture and signs; (ii) the substitution or addition of new or improved equipment, fixtures, furniture and signs; (iii) redecorating; (iv) repair of the interior and exterior of the Premises and repair and resurfacing of parking facilities; and (v) structural modifications and remodeling of the Premises. We will not require you to renovate the Restaurant during the first three years this Agreement is in effect, and after that we will not require you to renovate more than once every three years. We will not require you to renovate the Restaurant during the last year of the initial term or any renewal term of this Agreement. Notwithstanding the limitations on our ability to require you to renovate, we may at any time require you to (i) purchase or lease additional equipment if we develop and authorize new food preparation methods or products, (ii) make repairs or repaint if necessary to maintain the interior and exterior of the restaurant in a clean and orderly condition satisfactory to us, or (iii) upon any transfer of your Restaurant, in which case the Restaurant must be updated to our then-current System Standards.

## ARTICLE 9.
## CONTINUING FRANCHISE FEES, REPORTS, BOOKS AND RECORDS

9.1.    CONTINUING FRANCHISE FEES

9.1.1. Operator shall pay to Franchisor weekly during the term of this Agreement and any renewals or extensions thereof, 6% (Six Percent) of the weekly gross sales of Operator's System Restaurant. For the purposes of this Agreement, Gross Sales means gross revenues (excluding price discounts and allowances) received by Operator as payment, whether in cash or for credit (and, if for credit, whether or not payment is received therefor), for all beverages, food, and other goods, services, and supplies including all sales from approved co-brands as described in Article 23 sold in or from Operator's System Restaurant, and gross revenues received by Operator from any other



INITIALS

15

business (including, but not limited to, all revenues from any mechanical or other device, such as vending or game machines installed at the Location) operated at the Location, excluding sales taxes.

9.1.2. At Franchisor's request, Operator shall promptly execute or re-execute within five (5) days after Franchisor's request, and deliver to Franchisor appropriate pre-authorized check forms or such other instruments or drafts required by Franchisor's bank, payable against Operator's bank account, to enable Franchisor to electronically (draft on Operator's account by electronic withdrawal), collect the six percent (6%) and three (3%) (see Article 6) of Gross Sales payable under the terms of this Agreement.

9.1.3. Operator shall report its Gross Sales by mail or facsimile within two (2) days after the end of each business week (currently Tuesday for sales of the week ending the prior Sunday) or at such other times as are established by Franchisor in its sole discretion. Operator shall submit written weekly summaries showing results of its operations by the following Saturday. If Operator fails to report its sales on a timely basis, Franchisor may estimate the amount of Operator's sales. Franchisor will then deposit or transfer the reported, or in the absence of a report, the estimated, amounts due into its own account, using the System Operator's pre-authorized checks or other instruments. If any draft, electronic or otherwise, is unpaid because of insufficient funds or otherwise, then Operator shall pay Franchisor's expenses arising from such non-payment, including bank fees in the amount of at least $30.00, hourly staff charges arising from such default, and any other related expenses incurred by Franchisor. By the 5th day of each month Operator shall pay to Franchisor any sums unpaid for the prior month to adjust for sales owed for any partial week or sales that were unpaid, improperly recorded or not credited on Operators books and records. Operator hereby agrees to pay any sales, use or other tax now or hereinafter imposed on franchise fees, advertising fees or any additional rental collected under the sublease for the Location, imposed by any Federal, state or local governmental authorities. Franchisor, at its sole discretion, may collect the taxes in the same manner as franchise fees are collected herein and if franchisor collects such taxes, Franchisor shall promptly pay the tax collections to the appropriate governmental authority.

9.1.4. If you are late making any payment of Royalties, Advertising Fees or any other payment you owe us, we will charge you interest from due date until the date you make the payment at the rate of 1.5% per month or the highest interest rate allowed by law, whichever is less. For the late Royalty or Advertising Fee payments or for any periodic reports we require you to make, we will also charge you an administrative late fee of $100 for each later payment or report. If you are late with multiple payments or reports (if, for example, you are late on both your Royalty and Advertising Fees payments in a single month), you must pay a separate $100 fee for each late payment or report. The late fee is not interest; it compensates us for the costs we incur when you make late payments. You must also reimburse us for all of our expenses in collecting late payments, including our reasonable attorneys' fees. Any time you are more than seven days late paying a Royalty or Advertising Fee, making any required reports to us, or paying an invoice for goods or services you buy from us or our affiliates, we have the unrestricted right to suspend any support, products or services we provide you until you bring the late payments current or submit the delinquent reports. You agree that our suspension of support, products or services to you while you are more than seven days delinquent in submitting payments or filing reports will not be a breach of this Agreement. You understand that, despite our right to charge interest and late fees and suspend support and services, we are not required to permit or tolerate any late payments or reports, and we reserve the right, any time, under any circumstances and in our sole discretion, to notify you of default and terminate this Agreement as provided in Article 14. You also understand that if we tolerate one or more late



payments or reports from you or from other Blimpie franchisees, it does not mean we will tolerate late payments or reports from you in the future or that we have waived ay rights, including our right to declare a default and terminate this Agreement. We reserve the unrestricted right to deal with each late payment/reporting situation differently as we believe is in our best interest, including different treatment of different franchisees, and we always reserve the right to terminate this Agreement for any late payments or reports. We may apply any payments you make to us to any amounts you owe us for any reason, regardless of your directions to apply a particular payment to a particular obligation.

## 9.2. REPORTS AND INSPECTION OF RECORDS

9.2.1. Operator shall submit to Franchisor a semi-annual Profit and Loss Statement, signed and certified by Operator. The Profit and Loss Statement shall be prepared by a Certified or Public Accountant, in accordance with generally accepted accounting principles, and shall provide Operator's sales, expenses and financial status with respect to Operator's System Restaurant. Operator shall submit to Franchisor a copy of the original signed 1120 or 1120S tax form each and every year or any other forms which take the place of the 1120 or 1120S forms. Operator shall also provide Franchisor with copies of signed original sales and use tax forms contemporaneously with their filing with the appropriate state or local authority. Franchisor reserves the right to require such further information concerning Operator's System Restaurant as Franchisor may from time to time reasonably request.

9.2.2. Upon ten (10) days prior written notice, Franchisor, its agents or representatives may audit Operator's books and records in accordance with generally accepted standards established by certified public accountants. In connection with such audit(s) or other operational visits, Operator agrees to keep its cash receipts records, weekly and monthly control forms, accounts payable records including all payments to Operator's suppliers in its System Restaurant or at its business office for three (3) years after their due date, which records shall be available for examination by Franchisor or its representative(s), at Franchisor's request. Without any prior written notice, Franchisor, its agents or representatives may inspect Operator's entire System Restaurant and Operator's daily, weekly and monthly statistical information ("Redbook Information") which is required under the Operational Manual. Operator shall make such Redbook Information available for such inspections in recognition that an operational inspection cannot succeed without review of essential statistical information.

9.2.3. If any audit or other investigation reveals an under-reporting or under-recording error of five (5%) percent or more, then in addition to any other sums due, the expenses of the audit/inspection shall be borne and paid by Operator upon billing by Franchisor, plus interest at the highest compound rate authorized by the state in which the System Restaurant is located, but not to exceed the rate of fifteen (15%) percent per annum.

9.2.4. Operator acknowledges that Franchisor's Operations Department regularly reviews ongoing operations at System Restaurants to ensure consistency of products and service and compliance with the Manuals and this Agreement. Operator therefore agrees to promptly complete and submit all forms requested by Franchisor's Operations Department, whether on a daily, weekly or monthly basis. Non-compliance with this obligation constitutes a material violation of this Agreement.

INITIALS _____

17

## ARTICLE 10.
## COVENANT REGARDING OTHER BUSINESS INTERESTS

10.1.   For purposes of this Article only, "Operator" shall mean and include the individual Operator; Operator's spouse and minor children; Operator's shareholders, officers, and directors, if Operator is a corporation; and any one or more partners or participants in Operator, if Operator is a partnership or joint venture, or members, if Operator is an LLC.

10.2.   Operator acknowledges that the Blimpie System is unique and distinctive and has been developed by Franchisor at great effort, time, and expense, and that Operator has regular and continuing access to valuable and confidential information, training, and trade secrets regarding the Blimpie System. Operator recognizes its obligations to keep confidential such information as set forth herein. Operator therefore agrees as follows:

10.2.1. During the term of this Agreement, except with Franchisor's prior written consent, Operator shall not, in any capacity whatsoever, either directly or indirectly, individually or as a member of any business organization, engage in the production or sale at retail or wholesale of any submarine sandwich type product or any other main course item authorized by Franchisor, now or in the future approved by Franchisor for use in Operator's System Restaurant, or have any employment or interest in any firm engaged in the production or sale of such products; and

10.2.2. Upon the termination, expiration or nonrenewal of this Agreement, or if Operator assigns or transfers its interest herein to any person or business entity, or if any person identified in the first paragraph of this Article terminates its relationship with Operator, then for a period of sixty (60) months thereafter such Operator shall not, in any capacity whatsoever, either directly or indirectly, individually or as a member of any business organization, engage in the production or sale at retail of any type of sandwich on French/Italian type bread, or have any employment or interest in any firm engaged in the production or sale at retail or wholesale of any such products, at a site within a radius of five (5) miles of any of Operator's former System Restaurants or within five (5) miles of any other System Restaurant or Distribution Point then existing, unless Franchisor gives its prior written consent. If Operator violates the terms of this paragraph, Operator shall pay to Franchisor, as liquidated damages, an amount equal to $5,000 per month for each month this covenant is violated, plus six percent (6%) of the Gross Sales achieved at the site during the continuation of such violation.

10.2.3. In the event any portion of the above covenants violates laws affecting Operator, or is held invalid or unenforceable in a final judgment to which Franchisor and Operator are parties, then the maximum legally allowable restriction permitted by law shall control and bind Operator. Franchisor may at any time unilaterally reduce the scope of any part of the above covenants, and Operator shall comply with any such reduced covenant upon receipt of written notice.

10.3   The provisions of this Article shall not limit, restrain or otherwise affect any right or cause of action which may accrue to Franchisor for any infringement of, violation of, or interference with, this Agreement, or Franchisor's Marks, System, trade secrets, or any other proprietary aspects of Franchisor's business.

## ARTICLE 11.
## INTERFERENCE WITH EMPLOYMENT RELATIONS

Without Franchisor's prior written consent, during the term of this Agreement, Operator shall not employ or seek to employ, directly or indirectly, any person serving in an executive, managerial or operational position who is at the time or was at any time during the prior six (6) months employed by Franchisor or any of its subsidiaries. Request for Franchisor's consent shall be sent in duplicate and addressed in writing to Franchisor's President and to its Corporate Counsel.

## ARTICLE 12.
### SUBFRANCHISORS, SALESMEN

Inasmuch as this Agreement may not have been executed by the Operator at the office of Franchisor, Franchisor requires certain assurances that this Agreement has been sold in accordance with applicable laws, rules and regulations. Accordingly, in order to induce Franchisor to execute this Agreement, Operator agrees to execute a rider to this agreement that acknowledges that Franchisor is relying solely upon the acknowledgments, representations and commitments of Operator that no other salesman, staff member, entity, or associate of Franchisor has met Operator regarding this franchise sale or the offer and acceptance thereof other than those set forth in the rider. The rider shall identify all sales persons involved in the sales, negotiation and execution of this Agreement and shall identify the subfranchisor.

## ARTICLE 13.
### MARKETING MANUAL

Operator acknowledges that Franchisor's local restaurant marketing manual and other marketing and advertising materials emphasize the implementation of marketing efforts within a 2-3 mile radius of Operator's System Restaurant. Such references, suggestions and emphasis do not directly or indirectly grant to Operator a protected market or other exclusive right within such 2-3 mile marketing area, but rather reflects the reality that Operator's local marketing activities should initially be commenced in the area immediately adjacent to its System Restaurant.

## ARTICLE 14.
### NATURE OF INTEREST, AND TRANSFER

14.1    GENERAL PROVISIONS

14.1.1 This Agreement shall inure to the benefit of the successors and assigns of Franchisor. Franchisor shall have the right to transfer or assign this Agreement to any person or legal entity who assumes its terms and agrees to comply with Franchisor's obligations contained herein. Franchisor shall have no liability for the performance of any obligations contained in this Agreement after the effective date of such transfer or assignment.

14.1.2 The rights and duties created by this Agreement are personal to Operator. Accordingly, except as otherwise permitted herein, neither Operator nor any person with an interest in Operator shall, without Franchisor's prior written consent, directly or indirectly sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any direct or indirect interest in this Agreement or, if Operator is a partnership, joint venture, LLC or corporation, any direct or indirect interest in Operator. Any such purported assignment occurring by operation of law or otherwise without Franchisor's prior written consent shall constitute a default of this Agreement by Operator, and shall be null and void. Except in the instance of Operator advertising to sell its System

INITIALS [signature]                19                2004 UFOC

Restaurant pursuant to the terms hereof, Operator shall not, without Franchisor's prior written consent, offer for sale or transfer at public or private auction or advertise publicly for sale or transfer, the furnishings, interior and exterior decor items, supplies, fixtures, equipment, Operator's sublease or the real or personal property used in connection with Operator's System Restaurant.

### 14.2   CONSENT TO TRANSFER

For all proposed transfers or assignments of this Agreement, and transfers of more than 51% of the outstanding and issued stock of Operator by one or more transfers or any transfer which, directly or indirectly, effectively changes management control of Operator, Franchisor will not unreasonably withhold its consent to any transfer or assignment which is subject to the restrictions of this Article, provided however, Franchisor shall not be required to give its consent unless all of the following conditions are met prior to the effective date of assignment:

14.2.1   Upon the execution of this Agreement and upon each direct or indirect transfer of an interest in this Agreement or in Operator and at any other time upon Franchisor's request, Operator shall, within five (5) days prior to such transfer or at any other time at Franchisor's request, furnish Franchisor with an estoppel agreement indicating any and all causes of action, if any, that Operator may have against Franchisor or if none exist and a list of all shareholders or partners having an interest in this Agreement or in Operator, the percentage interest of each shareholder or partner, and a list of all officers and directors, in such form as Franchisor may require;

14.2.2   Operator's written request for transfer of either a partial or whole interest in this Agreement or Operator's System Restaurant must be accompanied by an offer to Franchisor of a right of first refusal at the same price offered by any bona fide buyer less five (5%) percent Franchisor shall have the right and option, exercisable within fifteen (15) days after receipt of such written notification, to send written notice to Operator or such person that Franchisor or its third-party designee, intends to purchase the interest which is proposed to be transferred, on the same terms and conditions offered by the third party.  If Franchisor accepts such offer, the five (5%) percent transfer/administrative fee due by Operator in accordance with Article 3 shall be waived by Franchisor. Any material change in the terms of an offer prior to closing shall cause it to be deemed a new offer, subject to the same right of first refusal by Franchisor, or its third-party designee, as in the case of the initial offer. Franchisor's failure to exercise such option shall not constitute a waiver of any other provision of this Agreement, including any of the requirements of this Article with respect to the proposed transfer;

14.2.3   The Operator is not in default under the terms of this Agreement, the Manuals or any other obligations owed Franchisor, and all of its then-due monetary obligations to Franchisor have been paid in full;

14.2.4   The Operator and its shareholders or members, if the Operator is a corporation or limited liability company, have executed a general release under seal, in a form prescribed by Franchisor, of any and all claims against Franchisor, its affiliates, subsidiaries, shareholders, directors, officers, subfranchisors and employees;

14.2.5   The transferee/assignee has demonstrated to Franchisor's satisfaction that it meets all of Franchisor's then-current requirements for new operators or for holders of an interest in a franchise, including, without limitation, possession of good moral character and reputation,

satisfactory credit ratings, acceptable business qualifications, and the ability to fully comply with the terms of this Agreement;

14.2.6  The transferee/assignee has assumed this Agreement by a written assumption agreement approved by Franchisor, or has agreed to do so at closing, and at closing executes an assumption agreement approved by Franchisor;

14.2.7  The transferee/assignee, its manager or other employees responsible for the operation of the System Restaurant have satisfactorily completed Franchisor's training program;

14.2.8  The transferee/assignee executes such other documents as Franchisor may require, including a replacement franchise agreement on the then-standard franchise agreement form used by Franchisor, in order to assume all of the obligations of this Agreement, to the same extent, and with the same effect, as previously assumed by the assignor; and

14.2.9  At the completion of Operator's sale transaction, Operator shall pay to Franchisor an administrative/transfer fee of five (5%) percent of the gross selling price of Operators System Restaurant or $5,000, whichever is greater, or in the event of a nonsale management transfer, a fee of $1,500 to cover Franchisor's training and administrative expenses. This five percent (5%) administrative transfer fee will not be due with respect to any transfer that (together with all other related previous, simultaneous, or proposed transfers) does not result in the transfer of control of Operator.

14.2.10  Operator's rights may pass to Operator's next of kin or legatee if they assume Operator's obligations and attend and complete Franchisor's training program.  Upon Operator's disability, Operator may sell the franchise or keep it, if operated by trained personnel.

14.2.11  Franchisor's consent to a transfer shall not constitute a waiver of any claims it may have against the transferring party arising out of this Agreement or otherwise.

## ARTICLE 15.
## TERM, DEFAULT AND TERMINATION

15.1    TERM

15.1.1  Provided Operator is not in default of the terms and conditions contained in its Location sublease and this Agreement, this Agreement shall continue for a period commencing on the date hereof and terminating on August 16, 2021 or for any longer period coterminous with the term of the Location sublease.

15.1.2  Operator may renew the rights granted by this Agreement for an additional term of twenty (20) years, subject to the following conditions:

15.1.2.1  Operator gives Franchisor written notice of Operator's election to renew not less than six (6) and not more than twenty-four (24) months before the end of the then current term;

15.1.2.2.  Operator is not in default of any provision of this Agreement or any amendments to this Agreement, the Location sublease, the Manuals or any monetary obligation owed to Franchisor or its affiliates;

INITIALS /ARO/                            21                            2004 UFOC

15.1.2.3.  Operator executes the then current from of Franchise Agreement and pays the then current Initial Franchise Fee to Franchisor; and

15.1.2.4.  At Franchisor's request, Operator shall undertake and complete the reasonable renovation or modernization of its System Restaurant to then-current specifications.

15.2     DEFAULTS WITHOUT OPPORTUNITY TO CURE

Except as otherwise provided herein, operator shall be in default and Franchisor may, at its option, upon thirty (30) days written notice to Operator, terminate this Agreement and all rights granted by it, without affording Operator any opportunity to cure the default, upon the occurrence of any of the following events:

15.2.1.  Operator's knowingly or intentionally maintaining false books or records, or submitting any false report or payment to Franchisor;

15.2.2.  Operator's conduct of the System Restaurant licensed pursuant to this Agreement is materially contrary to this Agreement, the System and the Manuals (for example allowing a dangerous condition arising from a lack of security for customers to continue despite Operator's knowledge of such condition), or regularly selling unauthorized products to the public after notice of default and continuing to sell such products whether or not Operator has cured the default after one or more notices;

15.2.3.  The conviction of a felony, or a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole reasonable opinion of Franchisor, to adversely affect the System, Franchisor's Marks; the goodwill associated with the System or Franchisor's interest in each of them by Operator's, or its controlling or operating shareholders or members if Operator is a limited liability company, or Operator's partners if Operator is a partnership, excluding non-managing partners

15.2.4.  Operator's intentional disclosure or use of the contents of the Manual, trade secrets or confidential or proprietary information provided to Operator by Franchisor in violation of this Agreement, excluding acts of independent employees or others not under Operator's control; or

15.2.5.  If Operator repeatedly commits defaults under any provisions of this Agreement on three (3) or more occasions in any twelve (12) month period, concerning which Operator has received written notices of default, even if Operator cured each such prior default, and even if Operator would otherwise be given an opportunity to cure the current default.

15.2.6  Notwithstanding anything to the contrary set forth in this Article 15, Section 15.2, in the event Operator's conduct of the System Restaurant licensed pursuant to this Agreement, in the reasonable judgment of Blimpie, constitutes an imminent danger to the public health (for example selling spoiled food knowing the food products are spoiled; failure after notice to remedy any health code violations; failure to adhere to proper food handling and refrigeration guidelines), which condition continues 48 hours following written notice by Franchisor requesting the correction thereof,  Franchisor may at its option, upon seventy-two (72) hour written notice to Operator, terminate this Agreement and all rights granted by it, without affording Operator any further opportunity to cure the default.

### 15.3    DEFAULTS WITH OPPORTUNITY TO CURE

15.3.1  Except as otherwise provided in this Agreement, Operator shall have ten (10) days after Franchisor's written notice of default within which to remedy any default under this Agreement, and to provide evidence of such remedy to Franchisor. If any such default is not cured within that time period, or such longer time period as applicable law may require, Franchisor may, at its option, terminate this Agreement and all rights granted by it, by sending a five (5) day written notice of cancellation of this Agreement to Operator. Upon the expiration of such five (5) day period, this Agreement shall end and expire as if it were the day fixed for termination of this Agreement.

15.3.2  Operator shall be in material default under this Article for any failure to comply with any of the requirements imposed by this Agreement. Such material defaults shall include, without limitation, the occurrence of any of the following events:

15.3.2.1. Operator's failure, refusal, or neglect to promptly pay any monies owed to Franchisor, its subsidiaries or affiliates, when due, or to submit the financial or other information required by Franchisor under this Agreement;

15.3.2.2. Operator's failure to maintain the standards specified by Franchisor in the Manual or otherwise;

15.3.2.3. Operator's failure, refusal or neglect to obtain Franchisor's prior written approval or consent as required by this Agreement;

15.3.2.4. Operator's misuse or unauthorized use of Franchisor's Marks or other material impairment of the goodwill associated therewith or Franchisor's rights therein;

15.3.2.5. Operator's commencement or conducting of any business operation, or marketing of any product, under a name or mark which, in Franchisor's reasonable opinion, is confusingly similar to Franchisor's Marks;

15.3.2.6. Operator's default, without cure after the applicable grace period, under any lease, sublease, sub-sublease, mortgage, or deed of trust covering the Location;

15.3.2.7. Operator's failure to procure or maintain the insurance required by this Agreement or in the lease and sublease for the Location;

15.3.2.8. Operator's, without Franchisor's consent, ceasing to operate or otherwise abandoning its System Restaurant or, upon destruction of its System Restaurant, failure to rebuild and resume operation within a reasonable time. Cessation of the business shall not, however, constitute a default under this Agreement if caused by condemnation, expiration of a Location lease pursuant to its terms at execution, or when failure to rebuild following destruction of the System Restaurant is prohibited by law or the Location lease; or

15.3.2.9. Operator's default in the performance of any term, condition or obligation in payment of any indebtedness to its landlord or sublandlord, distributors or suppliers or others arising out of the purchase of inventory, supplies or purchase or lease of equipment for operation of its System Restaurant, and if any such default is not cured within ten (10) days after written notice by

Franchisor to Operator, unless Operator is determined by a court of competent jurisdiction to be not in default.

15.4    In the event of a default by Operator, all of Franchisor's costs and expenses arising from such default, including reasonable legal fees and reasonable hourly charges of Franchisor's administrative employees shall be paid to Franchisor by Operator within five (5) days after cure.

15.5    Operator and Franchisor acknowledge that certain defaults require immediate action to protect the appropriate party, and accordingly, Franchisor and Operator each hereby consent to and authorize the other party to apply to any court of competent jurisdiction for judicial assistance in restraining and enjoining violations of this Agreement. Both Franchisor or Operator are entitled to an injunction restraining Franchisor or Operator from committing or continuing to commit any default, breach or threatened breach of this Agreement, without showing or proving any actual damage sustained by the party seeking such relief.

15.6    If within 48 hours following written notice by Franchisor requesting the correction of an unhealthy, unsanitary or unclean condition of the System Restaurant, Operator has not corrected the condition to Franchisor's reasonable satisfaction, Franchisor may, without being guilty of or liability for trespass or tort, and without prejudice to any other rights or remedies, enter the System Restaurant and cause the condition to be corrected, at the expense of Operator. Operator shall pay all bills for the correction of such condition within ten (10) days of receipt thereof, and such bills shall be deemed a monetary obligation of the Operator for all purposes under this Agreement.

15.7    Non-enforcement by Franchisor of any violation of the terms of this Agreement by Operator shall not constitute a waiver of such violation by Franchisor nor shall Franchisor be deemed to have waived any of its rights to enforce compliance by Operator of such breach or any other breach of this Agreement.

15.8    If you are organized other than as a sole proprietorship, all Principal Owner(s) must guarantee personally the payment and performance of all of your obligations under this Agreement. You must deliver signed guarantees, in the form attached as an Exhibit to this Agreement, for all such parties at the time you deliver the signed copy of this Agreement. If any person becomes a Principal Owner after the date of this Agreement, you must notify us and they must sign the personal guarantee. You and we intend for such persons to be jointly and severally bound to guarantee your obligations regardless of whether a signed guarantee is actually delivered to us.

## ARTICLE 16.
## RIGHTS AND OBLIGATIONS UPON TERMINATION

Upon the termination of Operator's rights granted under this Agreement, (whether during the term of the Agreement or at its conclusion) the following apply:

16.1    Upon termination of this Agreement by lapse of time or by default, Operator's right to use Franchisor's Marks, or any other mark distributed by Franchisor or insignia or slogan used in connection therewith, or any confusingly similar trademark, service mark, trade name or insignia shall cease. Operator shall immediately discontinue use of Franchisor's Marks, System, and color scheme. Operator shall at its own cost, make cosmetic changes to Operator's System Restaurant from Franchisor's proprietary designs including, but not limited to, the removal of all Blimpie

identifying materials and distinctive Blimpie cosmetic finishes, tile walls, interior wall coverings and colors, exterior finishes and colors, signage and Blimpie counter equipment (which shall be deemed proprietary to Franchisor) from the Location as Franchisor may reasonably direct.

16.2    Franchisor may retain all fees paid pursuant to this Agreement.

16.3    Any and all obligations of Franchisor to Operator under this Agreement shall immediately cease and terminate.

16.4    Any and all rights of Operator under this Agreement shall immediately cease and terminate.

16.5    In no event shall a termination or expiration of this Agreement affect Operator's obligations to take or abstain from taking any action in accordance with this Agreement. The provisions of this Agreement which constitute post-termination covenants and agreements shall survive the termination or expiration of this Agreement.

16.6    Operator acknowledges and agrees that rights in and to Franchisor's Marks and the use thereof shall be and remain the property of Franchisor.

16.7    If Operator has registered any of Franchisor's Marks or the name "Blimpie" as part of Operator's assumed, fictitious or corporate name, Operator shall promptly amend such registration to delete Franchisor's Marks therefrom.

16.8    Operator shall immediately pay any and all amounts owing to Franchisor, its subsidiaries and affiliates.

16.9    Franchisor shall have the option, exercisable by written notice within thirty (30) days after the termination of this Agreement, to take an assignment of all telephone numbers (and associated listings) for Operator's System Restaurant. Operator is not entitled to any compensation from Franchisor if Franchisor exercises this option.

## ARTICLE 17.
## INSURANCE

17.1    Operator shall obtain and maintain insurance coverage which shall in each instance designate Franchisor, and its subsidiaries, as an additional named insured, with an insurance company approved by Franchisor, which approval shall not be unreasonably withheld as follows:

17.1.1  comprehensive general liability insurance (including products liability); with coverage of $1,000,000.00 per incident and $3,000,000.00 in the aggregate for death or personal injury, and $100,000.00 property damage coverage;

17.1.2  business interruption insurance, including Location rentals and Additional Rentals for twelve (12) months after casualty, in amounts equal to at least One Hundred Thousand Dollars ($100,000);

17.1.3  workers' compensation insurance (coverage B) as required by applicable law;

INITIALS                               25                              2004 UFOC

17.1.4  fire, and extended coverage insurance, insuring the construction of improvements and completed System Restaurant operated by Operator, for the full replacement value thereof; and,

17.1.5  If Operator establishes a delivery service for Authorized Products, Operator shall obtain separate non-owned auto coverage insurance. Operator may not directly or indirectly deliver any Authorized Products until such insurance is obtained and Franchisor named as additional insured therein.

17.2   In the event of damage to the System Restaurant covered by insurance, the proceeds of any such insurance shall be used to restore the System Restaurant to its original condition as soon as possible, unless such restoration is prohibited by the Location lease or Franchisor has otherwise consented to in writing.  Upon obtaining such insurance, Operator shall promptly provide to Franchisor proof of such insurance coverage and/or at such other times upon the request of Franchisor.

17.3   Operator shall, prior to opening its System Restaurant, file with Franchisor, certificates of such insurance and shall promptly pay all premiums on the policies as they become due.  In addition, the policies shall contain a provision requiring thirty (30) days prior written notice to Franchisor of any proposed cancellation, modification, or termination of insurance.  If Operator fails to obtain and maintain the required insurance, Franchisor may, at its option, in addition to any other rights it may have, procure such insurance for Operator without notice and Operator shall pay, upon demand, the premiums and Franchisor's costs in taking such action.

## ARTICLE 18.
## SOLE OBLIGATIONS OF FRANCHISOR

18.1   As described in Franchisor's Uniform Franchise Offering Circular (the "UFOC"), received by Operator at least ten (10) business days prior to the execution of this Agreement, Franchisor has obligated itself to provide specific services to Operator. Franchisor also provides other voluntary services at its sole discretion. Franchisor and Operator agree that the following are the only required obligations of Franchisor:

18.1.1  To approve the Location of Operator;

18.1.2  To reasonably assist Operator with any operational or financial problem encountered by Operator, after notice to Franchisor in duplicate sent to: (i) Franchisor c/o Corporate Counsel, 7 Penn Plaza, 17th Floor, New York, New York 10001; and (ii) President, 7 Penn Plaza, 17th Floor, New York, New York 10001 by certified mail (return receipt requested) or at any subsequent addresses established by Franchisor, of Operator's problem and the type of assistance needed. At no time shall reasonable assistance be interpreted to require Franchisor to pay any money to Operator. Franchisor, in its sole discretion, may provide any assistance at Franchisor's designated office or where Operator is located, at a time to be determined by Franchisor;

18.1.3  To reasonably administer to the advertising program.  Operator acknowledges that pursuant to the advice of advertising and marketing professionals, advertising collections will at times be aggregated until sufficient revenues are accumulated to commence or complete an advertising or marketing program.  Reasonable administration shall be deemed to be good faith attempts to utilize the advertising funds in accordance with the advice and suggestions of the

advertising and marketing staff or outside advertising and/or marketing companies, consultants or other entities retained for such purpose;

18.1.4  To assist Operator in arranging for the initial financing of its System Restaurant, if feasible and necessary (Franchisor is not directly or indirectly responsible for the failure of Operator to meet the qualifying standards of such independent financing sources);

18.1.5  To supply to Operator a set of standard decor and layout plans and to thereafter approve the initial decor and layout of Operator's System Restaurant;

18.1.6  To loan Operator a copy of its Operations Manual which manual contains mandatory and suggested specifications, standards and procedures. This Manual is confidential and remains Franchisor's property.

18.1.7  To train Operator in accordance with Article 3 herein, and to provide representatives of Franchisor to assist in opening the System Restaurant.

18.2    Franchisor shall not, and can not be held in breach of this Agreement until (i) Franchisor has received notice of any alleged breach from Operator in duplicate, by registered mail, sent to the parties set forth in paragraph 2 of this Article; and (ii) Franchisor has failed to remedy the breach within a reasonable period of time after such notice, which period shall not be less than sixty (60) days. This is a material term of this Agreement and may not be modified or changed by any arbitrator in an arbitration proceeding or otherwise.

## ARTICLE 19.
## POINT OF SALE SYSTEM, COLLECTION OF DATA

19.1    This Agreement and the Manuals require the submission of weekly statistical control forms as well as other financial, operational and statistical information required by Operator and Franchisor to: (i) assist Operator in the operation of its System Restaurant in accordance with the System; (ii) allow Franchisor to monitor the Operator's gross sales, purchases, costs and expenses; (iii) enable Franchisor to develop chainwide statistics which may improve bulk purchasing; (iv) assist Franchisor in the development of new authorized products or the removal of existing unsuccessful Authorized Products; (v) enable Franchisor to refine existing Authorized Products; (vi) generally improve chainwide understanding of the System; and (vii) obtain new types of information unknown at this time (collectively, the "Information"). To achieve these results, cash collection and data processing systems are necessary.

19.2    Operator agrees to purchase and use the point of sale cash collection and data processing system (the "POS System") and only the specified software authorized by Franchisor, as specified in the Construction and Equipment Manual or otherwise by Franchisor in writing. The POS System includes a PC based cash register, register tape printer, magnetic stripe reader, cash drawer, defined Franchisor polling and register software and telecommunications equipment.

19.3    Operator agrees that if in the future, Franchisor shall so request, Operator shall (i) connect the POS System to Operator's telephone line(s); (ii) maintain it in good working order; and (iii) not disconnect any POS System connection or phone line at any time, for any reason, without prior written approval. Operator agrees, at Franchisor's request, to maintain membership in a

designated third party network (such as Compuserve, AOL, Prodigy, etc.) for the purpose of implementing, transmitting, collecting and maintaining any Information or data exchange system.

19.4    In the future, Franchisor may, in the interest of efficiency and to help facilitate the compilation, analysis and presentation of the Information, and to seek to decrease Operator's labor costs involved in the compilation of data, develop and/or acquire software, equipment and staff for the purpose of collecting and processing data and the Information. When Franchisor begins to provide such data processing services, Operator agrees to pay to Franchisor weekly, in the manner provided under Article 9 herein, a fee not to exceed thirteen ($13) dollars per week during the term of this Agreement for such data processing services. Franchisor may cancel such service upon thirty (30) days written notice to Operator, and may resume such services anytime in its sole discretion. Within a reasonable time upon Franchisor's request, Operator agrees to apply for and maintain debit cards, credit cards or other non-cash systems existing or developed in the future to enable customers to purchase Authorized Products via such procedure.

## ARTICLE 20.
## RELATIONSHIP OF PARTIES, DISCLOSURE

20.1    Franchisor and Operator are not and shall not be considered joint ventures, partners, or agents of each other, or anything other than Franchisor and Operator, and neither shall have the power to bind or obligate the other except specifically as set forth in this Agreement. Franchisor and Operator agree that the relationship created by this Agreement is not a fiduciary relationship. Operator shall not, under any circumstances, act or hold itself out as an agent or representative of Franchisor. Operator agrees to indemnify and hold Franchisor harmless from any claims, demands, liabilities, actions suits or proceedings asserted by third parties arising out of the operation of Operator's System Restaurant or Operator's breach of any of the terms of this Agreement. Franchisor agrees to indemnify and hold Operator harmless from any claims, demands, liabilities, actions suits or proceedings asserted by third parties and arising out of Franchisor's operations, unless caused by Operator.

20.2    As set forth in the UFOC delivered to Operator as described above, Operator acknowledges that Franchisor has entered into certain subfranchise agreements with subfranchisors and/or area developers in certain areas and territories. Pursuant to these contracts, the subfranchisors of Franchisor are obligated to provide certain sales, operational and support services for Franchisor. Operator acknowledges that the relationship between Franchisor and all of its subfranchisors and/or area developers is strictly contractual and that no subfranchisor and/or area developer is an agent of Franchisor. Accordingly, Operator acknowledges and agrees that any past, current or future subfranchisor is not the actual, express or implied agent of Franchisor, and has no power or authority to (i) act on Franchisor's behalf; (ii) enter into or execute any agreement on Franchisor's behalf; (iii) make any representation or promise on Franchisor's behalf; or (iv) bind Franchisor in any way. Unless otherwise specifically agreed to in writing, Franchisor expressly disavows any acts by others, including subfranchisors, that purport to bind Franchisor in any way. Operator agrees to waive any claim or defense in any litigation or arbitration proceeding that a subfranchisor is the express or implied agent of Franchisor. Operator agrees that any attempt to raise, assert or justify such claim or defense in any proceeding constitutes a material default of this Agreement.

## ARTICLE 21.

INITIALS _____    28

## LEGAL PROCEEDINGS: JURISDICTION, CONSTRUCTION
## AND INTERPRETATION

21.1   Except to the extent governed by the United States trademark laws, this Agreement shall be deemed to be executed and delivered in the City of New York, State of New York, regardless of the domicile of the Operator, and shall be governed by and construed in accordance with the laws of the State of New York, except to the extent covered by United States Trademark Law, as to form, substance and procedure.

21.2   Any and all claims asserted by or against the Operator, arising under this Agreement or related thereto, shall be heard and determined either in the courts of the United States, located in City and County of New York, State of New York, (hereinafter referred to as "Federal Court{s}") or in the courts of the State of New York, located in City and County of New York, State of New York, (hereinafter referred to as the "New York Court{s}"). To effect this intent, Operator agrees:

21.2.1   If the Franchisor initiates any action against the Operator, in a Federal Court or in a New York Court, service of process may be made on the Operator, either in person, wherever the Operator may be found, or by registered or certified mail, addressed to the Operator, at its address set forth in this Agreement;

21.2.2   With respect to any action between the Franchisor and the Operator, in a New York Court, the Operator hereby expressly waives and relinquishes any rights it might otherwise have (i) to move to dismiss on grounds of forum non conveniens, (ii) to remove to a federal court, (iii) to move for a change of venue to another court in the State of New York and (iv) to move to dismiss, for lack of subject matter jurisdiction.

21.2.3   With respect to any action between the Franchisor and the Operator, in a Federal Court, the Operator expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a United States Court, outside the City and County of New York, State of New York.

21.2.4   If the Operator commences any action against the Franchisor in a New York state court or a federal court, other than a Federal Court or New York Court, as defined above, upon request of the Franchisor, the Operator shall either consent to a transfer of the action to a court of competent jurisdiction, located in the City and County of New York, if a federal court or the City and County of New York, if a state court, or if the court where the action is initially brought will not or cannot transfer the action, the Operator shall consent to dismiss such action, without prejudice, and may thereafter reinstitute the action in the appropriate Federal Court or New York Court.

21.2.5   If any provision(s) of this paragraph is held unenforceable for any reason, each and all other provision(s) shall nevertheless remain in full force and effect.

21.3   The titles and subtitles of the various Articles and Paragraphs of this Agreement are inserted for convenience and shall not be deemed to affect the meaning or provide guidance as to the construction of any of the terms of this Agreement.

21.4   Since the words Franchisor and Operator herein may be applicable to one or more parties, the singular shall include the plural, and the masculine shall include the feminine and neuter.

If there shall be more than one (1) party or person referred to as Operator hereunder, then their obligations and liabilities hereunder shall be joint and several.

21.5    Unless otherwise stated, Franchisor reserves the right to withhold its consent hereunder for any reason or no reason whatsoever.

21.6    Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to law.  Whenever there is any conflict between any provision of this Agreement and any law, ordinance or regulation, the latter shall prevail, but in such event the provision of this Agreement thus affected shall be modified to the extent necessary to bring it within the requirements of the law.  If any court of appropriate jurisdiction deems any provision hereof (other than for the payment of money) unreasonable, said Court may declare a reasonable modification hereof and this Agreement shall be valid and enforceable, and the parties hereto agree to be bound by and perform the same as thus modified.

## ARTICLE 22.
## EXECUTION, REQUESTS, CONSENTS AND WAIVERS

22.1    This Agreement takes effect upon its acceptance and execution by Operator and Franchisor, and shall be governed by and construed in accordance with the laws of the State of New York, USA.  Franchisor will consider written requests by Operator for Franchisor's consent to a waiver of any obligation imposed by this Agreement.  Operator agrees, however, that Franchisor is not required to act uniformly with respect to waivers, requests and consents as each request will be considered on a case by case basis, and nothing shall be construed to require Franchisor to grant any such request.  Any waiver granted by Franchisor shall be without prejudice to any other rights Franchisor may have, will be subject to continuing review by Franchisor, and may be revoked, in Franchisor's sole discretion, at any time and for any reason, effective upon ten (10) days prior written notice to Operator.  Franchisor makes no warranties or guarantees upon which Operator may rely, and assumes no liability or obligation to Operator by providing any waiver, approval, consent, assistance, or suggestion to Operator in connection with this Agreement, or by reason of any neglect, delay, or denial of any request.

22.2    Unless otherwise provided, whenever this Agreement requires Operator to obtain Franchisor's prior written consent, Operator shall timely address its written request for such consent in duplicate to the parties set forth in paragraph 2 of Article 18 or such other persons as Franchisor may designate in writing.  Franchisor will then consider such request and advise Operator of the decision, in writing, within forty-five (45) days.  Franchisor's failure to advise Operator will constitute Franchisor's consent to such request.  The forty-five (45) day period shall not begin to run, however, until Operator has provided Franchisor with all information and documentation requested by Franchisor.  Neither Operator nor Franchisor shall be deemed to have waived or impaired any right, power or option reserved by this Agreement, including, without limitation, its right to demand strict compliance with every term, condition, and covenant herein, or to declare any breach thereof a default and to terminate this Agreement prior to the expiration of its term, by virtue of any custom or practice of the parties at variance with the terms hereof; by any forbearance, delay, failure, or omission to exercise any right, power, or option, whether of the same, similar, or different nature, against Franchisor, Operator, or any other operator; or by the acceptance of any payments due after any breach of this Agreement.

INITIALS _____    30    2004 UFOC

# ARTICLE 23.
## MISCELLANEOUS PROVISIONS

23.1    This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be deemed an original, but such counterparts together shall constitute but one and the same instrument.

23.2    This Agreement (as further explained in the UFOC) contains the entire agreement of the parties and cannot be modified, changed or amended except in writing and signed by Franchisor.

23.3    There is no other agreement, representation or warranty made by Franchisor or any other entity or person associated with Franchisor other than contained in this Agreement. This Agreement is not subject to or conditioned upon the obtaining of a Location for Operator's System Restaurant.

23.4    Except as otherwise provided, each party shall bear its own attorney's fees, expert witness fees, and other court costs incurred in connection with any violation of this Agreement.

23.5    Each article, paragraph, subparagraph, term, and condition of this Agreement shall be considered severable. If for any reason, any portion of this Agreement is determined to be invalid or in conflict with any law or rule in a final ruling issued by any court, agency, or tribunal with valid jurisdiction in a proceeding to which Franchisor is a party, that ruling shall not effect the validity or enforceability of any other portion of this Agreement.

23.6    All notices to Franchisor required by the terms of this Agreement, unless otherwise provided, shall be sent by certified or registered mail or by overnight delivery service, addressed to the parties set forth in this Agreement, or at such other address as Franchisor designates. All notices to Operator required by the terms of this Agreement shall be sent by certified or registered mail or by overnight delivery service, addressed to Operator at the Location, or at such other or additional address as Operator designates in writing. If Operator refuses acceptance of any certified, registered or overnight delivery, acceptance shall be deemed to have occurred forty-eight (48) hours after rejection of such notice.

23.7    Operator acknowledges that the evolution of the System requires the development Non-Traditional Blimpie Restaurants, Blimpie Distribution Points and Branded Products.

23.8    For the purpose of this article, a co-brand shall be defined as an independent operating system owned by another entity (not Franchisor) that is incorporated as an operational part within the Operator's System Restaurant. An example would be an independent ice cream/yogurt operation installed within Operator's System Restaurant. Subject to Franchisor's prior written approval, Operator may install approved co-branding marketing systems to be operated in conjunction with Operator's System Restaurant. Franchisor shall not be required to approve any cobranding marketing system unless Franchisor has recognized that co-branding system as an approved co-brand for operation within its system restaurants, either nationally or regionally. If Operator shall be permitted to incorporate a co-brand within its System Restaurant, all sales of the co-brand shall be included within the definition of "gross sales" as defined in article 9 herein and Operator shall pay to Franchisor franchise and advertising fees for such sales.

IN WITNESS WHEREOF, the parties hereof have executed this Agreement as of the date of execution by Franchisor.

BLIMPIE ASSOCIATES, LTD.

Dated: 5/4/04

By: _____

Witness: _____

NICHOLAS CAGANO, JR.
President

CHANS FOODS INC.

Dated: _____

By: _____

CHANDAR RATNAM
President

Witness: _____

By execution of this Agreement, the undersigned stockholder(s) of the corporate Operator, or members of the LLC, or the individual Operator hereby personally accepts and agrees to comply with Articles 10 & 16 of this Agreement and acknowledges that the Franchisor has executed this Agreement in reliance upon the commitments contained in this Paragraph.

_____
CHANDAR RATNAM

_____
ASHA CHANDAR

ASHA CHANDAR

RIDER

1.      Operator acknowledges receipt on February 25, 2004 (the "Disclosure Date") of Franchisor's (Effective Date January 30, 2004) Blimpie Restaurant Franchise Disclosure Document (the "UFOC") (that incorporates and discloses Items 1 through 22, and exhibits A-N as follows: Blimpie Restaurant Franchise Agreement (which Operator acknowledges is in all material respects identical to this Agreement) and Non-Traditional Rider, Sublease, sample promissory note, Multi-Unit Addendum, confidential information agreement, audited certified financial statements of Franchisor for the fiscal years ending September 30, 2002, 2001, and 2000, lists of: franchisees (i) operating at year end; (ii) with signed franchise agreement but store not opened at start of fiscal year; and (iii) who left the system; affiliates of the Franchisor; approved manufacturers; equipment for sale by Franchisor; equipment price list; Subfranchisors; agents/agencies for service or process; and in Item 3 the following litigation disclosures: Sutphin Hero Sandwich, Inc.; the salesman disclosure forms of Leslie Gardner (the "Salesperson") and all other salespersons or entities involved in the sale or execution of this Agreement, on the Disclosure Date, which date is at least 10 business days (excluding holidays and weekends) prior to the execution of this Agreement.

2.      The subfranchisor in the area of the Location is DCBG, Inc. (the "Subfranchisor"), as also discussed in Article 12.

3.      This Agreement may only be used in Retail Center, 8th and H Streets, N.E., Washington, DC 20002 (the "Area").

4.      Operator acknowledges that it has exercised due diligence in investigating Blimpie Restaurants located in the area, and that it has contacted or had an opportunity to contact other Blimpie Restaurant franchisees and sought from them or had the opportunity to seek from them information regarding (i) their financial condition; (ii) status; and (iii) and any other relevant fact that a diligent examination would determine. Operator agrees that Franchisor may open, or allow a franchisee to open, a BLIMPIE restaurant anywhere and at any time. Operator acknowledges that it has no exclusive rights in the Location's area. Operator agrees that Franchisor, in its sole direction, may open and operate company-owned System Restaurants, or other outlets selling similar products or services under different trade names, at any locations (including locations in close proximity to Operator's System Restaurant); may authorize others (including franchisees) to open and operate System Restaurants, or other outlets selling similar products or services under different trade names, at any locations (including locations in close proximity to Operator' System Restaurant); and may engage in other methods of distribution of similar and dissimilar products and services at any locations. Operator further agrees that Franchisor may sell or distribute, directly or indirectly, or license others to sell or distribute, any products or services under the BLIMPIE trademarks at any non-BLIMPIE restaurant locations (for example, BLIMPIE-branded products sold in supermarkets or other retail locations, or from carts, kiosks, vending machines or other mobile BLIMPIE-branded product delivery systems), even if the locations are in close proximity to Operator's System Restaurant, without compensation to Operator.

5.      This franchise agreement is in replacement of the franchise agreement by and between Blimpie Associates, Ltd., as Franchisor and Munni Enterprises, Inc., as Operator dated August 17, 2001 which has been assigned to and assumed by Operator herein which original franchise agreement shall be deemed null and void.

6.      Because Operator did not execute this agreement at Franchisor's office, Franchisor requires certain assurances that this Agreement has been sold in accordance with all applicable laws, rules and regulations. Accordingly, in order to induce Franchisor to execute this Agreement, Operator acknowledges and as follows:

**PLEASE <u>CIRCLE</u> THE APPROPRIATE RESPONSE TO EACH STATEMENT <u>AND</u> INITIAL WHERE INDICATED. IF YOUR ANSWER TO ANY QUESTION IS "NO" PLEASE EXPLAIN YOUR ANSWER IN THE LINED SPACES PROVIDED AT THE END OF THIS RIDER.**

6.1    Operator has been represented by independent counsel who has reviewed the UFOC and this Blimpie Restaurant franchise agreement.

(YES)        NO                     _____ (Initial)

6.2    Operator is fully informed as to all of Operator's obligations, and of Franchisor's limited obligations as set forth in this Agreement and the UFOC.

(YES)        NO                     _____ (Initial)

6.3    Operator has <u>only</u> had contact, negotiations and/or discussions with the Salesperson(s) identified in Paragraph 1 of this Rider regarding this franchise sale or the offer and acceptance of this agreement.

(YES)        NO                     _____ (Initial)

6.4    Except for the Salespersons(s), no other salesman, staff member, entity, or associate of Franchisor nor any other salesman, staff member, associate or entity of the Subfranchisor met the Operator regarding this franchise sale or the offer and acceptance of this agreement.

(YES)        NO                     _____ (Initial)

6.5    Operator acknowledges that Franchisor, Salesman, Subfranchisor or any of their agents, salesmen, directors, officers, employees or any other salesman, person or entity <u>have not made</u>, and Operator <u>has not relied</u> on any representations, warranties, inducements, pro formas, forecasts, estimates or any other inducement or statement regarding financing, net profits, gross profits, net sales, gross sales, costs or expenses of Blimpie restaurants generally or of any specific Blimpie restaurant or any other matter not stated here.

(YES)        NO                     _____ (Initial)

6.6    Operator acknowledges that neither the corporate Subfranchisor nor any officer, director or agent of Subfranchisor have made any offers to sell a Blimpie Restaurant franchise except for the Salesperson(s), who is (are) acting for Blimpie Associates, Ltd. as a commissioned salesman

(YES)        NO                     _____ (Initial)

6.7    Operator understands that in entering into this Agreement, Franchisor is relying upon Operator's acknowledgments, representations and commitments as stated in this Section.

(YES)        NO                     _____ (Initial)

INITIALS _____                34                2004 UFOC

**"NO" ANSWERS EXPLAINED HERE:**

61 Chose not to have an independent consel

*IF YOU NEED MORE ROOM, PLEASE ATTACH EXTRA SHEETS OF PAPER*

INITIALS

35

**REDACTED**

Asha,

The meeting you speak of was over a year and a half ago. At that meeting no one told us that Blimpie was not allowed to go in this location. Nothing was mentioned to you because, we did not know that there had been any objections.
Blimpie will not take over the sole responsibility to resolve this. You need to have a Lawyer on your behalf, and Blimpie has a lawyer on their behalf.

You need to understand that Blimpie didn't know that there had been an objection to us going into this location, after that meeting we were under the impression that everything had been resolved. I don't appreciate the accusation that we put you in there knowing this was going to happen, I think I have tried to help you in every way I can.

On another note, what about the payment of the $1588.00 for the Noble Romans Letters, I faxed you an invoice a couple of days ago. This needs to be addressed before you leave to go to India.

Thanks,

Jeffrey M. Garner
Director of Operations, DCBG Inc.
42764 Jonquil Lane
South Riding, Va. 20152
Cell# (703) 929-4994



12/20/2005

Fax# (301) 843-0310
E-mail: RGNJMG@AOL.COM



12/20/2005

GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT



**Appeal No. 17214 of Advisory Neighborhood Commission 6A,** pursuant to 11 DCMR §§ 3100 and 3101, from the administrative decision of the Zoning Administrator of the Department of Consumer and Regulatory Affairs. Appellant alleges that the Zoning Administrator erred by issuing a certificate of occupancy permit (No. C76349, dated May 19, 2004) for a 30-seat deli/restaurant. Appellant argues that the actual use of the business is a fast food restaurant as defined by § 199, and regulated by § 733. The C-2-A-zoned premise is located at 721 H Street, N.E. (Square 890, Lot 69).

| | |
|---|---|
| **HEARING DATE:** | October 12, 2004 |
| **DECISION DATE:** | November 2, 2004 |

## ORDER

### PRELIMINARY MATTERS

Advisory Neighborhood Commission ("ANC") 6A ("Appellant") filed this appeal on July 9, 2004, alleging that the Zoning Administrator ("ZA") of the Department of Consumer and Regulatory Affairs ("DCRA") erred in issuing Certificate of Occupancy No. C76349. The certificate of occupancy was issued on May 9, 2004 to "Chans Food, Inc." for a "restaurant." Appellant contends that the establishment for which the certificate of occupancy was issued is, in reality, a "fast food restaurant," as that use is defined by the Zoning Regulations, and not a "restaurant," which is defined differently by the Regulations. If a restaurant, the establishment is a matter-of-right use in this C-2-A zone, but if a fast food restaurant, it requires a special exception.

The subject property is located across the street from the boundary of ANC 6A, the Appellant herein, but is located within ANC 6C, which filed a letter in support of the appeal, as did the Capitol Hill Restoration Society.

The Board heard the appeal on October 12, 2004. The Appellant and DCRA participated in the hearing, as well as a representative of Chans Foods and the lessee of the property.

At its November 2, 2004 decision meeting, the Board decided to grant the appeal by a vote of 5-0-0.

### FINDINGS OF FACT



EXHIBIT
E

BZA APPEAL NO. 17214
PAGE NO. 2

1.    On May 19, 2004, DCRA issued Certificate of Occupancy No. C 76349 to "Chans Foods, Inc." for a "restaurant" at the property which is the subject of this appeal ("subject property.")

2.    The certificate of occupancy incorrectly noted the address of the subject property. It also incorrectly noted the zone district within which the subject property is located as C-4, in which a fast food restaurant is a matter-of-right use. *See*, 11 DCMR § 751.2[1].

3.    Even after correcting the zone district reflected on the certificate of occupancy to C-2-A, DCRA re-issued the certificate of occupancy for a restaurant, which is also a matter-of-right use in a C-2-A zone. *See*, 11 DCMR § 721.1.

4.    A fast food restaurant is not a matter-of-right use in a C-2-A zone, but requires a special exception. *See*, 11 DCMR § 733.

5.    The Zoning Regulations deem any restaurant with a drive-through a fast food restaurant. *See*, 11 DCMR § 199.1 (definition of "Restaurant, fast food).

6.    The establishment at the subject property does not have a drive-through.

7.    The Zoning Regulations list three other characteristics, the existence of two of which denote an establishment as a "fast food restaurant," as opposed to a "restaurant." These are: (1) whether at least 10% of the total floor space on any one floor that is accessible to the public is allocated and used for customer queuing for self-service for carry out and on-premises consumption, (2) whether at least 60% of food items are already prepared or packaged before a customer places an order, and (3) whether or not the establishment primarily serves its food and beverages in disposable containers and provides disposable tableware. *Id.*

8.    The Zoning Regulations' definition of "restaurant" specifically excludes a fast food restaurant from the definition.

9.    The queuing area in the establishment at the subject property, when calculated against the publicly accessible floor space, is approximately 231.8 of 907 square feet, or 25.6%. If the queuing area is calculated against the total floor space, it encompasses approximately 231.8 of 1521.1 square feet, or 15.2%. Either way, the queuing area takes up more than 10% of the floor area within the establishment.

---

[1] These errors led to some confusion early on, but they were subsequently corrected, and, at this point, have no bearing on the determination of this appeal.

BZA APPEAL NO. 17214
PAGE NO. 3

10.   Approximately 10 – 15% of the food items offered by the establishment at the subject property are prepared or packaged before a customer places an order.

11.   The establishment at the subject property primarily serves its food and beverages in disposable containers and provides disposable tableware.

## CONCLUSIONS OF LAW

An appeal to the Board may be taken by any person aggrieved by a decision of a District official in the administration and/or enforcement of the Zoning Regulations, including the issuance of a certificate of occupancy. 11 DCMR §§ 3100.2 and 3200.2. The Board's regulations arise out of the authority and jurisdiction conferred upon it by D.C. Official Code § 6-641.07(f) (2001), in accordance with § 8 of the Zoning Act of 1938 (52 Stat. 797, 799, as amended.) For purposes of the Board's regulations, an ANC is considered a "person" which can be "aggrieved" by, and appeal, a decision of a District official in the administration and/or enforcement of the Zoning Regulations.

This appeal turns entirely on the interpretation of the § 199 definition of "Restaurant, fast food," and particularly on the parsing of the meaning of one sentence therein. Therefore, the relevant portion of the definition is set forth in its entirety below, with the pivotal sentence highlighted in boldface type. A fast food restaurant is defined as:

> [A] place of business devoted to the preparation and retail sale of ready-to-consume food or beverages for consumption on or off the premises. A restaurant will be considered a fast food restaurant if it has a drive-through. **A restaurant will be considered a fast-food restaurant if the floor space allocated and used for customer queuing for self-service for carry out and on-premises consumption is greater than ten percent (10%) of the total floor space on any one (1) floor that is accessible to the public,** and it exhibits one (1) of the two (2) following characteristics:
>
> (a)   At least sixty percent (60%) of the food items are already prepared or packaged before the customer places an order; and/or
>
> (b)   The establishment primarily serves its food and beverages in disposable containers and provides disposable tableware.

(Emphasis added.) 11 DCMR § 199.1.

The other definition relevant to this appeal is that of "Restaurant" itself, which specifically states that the term "restaurant," when used in the Zoning Regulations, "shall not include a fast food restaurant." 11 DCMR § 199.1. Therefore, if something is a fast food restaurant, based on the three criteria in the definition of fast food restaurant above, it cannot also be a "restaurant." This is an important distinction because restaurants are matter-of-right uses in all commercial zone districts, whereas fast food restaurants are

BZA APPEAL NO. 17214
PAGE NO. 4

matter-of-right uses beginning only in C-2-B zones and continuing into the less restrictive
commercial zone districts. Fast food restaurants are special exception uses in C-2-A zone
districts, and therefore, must come before this Board. 11 DCMR § 733.

It was clear in the record that the establishment at the subject property primarily serves its
food and beverages in disposable containers and provides disposable tableware, thereby
meeting the last criterion, set forth in subparagraph (b), in the definition of fast food
restaurant. (See, Exhibit No. 23). The only real question in this appeal is whether the
floor space allocated and used for customer queuing for self-service for carry out and on-
premises consumption is greater than ten percent (10%) of the total floor space on any
one (1) floor that is accessible to the public.

At the hearing, the Chief of the Zoning Division of the Building and Land Regulation
Administration ("BLRA") of DCRA testified that, to determine the percentage of floor
space used for queuing, DCRA calculated "10 percent of the total area, of the gross floor
area dedicated to that use or the leased space." Hearing Transcript, at 254, lines 11-17.
As the hearing progressed, it became clear that DCRA interpreted the first criterion in the
definition of fast food restaurant by reading the clause "accessible to the public" to
modify the phrase "any one (1) floor." Therefore, DCRA determined its 10 percent
calculation by taking 10 percent of the total floor space of *that floor that is accessible to
the public.* In the subject establishment, there is only one floor and parts of that floor are
accessible to the public, therefore DCRA made its 10 percent calculation against the floor
area of the entire floor, including all areas accessible to the public and all areas that are
not.

The Board, however, disagrees with DCRA's interpretation of the first criterion. The
Board agrees with the Appellant that the clause "accessible to the public" modifies the
phrase "ten percent (10%) of the total floor space on any one (1) floor." Reading the
definition this way means that the 10 percent calculation is made against only the amount
of floor space that is accessible to the public on a particular floor. Indeed, this is
precisely the interpretation that DCRA itself gives the definition in the "Affidavit Eating
Establishment" which DCRA had the lessee complete.[2] According to DCRA, this
affidavit is completed whenever there is a question as to whether a restaurant-type use is
appropriate in a particular zone district. Under the correct interpretation of the first
criterion, the calculation would be 10 percent of the floor space *to which the public has
access, i.e.,* including queuing area, seating area, hallways to restrooms, restrooms
themselves, and the area immediately inside the front door. The area not accessible to the
public would include, for example, the food preparation and storage areas and the area
behind the service counter.

---

[2]DCRA's "Affidavit Eating Establishment" asks four questions derived directly from the definition of fast food
restaurant in § 199. The second question is; "What percentage of the floor space *that is accessible to the public on
any one floor* will be used for queuing for self-service for carry-out or on-premises consumption?" (Emphasis
added.) This rendition of the question is consistent with the Board's interpretation of the first criterion.

BZA APPEAL NO. 17214
PAGE NO. 5

DCRA also misinterpreted the first criterion to mean that only the customer queuing area must be more than 10 percent of a certain floor space. DCRA misread the phrase "queuing area" to mean both queuing area for carry out and queuing area for on-premise consumption. The Board disagrees and interprets the language to mean that the 10 percent calculation must be made including, as separate measurements, both the queuing area and the area for on-premise consumption. Simply put, if the total floor space for either customer queuing or on-premise consumption, or both, is more than ten percent of the total floor space that is accessible to the public on a particular floor, (and one of the other two criteria is met), then the establishment in question is a fast food restaurant.

As stated in Finding of Fact No. 9, when calculated against the publicly-accessible floor space within the establishment, the customer queuing area takes up approximately 25.6% of that space. As this is already well over 10 percent, the Board need not determine the separate measurement of percentage of floor space devoted to on-premise consumption. The establishment at the subject property meets the first and third criteria of the definition of fast food restaurant, and so falls within that definition. As it falls within that definition, it cannot be a "restaurant." Accordingly, DCRA erroneously issued C of O No. C76349 for a matter-of-right restaurant use.

For the reasons stated above, the Board concludes that the Appellant has met its burden of proof in demonstrating that DCRA erred in issuing Certificate of Occupancy No. C76349 for a matter-of-right restaurant use in a C-2-A zone district. Therefore, it is hereby **ORDERED** that this appeal be **GRANTED**.

VOTE:    5-0-0    (Geoffrey H. Griffis, Ruthanne G. Miller, Curtis L. Etherly, Jr., John A. Mann, II, and Carol J. Mitten to grant.)

**BY ORDER OF THE D.C. BOARD OF ZONING ADJUSTMENT**
Each concurring member has approved the issuance of this Decision and Order

ATTESTED BY:

Jerrily R. Kress, FAIA
Director, Office of Zoning

JUN 1 3 2005
FINAL DATE OF ORDER: _____

PURSUANT TO 11 DCMR § 3125.6, THIS DECISION AND ORDER WILL BECOME FINAL UPON ITS FILING IN THE RECORD AND SERVICE UPON THE PARTIES.

BZA APPEAL NO. 17214
PAGE NO. 6

UNDER 11 DCMR § 3125.9, THIS ORDER WILL BECOME EFFECTIVE TEN DAYS AFTER IT BECOMES FINAL.

LM/twr

GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT



## BZA APPEAL NO. 17214

As Director of the Office of Zoning, I hereby certify and attest that on **JUN 1 3 2005**, a copy of the order entered on that date in this matter was mailed first class, postage prepaid or delivered via inter-agency mail, to each party and public agency who appeared and participated in the public hearing concerning the matter, and who is listed below:

Cody Rice
Chair, ANC 6A Economic Development
& Zoning Committee
310 9th Street, N.E.
Washington, DC 20002

Lisa A. Bell
Senior Counsel
D.C. Department of Consumer and Regulatory Affairs
941 North Capitol Street, N.E.
Washington, DC 20012

Chairperson
Advisory Neighborhood Commission 6A
Miner Elementary
P.O. Box 75115
Washington, DC 20013

Chairperson
Advisory Neighborhood Commission 6C
635 Massachusetts Ave., N.W.
P.O. Box 77876
Washington, DC 20013

H Street Community Development Corp.
501 H Street, N.E.
Washington, DC 20002

BZA APPEAL NO. 17214
PAGE NO. 2

Corey Buffo
Acting Zoning Administrator
DCRA
Building and Land Regulation Administration
941 North Capitol Street, N.E., Suite 2000
Washington, DC 20009

Sharon Ambrose, Councilmember
Ward 6
1350 Pennsylvania Avenue, N.W.
Suite 102
Washington, DC 20004

Ellen McCarthy, Interim Director
Office of Planning
801 North Capitol Street, N.E.
4th Floor
Washington, D.C. 20002

Alan Bergstein
Office of the Attorney General
441 4th Street, N.W., 7th Floor
Washington, DC 20001

ATTESTED BY:

JERRILY R. KRESS, FAIA
Director, Office of Zoning

2

**EXHIBIT 1A**

**State Action Docket**



2006 CA 000618 B        RATNAM, CHANDAR et al  Vs.  BLIMPIE ASSOCIATES LTD. et al    GMA

Search Criteria
 Docket Entry
 Images          All Dockets
 Participant
 Display OptionExclude Non Display Dockets

Begin Date                SortDescending
End Date

Search Results

| Docket Date | Reference | Description | Amt | Amt Owed/ Dism/Credit | Amount Due |
|---|---|---|---|---|---|
| 2/2/2006 | | Issue Date:  02/02/2006<br>Service:  Summons Issued<br>Method:  Service Issued<br>Cost Per:  $<br><br>BLIMPIE ASSOCIATES LTD.<br>Seven Penn Plaza<br>17th Floor<br>NEW YORK, NY   10001<br>Tracking No: 5000011596<br><br>2001 B.A. REALTY INC<br>Seven Penn Plaza<br>17th Floor<br>NEW YORK, NY   10001<br>Tracking No: 5000011597<br><br>D.C.B.G., INC<br>4530 Wisconsin Avenue NW<br>Suite 200<br>WASHINGTON, DC   20016<br>Tracking No: 5000011598<br><br>H STREET COMMUNITY DEVELOPMENT<br>CORPORATION INC<br>501 H Street NE<br>WASHINGTON, DC   20002<br>Tracking No: 5000011599 | | | |
| 1/31/2006 | | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 05/05/2006    Time: 9:00 am<br>Judge: ALPRIN, GEOFFREY M    Location:<br>Courtroom 320 | | | |
| 1/31/2006 | | Complaint for Breach of Contract Filed<br>Attorney: HORN, Mr JOSEPH P (418448)<br>CHANDAR RATNAM (PLAINTIFF);  Receipt: 26501<br> Date: 01/31/2006 | 120.00 | | |

Case 1:06-cv-00372-JR     Document 1     Filed 03/02/2006     Page 67 of 68

---

| Case Number | Status | Judge |
|---|---|---|
| 2006 CA 000618 B | Open | ALPRIN, GEOFFREY M |

| In The Matter Of | | Action |
|---|---|---|
| RATNAM, CHANDAR et al  Vs. BLIMPIE ASSOCIATES LTD. et al | | Complaint for Breach of Contract Filed |

| Party | | Attorneys |
|---|---|---|
| RATNAM, CHANDAR | PLNTF | HORN, Mr JOSEPH P |
| BLIMPIE ASSOCIATES LTD. | DFNDT | |
| CHANDAR, ASHA | PLNTF | |
| CHANS FOODS | PLNTF | |
| 2001 B.A. REALTY INC | DFNDT | |
| D.C.B.G., INC | DFNDT | |
| H STREET COMMUNITY DEVELOPMENT CORPORATION INC | DFNDT | |

| Opened | Disposed | Case Type |
|---|---|---|
| 01/31/2006 | Undisposed | Civil II |

Comments:

---

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 1 | 02/02/06 | Issue Date:  02/02/2006<br>Service:  Summons Issued<br>Method:  Service Issued<br>Cost Per:  $ | 0.00 | 0.00 |

> BLIMPIE ASSOCIATES LTD.
> Seven Penn Plaza
> 17th Floor
> NEW YORK, NY   10001
> Tracking No: 5000011596
>
> 2001 B.A. REALTY INC
> Seven Penn Plaza
> 17th Floor
> NEW YORK, NY   10001
> Tracking No: 5000011597
>
> D.C.B.G., INC
> 4530 Wisconsin Avenue NW
> Suite 200
> WASHINGTON, DC   20016
> Tracking No: 5000011598
>
> H STREET COMMUNITY DEVELOPMENT
> CORPORATION INC

CRTR5925 Summary

2006 CA 000618 B RATNAM, CHANDAR et al Vs. BLIMPIE ASSOCIATES LTD. et al

501 H Street NE
WASHINGTON, DC 20002
Tracking No: 5000011599

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 2 | 01/31/06 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 05/05/2006 Time: 9:00 am<br>Judge: ALPRIN, GEOFFREY M Location:<br>Courtroom 320 | 0.00 | 0.00 |
| 3 | 01/31/06 | Complaint for Breach of Contract Filed<br>Attorney: HORN, Mr JOSEPH P (418448)<br>CHANDAR RATNAM (PLAINTIFF); Receipt:<br>26501 Date: 01/31/2006 | 120.00 | 0.00 |

| | Amount | Balance |
|---|---|---|
| Totals By: Cost | 120.00 | 0.00 |
| Information | 0.00 | 0.00 |

*** End of Report ***