# Superior Court of the District of Columbia

## CIVIL DIVISION

CHANDAR RATNAM, an individual, ASHA )
CHANDAR, an individual, CHANS FOODS, )
INC. )
14110 Gabrielle Way )
Centreville, VA 20121; )

    Plaintiffs, )

vs. )

BLIMPIE ASSOCIATES LTD. )
Seven Penn Plaza, 17th Floor )
New York, NY 10001, )

SERVE:   Hon. Anthony A. Williams )
          Mayor, District of Columbia )
          John A. Wilson Building )
          1350 Pennsylvania Avenue, NW )
          Washington, DC 20004; )

2001 B.A. REALTY, INC., )
Seven Penn Plaza, 17th Floor )
New York, NY 10001, )

SERVE:   Hon. Anthony A. Williams )
          Mayor, District of Columbia )
          John A. Wilson Building )
          1350 Pennsylvania Avenue, NW )
          Washington, DC 20004; )

D.C.B.G., INC. )

SERVE:   Tarrant H. Lomax, Esq. )
          4530 Wisconsin Avenue, N.W. )
          Suite 200 )
          Washington, D.C. 20016; )
)
)
)
)

Civil Action No. 06 ca 618 B.

RECEIVED
Civil Clerk's Office

JAN 3 1 2006

Superior Court of the
District of Columbia
Washington, D.C.

H STREET COMMUNITY DEVELOPMENT )
CORPORATION, INC.                )
501 H Street, NE                 )
Washington, DC 20002,            )
                                 )
SERVE:   William Barrow, Registered Agent )
                                 )
         611 H St., N.E.          )
         Washington, DC 20002;   )
                                 )
     Defendants.                 )
                                 )
                                 )
                                 )
                                 )

## COMPLAINT FOR CONSUMER PROTECTION VIOLATIONS, BREACH OF CONTRACT, FRAUD, NEGLIGENCE, AND UNJUST ENRICHMENT

Plaintiffs, Chandar Ratnam, Asha Chandar, and Chans Foods, Inc. (collectively

"Plaintiffs"), by counsel, for their Complaint against Defendants Blimpie Associates,

Ltd., 2001 B.A. Realty, Inc., H Street Community Development Corporation, Inc. (the

"HSCDC"), and D.C.B.G., Inc. (collectively "Defendants"), allege as follows:

### NATURE OF ACTION

This is an action in which Plaintiffs seek to recover losses that they have sustained

as a result of Defendants' violations of their statutory and common law duties. Plaintiffs

seek to rescind their franchise agreement and obtain compensatory damages, treble

damages and/or punitive damages under both the common law and applicable statutes for

Defendants' intentional and negligent representations and omissions of material facts,

breaches of contract and violation of consumer protection statutes. Essentially,

Defendants sold Plaintiffs a fast food restaurant franchise to be operated at a location

Defendants knew was not zoned for use as a fast food restaurant, and did not tell Plaintiffs of this fact or that there was local opposition to a fast food restaurant at the location of the franchise.

## PARTIES

1.      Plaintiffs are franchisees of the Blimpie franchise system, who signed, through Chans Foods, Inc., an April 28, 2004 Franchise Agreement (the "Franchise Agreement") with Blimpie Associates, Ltd., and the April 28, 2004 Sublease (the "Sublease") with 2001 B.A. Realty, Inc.  Chandar Ratnam and Asha Chandar are individuals, and are residents of the State of Virginia.  Both personally guaranteed performance of both the Franchise Agreement and Sublease.  Chans Foods, Inc. is a Washington D.C. corporation.

2.      Blimpie Associates, Ltd. is, upon information and belief, a New York corporation with a principal place of business at 7 Penn Plaza, New York, New York 10001.

3.      2001 B.A. Realty, Inc. is, upon information and belief, a New York corporation, with its principal place of business at 7 Penn Plaza, New York, New York 10001.

4.      D.C.B.G., Inc. is, upon information and belief, a Delaware corporation, with its principal place of business at 42764 Jonquil Lane, South Riding, Virginia  20152.

5.      HSCDC is, upon information and belief, a Washington D.C. corporation with its principal place of business at 501 H Street, NE, Washington, DC 20002.

## JURISDICTION AND VENUE

6.    Jurisdiction of this court is founded on D.C. Code Annotated, 1973 edition, as amended, Sec. 11-921.

7.    Defendant Blimpie Associates, Ltd. is subject to the personal jurisdiction of the courts of the District of Columbia as it transacts substantial business within the District of Columbia, under D.C. Code Annotated, 1973 edition, as amended, Sec. 13-423.

8.    Defendant, 2001 B.A. Realty, Inc. ("Sublessor") is subject to the personal jurisdiction of the courts of the District of Columbia as it transacts substantial business within the District of Columbia on D.C. Code Annotated, 1973 edition, as amended, Sec. 13-423.

9.    Defendant, D.C.B.G., Inc. is subject to the personal jurisdiction of the courts of the District of Columbia as it transacts substantial business within the District of Columbia, on D.C. Code Annotated, 1973 edition, as amended, Sec. 13-423.

10.    Defendant, the HSCDC is subject to the personal jurisdiction of the courts of the District of Columbia as it transacts substantial business within the District of Columbia, on D.C. Code Annotated, 1973 edition, as amended, Sec. 13-423.

11.    A substantial part of the facts giving rise to the dispute occurred in the District of Columbia, and therefore venue is proper here.

## FACTS

### Blimpie's Background

12.    The first Blimpie restaurant was opened in 1964 by Tony Conza, Angelo Baldassare and Peter DeCarlo. Today, there are nearly 1,600 Blimpie restaurants located throughout the United States.

13.    Upon information and belief, Blimpie trademarks are owned by Blimpie International, Inc., who licenses its Blimpie trademarks to affiliated companies for subsequent licensing to franchisees.

14.    One of these affiliated companies is Defendant Blimpie Associates, Ltd. (hereinafter "Blimpie"), a New York corporation that was founded in 1989; Blimpie offers for sale fast food sandwich restaurant franchises (and subfranchises) to be operated in the states of Delaware, Maryland, New Jersey, New York, Pennsylvania, Virginia, and the District of Columbia.

15.    Like other franchisors, Blimpie leases the properties that will house its franchises; it then turns around and subleases the property to its franchisees for their use as a Blimpie restaurant. Blimpie does this through an affiliated company.

**The Dispute**

16.    In 2002, the HSCDC was in the process of redeveloping property located at 8th and H Streets, N.E., Washington, D.C. This redevelopment project consisted of demolishing the existing structure and replacing it with a commercial building. The HSCDC soon located a potential suitor for the location, Blimpie. On August 26, 2002, Blimpie entered into a lease for property described in the lease as "Retail Center, 8th and H Streets, N.E., Washington, D.C. 20002" (the "Leased Premises").

17.    Before executing the lease, however, Blimpie learned that there was significant local opposition to using the Leased Premises for a fast food restaurant. In fact, local individuals and advisory groups were adamantly opposed to the opening of another fast food restaurant on H Street. One of the primary voices in this debate was the local Advisory Neighborhood Commission (the "ANC"), i.e., ANC 6A.

18.     The opposition to Blimpie was so strong, that on June 12, 2002, two months before signing the lease for the Leased Premises, representatives of Defendants, including Peter DeCarlo, one of the founders of the Blimpie System (who was then, upon information and belief, the Chief Executive Officer of Blimpie's licensor), appeared before the ANC 6A's Zoning and Licensing Committee. The goal of this meeting was to address community concerns regarding the use of the Leased Premises as a fast food restaurant.

19.     During this two and a half hour meeting, Mr. DeCarlo discussed with those in attendance the reasons to allow the use of the space by Blimpie. In response, those in attendance voiced their concerns of why the Leased Premises should not be used as a fast food restaurant such as Blimpie. The reasons for opposition included the fact that the Leased Premises were not actually zoned for use as a fast food restaurant; in order to operate there, a fast food restaurant would need to get an exemption, which those in attendance stated they would oppose.

20.     At this meeting, Mr. DeCarlo, in defending Blimpie's plans, admitted that Blimpie was a fast food restaurant, stating:

> I go where we can succeed..., where I don't see 15 brand-name stores competing for your fast-food dollar.

See, Annys Shin, Is H Street Too Good For Blimpie?, Washington City Paper, June 21, 2002, attached hereto as Exhibit A.

21.     Also in attendance at this meeting was Bill Barrow, Executive Director of the HSCDC.

22.     Blimpie apparently ignored the fact that the Leased Premises could not, without an exemption, be used as a fast food restaurant. On or about August 26, 2002,

the Sublessor entered into a lease with the HSCDC for the Leased Premises. Soon

thereafter, the Sublessor subleased the Leased Premises to Munni Enterprises, Inc.

("Munni Enterprises"), who also signed a guaranty of the sublease in favor of the

HSCDC. Munni Enterprises also executed a franchise agreement, which provided for the

operation of a Blimpie franchised restaurant that could only be located at the Leased

Premises.

  23. Subsequently, the HSCDC constructed the building that was to include the

Leased Premises, which was completed in September 2003. However, after construction

was completed, Munni Enterprises was either unable or unwilling to open a Blimpie

franchised restaurant at the Leased Premises. Thus, Munni Enterprises did not "build

out" the Leased Premises for use as a Blimpie restaurant, and never applied to the

responsible agency for a certificate of occupancy. Accordingly, there was no reason for

the ANC or anyone else to contest Munni Enterprises' franchise agreement or sublease.

**The Plaintiffs' Involvement**

  24. In early 2004, Plaintiffs Chandar Ratnam and Asha Chandar began

investigating franchise opportunities. Lacking business experience outside their chosen

field, i.e., the computer industry, they were interested in owning a franchise to take

advantage of what they perceived would be organizational experience a franchise would

provide.

  25. They soon identified Blimpie as a possible franchise in which to invest.

According to Blimpie's website, Blimpie would provide significant assistance to

franchisees, including the following:

> Financial Support
> BLIMPIE is the second largest sub sandwich chain. This may help you
> acquire financing from third party sources for your restaurant; but the
> BLIMPIE power does not end there.
>
> Real Estate and Construction Support
> We'll work with you as you negotiate a lease, provide you with design tips
> for your restaurant, and guide you to the right equipment and
> subcontractors for construction. We put the knowledge of having helped
> open over 2,000 restaurants right at your fingertips. [Emphasis added.]
>
> Operational Support
> BLIMPIE franchisees receive training both in the store and at BLIMPIE
> University in New York City at the BLIMPIE Franchise Support
> Headquarters. Before and after you open your store, we'll be there on
> national, regional, and local levels with everything you'll need to run a
> BLIMPIE restaurant....

26.    Intrigued with the opportunity, Chandar Ratnam and Asha Chandar
completed an on-line application on the Blimpie website. Soon thereafter, they were
contacted by Leslie Gardner. Upon information and belief, Ms. Gardner is an employee
of the subfranchisor. At that time, however, Plaintiffs Chandar Ratnam and Asha
Chandar were not aware that Leslie Gardner was not an employee of Blimpie. In fact,
Plaintiffs did not learn until training at Blimpie's training center that Ms. Gardner was an
employee of another entity, and that D.C.B.G., Inc. was the subfranchisor of Blimpie.

27.    At their first meeting, Ms. Gardner provided the Plaintiffs a copy of a
Blimpie Uniform Franchise Offering Circular ("UFOC").

28.    A UFOC is the disclosure statement that is required by both federal and
many states' laws to be delivered to prospective franchisees prior to the sale of a
franchise. A UFOC is required to contain truthful information about a franchise that can
be relied upon by a prospective franchisee in making a decision to purchase a franchise.

29.    Blimpie's UFOC contained several representations concerning Blimpie's obligations to perform a site selection analysis for franchisees. Specifically, the franchise agreement contained in the UFOC, which was identical to the agreement Plaintiffs later signed, stated that Blimpie was obligated to "approve the Location of Operator." The scope of this obligation was further defined in Item 11 of the UFOC as follows:

> Prior to the opening of the Blimpie restaurant to the public, Blimpie (or its designees) are required by the Franchise Agreement to provide the following assistance and services to you:
>
> Site selection is your sole responsibility. Although it is your responsibility to locate the premises for the establishment of your Blimpie restaurant, Blimpie will approve the proposed location whether found by you, or another person or entity, provided such location meets Blimpie standards. . . . .
>
> * * *
>
> It is solely your obligation to locate the approved Blimpie Restaurant site. Blimpie will approve the site for your Blimpie restaurant after analysis of the site, taking into consideration the proposed rental, population mixture, geographic area, including climate and applicable business hours, and any other facet of the particular location which would affect the possibilities of success or failure. Approval of your location by Blimpie shall not be interpreted as guarantee of success. Your ultimate decision as to acceptance or rejection of any site is your business risk.
> [Emphasis added.]

30.    Ms. Gardner provided Plaintiffs information on a few locations that were available in the Washington, D.C. area to rent from Blimpie for use as a fast food restaurant. One of these locations was the H Street site that Munni Enterprises had rented from Defendants, i.e., the Leased Premises. It was explained to Plaintiffs that Munni Enterprises wanted to sell its interest in the location.

31.    Based on Ms. Gardner's representations, and the statements made in the UFOC, Plaintiffs Chandar Ratnam and Asha Chandar decided to become Blimpie franchisees. They formed Plaintiff Chans Foods, Inc. and executed the Sublease with the

Sublessor (attached hereto as Exhibit B), and Franchise Agreement with Blimpie (attached hereto as Exhibit C), both of which provided that Plaintiffs could only open and operate a Blimpie franchise at the Leased Premises. In addition, Plaintiffs Chandar Ratnam and Asha Chandar also signed the April 28, 2004 Guaranty (the "Guaranty") in favor of the HSCDC.

32.    Plaintiffs also signed another franchise agreement to operate a Noble Romans' Pizza franchise from the Leased Premises, with Blimpie's authorization and approval; Noble Romans is a separate franchise system with whom Blimpie allowed its franchisees to co-brand. Thus, Plaintiffs would operate both franchises from the Leased Premises.

33.    At no time did the Defendants ever inform Plaintiffs that the Leased Premises were not zoned for use as a fast food restaurant, that Defendants had knowledge of local opposition to the use of the Leased Premises as a fast food restaurant, and that Blimpie had not performed, or had not reasonably performed, a site selection analysis prior to executing the Sublease with Plaintiffs.

34.    After signing the Franchise Agreement and Sublease, Plaintiffs took possession of the Leased Premises and began the construction process. At no time did any of the Defendants provide Plaintiffs with instruction on how best to build-out and/or construct the Leased Premises to make the Leased Premises compliant with the zoning regulations. Plaintiffs spent over three hundred and sixty thousand dollars ($360,000) to build out the Leased Premises for use as a Blimpie and Noble Romans restaurant.

35.    When construction was nearing completion, the Plaintiffs applied for, and were granted, the May 19, 2004 certificate of occupancy (the "Certificate of Occupancy")

by the District of Columbia's Department of Consumer and Regulatory Affairs (the "DCRA"). Their stated use on the Certificate of Occupancy was as a fast food restaurant. Plaintiffs opened for business on May 22, 2004.

36.     Soon thereafter, Plaintiffs received notice from the DCRA that an objection had been filed to the Certificate of Occupancy by the ANC. Plaintiffs contacted the Subfranchisor's Director of Operations, Jeffrey Garner, who informed Plaintiffs that their Certificate of Occupancy should not have said the intended use was as "fast food" restaurant, but instead should have said the intended use was as a "deli." Mr. Garner said that an attorney from Blimpie would be in attendance at the first hearing on the appeal of the Certificate of Occupancy.

37.     Mr. Garner later admitted, in a September 14, 2004 email, that Defendants knew about the local opposition at the meeting held in June 2002, but claimed that Defendants believed the matter had been resolved.

> The meeting you speak of was over a year and a half ago. At that meeting no one told us that Blimpie was not allowed to go in this location. Nothing was mentioned to you because, we did not know that there had been any objections...You need to understand that Blimpie didn't know that there had been an objection to us going into this location, after that meeting we were under the impression that everything had been resolved.

Jeffrey Garner's September 14, 2004 Email, attached hereto as Exhibit D. See infra, paras. 18 - 20.

38.     The DCRA held a hearing on the issue of whether or not the Certificate of Occupancy was issued in error on October 12, 2004. The Plaintiffs attended this hearing, but Blimpie did not send a representative to attend. On June 14, 2005, the DCRA granted the appeal of the Certificate of Occupancy, and held essentially that the Certificate of Occupancy had been granted in error. (The DCRA's Order is attached hereto as Exhibit

E). The DCRA subsequently informed Plaintiffs that the Certificate of Occupancy had been revoked, and therefore they could no longer operate the Leased Premises as a fast food restaurant.

39.     After being advised that an appeal of the DCRA's Order would likely take six to nine months, during which time they would not be allowed to operate, Plaintiffs decided to cease doing business at the Leased Premises, and closed their doors on August 6, 2005.

40.     On or about December 1, 2005, Plaintiffs surrendered possession of the property to the Defendants. Plaintiffs provided the keys to the Leased Premises to the HSCDC.

41.     On or about December 22, 2005, the HSCDC filed a Complaint against the Plaintiffs in the Landlord Tenant Branch of the Superior Court of the District of Columbia, action no. 045523-05, seeking possession of the Leased Premises.

42.     In the time that they operated their Blimpie restaurant, Plaintiffs experienced operating losses of over one hundred seventy thousand dollars ($170,000); these losses are separate from, and in addition to, the amounts Plaintiffs invested in building out the Leased Premises. Plaintiffs have also lost other amounts due to their purchase and investment in their Blimpie franchise, and have suffered severe emotional and physical distress due to the financial losses they have suffered.

### DEFENDANTS' REPRESENTATIONS TO PLAINTIFFS

43.     Prior to signing their franchise agreements, Blimpie was required, by federal and the law of some states, to provide each prospective franchisee a UFOC, which made certain disclosures about Blimpie and the franchise. The information contained in

12

Blimpie's UFOC was required, under both federal and state law, to be accurate, complete, truthful, and not misleading, so that prospective franchisees could rely upon it when deciding to purchase a franchise. In addition to the representations made in the UFOC, Defendants made omissions of material fact, the absence of which convinced Plaintiffs to sign the Franchise Agreement and Sublease. Defendants' pre-signing material representations and omissions included the following:

    i.    Defendants omitted telling Plaintiffs that the Leased Premises were not zoned for use as a fast food restaurant such as Blimpie;

    ii.    Defendants omitted telling Plaintiffs that Defendants had knowledge that there was neighborhood opposition to the use of the Leased Premises as a fast food restaurant based on the zoning of the Leased Premises;

    iii.    Blimpie represented in its UFOC and Franchise Agreement that it would perform a site analysis on the Leased Premises to determine its suitability as a Blimpie's franchise; and

    iv.    Blimpie omitted telling Plaintiffs that it either had not performed a site selection analysis or, considering Blimpie's knowledge of the facts regarding the Leased Premises, had not reasonably performed a site selection analysis, prior to executing the Sublease and Franchise Agreement with Plaintiffs.

## PLAINTIFFS' RELIANCE

    44.    In reliance upon the representations and omissions made by Defendants, Plaintiffs signed the Franchise Agreement, the Sublease and the Guaranty and paid Blimpie an initial franchise fee. See Exhibit D, Franchise Agreement, ¶ 1.1. Plaintiffs also spent additional amounts to outfit and open their Blimpie store, investing over $360,000.

13

45.    Plaintiffs also agreed to pay Blimpie a continuing franchise fee of 6% of gross revenues and a weekly advertising fee of 3%. (Exhibit D, Franchise Agreement, ¶¶ 6.1, and 9.1.1).

## THE FALSITY OF DEFENDANTS' REPRESENTATIONS

46.    After becoming Blimpie franchisees and opening their Blimpie restaurant, Plaintiffs discovered the truth about many of the representations made by Defendants. In particular:

   i.  Defendants had actual knowledge that the Leased Premises was not zoned for use as a fast food restaurant such as Blimpie;

   ii. Defendants had actual knowledge that there was local opposition to the use of the Leased Premises as a fast food restaurant based on the zoning of the Leased Premises;

   iii. Blimpie either did not perform a site selection analysis of the Leased Premises, or, considering Blimpie's knowledge of the facts regarding the Leased Premises, had failed to reasonably perform its obligation to perform a site selection analysis.

47.    As a result of the material misrepresentations and omissions by Defendants, Plaintiffs entered into the Franchise Agreement, Sublease and Guaranty upon false pretenses, and purchased and invested in a franchise that did not conform to the representations that had been made to them.  Plaintiffs, as a result, have suffered substantial damages because the franchise they purchased was not as represented and Plaintiffs are therefore entitled to rescind the Franchise Agreement, Sublease, and Guaranty, and to recover the present value of their lost investment, so that they are returned to the same position they would be in had they never become Blimpie franchisees.  Plaintiffs are therefore prepared to tender everything of value that they received under their Franchise Agreement and Sublease to Defendants.

14

## BREACHES OF CONTRACT AND OTHER DUTIES

48.     Blimpie has materially breached contractual and other legal obligations to the Plaintiffs that have caused damages to them. Blimpie's material breaches of its contractual duties to Plaintiffs include Blimpie's failure to not perform a site selection analysis of the Leased Premises, or, considering Defendants' knowledge of the facts regarding the Leased Premises, perform its obligation to perform a site selection analysis in a reasonable manner.

49.     As a result of the breaches of contract by Defendants, Plaintiffs have suffered substantial damages, and Plaintiffs are therefore entitled to rescind the Franchise Agreement and Sublease and to recover the present value of their lost investment, so that they are returned to the same position they would be in had they never become Blimpie franchisees. Plaintiffs are therefore prepared to tender everything of value that they received under their Franchise Agreement and Sublease to Defendants.

### COUNT ONE
### VIOLATION OF THE DISTRICT OF
### COLUMBIA CONSUMER PROTECTION PROCEDURES
### ACT §§ 28-3901, ET SEQ.
### AGAINST DEFENDANTS

50.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

51.     Under the terms of the applicable law of the District of Columbia, Plaintiffs are "persons". D.C. Code Ann., § 28-3904 (a) (1).

52.     Under the terms of the applicable law of the District of Columbia, Plaintiffs are "consumers". D.C. Code Ann., § 28-3904 (a) (2).

15

53. Under the terms of the applicable law of the District of Columbia, the Franchise Agreement, the Lease, Sublease and Guaranty are "goods and services". D.C. Code Ann., § 28-3904 (a) (7).

54. Under the terms of the applicable law of the District of Columbia, the sale and/or execution of the Franchise Agreement, Lease, Sublease and Guaranty by Defendants to Plaintiffs is a "trade practice". D.C. Code Ann., § 28-3904 (a) (6).

55. Further, under the applicable law of the District of Columbia, it is unlawful for Defendants to engage in, *inter alia*, the following unlawful trade practices:

 i. Represent that goods or services are a particular standard, quality, grade, style, or model, if in fact they are of another;

 ii. Misrepresent as to a material fact, which has a tendency to mislead;

 iii. Fail to state a material fact if such failure tends to mislead; and

 iv. Represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

D.C. Code Ann., § 28-3904 (d)-(f), (u).

56. Defendants willfully and intentionally violated the law of the District of Columbia by engaging in the following unlawful trade practices:

 i. Defendants omitted telling Plaintiffs that Defendants knew that the Leased Premises were not zoned for use as a fast food restaurant such as Blimpie;

 ii. Defendants omitted telling Plaintiffs that Defendants had knowledge that there was neighborhood opposition to the use of the Leased Premises as a fast food restaurant based on the zoning of the Leased Premises;

16

       iii.  Blimpie represented in its UFOC and Franchise Agreement that it would perform a site analysis on the Leased Premises to determine its suitability as a Blimpie franchise, and either did not perform a site selection analysis or, considering Blimpie's knowledge of the facts regarding the Leased Premises, failed to reasonably perform a site selection analysis prior to executing the Sublease and Franchise Agreement.

57.    Under the applicable law of the District of Columbia, and as a result of Defendants' unlawful conduct, Plaintiffs are entitled to recover treble damages, punitive damages, and attorneys' fees. D.C. Code Ann., § 28-3905 (k).

58.    The precise amount of Plaintiffs' damages cannot now be determined with precision; a more precise amount to which Plaintiffs are entitled will be presented at a trial on the merits of this matter.

## COUNT TWO
## COMMON LAW FRAUD AGAINST DEFENDANTS

59.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

60.    Defendants made false and material misrepresentations and omissions of fact to the Plaintiffs, as set forth above. Defendants made such statements and material omissions knowing that they were false and intending that Plaintiffs rely upon them in deciding to enter into the Franchise Agreement with Blimpie and to invest hundreds of thousands of dollars in a franchise, to enter into the Sublease, and to personally guaranty the Sublessor's performance in favor of HSCDC.

61.    Plaintiffs reasonably relied upon the false representations and material omissions of Defendants in making the decision to enter into their contacts and invest in a Blimpie franchise as described more fully above.

17

62.    As a result of the Plaintiffs' reliance upon the false representations of Defendant, Plaintiffs have lost hundreds of thousands of dollars.

63.    Plaintiffs are entitled to rescind the Franchise Agreement, Sublease, and Guaranty, and to recover from Defendants their rescission damages, consisting of the total of the amount invested in the franchise by Plaintiffs, their operating business losses, the cost of the leasehold improvements, and the amount invested in mitigating damages, less the consideration received from Defendants and any other benefits received from the franchise as well as the salvage value of the assets, plus interest.

## COUNT THREE
## NEGLIGENT MISREPRESENTATION AGAINST DEFENDANTS

64.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

65.    Defendants identified above had a duty to use reasonable care in making representations and statements to prospective and new franchisees and to take reasonable care to ensure that such statements and representations were not false or misleading.

66.    Defendant breached their duty of care to Plaintiffs by making false and misleading representations and material omissions as set forth above.

67.    Plaintiffs reasonably relied upon the false representations and material omissions of Defendants in making the decision to enter into their contacts and invest in a Blimpie franchise as described more fully above.

68.    Plaintiffs are entitled to rescind the Franchise Agreement, Sublease, and Guaranty, and to recover from Defendants their rescission damages, consisting of the total of the amount invested in the franchise by Plaintiffs, their operating business losses, the cost of the leasehold improvements, and the amount invested in mitigating damages,

18

less the consideration received from Defendants and any other benefits received from the franchise as well as the salvage value of the assets, plus interest.

## COUNT FOUR
### BREACH OF CONTRACT AND THE
### COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS

69. Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

70. In every contract, by operation of law, there is an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing in the trade. The implied covenant also prohibits either party from engaging in any conduct or in doing anything that deprives the other party of the fruits of the agreement or the benefit of the bargain. The implied covenant requires that Defendants act reasonably in the performance of their duties, and, among other things, refrain from engaging in conduct that would cause Plaintiffs to operate at a loss or to take actions that would cause Plaintiffs' businesses to fail.

71. Defendants have breached their express contractual duties and the implied covenant of good faith and fair dealing to Plaintiffs by violating the terms of the parties' agreements, and Plaintiffs' reasonable expectations of Defendant's performance, support, and assistance as prescribed under the Franchise Agreement and as described more fully above.

72. As a direct and proximate result of these breaches of contract and the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount undetermined at this time, but which will be demonstrated at trial.

19

## COUNT FIVE
## UNJUST ENRICHMENT AGAINST DEFENDANTS

73.  Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

74.  Defendants have been unjustly enriched at Plaintiffs' expense by taking the actions described above to induce Plaintiffs to agree to execute the Franchise Agreement, the Sublease and Guaranty, and then collecting both rent payments and franchise fees from Plaintiffs.

75.  Defendants' acquisition of these amounts constitutes unjust enrichment, and the Plaintiffs are entitled to recover from Defendants the amounts by which they have been unjustly enriched.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter judgment:

A.  Rescinding the Franchise Agreement, Sublease, and Guaranty;

B.  Enjoining Defendants' continued violation of the applicable consumer protection act;

C.  Awarding rescission damages consisting of the amount that they have invested in the franchise (including leasehold improvements), less consideration received and the salvage value of the franchise;

D.  Awarding such compensatory, consequential and incidental damages as the Plaintiffs have suffered, including treble damages and punitive damages pursuant to the District of Columbia's Consumer Protection Procedures Act; and

E.  Awarding attorneys' fees and costs, interest, such other and further relief as this Court deems just and proper.

Respectfully Submitted,

Dated: ___Feb 31___, 2006.

By: _____

Joseph Horn, Esq.
Attorney Bar No. 418448
Horn Legal, PLLC
1730 Rhode Island Avenue,
Suite 1208
Washington, D.C. 20036
202 321 0084
202 835 1557

— and —

Scott Korzenowski, Esq.
William S. Fulton, Jr., Esq.
4000 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 359-9000

**ATTORNEYS FOR PLAINTIFFS**

## JURY DEMAND

Plaintiffs demand trial by jury.

_____

Joseph P. Horn
Attorney for Plaintiff

· 21