**Exhibit 1**


**Complaint**

## Superior Court of the District of Columbia

### CIVIL DIVISION

CHANDAR RATNAM, an individual, ASHA   )
CHANDAR, an individual, CHANS FOODS,   )
INC.   )
14110 Gabrielle Way   )
Centreville, VA 20121;   )   Civil Action No. 06ca618 B.
  )
       Plaintiffs,   )
  )
vs.   )
  )
BLIMPIE ASSOCIATES LTD.   )
Seven Penn Plaza, 17th Floor   )
New York, NY 10001,   )
  )
SERVE:   Hon. Anthony A. Williams   )
       Mayor, District of Columbia   )
       John A. Wilson Building   )
       1350 Pennsylvania Avenue, NW   )
       Washington, DC 20004;   )
  )
2001 B.A. REALTY, INC.,   )
Seven Penn Plaza, 17th Floor   )
New York, NY 10001,   )
  )
SERVE:   Hon. Anthony A. Williams   )
       Mayor, District of Columbia   )
       John A. Wilson Building   )
       1350 Pennsylvania Avenue, NW   )
       Washington, DC 20004;   )
  )
D.C.B.G., INC.   )
  )
SERVE:   Tarrant H. Lomax, Esq.   )
       4530 Wisconsin Avenue, N.W.   )
       Suite 200   )
       Washington, D.C. 20016;   )
  )
  )

RECEIVED
Civil Clerk's Office

JAN 3 1 2006

Superior Court of the
District of Columbia
Washington, D.C.

H STREET COMMUNITY DEVELOPMENT  )
CORPORATION, INC.  )
501 H Street, NE  )
Washington, DC 20002,  )
                                )
SERVE:  William Barrow, Registered Agent  )
                       611 H St., N.E.  )
                       Washington, DC 20002;  )
                                  )
      Defendants.  )
                                  )
                                  )
                                  )

## COMPLAINT FOR CONSUMER PROTECTION VIOLATIONS, BREACH OF CONTRACT, FRAUD, NEGLIGENCE, AND UNJUST ENRICHMENT

Plaintiffs, Chandar Ratnam, Asha Chandar, and Chans Foods, Inc. (collectively "Plaintiffs"), by counsel, for their Complaint against Defendants Blimpie Associates, Ltd., 2001 B.A. Realty, Inc., H Street Community Development Corporation, Inc. (the "HSCDC"), and D.C.B.G., Inc. (collectively "Defendants"), allege as follows:

## NATURE OF ACTION

This is an action in which Plaintiffs seek to recover losses that they have sustained as a result of Defendants' violations of their statutory and common law duties. Plaintiffs seek to rescind their franchise agreement and obtain compensatory damages, treble damages and/or punitive damages under both the common law and applicable statutes for Defendants' intentional and negligent representations and omissions of material facts, breaches of contract and violation of consumer protection statutes. Essentially, Defendants sold Plaintiffs a fast food restaurant franchise to be operated at a location

Defendants knew was not zoned for use as a fast food restaurant, and did not tell Plaintiffs of this fact or that there was local opposition to a fast food restaurant at the location of the franchise.

## PARTIES

1.  Plaintiffs are franchisees of the Blimpie franchise system, who signed, through Chans Foods, Inc., an April 28, 2004 Franchise Agreement (the "Franchise Agreement") with Blimpie Associates, Ltd., and the April 28, 2004 Sublease (the "Sublease") with 2001 B.A. Realty, Inc. Chandar Ratnam and Asha Chandar are individuals, and are residents of the State of Virginia. Both personally guaranteed performance of both the Franchise Agreement and Sublease. Chans Foods, Inc. is a Washington D.C. corporation.

2.  Blimpie Associates, Ltd. is, upon information and belief, a New York corporation with a principal place of business at 7 Penn Plaza, New York, New York 10001.

3.  2001 B.A. Realty, Inc. is, upon information and belief, a New York corporation, with its principal place of business at 7 Penn Plaza, New York, New York 10001.

4.  D.C.B.G., Inc. is, upon information and belief, a Delaware corporation, with its principal place of business at 42764 Jonquil Lane, South Riding, Virginia 20152.

5.  HSCDC is, upon information and belief, a Washington D.C. corporation with its principal place of business at 501 H Street, NE, Washington, DC 20002.

## JURISDICTION AND VENUE

6. Jurisdiction of this court is founded on D.C. Code Annotated, 1973 edition, as amended, Sec. 11-921.

7. Defendant Blimpie Associates, Ltd. is subject to the personal jurisdiction of the courts of the District of Columbia as it transacts substantial business within the District of Columbia, under D.C. Code Annotated, 1973 edition, as amended, Sec. 13-423.

8. Defendant, 2001 B.A. Realty, Inc. ("Sublessor") is subject to the personal jurisdiction of the courts of the District of Columbia as it transacts substantial business within the District of Columbia on D.C. Code Annotated, 1973 edition, as amended, Sec. 13-423.

9. Defendant, D.C.B.G., Inc. is subject to the personal jurisdiction of the courts of the District of Columbia as it transacts substantial business within the District of Columbia, on D.C. Code Annotated, 1973 edition, as amended, Sec. 13-423.

10. Defendant, the HSCDC is subject to the personal jurisdiction of the courts of the District of Columbia as it transacts substantial business within the District of Columbia, on D.C. Code Annotated, 1973 edition, as amended, Sec. 13-423.

11. A substantial part of the facts giving rise to the dispute occurred in the District of Columbia, and therefore venue is proper here.

## FACTS

### Blimpie's Background

12. The first Blimpie restaurant was opened in 1964 by Tony Conza, Angelo Baldassare and Peter DeCarlo. Today, there are nearly 1,600 Blimpie restaurants located throughout the United States.

13.    Upon information and belief, Blimpie trademarks are owned by Blimpie International, Inc., who licenses its Blimpie trademarks to affiliated companies for subsequent licensing to franchisees.

14.    One of these affiliated companies is Defendant Blimpie Associates, Ltd. (hereinafter "Blimpie"), a New York corporation that was founded in 1989; Blimpie offers for sale fast food sandwich restaurant franchises (and subfranchises) to be operated in the states of Delaware, Maryland, New Jersey, New York, Pennsylvania, Virginia, and the District of Columbia.

15.    Like other franchisors, Blimpie leases the properties that will house its franchises; it then turns around and subleases the property to its franchisees for their use as a Blimpie restaurant. Blimpie does this through an affiliated company.

**The Dispute**

16.    In 2002, the HSCDC was in the process of redeveloping property located at 8th and H Streets, N.E., Washington, D.C. This redevelopment project consisted of demolishing the existing structure and replacing it with a commercial building. The HSCDC soon located a potential suitor for the location, Blimpie. On August 26, 2002, Blimpie entered into a lease for property described in the lease as "Retail Center, 8th and H Streets, N.E., Washington, D.C. 20002" (the "Leased Premises").

17.    Before executing the lease, however, Blimpie learned that there was significant local opposition to using the Leased Premises for a fast food restaurant. In fact, local individuals and advisory groups were adamantly opposed to the opening of another fast food restaurant on H Street. One of the primary voices in this debate was the local Advisory Neighborhood Commission (the "ANC"), i.e., ANC 6A.

18.     The opposition to Blimpie was so strong, that on June 12, 2002, two months before signing the lease for the Leased Premises, representatives of Defendants, including Peter DeCarlo, one of the founders of the Blimpie System (who was then, upon information and belief, the Chief Executive Officer of Blimpie's licensor), appeared before the ANC 6A's Zoning and Licensing Committee. The goal of this meeting was to address community concerns regarding the use of the Leased Premises as a fast food restaurant.

19.     During this two and a half hour meeting, Mr. DeCarlo discussed with those in attendance the reasons to allow the use of the space by Blimpie. In response, those in attendance voiced their concerns of why the Leased Premises should not be used as a fast food restaurant such as Blimpie. The reasons for opposition included the fact that the Leased Premises were not actually zoned for use as a fast food restaurant; in order to operate there, a fast food restaurant would need to get an exemption, which those in attendance stated they would oppose.

20.     At this meeting, Mr. DeCarlo, in defending Blimpie's plans, admitted that Blimpie was a fast food restaurant, stating:

> I go where we can succeed..., where I don't see 15 brand-name stores competing for your fast-food dollar.

See, Annys Shin, Is H Street Too Good For Blimpie?, Washington City Paper, June 21, 2002, attached hereto as Exhibit A.

21.     Also in attendance at this meeting was Bill Barrow, Executive Director of the HSCDC.

22.     Blimpie apparently ignored the fact that the Leased Premises could not, without an exemption, be used as a fast food restaurant. On or about August 26, 2002,

the Sublessor entered into a lease with the HSCDC for the Leased Premises. Soon thereafter, the Sublessor subleased the Leased Premises to Munni Enterprises, Inc. ("Munni Enterprises"), who also signed a guaranty of the sublease in favor of the HSCDC. Munni Enterprises also executed a franchise agreement, which provided for the operation of a Blimpie franchised restaurant that could only be located at the Leased Premises.

23. Subsequently, the HSCDC constructed the building that was to include the Leased Premises, which was completed in September 2003. However, after construction was completed, Munni Enterprises was either unable or unwilling to open a Blimpie franchised restaurant at the Leased Premises. Thus, Munni Enterprises did not "build out" the Leased Premises for use as a Blimpie restaurant, and never applied to the responsible agency for a certificate of occupancy. Accordingly, there was no reason for the ANC or anyone else to contest Munni Enterprises' franchise agreement or sublease.

**The Plaintiffs' Involvement**

24. In early 2004, Plaintiffs Chandar Ratnam and Asha Chandar began investigating franchise opportunities. Lacking business experience outside their chosen field, i.e., the computer industry, they were interested in owning a franchise to take advantage of what they perceived would be organizational experience a franchise would provide.

25. They soon identified Blimpie as a possible franchise in which to invest. According to Blimpie's website, Blimpie would provide significant assistance to

franchisees, including the following:

Financial Support
BLIMPIE is the second largest sub sandwich chain. This may help you acquire financing from third party sources for your restaurant; but the BLIMPIE power does not end there.

Real Estate and Construction Support
We'll work with you as you negotiate a lease, provide you with design tips for your restaurant, and guide you to the right equipment and subcontractors for construction. We put the knowledge of having helped open over 2,000 restaurants right at your fingertips. [Emphasis added.]

Operational Support
BLIMPIE franchisees receive training both in the store and at BLIMPIE University in New York City at the BLIMPIE Franchise Support Headquarters. Before and after you open your store, we'll be there on national, regional, and local levels with everything you'll need to run a BLIMPIE restaurant....

26.    Intrigued with the opportunity, Chandar Ratnam and Asha Chandar completed an on-line application on the Blimpie website. Soon thereafter, they were contacted by Leslie Gardner. Upon information and belief, Ms. Gardner is an employee of the subfranchisor. At that time, however, Plaintiffs Chandar Ratnam and Asha Chandar were not aware that Leslie Gardner was not an employee of Blimpie. In fact, Plaintiffs did not learn until training at Blimpie's training center that Ms. Gardner was an employee of another entity, and that D.C.B.G., Inc. was the subfranchisor of Blimpie.

27.    At their first meeting, Ms. Gardner provided the Plaintiffs a copy of a Blimpie Uniform Franchise Offering Circular ("UFOC").

28.    A UFOC is the disclosure statement that is required by both federal and many states' laws to be delivered to prospective franchisees prior to the sale of a franchise. A UFOC is required to contain truthful information about a franchise that can be relied upon by a prospective franchisee in making a decision to purchase a franchise.

29.    Blimpie's UFOC contained several representations concerning Blimpie's obligations to perform a site selection analysis for franchisees. Specifically, the franchise agreement contained in the UFOC, which was identical to the agreement Plaintiffs later signed, stated that Blimpie was obligated to "approve the Location of Operator." The scope of this obligation was further defined in Item 11 of the UFOC as follows:

> Prior to the opening of the Blimpie restaurant to the public, Blimpie (or its designees) are required by the Franchise Agreement to provide the following assistance and services to you:
>
> Site selection is your sole responsibility. Although it is your responsibility to locate the premises for the establishment of your Blimpie restaurant, <u>Blimpie will approve the proposed location whether found by you, or another person or entity, provided such location meets Blimpie standards.</u> . . . .
>
> \* \* \*
>
> It is solely your obligation to locate the approved Blimpie Restaurant site. <u>Blimpie will approve the site for your Blimpie restaurant after analysis of the site, taking into consideration the proposed rental, population mixture, geographic area, including climate and applicable business hours, and any other facet of the particular location which would affect the possibilities of success or failure.</u> Approval of your location by Blimpie shall not be interpreted as guarantee of success. Your ultimate decision as to acceptance or rejection of any site is your business risk.
> [Emphasis added.]

30.    Ms. Gardner provided Plaintiffs information on a few locations that were available in the Washington, D.C. area to rent from Blimpie for use as a fast food restaurant. One of these locations was the H Street site that Munni Enterprises had rented from Defendants, i.e., the Leased Premises. It was explained to Plaintiffs that Munni Enterprises wanted to sell its interest in the location.

31.    Based on Ms. Gardner's representations, and the statements made in the UFOC, Plaintiffs Chandar Ratnam and Asha Chandar decided to become Blimpie franchisees. They formed Plaintiff Chans Foods, Inc. and executed the Sublease with the

Sublessor (attached hereto as Exhibit B), and Franchise Agreement with Blimpie (attached hereto as Exhibit C), both of which provided that Plaintiffs could only open and operate a Blimpie franchise at the Leased Premises. In addition, Plaintiffs Chandar Ratnam and Asha Chandar also signed the April 28, 2004 Guaranty (the "Guaranty") in favor of the HSCDC.

32.     Plaintiffs also signed another franchise agreement to operate a Noble Romans' Pizza franchise from the Leased Premises, with Blimpie's authorization and approval; Noble Romans is a separate franchise system with whom Blimpie allowed its franchisees to co-brand. Thus, Plaintiffs would operate both franchises from the Leased Premises.

33.     At no time did the Defendants ever inform Plaintiffs that the Leased Premises were not zoned for use as a fast food restaurant, that Defendants had knowledge of local opposition to the use of the Leased Premises as a fast food restaurant, and that Blimpie had not performed, or had not reasonably performed, a site selection analysis prior to executing the Sublease with Plaintiffs.

34.     After signing the Franchise Agreement and Sublease, Plaintiffs took possession of the Leased Premises and began the construction process. At no time did any of the Defendants provide Plaintiffs with instruction on how best to build-out and/or construct the Leased Premises to make the Leased Premises compliant with the zoning regulations. Plaintiffs spent over three hundred and sixty thousand dollars ($360,000) to build out the Leased Premises for use as a Blimpie and Noble Romans restaurant.

35.     When construction was nearing completion, the Plaintiffs applied for, and were granted, the May 19, 2004 certificate of occupancy (the "Certificate of Occupancy")

by the District of Columbia's Department of Consumer and Regulatory Affairs (the
"DCRA"). Their stated use on the Certificate of Occupancy was as a fast food restaurant.
Plaintiffs opened for business on May 22, 2004.

36.    Soon thereafter, Plaintiffs received notice from the DCRA that an
objection had been filed to the Certificate of Occupancy by the ANC. Plaintiffs
contacted the Subfranchisor's Director of Operations, Jeffrey Garner, who informed
Plaintiffs that their Certificate of Occupancy should not have said the intended use was as
"fast food" restaurant, but instead should have said the intended use was as a "deli." Mr.
Garner said that an attorney from Blimpie would be in attendance at the first hearing on
the appeal of the Certificate of Occupancy.

37.    Mr. Garner later admitted, in a September 14, 2004 email, that Defendants
knew about the local opposition at the meeting held in June 2002, but claimed that
Defendants believed the matter had been resolved.

> The meeting you speak of was over a year and a half ago. At that
> meeting no one told us that Blimpie was not allowed to go in this
> location. Nothing was mentioned to you because, we did not know
> that there had been any objections...You need to understand that
> Blimpie didn't know that there had been an objection to us going
> into this location, after that meeting we were under the impression
> that everything had been resolved.

Jeffrey Garner's September 14, 2004 Email, attached hereto as Exhibit D.
See infra, paras. 18 - 20.

38.    The DCRA held a hearing on the issue of whether or not the Certificate of
Occupancy was issued in error on October 12, 2004. The Plaintiffs attended this hearing,
but Blimpie did not send a representative to attend. On June 14, 2005, the DCRA granted
the appeal of the Certificate of Occupancy, and held essentially that the Certificate of
Occupancy had been granted in error. (The DCRA's Order is attached hereto as Exhibit

E). The DCRA subsequently informed Plaintiffs that the Certificate of Occupancy had been revoked, and therefore they could no longer operate the Leased Premises as a fast food restaurant.

39.     After being advised that an appeal of the DCRA's Order would likely take six to nine months, during which time they would not be allowed to operate, Plaintiffs decided to cease doing business at the Leased Premises, and closed their doors on August 6, 2005.

40.     On or about December 1, 2005, Plaintiffs surrendered possession of the property to the Defendants. Plaintiffs provided the keys to the Leased Premises to the HSCDC.

41.     On or about December 22, 2005, the HSCDC filed a Complaint against the Plaintiffs in the Landlord Tenant Branch of the Superior Court of the District of Columbia, action no. 045523-05, seeking possession of the Leased Premises.

42.     In the time that they operated their Blimpie restaurant, Plaintiffs experienced operating losses of over one hundred seventy thousand dollars ($170,000); these losses are separate from, and in addition to, the amounts Plaintiffs invested in building out the Leased Premises. Plaintiffs have also lost other amounts due to their purchase and investment in their Blimpie franchise, and have suffered severe emotional and physical distress due to the financial losses they have suffered.

## DEFENDANTS' REPRESENTATIONS TO PLAINTIFFS

43.     Prior to signing their franchise agreements, Blimpie was required, by federal and the law of some states, to provide each prospective franchisee a UFOC, which made certain disclosures about Blimpie and the franchise. The information contained in

12

Blimpie's UFOC was required, under both federal and state law, to be accurate, complete, truthful, and not misleading, so that prospective franchisees could rely upon it when deciding to purchase a franchise. In addition to the representations made in the UFOC, Defendants made omissions of material fact, the absence of which convinced Plaintiffs to sign the Franchise Agreement and Sublease. Defendants' pre-signing material representations and omissions included the following:

    i.    Defendants omitted telling Plaintiffs that the Leased Premises were not zoned for use as a fast food restaurant such as Blimpie;

    ii.    Defendants omitted telling Plaintiffs that Defendants had knowledge that there was neighborhood opposition to the use of the Leased Premises as a fast food restaurant based on the zoning of the Leased Premises;

    iii.    Blimpie represented in its UFOC and Franchise Agreement that it would perform a site analysis on the Leased Premises to determine its suitability as a Blimpie's franchise; and

    iv.    Blimpie omitted telling Plaintiffs that it either had not performed a site selection analysis or, considering Blimpie's knowledge of the facts regarding the Leased Premises, had not reasonably performed a site selection analysis, prior to executing the Sublease and Franchise Agreement with Plaintiffs.

## PLAINTIFFS' RELIANCE

44.    In reliance upon the representations and omissions made by Defendants, Plaintiffs signed the Franchise Agreement, the Sublease and the Guaranty and paid Blimpie an initial franchise fee. See Exhibit D, Franchise Agreement, ¶ 1.1. Plaintiffs also spent additional amounts to outfit and open their Blimpie store, investing over $360,000.

13

45.     Plaintiffs also agreed to pay Blimpie a continuing franchise fee of 6% of gross revenues and a weekly advertising fee of 3%. (Exhibit D, Franchise Agreement, ¶¶ 6.1, and 9.1.1).

## THE FALSITY OF DEFENDANTS' REPRESENTATIONS

46.     After becoming Blimpie franchisees and opening their Blimpie restaurant, Plaintiffs discovered the truth about many of the representations made by Defendants. In particular:

    i.  Defendants had actual knowledge that the Leased Premises was not zoned for use as a fast food restaurant such as Blimpie;

    ii.  Defendants had actual knowledge that there was local opposition to the use of the Leased Premises as a fast food restaurant based on the zoning of the Leased Premises;

    iii.  Blimpie either did not perform a site selection analysis of the Leased Premises, or, considering Blimpie's knowledge of the facts regarding the Leased Premises, had failed to reasonably perform its obligation to perform a site selection analysis.

47.     As a result of the material misrepresentations and omissions by Defendants, Plaintiffs entered into the Franchise Agreement, Sublease and Guaranty upon false pretenses, and purchased and invested in a franchise that did not conform to the representations that had been made to them. Plaintiffs, as a result, have suffered substantial damages because the franchise they purchased was not as represented and Plaintiffs are therefore entitled to rescind the Franchise Agreement, Sublease, and Guaranty, and to recover the present value of their lost investment, so that they are returned to the same position they would be in had they never become Blimpie franchisees. Plaintiffs are therefore prepared to tender everything of value that they received under their Franchise Agreement and Sublease to Defendants.

14

## BREACHES OF CONTRACT AND OTHER DUTIES

48.     Blimpie has materially breached contractual and other legal obligations to the Plaintiffs that have caused damages to them.  Blimpie's material breaches of its contractual duties to Plaintiffs include Blimpie's failure to not perform a site selection analysis of the Leased Premises, or, considering Defendants' knowledge of the facts regarding the Leased Premises, perform its obligation to perform a site selection analysis in a reasonable manner.

49.     As a result of the breaches of contract by Defendants, Plaintiffs have suffered substantial damages, and Plaintiffs are therefore entitled to rescind the Franchise Agreement and Sublease and to recover the present value of their lost investment, so that they are returned to the same position they would be in had they never become Blimpie franchisees.  Plaintiffs are therefore prepared to tender everything of value that they received under their Franchise Agreement and Sublease to Defendants.

### COUNT ONE
### VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT §§ 28-3901, ET SEQ. AGAINST DEFENDANTS

50.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

51.     Under the terms of the applicable law of the District of Columbia, Plaintiffs are "persons". D.C. Code Ann., § 28-3904 (a) (1).

52.     Under the terms of the applicable law of the District of Columbia, Plaintiffs are "consumers". D.C. Code Ann., § 28-3904 (a) (2).

53.     Under the terms of the applicable law of the District of Columbia, the Franchise Agreement, the Lease, Sublease and Guaranty are "goods and services". D.C. Code Ann., § 28-3904 (a) (7).

54.     Under the terms of the applicable law of the District of Columbia, the sale and/or execution of the Franchise Agreement, Lease, Sublease and Guaranty by Defendants to Plaintiffs is a "trade practice". D.C. Code Ann., § 28-3904 (a) (6).

55.     Further, under the applicable law of the District of Columbia, it is unlawful for Defendants to engage in, *inter alia*, the following unlawful trade practices:

    i.   Represent that goods or services are a particular standard, quality, grade, style, or model, if in fact they are of another;

    ii.  Misrepresent as to a material fact, which has a tendency to mislead;

    iii. Fail to state a material fact if such failure tends to mislead; and

    iv.  Represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

D.C. Code Ann., § 28-3904 (d)-(f), (u).

56.     Defendants willfully and intentionally violated the law of the District of Columbia by engaging in the following unlawful trade practices:

    i.   Defendants omitted telling Plaintiffs that Defendants knew that the Leased Premises were not zoned for use as a fast food restaurant such as Blimpie;

    ii.  Defendants omitted telling Plaintiffs that Defendants had knowledge that there was neighborhood opposition to the use of the Leased Premises as a fast food restaurant based on the zoning of the Leased Premises;

16

    iii. Blimpie represented in its UFOC and Franchise Agreement that it would perform a site analysis on the Leased Premises to determine its suitability as a Blimpie franchise, and either did not perform a site selection analysis or, considering Blimpie's knowledge of the facts regarding the Leased Premises, failed to reasonably perform a site selection analysis prior to executing the Sublease and Franchise Agreement.

57.    Under the applicable law of the District of Columbia, and as a result of Defendants' unlawful conduct, Plaintiffs are entitled to recover treble damages, punitive damages, and attorneys' fees. D.C. Code Ann., § 28-3905 (k).

58.    The precise amount of Plaintiffs' damages cannot now be determined with precision; a more precise amount to which Plaintiffs are entitled will be presented at a trial on the merits of this matter.

## COUNT TWO
## COMMON LAW FRAUD AGAINST DEFENDANTS

59.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

60.    Defendants made false and material misrepresentations and omissions of fact to the Plaintiffs, as set forth above. Defendants made such statements and material omissions knowing that they were false and intending that Plaintiffs rely upon them in deciding to enter into the Franchise Agreement with Blimpie and to invest hundreds of thousands of dollars in a franchise, to enter into the Sublease, and to personally guaranty the Sublessor's performance in favor of HSCDC.

61.    Plaintiffs reasonably relied upon the false representations and material omissions of Defendants in making the decision to enter into their contacts and invest in a Blimpie franchise as described more fully above.

17

62. As a result of the Plaintiffs' reliance upon the false representations of Defendant, Plaintiffs have lost hundreds of thousands of dollars.

63. Plaintiffs are entitled to rescind the Franchise Agreement, Sublease, and Guaranty, and to recover from Defendants their rescission damages, consisting of the total of the amount invested in the franchise by Plaintiffs, their operating business losses, the cost of the leasehold improvements, and the amount invested in mitigating damages, less the consideration received from Defendants and any other benefits received from the franchise as well as the salvage value of the assets, plus interest.

## COUNT THREE
## NEGLIGENT MISREPRESENTATION AGAINST DEFENDANTS

64. Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

65. Defendants identified above had a duty to use reasonable care in making representations and statements to prospective and new franchisees and to take reasonable care to ensure that such statements and representations were not false or misleading.

66. Defendant breached their duty of care to Plaintiffs by making false and misleading representations and material omissions as set forth above.

67. Plaintiffs reasonably relied upon the false representations and material omissions of Defendants in making the decision to enter into their contacts and invest in a Blimpie franchise as described more fully above.

68. Plaintiffs are entitled to rescind the Franchise Agreement, Sublease, and Guaranty, and to recover from Defendants their rescission damages, consisting of the total of the amount invested in the franchise by Plaintiffs, their operating business losses, the cost of the leasehold improvements, and the amount invested in mitigating damages,

18

less the consideration received from Defendants and any other benefits received from the franchise as well as the salvage value of the assets, plus interest.

## COUNT FOUR
### BREACH OF CONTRACT AND THE
### COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS

69. Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

70. In every contract, by operation of law, there is an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing in the trade. The implied covenant also prohibits either party from engaging in any conduct or in doing anything that deprives the other party of the fruits of the agreement or the benefit of the bargain. The implied covenant requires that Defendants act reasonably in the performance of their duties, and, among other things, refrain from engaging in conduct that would cause Plaintiffs to operate at a loss or to take actions that would cause Plaintiffs' businesses to fail.

71. Defendants have breached their express contractual duties and the implied covenant of good faith and fair dealing to Plaintiffs by violating the terms of the parties' agreements, and Plaintiffs' reasonable expectations of Defendant's performance, support, and assistance as prescribed under the Franchise Agreement and as described more fully above.

72. As a direct and proximate result of these breaches of contract and the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount undetermined at this time, but which will be demonstrated at trial.

## COUNT FIVE
## UNJUST ENRICHMENT AGAINST DEFENDANTS

73. Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

74. Defendants have been unjustly enriched at Plaintiffs' expense by taking the actions described above to induce Plaintiffs to agree to execute the Franchise Agreement, the Sublease and Guaranty, and then collecting both rent payments and franchise fees from Plaintiffs.

75. Defendants' acquisition of these amounts constitutes unjust enrichment, and the Plaintiffs are entitled to recover from Defendants the amounts by which they have been unjustly enriched.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment:

A. Rescinding the Franchise Agreement, Sublease, and Guaranty;

B. Enjoining Defendants' continued violation of the applicable consumer protection act;

C. Awarding rescission damages consisting of the amount that they have invested in the franchise (including leasehold improvements), less consideration received and the salvage value of the franchise;

D. Awarding such compensatory, consequential and incidental damages as the Plaintiffs have suffered, including treble damages and punitive damages pursuant to the District of Columbia's Consumer Protection Procedures Act; and

E. Awarding attorneys' fees and costs, interest, such other and further relief as this Court deems just and proper.

20

Respectfully Submitted,

Dated: _____ 31 , 2006.          By: _____
                                      Joseph Horn, Esq.
                                 Attorney Bar No. 418448
                                 Horn Legal, PLLC
                                 1730 Rhode Island Avenue,
                                 Suite 1208
                                 Washington, D.C. 20036
                                 202 321 0084
                                 202 835 1557

                                 - and —

                                 Scott Korzenowski, Esq.
                                 William S. Fulton, Jr., Esq.
                                 4000 IDS Center
                                 80 South Eighth Street
                                 Minneapolis, Minnesota 55402
                                 (612) 359-9000

                                 ATTORNEYS FOR PLAINTIFFS


### JURY DEMAND

Plaintiffs demand trial by jury.

_____
Joseph P. Horn
Attorney for Plaintiff

21

# ARCHIVE

## Washington City Paper

## District Line

### From the June 21, 2002 issue.

### Sub Par

### Is H Street too good for Blimpie?

### By Annys Shin

Is H Street too good for Blimpie?

Illustration by Chad Martin

**June 21, 2002**

**1559 words.**

At the southwest corner of 8th and H Streets NE, there's a fenced-in vacant lot, lightly covered in rubble, with a few weeds poking out. It's an eyesore, but neighborhood residents and business owners say there's something worse coming to the site: a Blimpie sub shop.

The news of the sandwich chain's arrival is being met with the kind of ire usually reserved for halfway houses and adult-video parlors. At a June 4 D.C. Council hearing, Ward 6 Councilmember Sharon Ambrose introduced emergency legislation to stop the planned shopping development, which is also supposed to include a Foot Locker and a Shoe City.

Armed with a packet of constituent letters, Ambrose denounced the project as a misuse of public funds and a betrayal of community-planning priorities. When At-Large Councilmember Harold Brazil led a successful counterattack defending the chain, the anti-Blimpites dubbed him "Harold 'Blimpie's' Brazil" and accused him of being bought by the meatball-sub lobby.

"It is hardly the kind of place that you'd take your parents to dinner," sniffs resident Richard Layman.

All that the founders of Blimpie wanted to evoke was airships, according



EXHIBIT

A

to the company's Web site. Back in 1964, the story goes, high school pals Tony Conza, Peter DeCarlo, and Angelo Baldassare decided that the thickly stuffed sandwiches they were selling in Hoboken, N.J., looked like blimps, and the brand was born.

A brand identity, though, is a tricky thing to control. McDonald's has seen its "Mc-" prefix come to connote soulless prefabrication. Wal-Mart's name has become linked not only with a smile and a bargain but with all-consuming sprawl.

And Blimpie—with its wallpaper depicting schlubby customers and its penchant for mixing guacamole and mustard—has come to seem decidedly downscale. In a neighborhood where commercial development hasn't kept pace with the influx of affluent homesteaders, that's too much for some residents to bear.

As upwardly mobile H Streeters see it, the thoroughfare already has too many fast-food establishments. A McDonald's sits near the corner of 8th and H, as do two locally owned carryouts that sell subs and Chinese food. It's also true that sneakers are easy to come by in the area: A Sports Zone already occupies another corner of 8th and H Streets NE, and down the street is a Downtown Locker Room. But Blimpie, more than Foot Locker or Shoe City, has borne the brunt of the attacks.

Adding the sub shop and shoe stores to the intersection "will not add prestige to the street," says Shannon Salb, who's lived on G Street NE for the past six years. Nor, he says, will it attract other new businesses.

When he talks about putting something else on the site, though, he doesn't mention replacing Shoe City with Kenneth Cole. Instead, he focuses on eating and drinking, on the prospect of "a high-end chain like Starbucks or Xando." A coffee shop, he adds, would go nicely with the newly opened H Street Playhouse and the soon-to-be renovated Atlas Theater.

Anwar Saleem, president of the H Street Merchants Association, says he, too, would prefer a Starbucks, which he says offers "a better name brand" than Blimpie and "better food."

"Blimpie's doesn't even rate against Subway," he says.

So Saleem and Ambrose met with Starbucks executives earlier this month, hoping to woo them to the neighborhood. "I think having a Starbucks would make a statement about H Street," Ambrose says.

Unfortunately, that statement wouldn't be true. As far as the lords of the

latte are concerned, H Street is not a Starbucks kind of place. In their meeting with Ambrose and Saleem, Saleem says, company reps said that H Street needs "more work on infrastructure and streetscaping and a better mix of businesses." According to other officials at the meeting, Starbucks also thought the street was too dirty and unsafe.

Given the history of the site, it's hard to see why H Street boosters are being so choosy. Neighboring businesses include Super Nails, Check N Go, and the J&V Pawn Shop. For years, the corner was occupied by a collection of dilapidated buildings. In 1997, the city gave the H Street Community Development Corporation (CDC) federal funds to buy the land and then demolish the buildings, over the protests of historic-preservation-minded residents. Two million dollars later, it was a vacant lot.

After the mayor's office in April designated H Street part of its Main Streets revitalization program, the locals started dreaming of better things; instead, the CDC unveiled plans for two shoe stores and a Blimpie.

To the uplift-H Street crowd, the city seems to be working at cross purposes, lending them support with one hand and undermining them with the other. "This is not about Blimpie," Ambrose says, referring to the current controversy. "It's about the appropriateness of any fast-food place--Blimpie, Subway, McDonald's, whatever--on that corner, anywhere on the street, given the goals of the Main Streets program and the kind of planning that has been going on."

But is food served fast really the problem? It's hard to picture anyone kicking up a similar fuss over the arrival of a fancy fast-food chain such as Chipotle or Panera. Substantively speaking, Blimpie Director of Marketing Ron Feigenbaum points out, even a Starbucks is basically a Blimpie with cocoa sifters.

"We are in the quick-serve restaurant category, as is Starbucks," Feigenbaum says. "It's perception, not reality. It's like Tiffany's and Zales: Both are selling diamonds."

But perception--"brand prejudice," Feigenbaum calls it--rules. Audrey Hepburn didn't go to Zales. Blimpie's slogan may be "the freshest of everything," and it may tout Mediterranean flatbread and dolphin-safe tuna, but it still conjures images of rest stops and shopping-mall food courts.

Its far bigger rival, Subway, has managed to reinvent itself as a wholesome dining experience, thanks to a national TV campaign

featuring formerly overweight student pitchman Jared Fogle. Subway, though, has the financial muscle that comes with having 16,000 franchises worldwide; Blimpie has only 2,500. And it's not so easy to pitch healthy eating when you're named "Blimpie."

So on June 13, in a hands-on bit of image maintenance, Blimpie co-founder and CEO DeCarlo rushed down from New York for a neighborhood zoning meeting, bearing two trays of freshly made subs. Blimpie franchises, DeCarlo told the crowd, boast addresses in "prestigious office buildings" and "affluent suburbs." Only the best materials, he said, go into building each Blimpie: "marble floors, beautiful laminates, and custom-printed vinyls."

Blimpie foes were unimpressed. They barely picked at the subs (though they did make a big dent in DeCarlo's supply of baked potato chips and Doritos), as the Blimpie discussion stretched on for two-and-a-half hours. And they didn't much warm to the idea of the new sub shop.

"How did your market research justify another carryout on H Street?" demanded resident Leslie Thompson.

"I go where we can succeed," DeCarlo replied, "where I don't see 15 brand-name stores competing for your fast-food dollar."

"We don't want to see our H Street be a fast-food strip," Thompson retorted.

The choice confronting the neighborhood, though, isn't between a fast-food strip and an upscale shopping district: It's between a fast-food strip and a strip full of nothing. Given those options, the H Street CDC is going for Blimpie, even if the neighbors think it isn't classy enough.

Some residents can't get over that symbolism. "I'd like to see a better mix of retailers," Saleem complains, "something that's right for the neighborhood 10 or 15 years from now. What message are we sending our kids--that our neighborhood is all about athletic footwear, beauty products, and carryouts?"

The message, in fact, would be that the neighborhood isn't dead to commerce. So there's no Starbucks mermaid smiling down on H Street NE, the way there is on U Street NW, Connecticut Avenue NW, and Wisconsin Avenue NW. Unlike Starbucks, Blimpie is planning to franchise to a D.C. resident, keeping profits in the neighborhood.

A gourmet-coffee outlet wouldn't bring prosperity, only the appearance of prosperity. Blimpie foes seem to believe that the sound of steam

rushing out of an espresso machine will be a siren call to consumers and investors alike.

Actually, the opposite is true: In D.C., chain coffee stores aren't pioneers of urban renewal; they tend to follow development rather than spark it. Starbucks agreed to enter Columbia Heights only recently, with the development of the Tivoli Theatre. Starbucks is also planning to open a store in a strip mall on upper Georgia Avenue NW, according to news reports. The chain became more interested in the blighted corridor once Discovery Communications began building a headquarters just over the District line in Silver Spring.

Starbucks suits have their own philosophy about location selection. They like to pick spots they call "third places"—the "first" being home, the "second" being work, and the "third" being some comfortable place in between. H Street, as far as Starbucks executives are concerned, ranks fourth or lower.

But Blimpie wants to be there. Who cares if it brings cachet to go with its cappicola subs? If it makes it, more brand-name outlets may follow. Ultimately, the place may be more welcoming for the sorts of retailers that the anti-Blimpites want.

"Having a value-oriented business doesn't blight a neighborhood," Feigenbaum says. "I don't think there's a neighborhood we can't fit into—brand prejudice aside." **CP**

Art accompanying story in the printed newspaper is not available in this archive: Illustration by Chad Martin.

*Archive Comments? Send them here.*

### CityPaper

- Classifieds
- Employment
- Personals
- Restaurants
- Showtimes
- Music, Arts & Events Listings

---

- City Lights
- Cover Story
- Loose Lips
- Dept. of Media
- inD.C.
- Back Issues

Copyright © 2005 Washington Free Weekly Inc.



## SUBLEASE

AGREEMENT OF SUBLEASE dated April _28_, 2004, made between 2001 B.A. REALTY INC., a New York corporation with offices c/o Blimpie Associates, Ltd., Seven Penn Plaza, 17th Floor, New York, New York 10001 as landlord (hereinafter "Landlord") and CHANS FOODS INC., a District of Columbia corporation with an address at 14110 Gabrielle Way, Centreville, Virginia 20121 as tenant (hereinafter "Tenant").

### W I T N E S S E T H

Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the premises known as Retail Center, 8th and H Streets, N.E., Washington, D.C. 20002 ("Premises"), as more particularly described in the lease dated August 26, 2002, made between H Street Community Development Corporation, Inc., as landlords, and Landlord, as tenant (hereinafter referred to as the "Major Lease"), for a term of years, commencing on the date hereof and terminating, as set forth in Section 2 hereof, upon the payment of all the sums required to be paid under the Major Lease and hereunder, all without any offset or deduction whatsoever.

NOW, THEREFORE, it is agreed:

1.      The interest of the Landlord in the Premises is as the Tenant under the Major Lease. This Sublease and the leasehold created hereby are subject and subordinate to the terms, covenants and conditions of the Major Lease. Tenant agrees to pay to the Landlord under the Major Lease all rentals and additional rentals provided for therein, as more particularly described and provided for in the Major Lease, at the office of Landlord or at such place or to such agent as the Landlord may designate, subject to the terms of this Sublease.

2.      Each and every term of the Major Lease is hereby incorporated into this Sublease with like effect as if herein set forth in full, except to the extent inconsistent with the terms of this Sublease, and as so incorporated the words "landlord" and "tenant" contained in the Major Lease shall be deemed to apply to Landlord and Tenant under this Sublease. This Sublease shall terminate one (1) day prior to the expiration of the Major Lease, including any extensions thereof, unless sooner terminated as provided herein.

3.      Tenant may only use and occupy the Premises as a franchised Blimpie sandwich restaurant and for no other purpose. Tenant may only offer for sale Blimpie authorized products, and any other items that may be authorized in writing by the Landlord. Tenant may only install equipment in the Premises approved and authorized in writing by Landlord.

1

EXHIBIT

B

4.   Upon default by the Tenant herein (a) in the payment on their due date of any of the rentals and additional rentals payable under this Sublease, including, without limitation, any and all rentals and additional rentals payable pursuant to the Major Lease, or in the performance of any of the terms, covenants or conditions of the Major Lease and/or this Sublease, and the continuance of any such default beyond the expiration of any grace period provided under the Major Lease; or (b) of any term, covenant, or condition of the Blimpie Franchise Agreement hereinafter described, beyond cure period provided therein, the Landlord herein shall have the right and privilege of canceling this Sublease on ten (10) days notice, in writing to the Tenant, by certified mail, addressed to Tenant at the Premises. Upon the expiration of such ten (10) day period, the term of this Sublease shall cease in the same manner as if such date were herein expressly specified for the termination of the demised term, and the Landlord herein shall have the right to recover immediate possession of the Premises by summary proceedings or otherwise, the said Tenant in such event being, and being deemed to be, a holdover tenant.

5.   Notwithstanding any provision of the Major Lease to the contrary, Tenant shall not have the right to assign this Sublease or to sublet the Premises or any part thereof, or to license or permit the use of any part thereof by others, whether by operation of law or otherwise, without the prior written consent of Landlord. Any transfer of the corporate stock of Tenant shall be deemed an assignment of this Sublease requiring the Landlord's consent, as contained in this Section.

6.   Notwithstanding anything to the contrary contained in this Sublease, Landlord shall not be liable to Tenant, its permitted successors, assigns or subtenants, with respect to any of the affirmative covenants to be performed by Landlord under this Sublease by reason of the incorporated provisions of the Major Lease, or otherwise.

7.   Tenant agrees that, notwithstanding anything contained in this Sublease to the contrary, it will look solely to the estate and property of the Landlord in the land and building of which the Premises are a part for the satisfaction of Tenant's remedies for the collection of a judgment or other judicial process requiring the payment of money by Landlord, in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Sublease to be observed and/or performed by Landlord, if any, and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies, if any, and any principal or principals, disclosed or undisclosed, and all of the officers, directors and stockholders of the Landlord, in their individual capacity, and the Landlord, its successors and assigns, are hereby released from any liability pursuant to this Sublease, except Landlord's obligations to deliver possession of the Premises, as provided hereunder, and not to commit a breach under the Major Lease.

8.   Tenant does hereby assume the prompt and punctual payment of all rents and additional rentals payable pursuant to the terms of the Major Lease and does hereby further assume and agree to perform all the terms, covenants and conditions of the Major Lease, and hereby agrees to defend and indemnify and save Landlord, Landlord's agents, the landlord under the Major Lease and the landlord under any underlying lease harmless, burdened from all loss, cost, liability, claims, damage and expenses, including without limitation, reasonable attorneys' fees, penalties and fines, incurred in connection with or arising from (a) any default by Tenant in

the observance or performance of any of the terms, covenants or conditions of this Sublease and/or the Major Lease on Tenant's part to be observed or performed, and (b) the use or occupancy or manner of use or occupancy of the Premises by the Tenant or persons claiming through or under Tenant, and (c) any acts, omissions, or negligence of Tenant or any such person, or of contractors, agents, servants, employees, visitors or licensee's of Tenant, or any such person, in or about the Premises. This covenant shall survive the termination of this Sublease.

9. Tenant agrees, and nothing contained herein shall authorize the Tenant, to attorn to the landlord under the Major Lease, or to execute any agreement which shall modify, cancel or terminate the Major Lease.

10. If Tenant shall default in the performance of any of Tenant's obligations hereunder, Landlord, without thereby waiving such default, may, at Landlord's option, without notice to Tenant, perform the same for the account of Tenant. Landlord may enter the Premises at any time to cure any default. If Landlord makes any expenditures or incurs any obligations for the payment of money, including reasonable attorneys' fees, in instituting or prosecuting or defending any action or proceeding, by reason of any default of Tenant hereunder, such sum paid or obligations incurred shall be deemed to be additional rent and shall be paid by Tenant to Landlord, together with interest at the maximum legal rate, within ten (10) days of rendition of bill to Tenant therefore.

11. Tenant acknowledges that it has read and is fully familiar with the Major Lease. Tenant agrees that it will not take any action (or fail to take any action) which will cause Landlord to be in violation of any term, covenant or agreement contained in the Major Lease.

12. Tenant is hereby authorized and directed and hereby agrees to pay directly to the landlord under the Major Lease the security deposit, rentals and additional rentals provided for in the Major Lease, however, only as the agent for the Landlord. This right shall immediately cease upon Tenant's default in the performance of any term, covenant or condition of this Sublease or upon the written request of Landlord.

13. In the event of any default on the part of Tenant under any of the terms, covenants, provisions or agreements of this Sublease or the Major Lease or any other underlying lease, Landlord shall have the same rights and remedies against Tenant under this Sublease as are available to the landlord under the Major Lease or any other landlord against Landlord under the Major Lease or any of the provisions of any underlying lease. Such rights shall not be exclusive of each other, but inclusive, at the option of Landlord.

14. Whenever Landlord is, in accordance with the provisions of the Major Lease, required to render performance or to give notice to landlord under the Major Lease within a specified time, the period during which Tenant must render such performance or give notice shall, for the purpose of this Sublease, be five (5) days less than such time. However, where such period of time is five (5) days or less pursuant to the Major Lease, Tenant shall render such performance or give such notice as promptly as is possible.

3

19.    If the Major Lease becomes null and void, or is replaced by a new or substituted lease from the landlord under the Major Lease, its successors and assigns, whereby the Tenant assumes or obtains the interest of the tenant under such new or substituted lease, Tenant herein agrees to assign and hereby assigns to Landlord any such new lease procured by it and hereby appoints Landlord, its successors and assigns, as the Tenant's true and lawful attorney in fact, to execute and deliver any and all necessary papers and documents to effectuate the intent of this Paragraph.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement of Sublease, as of the day and year first above written.

LANDLORD:                          TENANT:

2001 B.A. REALTY INC.              CHANS FOODS INC.

By: _____       By: _____
    NICHOLAS LAGANO, JR.               CHANDAR RATNAM
        President                          President

5

# REDACTED

Asha,

The meeting you speak of was over a year and a half ago. At that meeting no one told us that Blimpie was not allowed to go in this location. Nothing was mentioned to you because, we did not know that there had been any objections.
Blimpie will not take over the sole responsibility to resolve this. You need to have a Lawyer on your behalf, and Blimpie has a lawyer on their behalf.

You need to understand that Blimpie didn't know that there had been an objection to us going into this location, after that meeting we were under the impression that everything had been resolved. I don't appreciate the accusation that we put you in there knowing this was going to happen, I think I have tried to help you in every way I can.

On another note, what about the payment of the $1588.00 for the Noble Romans Letters, I faxed you an invoice a couple of days ago. This needs to be addressed before you leave to go to India.

Thanks,

Jeffrey M. Garner
Director of Operations, DCBG Inc.
42764 Jonquil Lane
South Riding, Va. 20152
Cell# (703) 929-4994



12/20/2005

Fax# (301) 843-0310
E-mail: RGNJMG@AOL.COM



12/20/2005



GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT

Appeal No. 17214 of Advisory Neighborhood Commission 6A, pursuant to 11 DCMR §§ 3100 and 3101, from the administrative decision of the Zoning Administrator of the Department of Consumer and Regulatory Affairs. Appellant alleges that the Zoning Administrator erred by issuing a certificate of occupancy permit (No. C76349, dated May 19, 2004) for a 30-seat deli/restaurant. Appellant argues that the actual use of the business is a fast food restaurant as defined by § 199, and regulated by § 733. The C-2-A-zoned premise is located at 721 H Street, N.E. (Square 890, Lot 69).

**HEARING DATE:** October 12, 2004
**DECISION DATE:** November 2, 2004

## ORDER

### PRELIMINARY MATTERS

Advisory Neighborhood Commission ("ANC") 6A ("Appellant") filed this appeal on July 9, 2004, alleging that the Zoning Administrator ("ZA") of the Department of Consumer and Regulatory Affairs ("DCRA") erred in issuing Certificate of Occupancy No. C76349. The certificate of occupancy was issued on May 9, 2004 to "Chans Food, Inc." for a "restaurant." Appellant contends that the establishment for which the certificate of occupancy was issued is, in reality, a "fast food restaurant," as that use is defined by the Zoning Regulations, and not a "restaurant," which is defined differently by the Regulations. If a restaurant, the establishment is a matter-of-right use in this C-2-A zone, but if a fast food restaurant, it requires a special exception.

The subject property is located across the street from the boundary of ANC 6A, the Appellant herein, but is located within ANC 6C, which filed a letter in support of the appeal, as did the Capitol Hill Restoration Society.

The Board heard the appeal on October 12, 2004. The Appellant and DCRA participated in the hearing, as well as a representative of Chans Foods and the lessee of the property.

At its November 2, 2004 decision meeting, the Board decided to grant the appeal by a vote of 5-0-0.

### FINDINGS OF FACT



EXHIBIT
E

BZA APPEAL NO. 17214
PAGE NO. 2

1.  On May 19, 2004, DCRA issued Certificate of Occupancy No. C 76349 to "Chans Foods, Inc." for a "restaurant" at the property which is the subject of this appeal ("subject property.")

2.  The certificate of occupancy incorrectly noted the address of the subject property. It also incorrectly noted the zone district within which the subject property is located as C-4, in which a fast food restaurant is a matter-of-right use. See, 11 DCMR § 751.2[1].

3.  Even after correcting the zone district reflected on the certificate of occupancy to C-2-A, DCRA re-issued the certificate of occupancy for a restaurant, which is also a matter-of-right use in a C-2-A zone. See, 11 DCMR § 721.1.

4.  A fast food restaurant is not a matter-of-right use in a C-2-A zone, but requires a special exception. See, 11 DCMR § 733.

5.  The Zoning Regulations deem any restaurant with a drive-through a fast food restaurant. See, 11 DCMR § 199.1 (definition of "Restaurant, fast food).

6.  The establishment at the subject property does not have a drive-through.

7.  The Zoning Regulations list three other characteristics, the existence of two of which denote an establishment as a "fast food restaurant," as opposed to a "restaurant." These are: (1) whether at least 10% of the total floor space on any one floor that is accessible to the public is allocated and used for customer queuing for self-service for carry out and on-premises consumption, (2) whether at least 60% of food items are already prepared or packaged before a customer places an order, and (3) whether or not the establishment primarily serves its food and beverages in disposable containers and provides disposable tableware. Id.

8.  The Zoning Regulations' definition of "restaurant" specifically excludes a fast food restaurant from the definition.

9.  The queuing area in the establishment at the subject property, when calculated against the publicly accessible floor space, is approximately 231.8 of 907 square feet, or 25.6%. If the queuing area is calculated against the total floor space, it encompasses approximately 231.8 of 1521.1 square feet, or 15.2%. Either way, the queuing area takes up more than 10% of the floor area within the establishment.

---

[1] These errors led to some confusion early on, but they were subsequently corrected, and, at this point, have no bearing on the determination of this appeal.

BZA APPEAL NO. 17214
PAGE NO. 3

10.  Approximately 10 – 15% of the food items offered by the establishment at the subject property are prepared or packaged before a customer places an order.

11.  The establishment at the subject property primarily serves its food and beverages in disposable containers and provides disposable tableware.

## CONCLUSIONS OF LAW

An appeal to the Board may be taken by any person aggrieved by a decision of a District official in the administration and/or enforcement of the Zoning Regulations, including the issuance of a certificate of occupancy. 11 DCMR §§ 3100.2 and 3200.2. The Board's regulations arise out of the authority and jurisdiction conferred upon it by D.C. Official Code § 6-641.07(f) (2001), in accordance with § 8 of the Zoning Act of 1938 (52 Stat. 797, 799, as amended.) For purposes of the Board's regulations, an ANC is considered a "person" which can be "aggrieved" by, and appeal, a decision of a District official in the administration and/or enforcement of the Zoning Regulations.

This appeal turns entirely on the interpretation of the § 199 definition of "Restaurant, fast food," and particularly on the parsing of the meaning of one sentence therein. Therefore, the relevant portion of the definition is set forth in its entirety below, with the pivotal sentence highlighted in boldface type. A fast food restaurant is defined as:

> [A] place of business devoted to the preparation and retail sale of ready-to-consume food or beverages for consumption on or off the premises. A restaurant will be considered a fast food restaurant if it has a drive-through. **A restaurant will be considered a fast-food restaurant if the floor space allocated and used for customer queuing for self-service for carry out and on-premises consumption is greater than ten percent (10%) of the total floor space on any one (1) floor that is accessible to the public, and it exhibits one (1) of the two (2) following characteristics:**
>
> (a)  At least sixty percent (60%) of the food items are already prepared or packaged before the customer places an order; and/or
>
> (b)  The establishment primarily serves its food and beverages in disposable containers and provides disposable tableware.

(Emphasis added.) 11 DCMR § 199.1.

The other definition relevant to this appeal is that of "Restaurant" itself, which specifically states that the term "restaurant," when used in the Zoning Regulations, "shall not include a fast food restaurant." 11 DCMR § 199.1. Therefore, if something is a fast food restaurant, based on the three criteria in the definition of fast food restaurant above, it cannot also be a "restaurant." This is an important distinction because restaurants are matter-of-right uses in all commercial zone districts, whereas fast food restaurants are

BZA APPEAL NO. 17214
PAGE NO. 4

matter-of-right uses beginning only in C-2-B zones and continuing into the less restrictive commercial zone districts. Fast food restaurants are special exception uses in C-2-A zone districts, and therefore, must come before this Board. 11 DCMR § 733.

It was clear in the record that the establishment at the subject property primarily serves its food and beverages in disposable containers and provides disposable tableware, thereby meeting the last criterion, set forth in subparagraph (b), in the definition of fast food restaurant. (See, Exhibit No. 23). The only real question in this appeal is whether the floor space allocated and used for customer queuing for self-service for carry out and on-premises consumption is greater than ten percent (10%) of the total floor space on any one (1) floor that is accessible to the public.

At the hearing, the Chief of the Zoning Division of the Building and Land Regulation Administration ("BLRA") of DCRA testified that, to determine the percentage of floor space used for queuing, DCRA calculated "10 percent of the total area, of the gross floor area dedicated to that use or the leased space." Hearing Transcript, at 254, lines 11-17. As the hearing progressed, it became clear that DCRA interpreted the first criterion in the definition of fast food restaurant by reading the clause "accessible to the public" to modify the phrase "any one (1) floor." Therefore, DCRA determined its 10 percent calculation by taking 10 percent of the total floor space of *that floor that is accessible to the public.* In the subject establishment, there is only one floor and parts of that floor are accessible to the public, therefore DCRA made its 10 percent calculation against the floor area of the entire floor, including all areas accessible to the public and all areas that are not.

The Board, however, disagrees with DCRA's interpretation of the first criterion. The Board agrees with the Appellant that the clause "accessible to the public" modifies the phrase "ten percent (10%) of the total floor space on any one (1) floor." Reading the definition this way means that the 10 percent calculation is made against only the amount of floor space that is accessible to the public on a particular floor. Indeed, this is precisely the interpretation that DCRA itself gives the definition in the "Affidavit Eating Establishment" which DCRA had the lessee complete.[2] According to DCRA, this affidavit is completed whenever there is a question as to whether a restaurant-type use is appropriate in a particular zone district. Under the correct interpretation of the first criterion, the calculation would be 10 percent of the floor space *to which the public has access, i.e.,* including queuing area, seating area, hallways to restrooms, restrooms themselves, and the area immediately inside the front door. The area not accessible to the public would include, for example, the food preparation and storage areas and the area behind the service counter.

---

[2]DCRA's "Affidavit Eating Establishment" asks four questions derived directly from the definition of fast food restaurant in § 199. The second question is: "What percentage of the floor space *that is accessible to the public on any one floor* will be used for queuing for self-service for carry-out or on-premises consumption?" (Emphasis added.) This rendition of the question is consistent with the Board's interpretation of the first criterion.

**BZA APPEAL NO. 17214**
**PAGE NO. 5**

DCRA also misinterpreted the first criterion to mean that only the customer queuing area must be more than 10 percent of a certain floor space. DCRA misread the phrase "queuing area" to mean both queuing area for carry out and queuing area for on-premise consumption. The Board disagrees and interprets the language to mean that the 10 percent calculation must be made including, as separate measurements, both the queuing area and the area for on-premise consumption. Simply put, if the total floor space for either customer queuing or on-premise consumption, or both, is more than ten percent of the total floor space that is accessible to the public on a particular floor, (and one of the other two criteria is met), then the establishment in question is a fast food restaurant.

As stated in Finding of Fact No. 9, when calculated against the publicly-accessible floor space within the establishment, the customer queuing area takes up approximately 25.6% of that space. As this is already well over 10 percent, the Board need not determine the separate measurement of percentage of floor space devoted to on-premise consumption. The establishment at the subject property meets the first and third criteria of the definition of fast food restaurant, and so falls within that definition. As it falls within that definition, it cannot be a "restaurant." Accordingly, DCRA erroneously issued C of O No. C76349 for a matter-of-right restaurant use.

For the reasons stated above, the Board concludes that the Appellant has met its burden of proof in demonstrating that DCRA erred in issuing Certificate of Occupancy No. C76349 for a matter-of-right restaurant use in a C-2-A zone district. Therefore, it is hereby ORDERED that this appeal be GRANTED.

VOTE:     5-0-0     (Geoffrey H. Griffis, Ruthanne G. Miller, Curtis L. Etherly, Jr., John A. Mann, II, and Carol J. Mitten to grant.)

BY ORDER OF THE D.C. BOARD OF ZONING ADJUSTMENT
Each concurring member has approved the issuance of this Decision and Order

ATTESTED BY:

Jerrily R. Kress, FAIA
Director, Office of Zoning

JUN 1 3 2005

FINAL DATE OF ORDER:

PURSUANT TO 11 DCMR § 3125.6, THIS DECISION AND ORDER WILL BECOME FINAL UPON ITS FILING IN THE RECORD AND SERVICE UPON THE PARTIES.

BZA APPEAL NO. 17214
PAGE NO. 6

UNDER 11 DCMR § 3125.9, THIS ORDER WILL BECOME EFFECTIVE TEN DAYS
AFTER IT BECOMES FINAL.

LM/twr

GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT

★ ★ ★

## BZA APPEAL NO. 17214

As Director of the Office of Zoning, I hereby certify and attest that on __JUN 1 3 2005__, a copy of the order entered on that date in this matter was mailed first class, postage prepaid or delivered via inter-agency mail, to each party and public agency who appeared and participated in the public hearing concerning the matter, and who is listed below:

Cody Rice
Chair, ANC 6A Economic Development
& Zoning Committee
310 9th Street, N.E.
Washington, DC 20002

Lisa A. Bell
Senior Counsel
D.C. Department of Consumer and Regulatory Affairs
941 North Capitol Street, N.E.
Washington, DC 20012

Chairperson
Advisory Neighborhood Commission 6A
Miner Elementary
P.O. Box 75115
Washington, DC 20013

Chairperson
Advisory Neighborhood Commission 6C
635 Massachusetts Ave., N.W.
P.O. Box 77876
Washington, DC 20013

H Street Community Development Corp.
501 H Street, N.E.
Washington, DC 20002

441 4th Street, N.W.,  Suite 210 S, Washington, DC 20001   (202) 727-6311

BZA APPEAL NO. 17214
PAGE NO. 2

Corey Buffo
Acting Zoning Administrator
DCRA
Building and Land Regulation Administration
941 North Capitol Street, N.E., Suite 2000
Washington, DC 20009

Sharon Ambrose, Councilmember
Ward 6
1350 Pennsylvania Avenue, N.W.
Suite 102
Washington, DC 20004

Ellen McCarthy, Interim Director
Office of Planning
801 North Capitol Street, N.E.
4th Floor
Washington, D.C. 20002

Alan Bergstein
Office of the Attorney General
441 4th Street, N.W., 7th Floor
Washington, DC 20001

ATTESTED BY:

JERRILY R. KRESS, FAIA
Director, Office of Zoning

2