# RETAIL LEASE AGREEMENT

between

## H STREET COMMUNITY DEVELOPMENT CORPORATION, INC.
### (Landlord)

and

## 2001 B.A. REALTY INC.
### d/b/a BLIMPIE
### (Tenant)

**Retail Center**
**8th and H Streets, N.E.**
**Washington, DC**

## REFERENCE PAGES

<u>Retail Center</u>:  The "Building" (hereinafter defined) and related improvements and facilities to be constructed and located at 8th and H Streets, N.E., Washington, DC.

<u>Landlord</u>:  H Street Community Development Corporation, Inc.

<u>Tenant</u>: 2001 B.A. Realty Inc., a New York corporation.

<u>Trade Name of Tenant</u>:  Blimpie.

<u>Premises</u>:  The retail space designated as Tenant's premises at the Retail Center and containing approximately one thousand seven hundred (1,798) rentable square feet of floor area, as outlined on the floor plan attached to this Lease as <u>Exhibit "A"</u>.  The foregoing is subject to §§3.09 and 3.10 of this Lease.

<u>Building</u>:  The one (1) story building, containing approximately 6,298 square feet, to be constructed and located at the southwest corner of the intersection at 8th and Streets, N.E. in Washington, DC within which the Premises is located.

<u>Term</u>:  The period of fifteen (15) Years, beginning on the Commencement Date, subject to §1.01 of this Lease.

<u>Commencement Date</u>:  Subject to Article V of this Lease, the date that is the earlier of (a) ninety (90) days from the date Landlord (i) gives Tenant written notice that the Landlord's Work improvements to the Premises described in Article V of this Lease is substantially complete (<u>i.e.</u>, sufficient for Tenant to commence construction of the Space Improvements without material interference by the completion of the Landlord's Work) and (ii) tenders vacant possession of the Premises to Tenant, or (b) the date Tenant actually moves into occupancy of the Premises and conducts business with the public therein.

<u>Target Date</u>:  September 1, 2002.

<u>Permitted Use</u>:  Solely for the following purposes, subject to the other provisions of this Lease:  a typical Blimpie submarine sandwich restaurant with related Blimpie restaurant food sales, including Blimpie authorized pizza Co-Brand, cookies and Boardwalk Fries, and no other purpose.

<u>Prohibited Uses</u>:  Tenant shall not use the Premises for any purpose otherwise prohibited or restricted by the terms of any lease of any other tenant in the Retail Center existing as of the date of this Lease or the date of Tenant's proposed change in use of the Premises, as the case may be.

<u>Minimum Hours</u>:  10:00 a.m. to 9:00 p.m. on Monday through Saturday, and 12:00 p.m. to 5:00 p.m. on Sunday, each week during the Term.

Minimum Rent During the Initial Term:

| Year | Per Square Foot | Annual Amount | Monthly Amount |
|------|-----------------|---------------|----------------|
| 1 | $30.00 | $53,940.00 | $4,495.00 |
| 2 | $30.90 | $55,558.20 | $4,629.85 |
| 3 | $31.82 | $57,212.36 | $4,767.70 |
| 4 | $32.78 | $58,938.44 | $4,911.54 |
| 5 | $33.76 | $60,700.48 | $5,058.37 |
| 6 | $34.77 | $62,516.46 | $5,209.71 |
| 7 | $35.81 | $64,386.38 | $5,365.53 |
| 8 | $36.88 | $66,310.24 | $5,525.85 |
| 9 | $37.99 | $68,306.02 | $5,692.17 |
| 10 | $39.13 | $70,355.74 | $5,862.98 |
| 11 | $40.30 | $72,459.40 | $6,038.28 |
| 12 | $41.51 | $74,634.98 | $6,219.58 |
| 13 | $42.76 | $76,882.48 | $6,406.87 |
| 14 | $44.04 | $79,183.92 | $6,598.66 |
| 15 | $45.36 | $81,557.28 | $6,796.44 |

Minimum Rent During the First Extension Period:

| Year | Per Square Foot | Annual Amount | Monthly Amount |
|------|-----------------|---------------|----------------|
| 16 | $46.72 | $84,002.56 | $7,000.21 |
| 17 | $48.12 | $86,519.76 | $7,209.98 |
| 18 | $49.56 | $89,108.88 | $7,425.74 |
| 19 | $51.05 | $91,787.90 | $7,648.99 |
| 20 | $52.58 | $94,538.84 | $7,878.24 |

Minimum Rent During the Second Extension Period:

| Year | Per Square Foot | Annual Amount | Monthly Amount |
|------|-----------------|---------------|----------------|
| 21 | $54.16 | $ 97,379.68 | $8,114.97 |
| 22 | $55.78 | $100,292.44 | $8,357.70 |
| 23 | $57.45 | $103,295.10 | $8,607.93 |
| 24 | $59.17 | $106,387.66 | $8,865.64 |
| 25 | $60.95 | $109,588.10 | $9,132.34 |

Percentage Rent Fraction/Percentage: 4%.

Breakpoint (Natural):  A designated number for any respective period during the Term reached by dividing the Minimum Rent applicable pro-rata to such period by the Percentage Rent Fraction.

Proportionate Share:  28.55% ( i.e., 1,798 divided by 6,298 leasable square feet).

Security Deposit: $17,980.00.  $8,990.00

## RETAIL LEASE AGREEMENT

**THIS RETAIL LEASE AGREEMENT** (this "Lease") is made this 20 day of August 2002, by and between the **H STREET COMMUNITY DEVELOPMENT CORPORATION, INC.** ("Landlord"), and **2001 B.A. REALTY INC.**, a New York corporation ("Tenant").

For and in consideration of the rents, covenants, agreements and conditions herein contained on the part of Tenant to be paid, kept, observed and performed, Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, subject to (a) all the terms and conditions set forth in this Lease, and (b) all liens, encumbrances, Mortgages, easements, restrictions, and covenants, and all zoning and other land use laws and regulations, now or hereafter affecting or governing the Premises or the rest of the Retail Center.

### ARTICLE I - TERM

§1.01   Length.   Tenant's lease of the Premises shall be for the Term, which begins on the Commencement Date.  If Tenant enters into occupancy of the Premises prior to the Commencement Date for the purpose of constructing improvements or installing fixtures therein (and without conducting business therein), then all terms and conditions of this Lease (except those regarding the payment of Minimum Rent, Real Estate Taxes, and Common Area Expenses) shall apply to such occupancy.   "Year" means a consecutive period of twelve (12) months which begins on the Commencement Date or on an anniversary of the Commencement Date.   However, if the Commencement Date is not the first day of a calendar month, then, notwithstanding anything contained in this Lease to the contrary (a) the first Year shall be extended to be the period from the Commencement Date until the end of the first twelve (12) full calendar months thereafter, (b) the Minimum Rent for the first Year shall be increased on a per diem basis to include that extension period, (c) each succeeding Year shall begin at the expiration of the previous Year, and (d) the Term shall be extended to include that extension period.

§1.02   Confirmation.   After the Commencement Date, Landlord may submit to Tenant an estoppel certificate specifying the actual Commencement Date and the actual expiration date of the Term.  Within ten (10) days after such submission, Tenant shall execute that certificate, and return it to Landlord, with any corrections that are necessary.

§1.03   Surrender.   At the expiration of the Term or any earlier termination of this Lease, Tenant shall (a) promptly surrender to Landlord possession of the Premises, including (i) any and all fixtures and other improvements that were paid for by Landlord, all in good order, condition and repair (ordinary wear and tear excepted), and (ii) all other fixtures, built-in furniture and equipment, wires, pipes and other conduits that Landlord shall have notified Tenant are to remain in the Premises; (b) remove, from the Premises, Tenant's signs, goods and trade fixtures and such of Tenant's furniture, fixtures and equipment that are not to remain in the Premises under clause (a) of this Section; (c) repair any and all damage to the Premises and the Retail Center caused by such removal; (d) surrender to Landlord all keys to or for the Premises; and (e) give Landlord the combination of any and all locks, safes and vaults in the Premises.  Tenant understands that Landlord's dam-

4

ages on account of any breach of Tenant's obligations under the foregoing provisions may include those arising from the claims of any successor occupant on account of any resulting delay. In addition to the foregoing damages, any property of Tenant not removed as required above shall irrevocably be deemed abandoned and may be removed, kept or disposed of by Landlord as Landlord deems appropriate, in Landlord's sole and absolute discretion.

§1.04   Holding Over.   If Tenant continues to occupy the Premises beyond the expiration of the Term or any earlier termination of this Lease, Tenant shall be deemed to be occupying the Premises as a tenant from month-to-month and such occupancy shall be subject to all of the same terms and conditions as are contained in this Lease, as adjusted for a month-to-month tenancy, except that the Minimum Rent payable during the period of such occupancy shall be equal to two times the greater of (a) the Minimum Rent that was last in effect during the Term, or (b) the then current market rent for the Premises (as determined by a licensed broker or other professional designated by Landlord). However, the foregoing shall not be deemed in any way to limit or impair Landlord's right to evict Tenant immediately or to exercise any of Landlord's other rights and remedies under the provisions of this Lease or applicable law on account of such continued occupancy of the Premises. Also notwithstanding the foregoing, Tenant shall be liable for any and all damages and expenses that Landlord may sustain by virtue of Tenant's holding over, including, but not limited to, Landlord's reasonable attorneys' fees and any amount for which Landlord may be liable under, or as a result of, any other lease entered into by Landlord for the term beginning at or after the expiration of the Term of this Lease.

§1.05   Option to Extend the Term of the Lease.   Under the following terms and conditions, Tenant shall have the option to extend the initial Term of this Lease for two (2) additional consecutive terms of five (5) years (each such additional term being hereinafter referred to as an "Extension Period"). In each instance, such option shall be null and void unless (a) Tenant notifies Landlord, of Tenant's election to exercise that option, at least six (6) months prior to the date this Lease would otherwise expire; and (b) at the time of such exercise and at all times thereafter prior to the commencement of the applicable Extension Period, this Lease is in full force and effect, Tenant is in actual occupancy of the Premises, and Tenant is not in default of any of its obligations under this Lease. Such Extension Periods shall be upon the same terms and conditions as apply with respect to the initial Term, except (a) Tenant shall have no right to extend the Term beyond the Extension Periods referred to above, and (b) the Minimum Rent for the Extension Periods shall be as set forth in the Reference Pages above. "Term" shall include any and all Extension Periods for which the foregoing extension option shall be effective and shall have been duly exercised hereunder.

**[END OF ARTICLE I – TERM]**

ARTICLE II - RENT

§2.01   <u>Minimum Rent</u>.  Tenant shall pay to Landlord the respective amount(s) of Minimum Rent set forth on the Reference Pages.

§2.02   <u>Percentage Rent</u>.  In addition to the Minimum Rent, Tenant shall pay to Landlord "Percentage Rent" throughout the Term as follows:

(a)     Percentage Rent shall be paid quarterly as described in §2.06 hereof.  The Percentage Rent for each quarter (or part quarter) shall be equal to the Percentage Rent Fraction times the amount by which the Gross Receipts for the applicable period exceeds the Breakpoint for that period.

(b)     The term "Gross Receipts" means all receipts and revenues from all business conducted at, upon or from the Premises by Tenant, subtenants, assignees or others (whether such Gross Receipts are evidenced by cash, check, credit, charge account, exchange or otherwise).  Such Gross Receipts include, but are not limited to, amounts received from the sale of merchandise, for services performed, from vending or other machines, from the sale of lottery tickets, and from orders for merchandise or services taken at the Premises (whether such orders are filled from the Premises or elsewhere).  Gross Receipts shall not include (1) the amount of any sales or other tax imposed by any governmental authority directly on sales at the retail level and collected from customers, provided that the amount thereof is added to the selling price and paid by Tenant to such governmental authority; or (2) transfers of merchandise between different stores of Tenant, provided such transfers are not made to avoid liability for Percentage Rent.  Except as provided above, no income or other tax or other item of expense whatsoever shall be deducted from the amount of Gross Receipts which is used to calculate Percentage Rent hereunder.  Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) therefor.

(c)     For the purpose of ascertaining the amount payable as Percentage Rent, Tenant agrees to prepare and keep on the Premises, for each Year or part Year during the Term, accurate records which shall show inventories and receipts of all merchandise at the Premises and the Gross Receipts from the Premises on a daily basis.  Tenant shall record, at the time of each sale and in the presence of the customer, all receipts from sales and other transactions, whether for cash or credit, in cash registers having a cumulative total.  Such registers shall be sealed in a manner, and shall have such other features, as are reasonably acceptable to Landlord.  Landlord hereby acknowledges approval of the cash register system currently mandated by the Blimpie franchisor, the features and specifications of which have been provided, in writing, to Landlord by Tenant prior to the execution and delivery of this Lease.  Tenant further agrees to keep on the Premises, for each Year during the Term, the gross income, sales and occupational tax returns with respect to the Premises for such Years, as well as all pertinent original sales records.  Pertinent original sales records include (1) cash register tapes, including tapes from temporary registers, (2) serially numbered sales slips, (3) the originals of all mail orders at and to the Premises, (4) the original records of all

telephone orders at and to the Premises, (5) settlement report sheets of transactions with subtenants, assignees and licensees, (6) the original records showing that merchandise returned by customers was purchased at the Premises by such customers, (7) such other sales records, if any, which would normally be examined by an independent accountant pursuant to accepted auditing standards in performing an audit of the Gross Receipts, and (8) the records specified in clauses (1) through (7) of this ¶(c) with respect to subtenants, assignees and licensees.

(d)    Tenant shall submit to Landlord, on or before the thirtieth (30th) day following the end of each calendar month that occurs in whole or in part during the Term hereof [including the thirtieth (30th) day of the month following the end of the Term], a written statement signed by Tenant, certified by it to be true and complete, and showing the amount of Gross Receipts for that preceding month. Tenant shall also submit to Landlord, on or before the thirtieth (30th) day following the end of each calendar year that occurs in whole or in part during the Term hereof [except that the statement for the last such calendar year shall be due on or before the thirtieth (30th) day following the end of the Term], a written statement signed by Tenant, certified by it to be true and complete, and showing the amount of Gross Receipts for that preceding calendar year. The statements referred to in this paragraph shall be in such form and style, and contain such details and breakdown, as Landlord may reasonably require.

(e)    Landlord and Landlord's authorized representative shall have the right to examine all of the records described in ¶(c) of this Section, and all other records of Tenant related to the Premises, during regular business hours. When and as Landlord may reasonably require, Tenant shall also furnish Landlord with copies of all other sales and income tax reports and returns that separately show financial data for the Premises, and other data, statements and records Tenant may have evidencing Gross Receipts. In addition, and at its option, Landlord may at any reasonable time upon forty-eight (48) hours prior written notice to Tenant cause a complete audit to be made of Tenant's entire business affairs and records relating to the Premises for the period covered by any statement submitted by Tenant under ¶(d) of this Section. If such audit shall disclose that the actual Gross Receipts were more than two percent (2%) greater than the amount of Gross Receipts reported by Tenant, then (i) Tenant shall, within five (5) days after demand therefor, pay to Landlord the costs of said audit, the deficiency in Percentage Rent, plus interest on that deficiency at the rate of eighteen percent (18%) from the date such Percentage Rent was originally due hereunder until the date such payment is actually received by Landlord (such payment to be in addition to, and not be deemed to limit or waive, any of Landlord's other rights and remedies at law or in equity on account of Tenant's original failure to pay the total amount of Percentage Rent when and as due); and (ii) all statements thereafter submitted by Tenant under ¶(d) of this Section shall, without any further request or demand by Landlord, be audited statements, audited at Tenant's expense by an independent certified public accountant using generally accepted auditing standards. In addition, Landlord may at its option terminate this Lease upon five (5) days' notice to Tenant if any such audit by Landlord discloses willful or substantial inaccuracies in Tenant's reporting of Gross Receipts or, in any case, discrepancies of greater than five percent (5%).

§2.03   Real Estate Taxes.  Tenant shall pay, to Landlord, Tenant's Proportionate Share of the Real Estate Taxes applicable to the Retail Center for the Term of this Lease, subject to §2.05

hereof. "Real Estate Taxes" means all real estate taxes and assessments, general and special, ordinary and extraordinary, foreseen and unforeseen, including, without limitation, real property taxes, assessments, sewer rents and connection charges, ad valorem charges, water rents and connection charges, front foot benefit charges, all other government impositions in the nature of any of the foregoing, and all costs and expenses (including reasonable attorneys' fees and costs of court and administrative proceedings) incurred in contesting such taxes and assessments. If, due to a future change in the method of taxation or in the taxing authority, a franchise, gross receipts, transit, rent or other tax or other governmental imposition, however designated, shall be levied against Landlord in substitution (in whole or in part) for, or in addition to, said Real Estate Taxes, then such franchise, gross receipts, transit, rent or other tax or governmental imposition shall be included with-in said definition of "Real Estate Taxes". Landlord may institute any proceedings with respect to the assessed valuation of the Retail Center or any part thereof, and Tenant shall, if and as requested by Landlord, cooperate with, and participate in, such proceedings. If, after Tenant shall have made the required payment of Real Estate Taxes hereunder, Landlord shall receive a refund of any portion thereof, then, provided that Tenant is not then in default of any of its obligations under this Lease, Landlord shall, within thirty (30) days after Landlord's receipt of such refund, pay to Tenant Tenant's Proportionate Share of the difference between that refund, less one hundred fifteen percent (115%) of all costs and expenses (including, but not limited to, reasonable attorneys' and appraisers' fees) expended or incurred in obtaining that refund [the additional fifteen percent (15%) being intended to compensate Landlord for its overhead in relation thereto]. Tenant may not institute any proceedings with respect to the assessed valuation of the Retail Center or any part thereof.

§2.04  Common Area Expenses. In addition to the foregoing, Tenant shall pay, to Land-lord, for each Year (or part Year) of the Term a Proportionate Share of the Common Area Expenses for such Year. "Common Area Expenses" means all expenses and costs incurred in connection with the ownership, management, maintenance, repair, replacement and operation of all improvements and Common Areas of the Retail Center, including but not limited to the following: (1) costs of all wages and salaries of all employees engaged in the operation and maintenance of those improvements and Common Areas, including but not limited to payroll taxes, insurance and bene-fits; (2) costs of all supplies and materials used in the operation, maintenance and repair of those improvements and Common Areas; (3) costs of all utilities (including surcharges), including but not limited to water, sewer, electricity and gas for the Common Areas of the Retail Center; (4) costs incurred under all maintenance and service agreements for the Retail Center, including but not limited to security, trash removal, snow removal and landscaping; (5) costs of any and all insurance relating to the Retail Center, including but not limited to the costs of casualty and liability insurance; (6) costs of all repairs, replacements and general maintenance to those improvements and Common Areas, provided that any capital expenditures shall be amortized on a straight line basis over the useful life of the improvement for which the expenditure is made; (7) all property management fees and expenses; (8) costs of all audit and accounting services; (9) costs of any and all improvements required or made necessary by law or changes in law, including, without limitation, the Americans with Disabilities Act of 1990, the regulations issued thereunder, and the Accessibility Guidelines issued pursuant thereto, as the same may be modified, amended or supplemented (the "ADA"); (10) costs of any and all service agreements for maintenance of any HVAC systems, roofs or other facili-ties or equipment; (11) the costs of any and all licenses and permits required by any public author-

ity; and (12) a management and overhead administrative cost allowance in the amount of fifteen percent (15%) of the total Common Area Expenses. However, "Common Area Expenses" do not include principal, interest or other debt service payments or other financing or refinancing costs.

Notwithstanding anything contained in this Lease the contrary, Landlord's cost for purpose of computing Common Area Expenses under this Lease shall expressly exclude: (i) wages, salaries, fees, and fringe benefits paid to executive personnel of Landlord; (ii) any charge for Landlord's income, inheritance or franchise taxes; (iii) leasing commissions or legal expenses relating to activities for the solicitation, execution or enforcement of leases for other spaces in the Retail Center; (iv) the cost of correcting defects in the original construction of the Retail Center; (v) the cost of any repair made by Landlord due to the total or partial destruction of the Retail Center by fire or other casualty subsequent to the date of original construction or the exercise of the right of eminent domain; (vi) the cost of any alterations, additions, changes, replacements or other items which under generally accepted accounting principles are properly classified as capital expenditures to the extent the same upgrade or improve the Retail Center as opposed to replace existing items that have been worn out, unless any such upgrade or improvement shall result in a savings in annual Common Area Expenses, in which event such costs may be amortized and included in Common Area Expenses in the manner hereinbelow provided for capital replacement costs; and (vii) the cost of remedial action for Hazardous Material from the Retail Center.

Further, notwithstanding anything in this Lease to the contrary, but subject to the exclusion from Common Area Expenses listed in item (vi) of the immediately preceding paragraph of this Section 2.04, to the extent that the cost of the replacement of any portion of the Retail Center is a capital expenditure, then Tenant shall pay as part of Common Area Expenses on an annual basis its Proportionate Share of the annual amortized portion of such capital expenditure. Landlord shall amortize such capital replacement cost/expenditure using the median useful life permitted under the Internal Revenue Code, but in no event shall the useful life be greater than fifteen (15) years. Landlord may include such annual amortized amount in Common Area Expenses commencing in the Year that any such capital improvement is completed.

§2.05  Adjustment. Notwithstanding anything in this Lease to the contrary, for purposes of determining Tenant's Proportionate Share of Real Estate Taxes and Common Area Expenses, any or all of the following adjustments may, at Landlord's option, be made, from time to time, to the fraction used as Tenant's Proportionate Share:

(a)    To the extent that any portion of the Building contains both office and retail space, then (1) with respect to those Common Area Expenses that relate to the office space, Tenant's Proportionate Share may be adjusted to reflect that fraction of all office space that is represented by the Premises; and (2) with respect to those Common Area Expenses that relate to the retail space, Tenant's Proportionate Share may be adjusted to reflect that fraction of all retail space that is represented by the Premises.

(b)    To the extent that any item of Real Estate Taxes or Common Area Expenses relates to less than the entire Retail Center, then the denominator used in determining Tenant's

9

Proportionate Share with respect to such particular item of Real Estate Taxes or Common Area Expenses may be changed to be the rentable square footage of the building(s) and other property to which the particular item of Real Estate Taxes or Common Area Expenses relates.

      (c)    [Intentionally deleted].

§2.06  <u>When Due and Payable</u>.

      (a)    All rent, charges, expenses and other sums payable by Tenant under this Lease, except Minimum Rent, are also rental obligations and shall be referred to hereinafter as "Additional Rent". All Minimum Rent and Additional Rent are sometimes hereinafter together referred to as "Rent".

      (b)    The Minimum Rent for each Year during the Term shall be due and payable in twelve (12) consecutive, equal monthly installments, in advance, on the first day of each calendar month during the Term. However, the installment of Minimum Rent for the first full calendar month of the Term shall be due and payable upon execution of this Lease. Furthermore, if the Commencement Date is not the first day of a calendar month, then the Minimum Rent for the period commencing with and including the Commencement Date until and including the last day of the first full calendar month thereafter shall be pro-rated on the basis of the actual number of days in such period and shall be due and payable on the Commencement Date.

      (c)    Tenant shall pay installments of Percentage Rent in arrears on each of January 1, April 1, July 1 and October 1 in each Year during the Term for the quarter then-ending. Tenant shall pay all other Additional Rent within thirty (30) days after being billed therefor by Landlord. However, notwithstanding the foregoing, Landlord may at its discretion by giving notice thereof to Tenant (1) make, from time to time during the Term, a reasonable estimate of the amount of Additional Rent that may become due for any Year (including, at the option of Landlord, estimates of Percentage Rent); (2) require Tenant to pay to Landlord such Additional Rent in equal installments at the time and in the manner that Tenant is required hereunder to pay monthly installments of Minimum Rent; and (3) increase or decrease, from time to time during such Year, the amount initially estimated for such Year. In such event, Tenant or Landlord shall, within thirty (30) days after the actual amount of Additional Rent is known or submitted, pay to the other the amount of any deficiency or overpayment, whichever the case may be.

      (d)    Tenant shall pay Additional Rent within thirty (30) days after being billed therefor by Landlord. However, notwithstanding the foregoing, Landlord may at its discretion by giving notice thereof to Tenant (1) make, from time to time during the Term, a reasonable estimate of the amount of Additional Rent that may become due for any Year; (2) require Tenant to pay to Landlord such Additional Rent in equal installments at the time and in the manner that Tenant is required hereunder to pay monthly installments of Minimum Rent; and (3) increase or decrease, from time to time during such Year, the amount initially estimated for such Year. In such event, Tenant or Landlord shall, within thirty (30) days after the actual amount of Additional Rent is known or submitted, pay to the other the amount of any deficiency or overpayment, whichever the case may

10

be.

(e)    Tenant's Proportionate Share of the Real Estate Taxes and the Common Area Expenses due hereunder shall be payable, in advance, in equal monthly installments, subject to change from time to time by Landlord based upon Landlord's estimates of the actual amounts thereof to be due under §§2.03 and 2.04 hereof and subject to adjustment each year within thirty (30) days after Landlord notifies Tenant of the actual amounts due under those Sections.

§2.07    Proration.    All items of Rent shall be prorated for any month or quarter during the Term which is not a full calendar month or quarter or in which two different rental rates are applicable. If only part of any calendar year falls within the Term, the amount computed as Additional Rent for such calendar year under the foregoing provisions of this Article shall be appropriately prorated, but the expiration of the Term before the end of a calendar year shall not limit Tenant's obligation hereunder to pay the prorated portion of Additional Rent applicable to that portion of such calendar year falling within the Term.

§2.08    Late Penalties.    Each payment of Rent shall be made promptly when due (without any demand, deduction, recoupment or setoff whatsoever), in legal currency of the United States, and at the place directed by Landlord. Any payment of Rent not made when due shall, at Landlord's sole option, bear interest at the rate of eighteen percent (18%) per annum from and after the sixth (6th) day after the due date until paid. Additionally, any payment of Rent not paid within ten (10) days of when due shall be subject to a late payment charge of five percent (5%) of the amount due. This late payment charge shall be in addition to the interest provided for above and shall be due and payable with the next succeeding Rent payment.

§2.09    Security Deposit.    Upon signing this Lease, Tenant shall pay to Landlord the Security Deposit, which shall be retained by Landlord as security for Tenant's payment of Rent and performance of all of its other obligations under this Lease. On the occurrence of an Event of Default, Landlord shall be entitled, at its sole discretion, to apply any or all of such sum in payment of any Rent then due and unpaid, any expense incurred by Landlord in curing any such default, and/or any damages incurred by Landlord by reason of such default (including but not limited to Landlord's reasonable attorneys' fees), in which event Tenant shall restore to Landlord the amount of the Security Deposit so applied. However, the foregoing shall not serve to limit Landlord's rights or remedies under Article XIV or any other provision of this Lease on account of Tenant's default. On the termination of this Lease, any of the Security Deposit that is not so applied or retained shall be returned to Tenant. The Security Deposit shall not bear interest while being held by Landlord hereunder. Furthermore, the Security Deposit need not be held in an escrow or other separate account; rather, it may be commingled with Landlord's other funds.

## ARTICLE III - USE OF PREMISES

§3.01    Use and Operations.    Continuously throughout the Term, Tenant shall use and occupy the Premises only for the Permitted Use and only under the Trade Name of Tenant. Tenant

may not use the Premises for any other purpose or under any other trade name. At all times during the Term, such business shall be a high-quality establishment and shall be open for business to the public, and fully staffed and stocked with merchandise, during the Minimum Hours. Notwithstanding the provisions of the first sentence of this Section 3.01 to the contrary, and after Tenant initially opens the Premises for business as required by this Lease, the Premises will not be deemed to be closed in violation of this Section 3.01 under any of the following circumstances: (i) such closure is caused by fire or other casualty and continues during the making of repairs or restorations to the Premises; (ii) such closure is caused by "Condemnation" (hereinafter defined) and continues during the restoration of the Premises to a complete unit; (iii) such closure is due to Tenant making permitted or approved alterations, additions and/or improvements to the Premises pursuant to Section 5.04 of this Lease, provided any closure for such purposes does not exceed thirty (30) consecutive days or thirty (30) days in the aggregate during any twenty-four (24)-month period; or (iv) such closure is due to the abandonment of the Premises by any subtenant of Tenant or Tenant's repossession of the Premises from any subtenant Tenant, provided any closure caused by any such event shall not exceed thirty (30) consecutive days or thirty (30) days in the aggregate during any twenty-four (24)-month period.  Tenant shall not make any material change in its merchandise or operations that affects the character or style of Tenant's business at the Premises, nor shall Tenant hold or advertise any going out of business, bankruptcy, deep discount or fire sale at the Premises, without Landlord's prior written approval. All receiving and delivery of goods and merchandise at or to the Premises, and all removal of merchandise, supplies, equipment, trash and garbage from the Premises, shall be made at the rear of the Premises and during any special hours established by Landlord.  Tenant shall not allow any odors or noise to emanate from the Premises, nor shall Tenant permit any conduct therein which is objectionable to other tenants at the Retail Center or their customers.  For so long as Tenant is not in default under this Lease beyond any applicable notice and cure period, and provided Tenant is in actual occupancy of the Premises and conducting the Permitted Use therein, Landlord agrees that it will not lease any other space in the Building to a tenant whose **primary** use of such space is for the sale of submarine type sandwiches made on French or Italian type bread. Should Landlord breach the foregoing covenant, Tenant's sole and exclusive remedy shall be to seek injunctive relief and/or the remedy of specific performance in accordance with the provisions of Section 19.03 hereof.

   §3.02   Compliance with Laws and Matters of Title.  Tenant shall comply with any and all laws and regulations, including but not limited to zoning laws and the ADA, applicable to the Premises, to Tenant's use of the Premises, or to Tenant's use of the Common Areas.  Tenant shall make any and all changes or improvements to the Premises required thereby, subject to §5.04 hereof. Tenant shall hire, supervise and manage all persons appropriate or necessary for the operation of Tenant's business, which persons shall all be employees of Tenant and not Landlord; and Tenant shall pay all taxes and other amounts, and carry all workers' compensation insurance, with respect to such employees as is required by law.  Tenant may not violate any covenant, declaration, restriction or other title matter that affects the Retail Center and is of record as of the date hereof.

   §3.03   Insurance - Compliance and Rate.  Tenant shall, at its own cost and expense, comply with all requirements of Landlord's insurance carrier (if any) and those of Tenant's insurance carrier and with all of the orders, rules and regulations of the applicable insurance rating organization(s)

12

having jurisdiction and any similar bodies. Tenant shall not do or permit to be done any act or thing upon the Premises that would invalidate or be in conflict with any fire insurance or other policy or coverage referred to in this Lease. If, as a result of any failure by Tenant to comply with the terms of the foregoing sentences of this Section, any act or omission of Tenant, its employees, agents, contractors or licensees, or the use to which the Premises are put (whether or not such use may be for the purposes hereinbefore permitted or may have been consented to by Landlord), the fire, ex- tended coverage, or other insurance rate(s) applicable to the Premises or any other portion of the Retail Center shall be higher than would otherwise be applicable, then, in addition to all other remedies Landlord has under the terms of this Lease, Tenant shall pay to Landlord, on demand and as Additional Rent, such portion of the premiums as shall be attributable to such higher rate(s). If Tenant installs any electrical equipment that overloads any line in the Premises or the Building, Tenant shall, at its own cost and expense, promptly make whatever changes are necessary to remedy such condition and to comply with all requirements of the Landlord and the Board of Fire Insurance Underwriters, any similar body, and any governmental authority having jurisdiction thereof. For the purposes of this Section, any finding or schedule of the applicable insurance rating organization having jurisdiction shall be conclusive.

§3.04    Business Methods. Tenant may not engage in any unfair method of competition or unfair or deceptive act or trade practice of the type prohibited by applicable consumer protection laws or regulations of the jurisdiction in which the Retail Center is located. Committing such an act or practice shall be an Event of Default, whether or not action is taken by the appropriate governmental authority with respect thereto.

§3.05    Common Areas. Landlord hereby grants to Tenant a non-exclusive license to use all sidewalks, parking areas (if any) and access drives within the Retail Center which, by their nature, are manifestly designed and intended for common use by all the tenants at the Retail Center and their employees and customers (collectively, the "Common Areas"). However, Tenant may use those sidewalks and drives only for ingress and egress and those parking areas (if any) only for customer and, subject to the following terms, employee parking. The foregoing license shall be in common with Landlord and other tenants and their respective employees and customers and in accordance with the Rules and Regulations. Without limiting the foregoing, Tenant may not place any merchandise, sign or equipment upon the Common Areas or otherwise conduct any business thereon. Tenant shall direct all of its employees to use the employee parking areas(if any) as other- wise designated by Landlord, and not to park upon the customer parking areas (if any) of the Retail Center. Tenant shall park all of its own vehicles in those designated employee parking areas if any); Tenant shall not park any of its vehicles in those designated customer parking areas (if any). At all times, Landlord shall have the right to rearrange, improve, repair, replace and reduce the Common Areas. Landlord shall also have the right to close portions of the Common Areas, or to restrict access thereto, to the extent necessary (a) in the opinion of Landlord's counsel, to prevent a dedica- tion thereof or the accrual of any rights of any person or the public therein; (b) to discourage use thereof by persons or entities who or which are not customers or employees of the Retail Center; or (c) to make repairs, alterations or additional improvements to the Retail Center.

§3.06    [Intentionally deleted].

13

§3.07   [Intentionally deleted].

§3.08   [Intentionally deleted].

§3.09   [Intentionally deleted].

§3.10   <u>Limitations of the Premises</u>.  The provisions of this Section shall apply notwith-standing anything contained in the Reference Pages or any other portion of this Lease and regardless of the method of measurement set forth in this Lease.  Tenant may not impair any structural element of the Premises, and may not use or impair the roof of the Premises, the foundation of the Premises, the land beneath the Premises, or the exterior surface of any exterior wall of the Premises (said structural elements, roof, etc. being hereinafter referred to, collectively, as the "Structural Elements").  Landlord reserves the Structural Elements and the right to install, maintain, use, repair and replace pipes, ducts, conduits, wires and structural supports in the Premises to serve the Premises and/or other parts of the Retail Center.

## ARTICLE IV - INSURANCE / INDEMNIFICATION

§4.01   <u>Landlord's Insurance</u>.  Landlord may, at its option, obtain or maintain all-risk property insurance upon the Retail Center, rental income insurance, and commercial general liability insurance (in addition to, and not in lieu of, insurance required to be maintained by Tenant hereunder). The premiums for such insurance shall be Common Area Expenses.  Landlord may elect to self-insure for the coverages provided for in this Section.  Landlord shall not be obligated to insure any furniture, equipment, trade fixtures, machinery, goods or supplies which Tenant may keep or maintain in the Premises or any alteration, addition or improvement which Tenant may make upon the Premises.  Tenant shall not be named as an additional insured on any policy of liability insurance maintained by Landlord.  If the annual cost to Landlord for such property or rental income insurance exceeds the standard rates because of the nature of Tenant's operations, Tenant shall, upon receipt of appropriate invoices, reimburse Landlord for such increased cost.

§4.02   <u>Tenant's Insurance</u>.  Tenant shall procure and maintain, at its expense and throughout the Term, the following insurance policies:

(a)   All-risk property insurance policy covering all of Tenant's fixtures and personal property in the Premises, and on any alterations, additions, or improvements made by Tenant upon the Premises all for the full replacement cost thereof. Tenant shall use the proceeds from such insurance for the replacement of fixtures and personal property and for the restoration of Tenant's improvements, alterations and additions to the Premises. Landlord shall be named as loss payee with respect to such alterations, additions or improvements.

(b)   Worker's compensation insurance in statutory limits shall be provided for all employees. Employers liability insurance shall also be obtained and shall afford limits not less than

14

five hundred thousand dollars ($500,000) per accident, not less than five hundred thousand dollars ($500,000) per employee for bodily injury by disease, and not less than five hundred thousand dollars ($500,000) for bodily injury by disease;

(c)     Commercial general liability insurance which insures against claims for bodily injury, personal injury, advertising injury and property damage based upon, involving, or arising out of the use, occupancy, or maintenance of the Premises and the Retail Center. Such insurance shall afford, at a minimum, the following limits: (1) one million dollars ($1,000,000) per occurrence, (2) two million dollars ($2,000,000) for the general aggregate, (3) two million dollars ($2,000,000) for the products and completed operations aggregate, (4) one million dollars ($1,000,000) for personal and advertising injury liability, (5) fifty thousand dollars ($50,000) for fire damage legal liability, and (6) five thousand dollars ($5,000) for medical payments. Any general aggregate limit shall apply on a per location basis. Such insurance shall name Landlord and its leasing and property manager, and any and all mortgagees as additional insureds. This coverage shall include blanket contractual liability, broad form property damage liability, and shall contain an exception to any pollution exclusion which insures damage or injury arising out of heat, smoke, or fumes from a hostile fire. Such insurance shall be written on an occurrence basis and contain a standard separation of insureds provision;

(d)     Business auto liability insurance policy which insures against bodily injury and property damage claims arising out of the ownership, use or maintenance of any automobile, with a combined single limit per accident of not less than one million dollars ($1,000,000); and

(e)     Umbrella excess liability insurance, on an occurrence basis, that applies excess of required commercial general liability, business automobile liability and employer's liability insurance policies, which insures against bodily injury, property damage, personal injury and advertising injury claims with limits of not less than two million dollars ($2,000,000) per occurrence and not less than two million dollars ($2,000,000) for the annual aggregate. These limits shall be in addition to and not including those stated for underlying commercial general liability, business automobile liability, and employers liability insurance. Such policy shall name Landlord and its trustees, officers, directors, agents and employees, Landlord's leasing and property manager, and any and all mortgagees as additional insureds.

(f)     Business income and extra expense insurance policy with limits of at least Five Hundred Thousand Dollars ($500,000).

(g)     All policies required to be carried by Tenant hereunder shall be issued by and binding upon insurers licensed to do business in the state in which the Retail Center is located with a rating of at least "A-VIII" or better as set forth in the most current issue of Best's Key Rating Guide (unless otherwise approved by Landlord). Tenant shall not do or permit anything to be done that would invalidate the insurance policies required. Liability insurance maintained by Tenant shall be primary coverage without right of contribution by any similar insurance that may be maintained by Landlord.

(h)    Certificates of insurance, acceptable to Landlord, evidencing the existence and amount of each liability insurance policy required herein and Evidence of Property Insurance Form, Acord 27, evidencing property insurance as required shall be delivered to Landlord prior to delivery or possession of the Premises and ten (10) days prior to each renewal date. Certificates of insurance shall include an endorsement for each policy showing that Landlord and its trustees, officers, directors, agents and employees, and any and all mortgagees are included as additional insureds on the liability policies referred in Sections 4.02(c), (d) and (e). The Evidence of Property Insurance Form shall name Landlord as loss payee for property insurance with respect to Landlord's interest in improvements and betterments. Further, the certificates must include an endorsement for each policy whereby the insurer agrees not to cancel, non-renew, or materially alter the policy without at least thirty (30) days' prior written notice to Landlord. In the event that Tenant fails to provide evidence of insurance required to be provided by Tenant hereunder, prior to commencement of the Term of this Lease and thereafter during the Term of this Lease, within ten (10) days following Landlord's request thereof, and thirty (30) days prior to the expiration date of any such coverage, Landlord shall be authorized (but not required) to procure such coverage in the amount stated with all costs thereof to be chargeable to Tenant and payable upon written invoice thereof. The limits of insurance required herein, or as carried by Tenant, shall not limit the liability of Tenant or relieve Tenant of any obligation hereunder, except to the extent provided for with respect to the waiver of subrogation in Section 4.03 below. Any deductibles selected by Tenant shall be the sole responsibility of Tenant. Landlord may, at its sole discretion, change the insurance policy limits and forms which are required to be provided by Tenant. Such changes will be made to conform with common insurance requirements obtained for similar properties in similar geographic locations. Landlord will not change required insurance limits or forms more often than once per calendar year.

§4.03    Waiver of Subrogation. Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each waives all rights of recovery, claim, action, or cause of action against the other, its agents (including partners, both general and limited), trustees, officers, directors and employees, for any loss or damage that may occur to the Premises, or any improvements thereto, or the Retail Center or any personal property of such party therein, by reason of any peril required to be insured against under this Lease, regardless of cause of origin, including negligence of the other party. Tenant and Landlord covenant that, to the fullest extent permitted by law, no insurer shall hold any right of subrogation against the other. The foregoing waiver of subrogation shall be included in both Landlord's and Tenant's insurance policies.

§4.04    Indemnification. Tenant shall defend, indemnify and hold harmless Landlord (and Landlord's officers, directors, shareholders, partners, beneficiaries, employees and agents, Mortgagees, and any master lessor of all or part of the Retail Center) from and against any and all claims, demands, actions, suits, judgments, damages, losses, liability, costs and expenses (including reasonable attorneys' fees) that arise, directly or indirectly, in connection with (a) any injury to person or property, loss of life, or other act or omission that occurs on or about the Premises at any time between the date Landlord delivers possession thereof to Tenant and the termination of this Lease; or (b) any act or omission of Tenant or Tenant's agents, employees, contractors, licensees or

16

invitees upon the Premises, the Retail Center or otherwise. Tenant's liability hereunder covers any and all reasonable attorneys' fees Landlord, or any of the parties indemnified hereunder, may incur in hiring separate counsel, or in intervening in any litigation, to protect its, his or her interest in such manner as it, he or she deems appropriate. The liability of Tenant to indemnify Landlord shall not extend to any matter against which Landlord shall be effectively protected by the net proceeds collected by Landlord (after payment of all reasonable attorneys' fees and other costs of collection) under an insurance policy actually obtained hereunder; however, if any such liability exceeds the amount of such proceeds, then said liability of Tenant shall apply to such excess. Without limiting the foregoing, if a lien is filed against any portion of the Retail Center by reason of any of the matters covered by the foregoing indemnity, then Tenant shall, within ten (10) days after such filing, discharge the same by payment, bonding or otherwise.

## ARTICLE V - IMPROVEMENTS TO PREMISES

§5.01   Initial Improvements.

(a)    Certain improvements shall be constructed in the Premises according to the space plan attached hereto as Exhibit "B" (collectively, the "Space Improvements") for the purpose of initially preparing the Premises for occupancy by Tenant and shall be paid for as provided in ¶(b) of this Section. Such Space Improvements shall be constructed by Tenant, as provided in the Reference Pages above, and in accordance with the following procedures:

(1)    Tenant shall, promptly after execution of this Lease, engage an architect to prepare plans and specifications of the Space Improvements for Landlord's review and approval. Such plans and specifications shall be submitted to Landlord within ten (10) days after the date hereof. Landlord shall review those plans and specifications, and either approve them or notify Tenant of proposed changes thereto, within seven (7) days after receiving them. Tenant shall, within three (3) Business Days in each instance, make any changes to such plans reasonably requested by Landlord or necessary to make the plans and specifications conform to Exhibit "B" hereof. "Business Days" are everyday except (i) Saturdays, (ii) Sundays, and (iii) days recognized as legal holidays by the United States Government or the state in which the Retail Center is located. Notwithstanding the foregoing to the contrary, Landlord does hereby agree to approve plans and specifications submitted by Tenant that provide for Tenant's installation in the Premises of such designs, interior decorations and trade fixtures as are customary in connection with the operation of a typical Blimpie restaurant, provided the same are permitted by applicable laws and regulations.

(2)    Promptly after the plans and specifications have been finalized, Tenant shall solicit bids and/or negotiate with contractors for construction of the Space Improvements and enter into written contracts with a contractor or contractors for the construction of such improvements and with other professionals for appropriate services in connection therewith. The contractor(s) and professional(s) so engaged by Tenant, and the respective contracts between such parties and Tenant, shall be subject to Landlord's prior written approval, which shall not be unreasonably withheld. Additionally, each of Tenant's contract(s) with contractor(s) shall provide for, at a minimum, a retainage or holdback of ten percent (10%) of the total cost of the contract until

17

completion of the work and for payment and performance bonds satisfactory to Landlord. All such construction shall be done at Tenant's risk, in a first-class workmanlike manner, and in accordance with the approved plans and specifications and all applicable laws and regulations. Prior to commencing construction, Tenant shall obtain all building and other permits or licenses required by law for the work; and, promptly after completion of such work, Tenant shall procure a certificate of occupancy for the Premises from the applicable governmental authorities and provide a copy thereof to Landlord. Landlord hereby agrees, upon its receipt of written request from Tenant, and solely in its capacity as owner of the Building and the Premises, to execute and deliver such applications as may be properly prepared and completed by Tenant, at Tenant's sole cost and expense, and required by any applicable governmental authority having jurisdiction over the Building and the Premises in connection with Tenant's efforts to obtain any and all building and similar approvals and permits necessary for the construction of the Space Improvements in accordance with the plans and specifications approved by Landlord pursuant to Section 5.01(a)(1) above. Tenant shall indemnify Landlord for any and all costs and expenses and liability (including, without limitation, reasonable attorneys' fees) incurred by Landlord in executing, delivering and/or submitting any such applications. All such construction shall be overseen by Landlord through its construction manager. Tenant shall permit Landlord and Landlord's construction manager to inspect the Premises and Tenant's work at all times during construction. Subject to §1.01 hereof, Tenant and its agents and contractors shall have the right to enter the Premises prior to the Commencement Date for such construction purposes, provided that, inter alia, prior to any such entry, Tenant shall have obtained the insurance required under Article IV hereof, and its contractors shall have obtained such liability, workers' compensation and other insurance as is reasonably acceptable to Landlord.

(b)    Any and all costs and expenses of designing and constructing the Space Improvements, including but not limited to all fees, costs and expenses paid under construction contracts and subcontracts, the costs and expenses of materials, supplies, permits and other items, and any other out-of-pocket expenditures incurred in any connection with such construction, shall be paid by Tenant.

(c)    If the Space Improvements are to be constructed by Tenant, then Landlord shall use commercially reasonable efforts to complete "Landlord's Work" on or before the Target Date set forth on the Reference Pages hereto, subject to delays necessarily caused by "Force Majeure", ready for Tenant to commence construction of the Space Improvements. As used herein, the term "Landlord's Work" shall mean the construction, installation and/or performance of the following standard store finishes to the Premises, which shall be at Landlord's sole cost and expense: drywall taped and spackled, smooth and ready for covering; concrete floor ready for floor covering; acoustical tile ceiling using Blimpie standard ceiling tiles; lay-in fluorescent lighting; one (1) restroom (or such minimum number of restrooms as shall be required by applicable building code for fast food restaurant use) to applicable building code standard, which restroom(s) shall be "ADA" (herein defined) compliant; one (1) six (6)-ton heating, ventilating and air-conditioning system for normal retail use; basic storefront finish ready to accept standard Blimpie signage; rear service door with exterior doorbell and 180-degree peephole; sprinkler system if required by applicable building code; 850 MBTU's gas service; and 120/208V 3 Phase 400 amp total electrical

18

service. Landlord's Work shall be performed in a good and workmanlike manner and in compliance with all applicable laws, regulations and building codes, including ADA. As used herein, the term "Force Majeure" means a strike or other labor trouble, governmental restriction, failure or shortage of utility service, national or local emergency, accident, flood, fire or other casualty, adverse weather condition, other act of God, inability to obtain a building permit or a certificate of occupancy, or any other cause beyond the reasonable control of the party required to perform. Notwithstanding any language in this Lease to the contrary, if Landlord's delivery of the Premises to Tenant with the Landlord's Work substantially complete does not occur on or before February 1, 2003, this Lease shall automatically terminate and neither party shall have any further liability to the other.

(d)    Upon Landlord's delivery of possession of the Premises to Tenant as provided in the immediately preceding subsection, Tenant shall immediately commence and diligently pursue to completion construction of the Space Improvements, subject to delays necessarily caused by Force Majeure.

§5.02  Signs. Tenant shall at its own expense erect a sign at the front of the Premises, which sign shall (a) conform to any guidelines or sign criteria adopted by Landlord with respect to the Retail Center, (b) conform to all applicable laws and regulations, and (c) be otherwise subject to Landlord's prior written approval. Also, Tenant shall, at its own cost and expense, install under the canopy at the Retail Center a sign with Tenant's Trade Name in lettering standard to all similar signs for other tenants at the Retail Center; provided, however, that Landlord hereby agrees that, subject to Tenant complying with all governmental requirements and obtaining all necessary governmental permits and licenses, Tenant may install standard Blimpie signs on the exterior portion of the Building above the Premises. Tenant shall not install or erect any other signs, advertisements or other visual displays at, on or in the Premises which are visible from the exterior thereof without the prior written approval of Landlord. Any window signs or displays which are approved by Landlord shall be made with artist's lettering and otherwise with a professional appearance. Landlord may remove, at Tenant's cost and expense, any signs or displays that are objectionable to Landlord or to other tenants at the Retail Center or their customers. Notwithstanding the foregoing to the contrary, Landlord hereby approves Tenant's (a) logos, (b) colors, (c) neon signage for windows and (d) awing, and Tenant's criteria for exterior and neon signage and an exterior awning to the Premises, all as specifically set forth in Exhibit "D" attached hereto and made part hereof.

§5.03  Condition. Except for the Landlord's Work to be constructed by Landlord hereunder, Tenant acknowledges that the Premises are leased hereunder "AS-IS, WHERE-IS", without warranty as to condition, suitability for a particular purpose or any other matter whatsoever.

§5.04  Tenant's Alterations. Except for non-structural, cosmetic renovations costing less than Five Thousand Dollars ($5,000.00), Tenant shall not make any alteration, addition or improvement to the Premises, whether structural or nonstructural, without Landlord's prior written consent. Tenant shall provide such drawings, plans and specifications as are requested by Landlord in reviewing any such proposed improvements. If Landlord consents to any such proposed alteration, addition or improvement, it shall be made at Tenant's sole cost and expense and at such

time and in such manner as to not unreasonably interfere with the use and enjoyment of the remainder of the Retail Center by any other tenant or other person. Landlord may, as a condition of granting its consent or approval hereunder, require Tenant to post such payment and performance bonds as Landlord deems reasonable to protect Landlord, any Mortgagee, and the Premises. In making any alteration, addition or improvement to the Premises, Tenant shall use materials equal or exceeding in quality and kind the original construction, as certified by the architect who designed the Retail Center or by such other architect as is designated by Landlord. All such alterations, additions and improvements shall be performed (a) in a good and workmanlike manner; (b) in accordance with all applicable laws and regulations, including but not limited to the ADA; (c) in accordance with all applicable insurance requirements and requirements of any Mortgagee; and (d) in accordance with the drawings, plans and specifications approved by Landlord. All work performed by Tenant shall be subject to Landlord's inspection and approval to determine whether it complies with the requirements of this Lease. Prior to the commencement of any such work by Tenant, Tenant shall obtain all necessary endorsements to the insurance required by Article IV hereof to be sure the same covers the performance of such work. Furthermore, Tenant shall defend, indemnify and hold harmless Landlord from and against any and all damages, losses or liability arising from such alterations or improvements or the construction thereof by Tenant or by any other party other than Landlord.

§5.05  Mechanics' Liens.  Tenant shall (a) within ten (10) days after receipt of notification thereof bond or have released any mechanics', materialman's or other lien filed or claimed against any or all of the Premises, the Building, or any other property owned or leased by Landlord by reason of labor or materials provided for Tenant or any of its contractors or subcontractors, or otherwise arising out of Tenant's use or occupancy of the Premises; and (b) defend, indemnify and hold harmless Landlord from and against any and all liability or expense (including but not limited to attorneys' fees) incurred by Landlord on account of any such lien or claim.

§5.06  Ownership.  Any and all improvements, repairs, alterations, fixtures (except removable trade fixtures, unless paid for by Landlord) or other property attached to or otherwise affixed to the Premises by Landlord or Tenant shall, immediately on the completion of their installation, become Landlord's property, subject to §1.03 hereof.

ARTICLE VI - MAINTENANCE

§6.01  Maintenance by Tenant.  Except for the repairs and maintenance that Landlord is specifically obligated to make or perform pursuant to §6.02 hereof, Tenant shall, at its own expense and throughout the Term of this Lease, promptly make all repairs and replacements, and perform all maintenance, in, to or about the Premises, and to the equipment and fixtures therein or appurtenant thereto, that are necessary or desirable in order to keep the Premises in good, clean, safe and working order, condition and repair, or that are required by law or governmental authority, any Mortgagee, or any insurance carrier providing an insurance policy to Landlord or Tenant in connection with the Retail Center, the Premises or this Lease. Without limiting the foregoing, Tenant, at its expense, is specifically required to make promptly all repairs (or, if applicable, to notify

20

promptly the respective utility company to make all repairs within its exclusive control) to (a) all pipes, water and waste lines, ducts, wires and conduits beneath or in the Premises or within the ceiling of the Premises; (b) the glass windows and plate glass doors of the Premises; (c) Tenant's sign(s); (d) all electrical, natural gas (if any), plumbing and other systems, equipment, fixtures and other items to the extent installed in or solely servicing the Premises; and (e) the floors, ceilings and walls of the Premises. If §3.01 of this Lease permits Tenant to store or prepare food at the Premises, Tenant shall scrub, wash and clean all equipment, vents and cooking areas in the Premises on a daily basis and according to the highest standards of hygiene and cleanliness, and all tables in cus-tomer seating areas (if any) shall be wiped and cleaned on an hourly basis. All floors of the Pre-mises shall be mopped or vacuumed (as appropriate) on a daily basis, and all garbage and refuse shall be sealed in airtight containers and removed at least twice each day to trash collection containers designated by Landlord. In addition, Tenant shall make any such reasonable changes in the operation of its business at the Premises as are requested by Landlord in an effort to improve the attractiveness of the Premises or otherwise to improve the conditions of health and hygiene therein. Tenant shall, at its own expense, enter into a service contract with a contractor approved by Land-lord providing for regularly scheduled maintenance and servicing of all heating, ventilation and air conditioning systems and equipment ("HVAC") within or serving the Premises. Such contract shall include all services suggested by the equipment manufacturer and shall become effective within thirty (30) days after the Commencement Date. Notwithstanding the foregoing, Landlord may, at its option, maintain the HVAC serving the Premises, together with the HVAC serving other tenant spaces at the Retail Center, through a combined service contract, in which event the cost of such service contract shall be one of the Common Area Expenses and shared by all of the tenants whose HVAC is serviced in this manner. Tenant shall notify Landlord promptly of any and all defects and damages Landlord is required to correct or repair under §6.02 hereof.

§6.02   Maintenance by Landlord.   The Landlord shall, within thirty (30) days (or such longer period of time as may reasonably be required by Landlord) after written notice from Tenant with respect thereto, maintain in good condition and repair, subject to normal wear and tear (a) the roof, the structural portions and the exterior of the Building; and (b) all Common Areas. All costs and expenses incurred by Landlord under this Section shall be Common Area Expenses. However, if such maintenance or repair results from any act or neglect of Tenant, its agents, employees or contractors, then (a) the costs and expenses thereof shall not be Common Area Expenses; and (b) Tenant shall, upon demand, reimburse Landlord for one hundred fifteen percent (115%) of such costs and expenses [such costs to include Landlord's out-of-pocket expenses and the compensation of Landlord's employees, and with the additional fifteen percent (15%) being intended to compensate Landlord for its overhead in relation thereto].

§6.03   Interruption.   Landlord shall have no liability to Tenant on account of any failure, modification or interruption of electricity, water or other utility, HVAC or other service, and Tenant shall not be entitled to any abatement or diminution of Rent on account thereof. However, if such interruption occurs, Landlord shall take reasonable steps to provide for the resumption of such ser-vice to the extent the same is part of Landlord's responsibility hereunder and within Landlord's control.

21

## ARTICLE VII - RIGHT OF ENTRY

Landlord and its agents and contractors shall be entitled to enter the Premises at any time (a) to inspect the Premises; (b) to exhibit the Premises to any existing or prospective purchaser, tenant or Mortgagee; (c) to make any alteration, improvement or repair to the Building or the Premises; or (d) for any other purpose relating to the operation or maintenance of the Retail Center. Landlord shall (a) give Tenant at least twenty-four (24) hours' prior notice of its intention to enter the Premises (unless doing so is impractical or unreasonable because of emergency), and (b) use reasonable efforts to avoid interfering with Tenant's use and enjoyment thereof.

## ARTICLE VIII – CASUALTIES

§8.01  General. If the Premises are damaged by fire or other casualty during the Term, then the following shall apply:

(a)    Landlord shall restore the Premises with reasonable promptness, taking into account the time required by Landlord to effect a settlement with, and to procure any insurance proceeds from, any insurer against such casualty, to substantially the same condition as existed immediately before such casualty. Landlord may temporarily enter and possess any or all of the Premises for such purpose. Landlord shall not be obligated to repair or restore any fixture, improvement, alteration, furniture or other property owned or installed by Tenant, except alterations or improvements for which insurance proceeds are specifically made available under policies obtained hereunder.

(b)    The times for commencement and completion of any such restoration shall be extended for the period of any delay due to Force Majeure. If Landlord undertakes to restore the Premises and such restoration is not substantially completed within two hundred forty (240) days plus the period of any extension for Force Majeure as aforesaid, then Tenant may terminate this Lease by giving written notice thereof to Landlord within thirty (30) days thereafter.

(c)    From the time of such fire or other casualty to substantial completion of the restoration, Tenant's rental obligations shall be abated proportionately for that portion of the Premises which is rendered untenantable as a result of the casualty.

§8.02  Substantial Destruction. Notwithstanding §8.01 hereof, the following shall apply:

(a)    Landlord may terminate this Lease, by giving written notice thereof to Tenant within sixty (60) days after the fire or other casualty, if the Building is so damaged thereby that (1) either the Premises or the Building is rendered substantially unfit for occupancy, as reasonably determined by Landlord, (2) the Building is damaged to the extent that Landlord elects to demolish the Building, or (3) any Mortgagee requires that any or all of the insurance proceeds issued on account of such damage be used to retire any or all of the debt secured by its Mortgage.

(b)    If Landlord terminates this Lease under ¶(a) of this Section, then (1) Tenant

22

shall pay to Landlord the Minimum Rent and any Additional Rent payable by Tenant hereunder through the date of the fire or other casualty, (2) Landlord shall repay to Tenant any and all prepaid Rent for periods after such fire or other casualty, and (3) Landlord may enter upon and repossess the Premises without further notice.

§8.03   Tenant's Negligence.   Also notwithstanding §8.01 hereof, but subject to §4.03 hereof, if any such damage to the Premises, the Building or the Retail Center is caused by or results from the negligent or intentional act or omission of Tenant or any of its employees, contractors, agents, invitees or licensees, then (a) the Rent shall not be abated or apportioned as aforesaid; and (b) Tenant shall pay to Landlord, upon demand and as Additional Rent, the cost of (1) any repairs and restoration made or to be made as a result of such damage, or (2) if Landlord elects not to restore the Premises, the Building, or the Retail Center, as the case may be, all damages and losses that Landlord incurs as a result of such damage.

§8.04   Tenant's Rights.   In addition to Tenant's right to terminate this Lease as provided in Section 8.01(b) above, Tenant shall have the right to terminate this Lease if the Premises shall be damaged by fire or other casualty within the last Lease Year of the Term, provided (i) such fire or other casualty is not caused by the negligence or intentional act or omission of Tenant or any of its employees, contractors, agents, invitees or licensees, (ii) Tenant is not reasonably able to use fifty percent (50%) or more of the Premises due to such damage and, if such damage occurs at least six (6) months prior to the scheduled expiration of the Term, restoration of the Premises  cannot take place within sixty (60) days of the fire or other casualty, and (ii) Tenant gives Landlord written notice of such termination election within twenty (20) days after the fire or other casualty.

## ARTICLE IX - CONDEMNATION

§9.01   Right to Award.   If any or all of the Premises are taken by the exercise of any power of eminent domain or are conveyed to or at the direction of any governmental entity under a threat of any such taking (a "Condemnation"), Landlord shall be entitled to collect, from the condemning authority, the entire amount of any award or consideration for such taking or conveyance, without deduction therefrom for any leasehold or other estate held by Tenant under this Lease.  Landlord shall be entitled to conduct any Condemnation proceeding and any settlement connected therewith free of interference by Tenant; Tenant waives any right that it may otherwise have to participate therein.  However, Tenant may seek, in a separate proceeding, a separate award on account of any damages or costs it incurs as a result of the Condemnation (e.g., Tenant's moving expenses, trade fixtures, etc.), so long as such separate award in no way diminishes any award or payment which Landlord would otherwise receive as a result of the Condemnation.

§9.02   Effect of Condemnation.   The following provisions of this Section shall apply if (a) all of the Premises are covered by a Condemnation; (b) any portion of the Premises is covered by a Condemnation and the remainder is insufficient for the reasonable operation of Tenant's business; (c) any portion of the Building is covered by a Condemnation and, in Landlord's reasonable opinion, it would be impractical to restore the remainder thereof; or (d) any portion of the Retail Center is

covered by a Condemnation and, in Landlord's reasonable opinion, it would be impractical to continue to operate the remainder of the Retail Center thereafter. If any of the events described in the immediately preceding sentence shall occur during the Term, then the Term shall terminate on the date possession of the property covered by such Condemnation is taken by the condemning authority, and all Rent shall be apportioned and paid to such date. If there is a Condemnation and the Term does not terminate pursuant to the foregoing provisions of this Section, then (i) the operation and effect of this Lease shall be unaffected by such Condemnation, except that the Minimum Rent shall be reduced in proportion to the square footage of floor area (if any) of the Premises taken or conveyed by reason of such Condemnation, and (ii) Landlord, at its sole cost and expense but only to the extent of the proceeds of any award received by Landlord for such Condemnation, shall restore the Premises with reasonable promptness, taking into account the time required by Landlord to effect its claim for and to receive an award for such Condemnation, as nearly a practicable to a complete unit of like quality and character as existed prior to the Condemnation, except that Landlord shall not be obligated to repair or restore any fixture, improvement or alteration owned or installed by Tenant, except any such fixtures, improvements or alterations for which Condemnation award proceeds are specifically made available to Landlord.

§9.03  Interruption.  If there is a Condemnation, Landlord shall have no liability to Tenant on account of any (a) interruption of Tenant's business upon the Premises, (b) diminution of Tenant's ability to use the Premises, or (c) other injury or damage sustained by Tenant as a result of such Condemnation.

## ARTICLE X - ASSIGNMENT AND SUBLETTING

§10.01  Consent.  Notwithstanding any reference in this Lease to assignees, subtenants, licensees, concessionaires, or similar persons or entities, Tenant may not assign any of its rights under this Lease or make or permit any sublease, license, mortgage, pledge or other transfer of any part of the Premises (any such assignment, sublease, etc., or attempted assignment, sublease, etc., being hereinafter referred to as a "Transfer"), without first obtaining Landlord's written consent thereto, which consent may be given or withheld by Landlord in its sole and absolute discretion. If consent to any one Transfer is given, such consent shall not extend to any subsequent Transfer. Landlord shall be entitled, in its sole and absolute discretion, to condition any such consent upon the entry by such proposed transferee into an agreement with (and in form and substance satisfactory to) Landlord, by which the proposed transferee assumes all of Tenant's obligations hereunder. Any person or entity to whom any Transfer is attempted without such consent shall have no claim, right or remedy whatsoever hereunder against Landlord. Landlord shall have no duty to recognize any person or entity claiming by, under or through any such Transfer. The foregoing terms of this Section shall apply whether or not Landlord accepts Rent from, or performance of Tenant's other obligations by, such person or entity. The sale, assignment or other transfer of a controlling interest in the ownership of Tenant (if a corporation), the sale, assignment or other transfer of any general partnership interest in Tenant (if a partnership), the sale of substantially all of Tenant's assets, and the merger of Tenant into another organization, after which merger Tenant shall not be the surviving corporation or partnership -- whether such sale, merger, etc. be by operation of law or otherwise -- shall each be

24

considered a Transfer for the purposes of this Lease.

§10.02 <u>Consent Procedure</u>.   Without conferring any rights upon Tenant not otherwise provided in this Article, the parties agree that, should Tenant desire to enter into a Transfer, then, at least thirty (30) days before the proposed effective date of the Transfer, Tenant shall request Landlord's consent and provide the following:  (a) the full particulars of the proposed Transfer, including its nature, effective date, terms and conditions, and copies of all offers, draft agreements, subleases, letters of commitment or intent, and other documents pertaining to the proposed Transfer; and (b) a description of the identity, net worth and previous business experience of the proposed transferee, including without limitation copies of the proposed transferee's then latest income, balance sheet and changes in financial position statements (with accompanying notes and disclosure of all material changes thereto) in audited form, if available, and certified as accurate by the proposed transferee.  Tenant shall pay promptly all reasonable attorneys fees Landlord may incur in reviewing the foregoing materials and in granting or denying its consent hereunder, including those for drafting or reviewing the documents granting or denying such consent.

§10.03 <u>No Release</u>.   No Transfer or other action taken with or without Landlord's consent shall in any way relieve or release Tenant from full liability for the timely performance of all of Tenant's obligations under this Lease.

§10.04 <u>Excess Rents</u>.   If Tenant effects a Transfer and at any time receives periodic rent and/or other consideration which exceeds that which Tenant is obligated to pay to Landlord hereunder, Tenant shall pay to Landlord all of such excess rent or other consideration promptly [but in no event later than two (2) days] after receipt of such monies.

§10.05 <u>Blimpie Franchisees</u>.   Landlord hereby acknowledges that the Guarantor (or an entity owned and controlled by the Guarantor) is an approved franchisee/licensee of Blimpie Associates, Ltd., and that the original Tenant under this Lease, 2001 B.A. Realty Inc., an affiliate of Blimpie Associates, Ltd., upon the full execution and delivery of this Lease, will sublease the entire Premises to the Guarantor (or an entity owned and controlled by the Guarantor).  Landlord hereby approves such subletting of the Premises to the Guarantor.  Should the original Tenant, 2001 B.A. Realty Inc., desire to replace the Guarantor, as subtenant, with another subtenant that is an approved franchisee/licensee of Blimpie Associates, Ltd., then Landlord hereby agrees that it will not unreasonably withheld its consent thereto, provided the following conditions are satisfied:  (i) at least thirty (30) days prior to the effective date of the proposed subletting, Landlord shall have received the documentation referenced in Section 10.02 above, along with written evidence from Blimpie Associates, Ltd. that the proposed subtenant is an approved franchisee/licensee of Blimpie Associates, Ltd.; (ii) the proposed subtenant has a net worth equal to or greater than the Guarantor or the then most recent subtenant, as the case may be; and (iii) the proposed subtenant executes and delivers to Landlord its guaranty of this Lease, in the form of the Guaranty, which shall be secured and accompanied by Additional Collateral provided by such proposed subtenant.

ARTICLE XI - RULES AND REGULATIONS

Landlord shall have the right to impose and subsequently modify, from time to time and at its sole and absolute discretion, reasonable rules and regulations governing the use of the Retail Center ("Rules and Regulations"). Tenant shall comply with such Rules and Regulations and require its agents, employees, invitees and licensees to do so.

## ARTICLE XII - MORTGAGE LENDERS

§12.01 Subordination. This Lease shall be subject and subordinate to the lien, operation and effect of each Mortgage, automatically and without the necessity of any further action by either party hereto. However, if the mortgagee or beneficiary under any Mortgage (a "Mortgagee") succeeds to the interest of Landlord hereunder through foreclosure or otherwise, then, at the request of such Mortgagee, Tenant shall attorn to such Mortgagee and recognize such Mortgagee as the Landlord under this Lease, and this Lease shall continue in full force and effect as a direct lease between such Mortgagee and Tenant upon all of the terms of this Lease, except that such Mortgagee shall not be (a) liable for any act, omission or default of any prior Landlord or any other event occurring prior to such Mortgagee's succeeding to the interest of Landlord hereunder; (b) subject to any counterclaim, defense, recoupment or offset to the extent the same relates to any time prior to such Mortgagee's succeeding to the interest of Landlord hereunder; (c) bound by any payment of Rent for more than one month in advance (unless actually received as such by the Mortgagee); (d) bound by any modification or amendment of this Lease, unless such modification or amendment shall have been approved in writing by the Mortgagee or shall have been entered into and effective prior to the creation of such Mortgagee's Mortgage; (e) obligated to construct all or any portion of the Space Improvements or to grant any credit toward the cost of the Space Improvements; (f) in the event of damage to the Retail Center by fire or other casualty, obligated to repair the Premises or the Retail Center beyond such repair as may be reasonably accomplished with the net proceeds of any insurance policy therefor not applied toward the amount due under such Mortgagee's Mortgage or under any Mortgage prior in title thereto; or (g) in the event of partial condemnation, obligated to repair the Premises or the Retail Center beyond such repair as may be reasonably accomplished with the net proceeds of any award therefor not applied toward the amount due under such Mortgagee's Mortgage or under any Mortgage prior in title thereto. A "Mortgage" is a mortgage, deed of trust, ground lease or similar instrument now or hereafter granted by Landlord and encumbering all or part of the Retail Center or any renewal, modification or extension thereof. Landlord hereby agrees that it will request that any existing and/or future Mortgagee provide and enter into with Tenant, such Mortgagee's standard form non-disturbance agreement.

§12.02 Written Agreement. Tenant shall, within seven (7) days after request by Landlord or any Mortgagee, execute, acknowledge and deliver such further instrument as is requested by Landlord or any Mortgagee to acknowledge the rights described in §12.01 hereof and/or to provide such other information and certifications as are reasonably requested. Any Mortgagee may at any time subordinate the lien of its Mortgage to the operation and effect of this Lease without obtaining Tenant's consent thereto, in which event this Lease shall be deemed to be senior to such Mortgage without regard to their respective dates of execution, delivery and/or recordation.

§12.03 Estoppel Certificate.  Tenant shall, in each instance within seven (7) days after request therefor by Landlord or any Mortgagee, execute, acknowledge and deliver to Landlord (or, at Landlord's request, to any existing or prospective purchaser, assignee or Mortgagee) a written certification (a) that this Lease is unmodified and in full force and effect (or, if there has been any modification, stating the nature of such modification); (b) as to the dates to which the Minimum Rent and Additional Rent have been paid; (c) as to the amount of any prepaid Rent or any credit due to Tenant hereunder; (d) whether Tenant has accepted possession of the Premises and all improvements thereto are as required hereunder; (e) as to the date on which the Term commenced; (f) as to whether, to the best of Tenant's knowledge, information and belief, Landlord or Tenant is then in default in performing any of its obligations hereunder (and, if so, specifying the nature of each such default); (g) as to Tenant's usage of the Premises and, without limiting the provisions of §13.01 hereof, as to the status of any Hazardous Materials thereon; and (h) as to any other fact or condition reasonably requested by Landlord or such Mortgagee.  Any such certificate may be relied upon by Landlord and any such other person or entity to whom the certificate is directed.

## ARTICLE XIII - ENVIRONMENTAL COVENANTS

§13.01 Prohibitions.  Neither Tenant nor its employees, licensees, invitees, agents or contractors shall use, manufacture, release, store or dispose of, on, under or about the Premises, any explosive, flammable substance, radioactive material, asbestos in any form, paint containing lead, materials containing urea formaldehyde, polychlorinated biphenyls, or any other hazardous, toxic or dangerous substances, wastes or materials, whether having such characteristics in fact or defined as such under laws or regulations (collectively, "Hazardous Materials").  However Tenant may store and use cleaning fluids of the type sold in supermarkets, provided that Tenant does so in a safe and lawful manner without contaminating the Premises or the environment.  Without limiting the foregoing, Tenant agrees (a) to notify Landlord immediately in the event any Hazardous Materials are released or spilled on or about the Premises; (b) to monitor and clean up, immediately, any such releases and spills in compliance with all laws and governmental directions and subject to such instructions (if any) as Landlord may provide; (c) to obtain promptly such evidence or governmental approvals, that such clean-up has been completed in compliance with all laws and governmental directions, as Landlord may require; (d) to deliver to Landlord, in each instance within three (3) Business Days after Tenant's receipt thereof, copies of any and all notices received by Tenant relating to any actual or alleged contamination of the Premises; and (e) simultaneously with delivering any monitoring report or notice to any governmental agency as to any Hazardous Materials or the operation of the Premises with respect thereto, to deliver a copy thereof to Landlord.

§13.02 Inspection.  In addition to its other rights under this Lease, Landlord may enter upon the Premises at any time for the purposes of inspecting for Hazardous Materials.  If Landlord discovers the existence of any actual or potential Hazardous Materials due to fault or other act of Tenant or its agents, employees, invitees or licensees, then Tenant shall reimburse Landlord upon demand for the costs of such inspection, sampling and analysis.

§13.03 <u>Landlord's Representations and Covenants</u>.  Landlord hereby represents to and covenants with Tenant that (i) as of the date of this Lease, Landlord has not received from any governmental authority any written notice that the Retail Center is in violation of any applicable environmental laws, except as may have been disclosed in writing to Tenant prior to Tenant's execution and delivery of this Lease, and (ii) the Premises will be delivered to Tenant free and clear of any and all Hazardous Materials, except in such legally permitted nominal amounts and under such conditions as may be legally permitted by applicable environmental laws in the construction of buildings.

ARTICLE XIV - DEFAULT AND REMEDIES

§14.01 <u>Default</u>.  Each of the following shall constitute an "Event of Default":

(a)  Tenant fails (1) to make one or more payments of Rent when and as due and payable hereunder, or (2) to perform or observe any one or more of its other obligations under this Lease when and as due hereunder;

(b)  Tenant or any guarantor of this Lease (1) applies for or consents to the appointment of a receiver, trustee or liquidator of Tenant or such guarantor or of all or a substantial part of the assets of Tenant or such guarantor; (2) is subject to a petition in bankruptcy or admits in writing its inability to pay its debts as they come due; (3) makes an assignment for the benefit of its creditors; (4) files a petition or an answer seeking a reorganization or an arrangement with creditors or otherwise seeks to take advantage of any insolvency law as to its own indebtedness or obligations; (5) performs any other act of bankruptcy; or (6) files an answer admitting the material allegations of a petition filed against Tenant or such guarantor in any bankruptcy, reorganization or insolvency proceeding; or

(c)  Tenant fails to take possession of the Premises when and as required under the terms hereof, Tenant fails to open for business with the public at the Premises (with all improvements to the Premises having been completed as required herein) by the Commencement Date, or Tenant thereafter vacates or abandons the Premises for more than three (3) continuous days.

§14.02 <u>Grace Period</u>.  Notwithstanding anything contained in this Article, upon the occurrence of an Event of Default, Landlord shall not exercise any right or remedy which it has under any provision of this Lease or applicable law unless and until:

(a)  Landlord has given written notice thereof to Tenant, and

(b)  Tenant has failed (1) if such Event of Default consists of a failure to pay money, to pay all of such money within five (5) days after such notice; or (2) if such Event of Default consists of something other than a failure to pay money, to fully cure such Event of Default within fifteen (15) days after such notice [however, if an Event of Default of the type described in

28

this clause (2) cannot be cured within that fifteen (15)-day period, to fully cure the same within such longer time as is necessary provided that Tenant commences that cure within that fifteen (15)-day period and thereafter diligently and continuously pursues completing that cure].

However, no such notice shall be required, and Tenant shall be entitled to no such grace period (1) in an emergency in which Landlord acts to cure such Event of Default pursuant to ¶(b) of §14.03 hereof; (2) if the same type of Event of Default occurs more than twice during any twelve (12) month period; (3) if Tenant closes its business to the public during the hours Tenant is required to remain open under §3.01 hereof; or (4) in the case of any Event of Default of the type described in ¶(b) of §14.01 hereof.

§14.03 Remedies. Upon the occurrence of any Event of Default, Landlord may, subject to §14.02 hereof, take any or all of the following actions:

(a) Sell at public or private sale all or any part of the fixtures, equipment, inventory and other property belonging to Tenant and in which Tenant has granted a lien to Landlord under §14.05 hereof, at which sale Landlord shall have the right to become the purchaser upon being the highest bidder. The rights of Landlord set forth in the immediately preceding sentence shall be subject and subordinate to the lien rights and interest of any lender making a U.S. Small Business Administration guaranteed loan to Tenant. The proceeds of any such sale by Landlord shall be applied first toward the payment of all costs and expenses of seizing and storing such property and conducting the sale (including all reasonable attorneys' fees); second toward the payment of any indebtedness, including without limitation Rent, which may be, or may thereafter become, due from Tenant to Landlord; and third to pay Tenant any surplus remaining.

(b) Perform, on behalf of and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant has failed to perform, without prior notice to Tenant, in which event one hundred fifteen percent (115%) of the total cost incurred by Landlord in doing so [the additional fifteen percent (15%) being intended to compensate Landlord for its overhead in relation thereto], together with interest thereon at the rate of eighteen percent (18%) per annum from the date of such expenditure, shall be deemed Additional Rent and shall be payable by Tenant to Landlord upon demand.

(c) With or without (at Landlord's discretion) terminating this Lease, re-enter the Premises, with or without court action or summary proceedings, remove Tenant and all other persons and property from the Premises, and store any such property in a public warehouse or elsewhere at the costs of and for the account of Tenant, all without resort to legal process and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby and without relieving Tenant of any liability.

(d) With or without (at Landlord's discretion) terminating this Lease, make, from time to time, such improvements, alterations and repairs as may be necessary in order to relet the Premises, and relet the Premises or any part thereof upon such term or terms (which may be for a term extending beyond the Term of this Lease), at such rental or rentals, and upon such other terms

and conditions (which may include concessions, free rent and/or improvements) as Landlord, in its sole and absolute discretion, deems appropriate.  Upon each such reletting, all rentals received by Landlord shall be applied first toward the payment of any indebtedness other than Rent due hereunder from Tenant to Landlord, second toward the payment of all costs and expenses of such reletting (including but not limited to brokerage fees, reasonable attorneys' fees and costs of improvements, alterations and repairs), third toward the payment of all Rent due and unpaid hereunder, and the balance (if any) shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder.

        (e)    Exercise any other rights or remedies that Landlord may have at law or in equity.

No reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease unless Landlord gives a written notice of such intention to Tenant. Notwithstanding that Landlord may have re-leased the Premises without termination, Landlord may at anytime thereafter elect to terminate this Lease for any previous default.  Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure of Landlord to relet the Premises or to collect rent or other amounts due in connection with such reletting. No action taken by Landlord under the terms of this Section shall operate as a waiver of any right that Landlord would otherwise have against Tenant for the Rent hereby reserved or otherwise, and Tenant shall at all times remain responsible to Landlord for any loss and/or damage suffered by Landlord by reason of any Event of Default.

    §14.04 Damages.  Upon any Event of Default, Tenant shall remain liable to Landlord for the following amounts: (a) all Rent that may have become due with respect to the portion of the Term that has already expired; (b) all Rent that shall become due during the remainder of the Term; (c) all costs, fees and expenses incurred by Landlord in leasing the Premises to others from time to time, including but not limited to leasing commissions, construction and other build-out costs, design and permitting costs and the like; and (d) all costs, fees and expenses incurred by Landlord in pursuit of its remedies hereunder, including but not limited to reasonable attorneys' fees and court costs.  Furthermore, at Landlord's option, Tenant shall be obligated to pay, in lieu of the amount described in clause (b) above in this Section, an amount (the "Substitute Amount") which is equal to the present value of all Rent that would become due during the remainder of the Term (calculating Additional Rent as though the same were to continue to increase over such remainder of the Term at the average rate of increase occurring over the then-expired portion of the Term), with such present value to be determined by discounting at an annual rate of interest which is equal to the interest paid on U.S. Treasury Notes issued at the time the calculation is made and with a one-year maturity.  All such amounts shall be due and payable immediately upon demand by Landlord and shall bear interest at the rate of eighteen percent (18%) per annum from the date of such demand until paid.  Provided that the Substitute Amount is actually paid in full to Landlord and the Premises are surrendered by Tenant, Landlord shall list the Premises with its broker as available for lease (to the extent Landlord's contract with such broker does not already apply to all vacant space in the Retail Center), and Tenant shall receive a reduction and reimbursement of all such amounts which is equal to the amount of any rent actually received from others to whom the Premises are rented during the re-

mainder of the Term; however, in its leasing efforts, Landlord may give preference to leasing other available space in the Retail Center rather than the Premises. Tenant and Landlord acknowledge and agree that payment to Landlord of the Substitute Amount, together with the corresponding reduction by reimbursement to Tenant of any rent paid by substitute tenants, are a reasonable forecast of the actual damages that would be suffered by Landlord in case of an Event of Default by Tenant, which actual damages are otherwise difficult or impossible to ascertain, and therefore such payment and reimbursement together constitute liquidated damages and not a penalty. Any suit or action brought by Landlord to collect any such liquidated damages shall not in any manner prejudice any other rights or remedies of Landlord hereunder.

Notwithstanding the foregoing to the contrary, so long as 2001 B.A. Realty Inc. is the Tenant under this Lease, **and** so long as Landlord then holds a valid and enforceable Guaranty from a subtenant approved by Landlord, which Guaranty is then secured by Additional Collateral held by Landlord, Landlord hereby agrees that it will look only to the Security Deposit hereunder, such subtenant, the Guaranty and the Additional Collateral to satisfy the monetary obligations of the Tenant under this Lease; it being expressly understood and agreed, however, that should 2001 B.A. Realty Inc. and/or Blimpie Associates, Ltd. occupy and operate the Premises at any time during the Term of this Lease, then and in any such event, 2001 B.A. Realty Inc. and/or Blimpie Associates, Ltd., as the case may be, shall be liable for any and all monetary obligations of the Tenant under this Lease that accrue during each and every period of its or their (as the case may be) occupation and operation of the Premises.

§14.05 <u>Landlord's Lien</u>. Tenant hereby grants to Landlord a first contract lien and security interest in and to all fixtures, equipment, inventory and other property that may be placed in the Premises or affixed or attached thereto and also upon all proceeds of any insurance that may be issued on account of damage to any such property. All exemption laws are hereby waived in favor of said lien and security interest benefitting Landlord. This lien and security interest is given in addition to any statutory lien benefitting Landlord and shall be cumulative thereto or alternative thereto as elected by Landlord at any time. If requested by Landlord, Tenant shall execute, deliver to Landlord and/or file at Tenant's expense, in all of the appropriate public records, Uniform Commercial Code financing statements in sufficient form to perfect the security interest hereby given. Landlord shall have, in addition to all of its rights under this Lease, all of the rights and remedies of a secured party under the Uniform Commercial Code of the jurisdiction in which the Premises are located. Landlord hereby agrees that the foregoing lien shall be subject and subordinate to the lien of any bona fide lender making a U.S. Small Business Administration guaranteed loan to Tenant for the purchase of any of the aforesaid fixtures, equipment, inventory or other personal property.

§14.06 <u>Waiver of Jury Trial</u>. Landlord and Tenant and any guarantors each hereby releases and waives any and all rights provided by law to a trial by jury in any court or other legal proceeding to enforce the terms of this Lease or with respect to any and all claims among them <u>inter se</u> that are otherwise connected with this Lease.

§14.07 <u>Waiver of Exemptions and Right of Redemption</u>. If and to the extent permitted by

law, Tenant waives the benefit of any and all homestead and other exemptions, and rights of redemption or restoration of the operation of this Lease, conferred by any present or future law or otherwise.

§14.08 <u>No Accord and Satisfaction</u>. No payment by Tenant, or receipt by Landlord, of a lesser amount than the total amount of Rent due under the terms of this Lease shall be deemed to be other than a payment of a portion of the Rent due under this Lease. No endorsement or statement on or with any check or other payment, or in any letter or other instrument accompanying any check or other payment, shall be deemed an accord and satisfaction. Landlord may accept such check or other payment, despite such endorsement or statement, without prejudice to Landlord's rights to recover the balance of the Rent due and to pursue any other rights or remedies provided in this Lease or otherwise available at law or in equity.

§14.09 <u>Waiver of Counterclaims</u>. To the extent permitted by law, Tenant waives any and all right it may have to assert a counterclaim in any summary proceeding. The parties hereto specifically acknowledge and agree that Tenant's covenants to pay Rent or any other payments required of it hereunder are independent of all other covenants and agreements herein contained. The foregoing shall not be construed as a waiver of Tenant's rights to assert any such claim in a separate action brought by Tenant against Landlord.

§14.10 <u>Landlord Defaults</u>. If Landlord is in default of any of its obligations under this Lease for more than thirty (30) consecutive days, plus such additional time (if any) for delays due to Force Majeure, after written notice given to Landlord and to all Mortgagees (of which Tenant shall have been given written notice) by Tenant hereunder specifically describing such default, then, but not before, Landlord shall be deemed to be in default with respect to this Lease and Tenant shall have such rights at law or in equity to which it may be entitled, subject however to the provisions of Article XVII hereof.

§14.11 <u>Granting of Future Security Interests</u>. During the Term of this Lease, Tenant agrees to give written notice to Landlord of any loan in excess of $10,000 made to Tenant by an officer, director or shareholder of Tenant, or by a parent, grandparent or sibling of an officer, director or shareholder of Tenant, if such loan is secured by any personal property, inventory, or accounts receivable of Tenant. Such notice shall indicate the amount and terms of the loan, the name of the person making the loan, and the nature of any security interest provided by Tenant. Tenant shall also provide notice to Landlord of any default by Tenant on the terms of any such loan or the receipt of notice of default on such loan.

ARTICLE XV - QUIET ENJOYMENT

Landlord covenants that, upon paying the Rent as and when due under the terms of this Lease and observing and performing all of the other terms and conditions, on Tenant's part to be ob-served and performed, in accordance with the terms of this Lease, Tenant may, throughout the Term but subject to the terms and conditions of this Lease, peaceably and quietly hold and enjoy the

32

Premises, and use the Common Areas hereunder, free from any interference by Landlord or by anyone claiming by, under or through Landlord.

## ARTICLE XVI - NOTICES

Each and every notice, demand and other communication to be provided hereunder to a party hereto shall be (a) in writing; (b) sent by personal delivery, registered or certified mail through the United States Postal Service with first class postage prepaid, or recognized overnight commercial courier (such as Federal Express); and (c) addressed to that party at its respective Notice Address set forth on the Reference Pages. However, notwithstanding §19.02 hereof, Landlord may change its Notice Address by so notifying Tenant hereunder, whereupon Landlord's new Notice Address shall apply. If Tenant sends Landlord any notice of default with respect to Landlord's obligations under this Lease, Tenant shall simultaneously send a copy thereof to each Mortgagee of whom Tenant has received actual notice.

## ARTICLE XVII - LIMITATIONS UPON LIABILITY

§17.01 Exculpation of Landlord. None of the following persons or entities shall be personally liable in any connection with this Lease, any breach of this Lease, or any act or omission connected with this Lease or otherwise connected with the Retail Center: Landlord or any director, officer, partner, shareholder, employee, representative, asset manager or agent of Landlord, or any Mortgagee. Tenant shall resort solely to the equity of Landlord in the Retail Center, as of the time Tenant notifies Landlord of the particular details of Tenant's claim, for the satisfaction of all judgments and other rights and remedies Tenant may have with respect to the foregoing. The foregoing exculpation of personal liability is absolute and without any exception or condition whatsoever.

§17.02 Exclusions from Liability. Landlord shall not be liable for any loss, damage or injury to person or property, or any interference or interruption of Tenant's use of the Premises or the rest of the Retail Center hereunder, that may be occasioned by (a) acts or omissions of other occupants of the Retail Center, their employees, agents, subtenants, licensees or concessionaires, or any visitors to, or customers of, the Retail Center; (b) water, gas, steam, wind, or the bursting, stoppage, or leaking of any pipes, sewer or water lines, or other conduits, fixtures, or equipment; (c) any repairs, alterations, maintenance or additions to the Premises or any other portion of the Retail Center; or (d) any criminal act on the part of any person or entity other than Landlord. Nor shall Tenant be entitled to any abatement or diminution of Rent on account of any event described in clause (a), (b), (c) or (d) of the immediately preceding sentence, unless in the case of clauses "(b)" and "(c)" only, the interruption or interference with Tenant's business in the Premises is material, caused solely by the gross negligence or intentional misconduct of Landlord or its employees, agents or contractors while acting within the scope of their employment with Landlord, and continues for longer than ten (10) consecutive business days, in which event Rent shall be equitably abated. Landlord makes no representation or warranty as to the number or type of other tenants in the Retail Center or that any of the other leases for premises within the Retail Center will continue

for any period of time. Neither this Lease nor any term hereof is contingent upon such other tenants or leases. Tenant has neither any right against Landlord, nor any right to an abatement or diminution of Rent, by reason of any act or omission by Landlord with respect to any leases for other premises within the Retail Center or by reason of any failure of Landlord to enforce any provision of said other leases or any Rules or Regulations.

§17.03 <u>Transfers by Landlord</u>. The term "Landlord", as used in this Lease, means any Mortgagee then in possession of the Retail Center, or, in the absence thereof, the then fee owner of the Retail Center. Landlord shall have the unrestricted right to assign or transfer this Lease or its interests hereunder to any purchaser of the Retail Center or any part thereof, to the holder(s) of Mortgages, or to any other person or entity. In the event of an assignment or transfer by a Landlord of its rights or interests under this Lease, or an assignment or transfer of the Premises, the Retail Center or the improvements included within the Retail Center, then (a) the Landlord who makes the assignment or transfer shall thereupon automatically be entirely freed and relieved of all obligations thereafter arising under this Lease, and (b) the person or entity thereby acquiring those rights and interests or the Premises, the Retail Center or the improvements shall automatically be deemed to have assumed and agreed to observe and perform all obligations of Landlord under this Lease thereafter arising.

## ARTICLE XVIII - REQUIRED LEASE AMENDMENTS

In each instance within ten (10) days after request therefor by Landlord, Tenant shall execute and deliver to Landlord any and all amendments to this Lease incorporating such modifications of, and additions to, the terms of this Lease as any Lending Institution shall require as a condition precedent to its granting of any loan or commitment in connection with any Mortgage. Notwithstanding the foregoing, Tenant shall not be required to execute any amendment that would modify the provisions of this Lease as to the amount of Minimum Rent, Real Estate Taxes, Common Area Expenses, Security Deposit, for Monthly Dues, the size of the Premises, or the duration of the Term. "Lending Institution" means any insurance company, bank, savings bank, trust company, savings and loan association, insurance company, university, pension, profit, retirement or welfare fund or trust, governmental or quasi-governmental agency or entity, real estate investment trust, or other financial or lending institution whose loans on real estate or with respect thereto are regulated by state or federal law.

## ARTICLE XIX - GENERAL PROVISIONS

§19.01 <u>Entire Agreement</u>. This Lease constitutes the entire agreement between the parties hereto as to the subject matter hereof and supersedes all prior written or oral negotiations, representations, warranties, statements or agreements between the parties hereto.

§19.02 <u>Amendment</u>. This Lease may be amended by and only by a written instrument executed and delivered by both parties hereto.

§19.03 <u>Applicable Law</u>.  This Lease shall be given effect and construed by the application of the law of the jurisdiction in which the Premises are located, without reference to the choice of law rules of that jurisdiction.

§19.04 <u>Waiver</u>.  Landlord shall not be deemed to have waived the exercise of any right which it holds hereunder unless such waiver is made expressly, specifically, and in writing.  No delay or omission by Landlord in exercising any such right shall be deemed to be a waiver thereof or of its future exercise.  No waiver shall be deemed to apply in any other instance or to any other right.

§19.05 <u>Time of Essence</u>.  Each and every term of this Lease shall be construed in accordance with the principle that time is of the essence.

§19.06 <u>Headings</u>.  The headings of the articles, sections and paragraphs of this Lease are provided herein only for convenience of reference and shall not be considered in construing their contents.

§19.07 <u>Severability</u>.  No determination by any court, governmental body or otherwise that any term of this Lease is invalid or unenforceable in any instance shall affect the validity or enforceability of this Lease, that term in any circumstance not controlled by such determination, or any other term of this Lease.  Rather, each term of this Lease shall be valid and enforceable to the fullest extent allowed by, and shall be construed wherever possible as being consistent with, applicable law.

§19.08 <u>Successors and Assigns</u>.  Subject to the provisions of Article X hereof, this Lease shall be fully binding upon the parties hereto and each of their respective successors and assigns.

§19.09 <u>Joint and Several Liability</u>.  Whenever two or more parties constitute Tenant, all such parties shall be jointly and severally liable for Tenant's obligations hereunder.

§19.10 <u>Commissions</u>.  Each party hereto hereby represents and warrants to the other that, in connection with the leasing of the Premises to Tenant, the party so representing and warranting has not dealt with any real estate broker, agent or finder, except the Brokers of Record.

§19.11 <u>Recordation</u>.  This Lease may not be recorded among the land records, or any other public records, without Landlord's prior written consent.

§19.12 <u>Perpetuities Savings Clause</u>.  If the rule against perpetuities would invalidate this Lease or any portion hereof, or would limit the time during which this Lease shall be effective, due to a potential failure of an interest in property created herein to vest within a particular time, then, notwithstanding anything contained in this Lease to the contrary, each such interest must vest, if at all, within twenty-one (21) years from the date of this Lease.  If any such interest does not vest within that period, then this Lease shall automatically terminate immediately prior to the expiration

35

of that twenty-one (21)-year period.

§19.13 <u>Incorporation into this Document</u>.  The Reference Pages and each exhibit hereto is a part of this Lease.

§19.14 <u>Survival</u>.  Notwithstanding any termination of this Lease (a) each party shall remain liable for any and all breaches, that shall have theretofore occurred, of its respective obligations under the terms of this Lease; (b) Tenant shall remain liable, under §§1.03, 4.04 and 13.01 hereof, with respect to any acts or omissions that shall have occurred at or prior to such termination; and (c) Tenant shall remain liable, under Article II hereof, for Rent related to the Term of this Lease.

§19.15 <u>Rights of Third Parties</u>.  No term of this Lease shall be deemed to confer any right upon any person or entity other than (a) Landlord and Tenant, respectively; (b) subject to Article X hereof, their respective successors and assigns; and (c) Mortgagees as provided under the terms of this Lease.

§19.16 <u>Plurality and Gender</u>.  Wherever appropriate herein, the singular includes the plural and the plural includes the singular.  All feminine, masculine and neuter terms contained herein are used interchangeably.

§19.17 <u>Counterparts</u>.  This Lease may be executed in two or more counterparts, in which event all counterparts shall constitute one and the same instrument.

§19.18 <u>Relationship of Parties</u>.  Nothing contained in this Lease shall be construed to create the relationship of principal and agent, partnership, joint venture or any other relationship between the parties hereto, other than the relationship of landlord and tenant.

§19.19 <u>Effectiveness</u>.  The submission of this Lease by Landlord does not constitute an offer by Landlord or other option for, or restriction of, the Premises.  This Lease shall become effective and binding only if and when Landlord and Tenant each executes this Lease or counterpart copies of this Lease and delivers such a signed original hereof to the other.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each party hereto has executed this Lease under seal on the day and year written first above.

**LANDLORD:**

H STREET COMMUNITY
DEVELOPMENT CORPORATION, INC.

By: _____
Name: William S. Barrow
Title: Executive Director.

**TENANT:**

2001 B.A. REALTY INC.,
a New York corporation

By: _____ [SEAL]
Name: Nicholas Lagano, Jr.
Title:   President

STATE OF _District of Columbia_, ~~CITY/COUNTY OF~~ _____, TO WIT:

    **I HEREBY CERTIFY** that on this _26th_ day of _August._, 2002, before me, the subscriber, a Notary Public of the State and City/County aforesaid, personally appeared _William J. Barrow_, _Executive Director_ of H Street Community Development Corporation, Inc., and he or she acknowledged the foregoing document to be the act and deed of said corporation.

    WITNESS my hand and Notarial Seal.

My Commission Expires: Deirdre-Ann L. Smith
Notary Public, District of Columbia
My Commission Expires 11-30-2005

_Deirdre Ann L. Smith_
Notary Public


STATE OF _New York_, **CITY/COUNTY OF** _New York_, **TO WIT:**

    **I HEREBY CERTIFY** that on this _19th_ day of _August_, 2002, before me, the subscriber, a Notary Public of the State and City/County aforesaid, personally appeared _Nicholas Lagano, Jr._, _PRES._, of _2001 Bar Realty Inc._ and he or she acknowledged the foregoing document to be the act and deed of said corporation.

    WITNESS my hand and Notarial Seal.

My Commission Expires: _____

JOEL R. SCHWEIDEL
Notary Public, State of New York
No. 31-8881180
Qualified in New York County
Commission Expires Jan. 31, 2003

Notary Public

## EXHIBIT "A"

FLOOR PLAN OF THE RETAIL CENTER

## EXHIBIT "B"

SPACE PLAN OF THE PREMISES

**EXHIBIT "C"**

FORM OF GUARANTY

**GUARANTY**

THIS GUARANTY is made and granted this ____ day of _____, 2002, by **NAZIM M. ALI**, an unmarried natural person (hereinafter referred to, collectively, even if only one, as the "Guarantors"), to and in favor of **H STREET COMMUNITY DEVELOPMENT CORPORATION, INC.**, a District of Columbia corporation ("Landlord").

**W I T N E S S E T H:**

WHEREAS, Landlord is contemplating entering into a "Retail Lease Agreement" of even date herewith (the "Lease") with 2001 B.A. Realty Inc., d.b.a. Blimpie, a New York corporation, as tenant ("Tenant") for approximately 1,798 square feet of space (the "Premises") in the one (1)-story retail building to be constructed and located at 8th and H Streets, N.E. in the District of Columbia.

WHEREAS, Guarantors will be the franchisee of Tenant that will occupy and operate the Premises in accordance with the terms, conditions and provisions of the Lease.

WHEREAS, Guarantors desire to induce Landlord to execute and deliver the Lease, but Landlord is willing to do so if and only if Guarantors guarantee to Landlord, under the following terms and conditions, the observance and performance of all of Tenant's obligations when and as due under the terms of the Lease.

NOW, THEREFORE, simultaneously with Landlord's execution of the Lease, and in consideration thereof, the Guarantors do hereby, jointly and severally, make the following covenants and agreements in favor of Landlord with respect to all present and future obligations of Tenant under the Lease:

1.      Guarantors hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantee to Landlord, without limit (a) the prompt and complete payment to Landlord of all Rent, when and as the same becomes due and payable under the terms of the Lease; (b) the prompt and complete observance and performance of all other obligations of Tenant under the Lease, when and as the same are to be observed or performed under the terms of the Lease; and (c) the prompt and complete payment to Landlord of all other damages, costs and expenses (including reasonable attorneys fees) that, by reason of the Lease, may become payable by Tenant to Landlord.

2.    Guarantors' liability hereunder shall in no way be affected by (a) any waiver, release, indulgence, extension or forbearance that Landlord may hereafter grant to Tenant with respect to the observance or performance of any obligation of Tenant under this Lease; (b) any settlement between Landlord and Tenant with respect to any rights or remedies Landlord may have against Tenant; (c) any waiver, release, indulgence, extension or forbearance that Landlord may hereafter grant to any one or more of the Guarantors individually (if more than one) with respect to any of that Guarantor's, or those Guarantors', obligations under this Guaranty; or (d) any settlement between Landlord and any one or more of the Guarantors individually (if more than one) with respect to any rights or remedies Landlord may have against such individual Guarantor(s) hereunder. Guarantors waive any requirement that Guarantors be notified of any such waiver, release, indulgence, extension, forbearance, or settlement.

3.    In the event of any default in the observance or performance of any of Tenant's obligations under the Lease, Guarantors covenant and agree to perform such obligations forthwith upon Landlord's demand (in the same manner as if the same constituted the direct primary obligations and liabilities of Guarantors), including, without limitation, payments of all attorneys fees and other sums owing to Landlord by reason of such default.

4.    The obligations of the Guarantors hereunder shall in no way be terminated, postponed or impaired by reason of any assertion by Landlord against Tenant of any rights or remedies Landlord may have.

5.    Landlord may make demand upon, or institute legal proceedings against, Guarantors for the performance of any obligations of Tenant under the Lease, without first proceeding in any way against Tenant and without enforcing any rights or remedies Landlord may have under, or in connection with, the Lease.

6.    Landlord and Tenant may, at any time and from time to time, without notice to, or consent by, the Guarantors, enter into such modifications, extensions, or amendments of the Lease, or other covenants respecting the Lease, as they deem appropriate. The Guarantors' liability hereunder shall not be released or impaired thereby; rather, the Guarantors shall continue to be fully liable, in the manner set forth in this Guaranty, for the payment, observance and performance of all obligations of Tenant under the Lease as thus modified, extended or amended.

7.    Guarantors waive any and all rights they may otherwise have to receive notice of acceptance of this Guaranty, notice of failure or default in the observance or performance of any of Tenant's obligations under the Lease, and other notices that may be lawfully waived by Guarantors. No delay of Landlord in exercising any of its rights or remedies or under this Guaranty, or in taking any action to enforce the observance or performance of Tenant's obligations under the Lease, shall operate as a waiver of such rights or remedies or in any manner impair any of Landlord's rights or remedies against Guarantors hereunder.

8.      In any action or proceeding brought by either the Landlord or the Guarantors against the other with respect to any matters whatsoever arising out of, under or by virtue of the Lease or this Guaranty, the Landlord and the Guarantors shall and do hereby waive trial by jury.

9.      Neither the disaffirmance, discharge, postponement nor impairment of Tenant's liability or obligations under the Lease in any bankruptcy, insolvency, reorganization or similar proceeding, nor any resulting termination of this Lease, shall relieve the Guarantors of any of their liability under this Guaranty. Rather, such liability shall continue just as though the Lease had not been affected by such disaffirmance, discharge, postponement, impairment or termination.

10.     The Guarantors agree to pay all reasonable attorneys' fees, court costs, expert witness fees and charges, and other expenses incurred by Landlord in connection with any action taken as a result of a breach of the Lease or this Guaranty.

11.     If any term of this Guaranty is or becomes void, in whole or in part, for any reason whatsoever, then this Guaranty shall be valid and remain in full force and effect to the extent that it is not void.

12.     All claims that Guarantors may have against Tenant, whether by way subrogation to any position of Landlord or for contribution or reimbursement or otherwise, shall be subordinate to any then outstanding claims that Landlord may then have against Tenant. Guarantors hereby release Landlord from any and all liability to Guarantors or to Tenant for failing to recognize, observe, or protect any legal or equitable right Guarantors may have with respect to Tenant, the Lease, or the Premises described in the Lease. No such failure on the part of Landlord shall relieve Guarantors of any of their liability under this Guaranty.

13.     This Guaranty may not be modified, altered or terminated, except pursuant to an instrument in writing executed by Guarantors and consented to in writing by Landlord. No waiver of any term of this Guaranty shall be valid unless in writing and signed by Landlord. Any failure of Landlord to insist upon strict performance of any obligation or covenant of Guarantors under this Guaranty in any one or more instances shall not be construed as a waiver or relinquishment of (a) the right to insist upon strict performance of such obligation or covenant thereafter, (b) any other rights or remedies of Landlord, or (c) any other obligations or covenants of Guarantors.

14.     This Guaranty shall be construed and enforced in accordance with the laws of the State in which the Premises described in the Lease are located, without reference to the choice of laws rules of that state.

3

15.     This Guaranty shall be binding upon Guarantors, their heirs, executors, personal representatives, successors and assigns; and shall inure to the benefit of, and be enforceable by, Landlord, its successors and assigns, and by any successor to the interests of the Landlord under the Lease.  However, the foregoing terms shall not be deemed to modify any provision of the Lease regarding assignments.

16.     The terms defined in the Lease shall have the same respective meanings in this Guaranty.

17.     Guarantor's obligations and liabilities under this Guaranty shall be construed in accordance with the principle that time is of the essence.

18.     For the purposes of this Guaranty, Tenant's obligations under the Lease shall be deemed to include the acts or omissions of Tenant's employees, agents, contractors, subtenant, licensees, concessionaires, and invitees for which Tenant is liable under the terms of the Lease.

19.     This Guaranty may be executed in several counterparts, in either original typed instruments or reproductions thereof, but all counterparts shall constitute one and the same instrument.

20.     Any notice which Landlord may desire to give to Guarantors shall be deemed sufficiently given or rendered if in writing and either (a) delivered to Guarantors personally, or (b) deposited with the U.S. Postal Service (with first-class postage prepaid and sent by certified or registered mail, return receipt requested) or with a recognized overnight commercial courier service (such as Federal Express), and addressed to Guarantors at _____, _____, _____, Attention: _____, or at such other address as Guarantors may designate by written notice given to Landlord in the manner hereinafter provided.  The time of the rendition or giving of such notice shall be deemed to be the time when the same is personally delivered, or one day after the same is deposited as aforesaid, as the case may be.  However, in the event of an emergency, any notice by Landlord to Guarantors hereunder may be oral, delivered by telephone or telegraph, or delivered by hand as the exigencies of the particular situation may allow.  Any notice by Guarantors to Landlord must be served by certified or registered mail return receipt requested, or by a recognized overnight commercial courier service, addressed to Landlord at the same address as is designated under the Lease from time to time for notices to Landlord, or at such other addresses as Landlord may designate by written notice given to Guarantors in the manner hereinbefore provided.

## [SIGNATURE PAGE AND ACKNOWLDEGEMENT FOLLOW]

4

**IN WITNESS WHEREOF**, the Guarantors have executed and delivered this Guaranty under seal as of the date first written above.

**GUARANTORS**:

_____[SEAL]
Name: Nazim M. Ali,
          an unmarried natural person

**STATE OF** _____, **CITY/COUNTY OF** _____, **TO WIT:**

    **I HEREBY CERTIFY** that on this _____ day of _____, 2002, before me, the subscriber, a Notary Public of the State of _____, in and for the City/County aforesaid, personally appeared Nazim M. Ali, and he acknowledged the foregoing document to be his act and deed.

    WITNESS my hand and Notarial Seal.

_____
Notary Public

My Commission Expires: _____

6

**EXHIBIT "D"**

**APPROVED SPECIFICATIONS AND CRITERIA
FOR TENANT'S SIGNS AND AWNING**