May 04 06 10:37a    Jeannie McConnell    7032277409    p.1

# Council of the District of Columbia
## Report

City Hall, 14th and E Streets, N.W.    ~~RECEIVED~~ Fifth Floor    638-2223 or Government Code 137-3806

| | |
|---|---|
| To | All Councilmembers |
| From | John A. Wilson, Chairperson, Committee on Public Services and Consumer Affairs |
| Date | March 24, 1976 |
| Subject | Committee Report on Bill 1-253, the District of Columbia Consumer Protection Procedures Act |

This bill, "to provide consumers in the District with procedures for the redress of improper trade practices, and for other purposes," was introduced by Councilmember John A. Wilson on March 4, 1976, and referred to the Committee on Public Services and Consumer Affairs. The legislation will abolish the present Office of Consumer Affairs (OCA) and establish an Office of Consumer Protection (OCP) with powers and procedures to deal administratively with consumer complaints.

A similar bill, No. 1-187, was vetoed by the Mayor on February 10, 1976. This bill is identical to Bill 1-187 as passed by the Council except:

(1) the Mayor's appointments of the Director and administrative law judge of the Office of Consumer Protection are not subject to Council confirmation;

(2) the Director and general counsel of the Office of Consumer Protection are not required to be District residents;

(3) editorial corrections were made to sections 4(a)(1) and (2), 5(n), (p), (q), (r)(4), (r)(5), (t), and (w), and 6(h)(2).

On March 19, 1976, the Committee reported out the bill with two amendments noted below.

### Legislative History of OCA

The Office of Consumer Affairs, as part of the Executive Office of the Mayor, was authorized by Congress in Fiscal 1974, P.L. 93-91 approved August 14, 1973. The Office was formally established by Commissioner's Order 73-225 dated October 3, 1973. This order, which, as amended July 17, 1974, is the basic law being changed by this act, is attached to this report.



EXHIBIT B

Report on Bill 1-253
Page 2
March 24, 1976

### General History and Background

Starting in 1968, consumer groups in the District lobbied the Mayor and the Congress for an independent consumer protection agency in the District government, structured along the lines and authority of a "mini-FTC".

The "official" history of the Office--i.e., the history of attempts by the Executive Branch to establish such an agency--is depicted in the chart following.

May 04 06 10:38a    Jeannie McConnell        7032277409        P.3

# Council of the District of Columbia
## Report

City Hall, 14th and E Streets, N.W.    Fifth Floor    638-2223 or Government Code 137-3806

RECEIVED

OFFICE OF THE SECRETARY
DISTRICT OF COLUMBIA COUNCIL

| | |
|---|---|
| To | All Councilmembers |
| From | John A. Wilson, Chairman, Public Services & Consumer Affairs Committee (Polly Shackleton & Willie Hardy, members) |
| Date | November 19, 1975 |
| Subject | Report on Bill #1-187, "District of Columbia Consumer Protection Procedures Act" |

The Committee on Public Services and Consumer Affairs supports Bill #1-187, "to provide consumers of the District of Columbia with procedures for the redress of improper trade practices, and for other purposes", which was introduced on September 23, 1975, by Councilmember John A. Wilson, and referred to the Committee on Public Services and Consumer Affairs.

This legislation will abolish the present Office of Consumer Affairs and establish an Office of Consumer Protection.

### Legislative History of OCA

The Office of Consumer Affairs, as part of the Executive Office of the Mayor, was authorized by Congress in Fiscal 1974, P.L. 93-91 approved August 14, 1973. The Office was formally established by Commissioner's Order 73-225 dated October 3, 1973.

### General History and Background

Starting in 1968, consumer groups in the District lobbied the Mayor and the Congress for an independent consumer protection agency in the District government, structured along the lines and authority of a "mini-FTC".

The "official" history of the Office--i.e., the history of attempts by the Executive Branch to establish such an agency--is depicted in the chart following.

## DISTRICT OF COLUMBIA GOVERNMENT

### HISTORY OF CONSUMER AFFAIRS REQUESTS

| Fiscal Year | Amount Requested | Positions | Requesting Office | Congressional Action |
|---|---|---|---|---|
| 1969 | $ 51,812 | 3 | Executive Office (Office of Community Renewal) | Denied |
| 1970 | (215,300)<br>50,000<br>165,300 | 19 | Joint Request<br>Executive Office<br>(Department of Licenses & Inspections) | Denied |
| 1971 | 50,000 | 3 | Executive Office | Denied |
| 1972 | 54,000 | 3 | Department of Economic Development | $29,400 and 3 positions approved. Never implemented. |
| 1973 | 171,600 | 19 | Department of Economic Development | Request denied including the 3 previously approved positions. Directed that city study needs and develop program other than in DED. |
| 1974 | 186,700 (9 mos.) | 14 | Executive Office | Granted |
| 1975 | 289,800 | 19 1/2 | Executive Office | Granted |

5061-1-00100

Report on Bill 1-253
Page 4
March 24, 1976

The OCA was:

- approved by Congress (in the FY 1974 budget) in August, 1973,

- established by the Mayor in October, 1973,

- activated (through appointment of a part-time--now full-time--Director) in November, 1973,

- opened approximately five months after Congressional approval.

In spite of its weak mandate, limited authority (especially compared to neighboring jurisdictions) and slow start, consumer groups supported the OCA at the FY 1975 budget hearings as an important step forward.

### Functions and Authority of OCA

Commissioner's Order 73-225 gave the Office the following functions and authority:

(1) Receive and evaluate consumer complaints.

(2) Administer and enforce the D.C. Consumer Retail Credit Regulation (City Council Regulation 71-18, June 1, 1971), and such other consumer protection regulations as may be assigned.

(3) Perform the functions vested in the Commissioner by the District of Columbia Consumer Protection Act of 1971 (P.L. 92-200).

(4) Recommend to the Mayor-Commissioner a Consumer Protection Plan for the District of Columbia.

(5) Recommend to the Mayor-Commissioner appropriate legislation or regulations necessary to protect and promote the interests of consumers.

(6) Promote fair business practices within the business community.

Report on Bill 1-253
Page 5
March 24, 1976

(7)  Conduct educational programs to assist consumers and businessmen.

(8)  Establish liaison with consumer groups.

(9)  Be available to advise, consult, and cooperate in the implementation of consumer protection policies throughout the District Government.

(10) Conduct research surveys and special studies and render annual reports on the status of consumer protection efforts in the District of Columbia.

The Office of Consumer Affairs has virtually no regulatory or enforcement authority except in two areas--the enforcement of the D.C. Consumer Retail Credit Regulations and indirectly, administration of the Consumer Goods Repair Regulation.  The latter is enforced by the Board of Consumer Goods Repair Services which works very closely with the OCA and is dependent upon OCA's staff for administration of licensing, investigation of repair complaints, etc.  In addition, the Office administers the 1971 D.C. Consumer Credit Protection Act which, because of the lack of any enforcement provisions or rule-making, has in effect remained unenforced.  Unlike the Montgomery County and Prince George's County consumer protection agencies, the D.C./OCA has no general authority to hold hearings, subpoena witnesses, issue cease and desist orders, order restitution, or order suspension or revocation of licenses, except under the two regulations cited above.

Under the D.C. Consumer Retail Credit Regulation, the OCA has the authority to hold administrative hearings, subpoena witnesses, promulgate rules, issue cease and desist orders, and order suspension of registration on complaints which specifically violate that regulation.  The Board of Consumer Goods Repair Services has similar authority to enforce the Consumer Goods Repair Regulation, with adminis-trative support from the OCA

Briefly, the three laws under the administration of OCA provide the following:

(1)  D.C. Consumer Retail Credit Regulation (enacted by Council in September, 1971):  Requires registration

Report on Bill 1-253
Page 6
March 24, 1976

>       of all businesses which sell goods on credit and
>       all sales finance companies which purchase retail
>       credit paper.  Requires strict credit disclosures,
>       regulates credit practices, and provides for
>       administrative penalties (deregistration, cease and
>       desist orders, etc.) as well as criminal penalties
>       for non-compliance.

(2)  Consumer Goods Repair Regulation (enacted by
     Council in March, 1974):  Requires the licensing of
     all automotive and electronic repair dealers
     (approximately 400) operating in the District
     (effective November, 1974); requires written
     estimates and final bills with extensive disclo-
     sures; prohibits a variety of unscrupulous
     practices; and provides for specific enforcement
     procedures, including hearings, cease and desist
     orders, denial, suspension and revocation of
     licenses and criminal penalties.  Also requires the
     Board with assistance from the OCA, to hold
     hearings on the need to include other repair
     industries, starting with a hearing on major
     appliance, which was to be held no later than
     January 15, 1975.

(3)  1971 Consumer Credit Protection Act (enacted by
     Congress in December, 1971):  This comprehensive
     Act regulating sale and financing of consumer goods
     in the District is largely "self-enforcing"--i.e.,
     dependent on consumer civil action to affect
     enforcement.  In two important areas, however,--
     home solicitation and debtor harassment--specific
     prohibitions are provided and the Mayor is given
     enforcement powers, but no rules or provisions for
     enforcement (such as administrative procedures).

   In addition to complaints under the purview of the regu-
lations mentioned above, the Office receives and handles a
variety of consumer complaints in areas where it has no
enforcement authority.  The method of disposition is
normally conciliation or referral to other agencies.

Report on Bill 1-253
Page 7
March 24, 1976

### Philosophy and Programs of OCA

Until at least the end of 1975, the emphasis of the
D.C./OCA was away from consumer advocacy (forceful complaint
handling and enforcement of regulations). Instead the
priorities, as frequently stated by the Director, were on
"fostering good relations" between business and consumers
and on consumer education. This philosophy set the tone for
the Office and was reflected in program priorities.

The Office has produced and distributed many publi-
cations, sponsored several programs, and spoken on numerous
occasions to apprise District residents of their rights as
consumers and to give advice on certain consumer problems.

In April of 1974, OCA sponsored a Consumer Education
Awareness Conference in order that approximately 75
representatives of government, business and private groups
involved in consumer education could get together to
exchange ideas, outline major needs and coordinate their
efforts.

A two-day Food Conference was sponsored by OCA in
September, 1974, which was attended by approximately 400
District residents from all socio-economic levels. The
purpose of this Conference was to provide information on
ways to simultaneously stretch the consumer food dollar and
maintain good nutrition, and the cost to OCA was approxi-
mately $10,000.

One of the fundamental intentions of Bill 1-253 is to
shift the philosophy and emphasis of the Office to
individual complaint handling and enforcement of
regulations, and therefore to decrease the relative
importance of consumer education. While this bill continues,
on the same level, the Office's full authority to carry on a
consumer education program (sections 4(a)(7) and 7), it greatly
expands and specifies the powers and procedures for dealing with
complaints brought by consumers. The bill also provides for a
shift in emphasis within the Office's consumer education
work, from educating the general public to backing up the
enforcement programs of the Office (sections 4(a)(14),
6(h)(2), 6(o), and 7(a)(2) and (3)), much in the manner of
Federal Trade Commission publicity. Under Bill 1-253,
publicity of consumer protection legislative policies of the

Report on Bill 1-253
Page 8
March 24, 1976


District (section 7(a)(1)) would also take a high priority.
The Committee believes that by far the best possible
consumer education program will be the knowledge spread by
word of mouth among both consumers and business people that
a fair and forceful consumer protection office is ready to
redress improper trade practices for consumers.

### OCA's Position with Consumer Groups in the District

D.C. Power disseminated in August, 1975, a preliminary
report on the Office of Consumer Affairs which incorporates
the views of several consumer groups in the District. The
report states:

"The OCA serves as a place where consumer
complaints are heard but not effectively acted
upon. The OCA sponsors programs that repeat-
edly tell the consumer what he/she is doing
poorly, and how to do it better. But the OCA
lacks programs that show the business
community what changes they need to make. The
OCA has not offered significant consumer
protection from fraudulent trade practices and
has not adequately enforced consumer
protection laws. Further the functions of
mediation and pacification of consumer
desires, interests, and rights have taken
precedence over an advocacy role."

Twenty-seven months after the establishment of the
D.C./OCA (at the time Bill 1-253 was introduced), there had
been no rules drafted or promulgated for administrative
enforcement procedures in spite of pressures from the
Corporation Counsel's Office (beginning in January, 1974
when the Corporation Counsel supplied OCA with sample rules
to use as guidelines). In fact, enforcement action had been
initiated in only two cases--one by direct referral to
Corporation Counsel and one to the U.S. Attorney's office.
It should be noted that the procedures in section 6 of Bill
1-253 are sufficiently specific so that the procedural rule-
making powers in section 4(a)(10) will probably be needed
only sparingly.)

Report on Bill 1-253
Page 9
March 24, 1976

In implementing the Consumer Goods Repair Regulations, license application forms were mailed out only a few days before the license deadline.

The support and enthusiasm of consumer groups who had lobbied for the Office, waned considerably after the first year record of the Office, and continued to wane as time passed without improvement in the record of the Office.

OCA supported issues that consumer groups and consumers lobbied against and vice versa. This is exemplified by the testimony of OCA at Council hearings on Auto Repossession (9/26/75) and the Universal Product Code System (7/23/75).

At the Auto Repossession hearings, the Director of OCA opposed the proposed legislation, and stated that there is no problem with auto repossession in the District. He stated further that if consumers pay on time there would be no repossession. To the contrary, representatives from finance companies, consumer groups, and victims of repossession acknowledged the problems of District residents with auto repossessions, and most favored the bill or the intent of the bill with suggestions.

The Universal Product Code System utilizes a computerized checkout system at the supermarkets, and eliminates individual price marking of items. Many consumer organizations advocate requiring individual price marking. OCA, however, testified in favor of waiting for the testing in the suburban stores to be completed before taking a position. Unlike consumer representatives, the Office did not argue that conditions in the District are far different from those in the suburbs, and may create a greater need for individual price marking.

It has been stressed by many consumer groups in the District that OCA rarely, if ever, solicits input from these groups. Second Tuesday meetings are held, where consumer groups and consumers can attend, but there is very little chance of any input from these groups.

Report on Bill 1-253
Page 10
March 24, 1976

### Establishment of a New Office

An attempt to reorganize the present Office of Consumer Affairs would be fruitless, as well as complex and cumbersome. It would be much more feasible to create a new Office and provide this Office with procedures and powers needed to efficiently deal with any given consumer problem. Bill 1-253 proposes to do just that.

Bill 1-253 creates an Office of Consumer Protection and yields to this office the following powers:

(1) to investigate

(2) to subpoena pertinent witnesses and papers

(3) to mediate

(4) to prosecute

(5) to hold hearings

(6) issue cease and desist orders

(7) to preserve property involved in a case, when it might be destroyed or hidden before the case ends

(8) to represent the consumer interest before other District Government agencies.

Further, the bill:

(1) establishes a procedure to decide the factual validity of consumer complaints

(2) provides an in-house General Counsel

(3) provides an administrative law judge, having nearly all the powers of a judge in the courts, sitting in a contract case on a consumer matter

(4) mandates that the Director have a refined, complete classification system for past cases, which helps to organize them in order to reveal issues that are troubling large numbers of District consumers

2008 05/04 11:18 FAX    ☑001

Report on Bill 1-253
Page 11
March 24, 1976

(5)   allows the Director to initiate complaint cases.

<u>Summary of Public Hearing</u>

A public hearing was held on Bill 1-187 on November 5, 1975, at which the Committee received oral testimony from twelve persons.

Witnesses who favored the bill were:

Anne Brown, Americans for Democratic Action; Joel Bennett, D.C. Bar, Consumer Affairs Committee Substantive; Jim Vitarello, D.C. Public Interest Research Group; James Goldberg, Mid-Atlantic Food Council; Cathaleen Mullen, Legal Research for the Elderly; Barbara Gilliam, Board of Nursing; John Hechinger, representing his father John Hechinger, Chairman of the Consumer Affairs Task Force of the Democratic National Committee; and Dr. William H. Cooper, M.D., D.C. Medical Society.

Common issues raised by and viewpoints of, those persons favoring the Bill were:

(1)   the transfer of some, but not all of the licensing Boards and Commissions to the new Office of Consumer Protection (as section 3 of Bill 1-187 originally provided):

The general feeling was that all or none of the Boards and Commissions should be transferred, and that the Boards and Commissions should have equal representation of consumers and specialists.

(2)   appointment of administrative law judge by the Director:

It was felt that the administrative law judge should be independent of the Director, and appointed by the Mayor.

(3)   the agency should be independent, rather than a cabinet agency as provided for in the bill. Such an amendment was never made to the bill.

Witnesses who addressed only specific sections of the bill were:

Report on Bill 1-253
Page 12
March 24, 1976

William Robertson, Director - Office of Consumer
Affairs; Louise Wilson, President - Board of Cosmetology;
and Bernard LePrince, Washington Hairdressers Cosmetologist
Association.

Mr. Robertson of CCA stated that he favors Section 4 of
the bill relating to the powers of the Office. He submitted
for the record, a copy of a favorable evaluation of the OCA
prepared by Associated Counselors International and costing
OCA $9,600. The evaluation was released the day of the
hearing, although it was completed in late September.

Mrs. Wilson and Mr. LePrince disapproved of consumer
representation on the Boards and Commissions, stating that
consumers are not knowledgeable enough to sit on the
Boards/Commissions.

Mrs. Virginia Keith appeared on behalf of herself and
opposed the bill in defense of the Director of the OCA She
did not address the bill at all.

<u>Committee Amendments to Bill 1-253</u>

The Committee voted two amendments to the bill, as
follows:

(1) Page 6, subsection (g), second line:  after "Acting
Director", add "or Director"

(2) Page 8, paragraph (10), second and third lines:
strike "or further defining unlawful trade practices
proscribed in section 5 of this act,"

Amendment (1) would allow the Mayor to appoint either a
Director or an Acting Director, after the bill takes effect
and the new Office of Consumer Protection begins. The bill
now required that an Acting Director be initially appointed,
but this is unnecessary without Council confirmation.

Amendment (2) would deny the consumer protection agency
the power to make substantive rules. The interpretation of
unlawful trade practices would therefore depend on 3 main
sources:

(A)  Future Council legislation

Report on Bill 1-253
Page 13
March 24, 1976


(B)   The case-by-case decisions of the Office of Consumer Protection.

(C)   Court review - the bill provides for the opportunity for judicial review after the Office takes final action in a case.

In regard to (B), it should be noted that section 6(m)(2) of the bill requires that a detailed index of all finished cases be maintained for public view by the Office. This will enable anyone to find out what are the Office's interpretations of unfair trade practices.  Thus, there is no need to grant the Office substantive rule-making powers.

## Section-by-Section Analysis

### SECTION 1 -- TITLE

The bill is entitled the "District of Columbia Consumer Protection Procedures Act".

### SECTION 2 -- DEFINITIONS AND PURPOSES

#### Sec. 2(a)  Definitions

(1)   "person" is defined broadly to include any individual or entity.

(2)   "consumer" is used as both an adjetive and a noun throughout the bill.  As an adjective, the conventional legal definition - "primarily for personal, household, or family use" - is employed.  As a noun, a consumer is a person on the "demand" side of a consumer transaction.

(3)   "merchant" is a person on the "supply" side of a consumer transaction.

(4)   "complainant" is the consumer complaining before the Office of Consumer Protection.  In some cases, especially for elderly, very young, and mentally incompetent consumers, another person, such as an adult child, parent, or guardian, will act as complainant on behalf of the consumer.

Report on Bill 1-253
Page 14
March 24, 1976

(5)  "respondent" is the merchant, or another merchant further along the supply chain who is deemed legally responsible under relevant substantive law, defending before the Office.

(6)  "trade practice" is any economic act between a consumer and a merchant.

(7)  "goods and services" are the subject matter of any trade practice, including any action normally considered only incidental to the supply of goods and services to consumers.

(8)  "Office" is the Office of Consumer Protection.

Sec. 2(b)  The purposes of the bill are briefly stated in this subsection.

## SECTION 3 -- OFFICE OF CONSUMER PROTECTION

Sec. 3(a)  The Office of Consumer Protection is established as the principal consumer protection agency of the District of Columbia Government.  Other agencies with consumer protection functions include the Department of Economic Development, the Department of Environmental Services, the Insurance Department, the Public Service Commission, the Department of Human Resources , and the Corporation Counsel.

Sec. 3(b)  The Director of the Office is appointed by the Mayor.  The Director has the power to administer and exercise the powers of the Office of Consumer Protection, consistent with this bill and other District laws.

Sec. 3(c)  A Section of Investigations is established within the Office, under the leadership of the Deputy Director of the Office, to investigate and attempt to conciliate all consumer complaint cases brought to the Office.

Sec. 3(d)  A General Counsel, who must be a member of the District of Columbia Bar, will be appointed by the Director.

Report on Bill 1-253
Page 15
March 24, 1976

Sec. 3(e) One full-time administrative law judge shall be appointed by the Mayor for a three-year term to a Section of Hearings in the Office.  The Director would hire any other personnel in the Section of Hearings.

Sec. 3(f) The present Office of Consumer Affairs is abolished, and all its functions, property, and personnel are authorized to be transferred to the Office of Consumer Protection.  The civil service rights of OCA employees are protected.

Sec. 3(g) The Mayor shall appoint a Director or Acting Director as soon as the Office of Consumer Protection begins life.  An Acting Director may do anything except hire or designate the Deputy Director, General Counsel, or Consumer education chief.

SECTION 4 -- POWERS OF THE OFFICE

Sec. 4(a) The Office of Consumer Protection is given power to:

(1)  investigate complaints, initiate its own investigations, hold hearings, and subpoena witnesses.

(2)  subpoena documents.

(3)  issue cease and desist orders to stop unlawful trade practices which are found to exist.

(4)  furnish information of violations of laws beyond its jurisdiction, to appropriate governmental enforcement agencies.

(5)  represent consumer interests before other government agencies.

(6)  work with federal agencies and private groups in the interests of District of Columbia consumers.

(7)  carry on a consumer education program.

(8)  encourage high standards of business conduct.

Report on Bill 1-253
Page 16
March 24, 1976

(9)  perform such other services as will aid
District consumers.

(10) develop procedural rules.  Substantive rule-
making powers are not delegated to the Office in the bill,
in order that the Office may devote all its resources to
complaint cases over the next few years.

(11) order third parties to take part in complaint
cases.  For example, if a consumer complains against a
District retailer concerning defective merchandise, but
under the facts in the case and District law, a District or
out-of-state manufacturer is responsible or potentially
responsible for the defects, this provision allows the
Office to force the manufacturer into the case.  This
provision should be read in tandem with the "long-arm"
jurisdiction of the Office, in Section 6(d)(3).

(12) settle complaint cases prior to a final
judgment by the administrative law judge, by consent decrees
enforceable in court.

(13) decide complaint cases, and provide contract,
restitutionary, injunctive, and other remedies for proven
violations.  This paragraph also defines the subject matter
jurisdiction of the Office, in terms of the power to
determine whether a person has executed a trade practice in
violation of any law of the District and remedy any such
violation determined to have been carried out, rather than
in terms of any specific laws.  This subject matter juris-
diction applies to section 6 complaints, to investigations
and research and many other matters, but not to the
responsibility to administer certain laws, as specified in
section 4(b)(1) or in laws which may later be passed.  It
would be a violation of this act to use the prosecutorial
discretion powers in section 6(e)(4)(B) to effectively
reduce the jurisdiction of the Office as provided in this
paragraph.

(14) publicize its own actions consistent with the
confidentiality provisions of section 6.

Sec. 4(b) The Office is responsible to:

2006 05/04 11:19 FAX                                                    ☑007

Report on Bill 1-253
Page 17
March 24, 1976


        (1)   perform the functions of the Office of
Consumer Affairs in the consumer credit statute (P.L. 92-
200), the consumer credit regulation, and the consumer goods
repair regulation.

        (2)   file annual reports with the Mayor and
Council.

     Sec. 4(c)(1) The Office has no power to grant tort
damages.  Tort damages are most commonly granted for
negligent and intentional injuries.  The precise line
between tort and contract damages is left to the Office and
ultimately the courts to decide.

     Sec. 4(c)(2) The following businesses are exempt from
complaint cases under section 6:

            (A)   real estate rentals;

            (B)   public utilities and securities
brokerage;

            (C)   religion, law, and medicine;

            (D)   advertising.  This exemption applies only
to broadcasters and publishers, and only to the extent that
the broadcasters' and publishers' own goods or services are
not being advertised, and they are unaware that the adver-
tising is unlawful.

            (E)   government.  This means the Office may
not act as an ombudsman.


     SECTION 5 -- UNLAWFUL TRADE PRACTICES

     Section 5.  In addition to other consumer-related laws
already on the books in the District, this section requires
that all merchants do not:

     (a) - (f) misrepresent or omit material facts, or use
misleading sales practices.

     (g)  disparage the goods or services of another by
falsehood.

2006 05/04 11:19 FAX                                                    ☐008

Report on Bill 1-253
Page 18
March 24, 1976


(h)  advertise, without intending to sell in the manner that is advertised or offered.

(i)  use bait-and-switch tactics.

(j) - (l) make misrepresentations concerning price reductions or the need for a repair.

(m)  harass or threaten consumers.

n)  stop work on merchandise while it is still in a condition not contracted for, or make a charge not contracted for to return merchandise to a condition contracted for.

(o)  unnecessarily replace parts when not requested.

(p)  state that repairs were made when they were not made.

(q)  fail to give a consumer a copy of evidence of indebtedness.

(r)  make contracts so unfair as to be "unconscionable".

(s)  represent that goods and services which are one's own are someone else's.

(t)  falsely state the geographic origin of goods or services.

(u)  falsely state that a previous specification for a transaction has been met.

(v)  misrepresent an individual's authority to negotiate final terms.

(w)  sell or distribute any goods in violation of Consumer Product Safety Commission standards, rules, or procedures.

(x)  sell goods in violation of Uniform Commercial Code warranties, or those provided in federal law (such as the recently enacted Magnuson-Moss Act, P.L. 93-637).  The phrase "sell consumer goods in a...manner not consistent

2006 05/04 11:19 FAX                                                                 ☑ 009

Report on Bill 1-253
Page 19
March 24, 1976

with that warranted" includes breach of warranty, such as
where service of goods sold is warranted.

SECTION 6 -- COMPLAINT PROCEDURES

The bill is designed so that nearly all the efforts of
the Office of Consumer Protection will be spent in handling
consumers' complaints in accordance with this section.

Sec. 6(a) permits a complaint to be filed in writing by
the consumer, or orally to an Office investigator who may
then reduce it to writing. A full and complete description
is permitted but not required. The words "plainly
describing" are similar to those in the Federal Rules of
Civil Procedure, and underscore the simplicity of the
requirements of the initial complaint, the purpose of which
is essentially to give the Office enough information to
initiate its investigation. The Director may further define
the information to be taken.

Sec. 6(b)(1) provides for the first step in handling any
complaint finding out what happened. Sec. 6(b), in the last
paragraph, goes on to require that the merchant complained
against be contacted and thus given a chance to explain the
occurrence. A thorough investigation must be made, and no
sources of information are foreclosed by the bill. A
relevant board or commission may, but need not, be
consulted.

Sec. 6(b)(2) provides for an initial determination of
whether the trade practice was illegal under District law.
The phrase "other law" includes executive and administrative
orders, and common law. The word "law" in this section
means the same as it does in section 4(a)(13) and throughout
the bill.

Sec. 6(c) provdes for informing another appropriate
government agency of a suspected law violation. The Office
would not stop working on a case pursuant to this section.
Temporary consultations on complaint cases with other
agencies are also provided for in the bill, in section
4(a)(6).

2006 05/04 11:19 FAX                                                      ☒010

Report on Bill 1-253
Page 20
March 24, 1976

Sec. 6(d) requires the Office to complete the investi-
gation, and initial factual and legal determination of
whether there are reasonable grounds to believe a trade
practice subject to the Office's enforcement powers was
executed, within 60 days.  The respondent and complainant
must be informed of the determination, and if part or all of
the complainant's allegations are dismissed, such dismissal
must be explained to him or her in writing.  Sec. 6(d) goes
on to list the possible reasons for dismissal:

    (1)  Outside the jurisdiction of the Office.  Such
problems would be:  trade practice beyond any District law;
exemptions provided in section 4(c)(2); a trade practice,
consumer, or merchant, as defined in section 2(a), is not
involved.  Also, a case that is filed more than 3 years
after the trade practice occurred could be dismissed.

    (2)  The facts indicate that no law was violated.

    (3)  The respondent cannot be found, or is beyond
the personal jurisdiction of the Office, under the standards
of D.C. Code Title 13, Subchapter 4 - II.

    (4)  The Office is aware that the complainant has
dropped the case.

    (5)  The Office is aware that the respondent and
complainant have settled the case.

    (6)  The complainant can no longer be found.

Sec. 6(e) requires the Office to try to settle every
case in which the investigation indicates the respondent
will be subject to the enforcement powers of the Office.  If
the complainant refuses to take part in settlement
discussions at this point in the case, the Director may
dismiss the complaint pursuant to section 6(h)(2).  If the
Office signs the settlement accord, it becomes a "consent
decree" enforceable in court.  If settlement is not possible
in 45 days, the case should be referred to the Section of
Hearings (Administrative Law Judge) for formal adjudication,
unless, in the intervening period, the facts change or the
Director makes a new determination that a case should be
dismissed under the standards in section 6(d), or
determines, under the standards in section 2(b), that the

Report on Bill 1-253
Page 21
March 24, 1976


Office should not proceed with the case." If the Board of
Consumer Goods Repair Services has jurisdiction, formal
adjudication should be referred to that Board.  The words
"brief and plain statement" in section 6(e)(3) once again
refer to the simple pleading requirements of the Federal
Rules of Civil Procedure.

    Sec. 6(f) provides for an expeditious, fair, and formal
hearing before the Administrative Law Judge, who thereafter
decides the case.  Based on the investigation having found
in favor of the consumer, the Director replaces the
complainant as the moving party, and the General Counsel
would present the case for the Director.  There is no
requirement of proof of any intention.

    Sec. 6(g) provides that the Section of Hearings, if it
finds in favor of the complainant (Director), shall:

        (1)  issue a cease and desist order to stop the
particular trade practice in violation of the law, either as
to the complainant or as to everyone in the future.

        (2)  order redress for the consumer through
contract damages, money back, repairs to be done, or any
method which is fair and effective.

        (3)  issue a judgment in the form of counts of
violation of the law.

    The Section of Hearings may also:

        (4)  charge the respondent for the Office's costs
in dealing with the case.  The costs of "hearing" include
all the labor and non-labor costs of both prosecution and
adjudication.

        (5)  make further findings or orders, of all kinds.

        (6)  refer the case for further proceedings
concerning license revocation or discipline to an appro-
priate board or commission.  The Office of Consumer
Protection may act concerning a license only if there is no
such board or commission.  The boards and commissions
generally have no power to order the money damages and
injunctive relief which the Office has the power to do, so

Report on Bill 1-253
Page 22
March 24, 1976

there is no duplication of functions proposed in this bill
so far as the boards and commissions go.

    Sec. 6(h)(1) provides rules for consent decrees made
between the Office, respondent, and complainant.  Such
decrees may apply to and settle an entire case, or only
specified parts of it.  A decree may:

        (A)   contain the types of redress, penalties,
and orders permitted in the final decision of a case.

        (B)   not allege a violation of law.

        (C)   contain promises by the merchant
concerning future practices.

        (D)   stop prosecution of the case.

        (E)   provide for payment of money in lieu of
civil fines to the Office, and have other provisions.

    Sec. 6(h)(2) provides for informal and confidential
settlement procedures administered by the Office.

    Since a consent decree is essentially a contract to
settle a case, sec. 6(h)(3) permits modifications agreed to
by all three parties.

    Section 6(i)(1) provides for an appeal to the District
of Columbia Court of Appeals whenever all parts of a
complaint case are finally decided by the Office.

    Section 6(i)(2) permits an appeal to the Superior Court
of the District of Columbia when the Section of Hearings
acts, under section 6(j), on an application for an order to
preserve property during the pendency of a case in the
Office.

    Section 6(i)(3)(A) sets a civil fine, collectible only
in court, of up to $1000.00, for an unlawful trade practice
found by the Office, and for violation of an order or
consent decree made by the Office.  The fines are payable
strictly to the Office, but any party aggrieved by violation
of a cease and desist or other order, or consent decree, may
ask the court to collect such a fine.

Report on Bill 1-253
Page 23
March 24, 1976

Section 6(i)(3)(B) provides the Superior Court as the
forum of first instance for enforcement and collection, at
the suit of the Office, respondent or complainant, of the
various orders, decrees, and civil fines which are produced
pursuant to section 6.

Section 6(i)(4) provides that the Corporation Counsel
will represent the Office in court matters concerning
complaint cases.

Sec. 6(j) permits the Section of Hearings, at the behest
of the Director, to order that the property or the status
quo in a case before the Office be preserved.

Sec. 6(k)(1) permits a consumer to go directly to court
when injured by a trade practice, without going through the
Office first. Treble damages and reasonable attorneys' fees
are recoverable in order to encourage the private bar to
take such cases. Punitive damages are also recoverable, and
the standards the courts would use in determining them are
the amount of actual damages awarded, the frequency, persis-
tence, and degree of intention of the merchant's unlawful
trade practice, and the number of consumers adversely
affected. The court would not be limited to these types of
relief; however.

Sec. 6(k)(2) states that an injured consumer may bring
another type of action or file a complaint with another
agency if he or she deems that to be appropriate. The
subject matter jurisdiction of the Office, as stated in
section 4(a)(13), may coincide with, and does not limit,
that of other agencies of the District Government. On the
other hand, the powers of other agencies may not be
construed to detract from the powers of the Office, under
any provision of the bill, to obtain relief for consumers
and compliance with District laws.

Sec. 6(k)(3) makes orders of the Section of Hearings
admissible in judicial and administrative proceedings.

Sec. 6(k)(4) requires that, if a complainant has a case
before the Office over a trade practice out of which the
respondent is seeking to collect a debt in a suit in the
courts, the case before the Office shall be decided first.

Report on Bill 1-253
Page 24
March 24, 1976


Sec. 6(l) states certain general principles for the
Office in deciding complaint cases.  The first sentence says
that all of the section 4 powers of the Office, such as the
subpoena power and the power to make all types of orders not
specifically prohibited in the bill - are generally
available to the Office, or the appropriate Section of the
Office as specified in Section 6, at all times in processing
complaint cases.  The last sentence allows other consumer
protection enforcement laws to continue side-by-side with
this one, while leaving the procedures and sanctions
provided by section 6 whenever the Office deals with or
follows up on a complaint case.

Sec. 6(m) (1) requires the Office to explain its final
actions in plain English to the complainant and respondent,
whenever requested.

Sec. 6(m) (1) requires the Office to maintain a public
index of all its final actions by names of complainant and
respondent, industry, nature of complaint, and final dispo-
sition.

Sec. 6(n) requires that money earned by the Office for
costs and civil fines in complaint cases goes to the General
Fund of the District Government.

Sec. 6(o) requires that the Office keep each complaint
case in confidence until its final action, except that
hearings before the administrative law judge would be
public.

Sec. 6(p) permits the Director to be a complainant in a
case.  In such a matter, the investigation may precede the
filing of the case, but the responsibility to try to
conciliate the case would remain.  The Director would often
have research and investigation data, gathered in the course
of carrying out section 6 and the powers in section 4(a),
which would support the filing of such cases.  Consumers and
merchants could enforce orders and consent decrees arising
out of such cases.

Sec. 6(q) assures witnesses and parties to the case that
they may have their own private counsel present to advise
them.

Report on Bill 1-253
Page 25
March 24, 1976

### SECTION 7 -- CONSUMER EDUCATION

There shall be a Section of Consumer Education in the
Office to carry on a consumer education program.  The
section chief is not required to be full-time.

### SECTION 8 -- ADVISORY COMMITTEE ON CONSUMER PROTECTION

An Advisory Committee consisting of 11 members - 4
merchants (as defined in section 2(a)(3)) and 7 consumer
advocates - will be appointed by the Mayor.  The Committee
will monitor the operations of the Office, and carry on
research to suggest broad directions for the Office.

### SECTION 9 -- SEVERABILITY

If any section or paragraph is held unconstitutional or
otherwise invalid, the rest of this legislation would remain
in full force and effect.

### SECTION 10 -- EFFECTIVE DATE

This act will take effect after the regular period of
Congressional review.

### Fiscal Impact

In comparison to current employment in the Office of
Consumer Affairs, the bill would combine two positions, a
GS-14 Deputy Director and a GS-11 Chief Advisor, into one
Deputy Director-Chief of Section of Investigations.  It
would add a General Counsel and an Administrative Law Judge.
It does not require a full-time Chief of the Section of
Consumer Education, or prevent the occupant of that position
from working on complaint cases.  Thus, the bill requires a
net addition of between one-half and a whole senior
position.  The existing support staff, the existing space,
furniture and materials in the present OCA main office at
1407 L Street, N.W., and the existing non-personnel funding
in the OCA budget, is sufficient for at least the individual

Report on Bill 1-253
Page 26
March 24, 1976

casework which will be concomitant with the net addition of
employment at the senior level. The bill does not state the
GS levels of the Director, Deputy Director, General Counsel,
Administrative Law Judge, or Chief of the Section of
Consumer Education. Therefore, it is impossible to place a
precise price tag on the net employment increase required by
the bill.

Sections 6(g)(4), 6(h)(1)(E), 6(i)(4), and 6(n) require
or permit certain fines, operating costs, or payments in
lieu of fines and costs, to be paid to the Office and
thereby to the General Fund of the District. Any estimate
of the income to be derived through these provisions would
be speculative; but the experience of the Montgomery County
Office of Consumer Affairs is highly favorable in this
regard.

In calculating the fiscal impact of the whole bill, such
income must be considered as an offset to the salary and
benefits for the required net employment increase. Thus,
the net fiscal impact of Bill 1-253 is likely to be between
+$15,000 and -$15,000 each year for the next five years.

## Executive Comments

As of March 20, 1976, no official comment on Bill 1-253
had been made on behalf of the Mayor.

Report on Bill 1-253
Page 27
March 24, 1976

Extensive discussions with the Executive Branch took place concerning Bill 1-187, the predecessor of this bill. Highlights of these discussions were:

November 5, 1975   Testimony by Director, OCA, at hearing on bill

November 18, 1975  Executive comments

December 16, 1975  Alternative bill (#1-222) introduced on behalf of the Mayor
Request for further meetings

January 12, 1976   Further executive comments

February 10, 1976  Mayor's veto message

The veto was based on the grounds that the requirements of Council confirmation and District residency for the Director, General Counsel, and Administrative Law Judge, were illegal.