

# FRANCHISE OFFERING CIRCULAR

FOR USE
IN

---

**DISTRICT OF COLUMBIA, MARYLAND, NEW JERSEY, NEW YORK,
PENNSYLVANIA, and VIRGINIA**

---

**BLIMPIE ASSOCIATES, LTD.**
**Seven Penn Plaza**
**New York, New York 10001**
**(212) 279-7100**

**INFORMATION FOR PROSPECTIVE FRANCHISEES**
**REQUIRED BY THE FEDERAL TRADE COMMISSION**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

TO PROTECT YOU, WE'VE REQUIRED YOUR FRANCHISOR TO GIVE YOU THIS INFORMATION. <u>WE HAVEN'T CHECKED IT, AND DON'T KNOW IF IT'S CORRECT</u>. IT SHOULD HELP YOU MAKE UP YOUR MIND. STUDY IT CAREFULLY. WHILE IT INCLUDES SOME INFORMATION ABOUT YOUR CONTRACT, DON'T RELY ON IT ALONE TO UNDERSTAND YOUR CONTRACT. READ ALL OF YOUR CONTRACT CAREFULLY. BUYING A FRANCHISE IS A COMPLICATED INVESTMENT. TAKE YOUR TIME TO DECIDE. IF POSSIBLE, SHOW YOUR CONTRACT AND THIS INFORMATION TO AN ADVISOR, LIKE A LAWYER OR AN ACCOUNTANT. IF YOU FIND ANYTHING YOU THINK MAY BE WRONG OR ANYTHING IMPORTANT THAT'S BEEN LEFT OUT, YOU SHOULD LET US KNOW ABOUT IT. IT MAY BE AGAINST THE LAW.

THERE MAY ALSO BE LAWS ON FRANCHISING IN YOUR STATE. ASK YOUR STATE AGENCIES ABOUT THEM.

FEDERAL TRADE COMMISSION
WASHINGTON, D.C 20580

Date of Issuance of Offering Prospectus:    February 10, 2004

# FRANCHISE OFFERING CIRCULAR



**Blimpie Associates Ltd.**
**Incorporated in the State of New York**
**Seven Penn Plaza, 17th Floor**
**New York, New York 10001**
**(212) 279-7100**

Blimpie offers both franchises and subfranchises.

The franchisee will operate a non-cooking fast food business operated under the franchisor's trademark "BLIMPIE" and according to the franchisor's system of operation.

The initial franchise fee for a Traditional Blimpie Restaurant is $18,000.00. The estimated initial investment required ranges from $113,250 - $298,000.

The initial franchise fee for a Non-Traditional Blimpie Restaurant is $10,000.00, or $5,000.00, or $2,500.00, or $1,500.00, or $1.00. The estimated initial investment required ranges from $42,251 to $153,100.

A subfranchisor will develop and manage a business which sells (as sales agent for Blimpie), opens and services all Blimpie franchise restaurants within a designated territory.

The initial subfranchise fee which ranges from $10,000 to $500,000, is determined either by calculation of $.10 times the population of the subfranchise territory, or by calculating the number of Blimpie restaurants that can be opened in your territory and multiplying that number by $10,000 (if the population and possible development do not reasonably correlate).

Risk Factors:

1.    THE FRANCHISE AGREEMENT OBLIGATES THE FRANCHISEE TO SUBMIT ANY DISPUTES WITH THE FRANCHISOR ONLY TO THE STATE AND FEDERAL COURTS IN NEW YORK. OUT OF STATE LITIGATION MAY COST MORE THAN IN YOUR HOME STATE. CERTAIN STATES AND LOCAL LAWS MAY SUPERCEDE THIS REQUIREMENT. PLEASE REFER TO ANY STATE SPECIFIC ADDENDUM THAT MAY BE IN THE OFFERING CIRCULAR FOR FURTHER DETAILS.

2.    THE FRANCHISE AGREEMENT STATES THAT NEW YORK LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME

PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS. CERTAIN STATES AND LOCAL LAWS MAY SUPERCEDE THIS REQUIREMENT. PLEASE REFER TO ANY STATE SPECIFIC ADDENDUM THAT MAY BE IN THE OFFERING CIRCULAR FOR FURTHER DETAILS

3.     THE FRANCHISE AGREEMENT DOES NOT PROVIDE AN EXCLUSIVE TERRITORY. THE FRANCHISOR AND ITS AFFILIATES MAY ESTABLISH OTHER FRANCHISED OR COMPANY OWNED LOCATIONS AND MAY SELL OR DISTRIBUTE ANY PRODUCT OR SERVICE TO THE GENERAL PUBLIC IN COMPETITION WITH THE FRANCHISE.

4.     THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE

THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE PROSPECTUS. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS PROSPECTUS.

**INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT N OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION. REGISTRATION OF THE FRANCHISE WITH THE STATE DOES NOT MEAN THAT THE STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS OFFERING CIRCULAR. IF YOU LEARN THAT ANYTHING IN THIS OFFERING CIRCULAR IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND THE APPROPRIATE STATE AGENCY IN EXHIBIT N.**

## <u>EFFECTIVE DATES</u>

| | |
|---|---|
| **MARYLAND** | February 17, 2004 |
| **NEW YORK** | February 10, 2004 |
| **VIRGINIA** | January 30, 2004 |
| **ALL OTHER STATES** | February 10, 2004 |

## PROVISIONS APPLICABLE TO MARYLAND LAW

**THE FRANCHISE AGREEMENT OBLIGATES THE FRANCHISEE TO SUBMIT ANY DISPUTES WITH THE FRANCHISOR ONLY TO THE STATE AND FEDERAL COURTS IN NEW YORK.  OUT OF STATE LITIGATION MAY COST MORE THAN IN YOUR HOME STATE.  NOTWITHSTANDING THE FOREGOING, A FRANCHISEE MAY BRING A LAWSUIT IN MARYLAND FOR CLAIMS ARISING UNDER THE MARYLAND FRANCHISE REGISTRATION AND DISCLOSURE LAW.**

## TABLE OF CONTENTS

Item                                                                                                    Page

1.    THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES............................. 8

2.    BUSINESS EXPERIENCE ...................................................................................... 12

3.    LITIGATION............................................................................................................ 15

4.    BANKRUPTCY........................................................................................................ 17

5.    FRANCHISEE'S INITIAL FRANCHISE FEE ........................................................ 17

6.    OTHER FEES .......................................................................................................... 20

7.    YOUR ESTIMATED INITIAL INVESTMENT ....................................................... 22

8.    RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ..................... 27

9.    FRANCHISEE'S OBLIGATIONS............................................................................ 32

10.   FINANCING............................................................................................................. 34

11.   FRANCHISOR'S OBLIGATIONS .......................................................................... 35

12.   TERRITORY ............................................................................................................ 44

13.   TRADEMARKS ....................................................................................................... 46

14.   PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ...................... 48

15.   OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
      FRANCHISE BUSINESS.......................................................................................... 49

16.   RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL .............................. 49

17.   RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION......... 51

18.   PUBLIC FIGURES .................................................................................................. 56

19.   EARNINGS CLAIMS .............................................................................................. 56

20.   LIST OF OUTLETS .................................................................................................57

21.   FINANCIAL STATEMENTS ...................................................................................63

22.   CONTRACTS ...........................................................................................................63

23.   RECEIPT ..................................................................................................................63

      STATE ADDENDUM TO DISCLOSURE DOCUMENT

# TABLE OF CONTENTS
## (continued)

Exhibits

A     Traditional Location Franchise Agreement

B     Guaranty

C     Non-Traditional Rider

D     Multi-Unit License Addendum

E     Subfranchise Agreement

F     Sublease

G     Form of Promissory Note

H     Financial Statements

I     List of current Franchisees

J     List of Franchisees/Subfranchisors who have left the Blimpie Restaurant system within the past 12 months

K     Standard Equipment Order Form

L     General Release

M     Subfranchisors

N     Administrators and Agents for Service of Process

O     Receipt

**ITEM 1**
**THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES**

The Franchisor

To simplify the language in this offering circular, "Blimpie", "us", "we" and "our" means Blimpie Associates, Ltd., the franchisor. Blimpie is a New York corporation that was incorporated on March 23, 1988. Blimpie does not do business under any other name. Our principal business address is Seven Penn Plaza, New York, New York 10001.

Blimpie's agents for service of process are disclosed in Exhibit "N".

Blimpie currently does not operate businesses of the type being franchised. We have offered franchises of the type offered in this offering circular since December, 1989.

Predecessors of Blimpie

Blimpie does not offer franchises in any other line of business, and does not currently operate any Blimpie Restaurants. There are no predecessors to Blimpie. Franchised sandwich restaurants of the type offered by Blimpie have been and are offered for sale by various corporations. However, none of these corporations are affiliated with us, except with regard to certain ownership rights of the Blimpie proprietary marks.

The Franchise Offered

Blimpie will offer to individuals, partnerships, or corporations ("Franchisee", "you" and "your") a trademark license through a franchise agreement (the "Franchise Agreement") which grants you the right to establish and operate one or more Blimpie Restaurants or additional Blimpie Restaurants (the "Blimpie Restaurant") at a location approved by Blimpie. Blimpie believes that the market for fast food, and specifically Blimpie Restaurant products, is currently developing (although the rate of development may vary from state to state). You must compete with other fast food and non-fast food restaurants. A Blimpie Restaurant may be operated year round and is not a seasonal business, although sales may fluctuate during the year, and Blimpie Restaurant products are offered for sale to the general population.

A Blimpie Restaurant may be located in urban in-line stores, malls, shopping centers, food courts, free standing buildings and other typical fast food locations (the "Traditional Blimpie Restaurant"). A Blimpie Restaurant may also be located in a convenience store, institutional food service company, college, elementary or secondary school, supermarket, hospital, factory or any other entity or location that desires to install a Blimpie Restaurant within its primary business operation (the "Non-Traditional Blimpie Restaurant").

We have entered into an arrangement relating to the development of opportunities for Blimpie Restaurants in major accredited hospitals and related facilities with IHE, LLC, a company owned by Patrick G. Meglio, principal of DCBG, Inc., our subfranchisor for the District of Columbia, portions of Maryland and Virginia. Pursuant to the arrangement IHE, LLC will use its resources and best efforts to negotiate the rights to operate Blimpie Restaurants in such facilities

UFOC 2004

directly from the facility, or with a food service organization with holds a master agreement to furnish food services within the facility.  IHE, LLC will lease or subcontract the space from the hospital or food service organization and will then sublet or subcontract to Blimpie's franchisee.

A Blimpie Restaurant will offer for sale a number of cold and hot sandwiches, salads and other food items marketed in an aesthetic and distinctive decor characterized by a portion controlled and non-cooking method of operation. In addition to the basic sandwich line, there will be offered for sale, salad, Pizza (in certain locations) and beverages, as well as breakfast, bakery and general dessert items. A Non-Traditional Blimpie Restaurant may only be able to sell a portion of the approved product line due to unusual circumstances or as a result of the Non-Traditional Blimpie Restaurant franchisee's other business operations. For example, a Blimpie Restaurant operating in a convenience store that already has a soda system placed in the center of the store would probably not be able to provide fountain beverage service to its customers from the Blimpie unit.

Blimpie also offers a license to operate a subfranchise (the purchaser of a subfranchise hereinafter referred to as a "Subfranchisor"). A Subfranchisor has the right to develop and manage the Subfranchise Business including, without limitation, the selling, opening and servicing of all Blimpie franchise restaurants within the territory of the Subfranchisor, in accordance with Blimpie's requirements.  A Subfranchisor's principal activities are (i) the development of Blimpie franchises and distribution points; (ii) regular inspection of all Blimpie restaurants in the territory to insure compliance with the Blimpie System, the Franchise Agreement, the manuals and Blimpie's operating standards, (iii) assisting each franchisee in the territory with site selection and other pre-opening matters; and (iv) assisting each franchisee in the negotiation of business terms of the proposed leases for Blimpie restaurants to be opened in the territory, subject to Blimpie's approval.

All franchises included in an area in which a subfranchise has been sold, will be granted by Blimpie and not by the Subfranchisor, and therefore no separate registration or franchise offering circular is required by any Subfranchisor.  However, a Subfranchisor will be a franchise sales agent if Subfranchisor participates in the sale of a franchise, and will be required to file a Salesman Disclosure Form with the state agency regulating franchise sales.  Subfranchisors are not our agents and cannot bind us, directly or indirectly, unless specifically authorized by us in writing.

In certain situations, a Blimpie Unit may be at or within premises operated under tradenames or trademarks of another food service or business concept, by which proximity and/or dual operation requires special accommodations by Blimpie.  The Non-Traditional Location Rider to the Franchise Agreement shall be used in such instances with the Blimpie Traditional Location Franchise Agreement.

<u>Co-Branding</u>

Blimpie believes that its franchisees may have additional opportunity for business growth by offering for sale within Blimpie franchised restaurants additional recognized branded products which complement the product line currently offered by Blimpie, which have gained public recognition and have satisfied Blimpie standards of quality.

Generally, Blimpie will enter into master agreements with selected co-brand partners permitting their presence and the sale of products within a Blimpie franchised location from a

stylized counter, kiosk, or other sale unit bearing the specific trademark and style of the co-brand. In some instances the co-brand will be approved as the sole purveyor of branded products in the product line it offers for sale. Blimpie is not required to approve any co-branding marketing system unless Blimpie has recognized that co-branding system as an approved co-brand for operation within its system restaurants, either nationally or regionally.

While Blimpie may make co-brand opportunities available to its franchisees, you will not be obligated to enter into such an arrangement. The decision of whether or not to enter into a co-brand program approved by Blimpie will be within your exclusive discretion and on the basis of your negotiations directly with the co-brand partner. All costs associated with the establishment of a co-brand within your Blimpie franchised restaurant will be borne by you.[*]

In certain cases, the co-brand products will be considered authorized product of Blimpie subject to your payment of continuing royalties and advertising fees under the Franchise Agreement. In other cases, Blimpie has made provision in its agreements with co-brand partners to receive payment directly from the co-brand partner, in which case no payment will be made by you to Blimpie as a result of co-brand sales.

Currently, Blimpie has entered into master agreements with TCBY, Mrs. Field's, Nathan's Famous, Twin Donut, and Taco Maker. Blimpie evaluates other co-branding opportunities on an ongoing basis.

Industry Specific Regulations

You must comply with the following Industry Specific Regulations: (i) Federal Immigration Laws, Tax Laws, Unemployment and Workers' Compensation Laws, Employment and Discrimination Laws, Disability Laws, including the Americans with Disabilities Act, and Product Labeling Laws, and (ii) State and local Health, Building, and Zoning Codes.

Affiliates

Each Traditional Blimpie Restaurant location (and some Non-Traditional Blimpie Restaurants) is leased by a corporate designee of Blimpie, which corporate designee then subleases the location to the franchisee of that particular Blimpie Restaurant. These affiliates are 1989 B.A. Leasing Corp., Inc., 1990 B.A. Leasing Corp., Inc., 1991 B.A. Leasing Corp., Inc., 1992 B.A. Leasing Corp., Inc., 1992 B.C. Properties, Inc., 1993 B.A. Leasing Corp., Inc., 1993 B.A. Realty, Inc., 1993 B.A.V.A. Leasing Corp., Inc., 1994 B.A. Leasing Corp., Inc. and 1994 B.A. Properties, Inc., 1995 B.A. Leasing Corp., 1995 B.A. Realty, Inc., 1996 B.A. Leasing Corp., 1996 B.A. Realty, Inc., 1997 B.A. Leasing Corp., 1997 B.A. Realty, Inc., 1998 B.A. Leasing Corp, 1998 B.A.

---

[*] Blimpie's approval of a co-brand partner is not the same as approval of your site for participation. If you wish to participate Blimpie must approve your location for co-branding. Factors will include whether you are then in good standing under the Franchise Agreement, suitability of the physical space with your store and other lease related provisions which may restrict use and occupancy. Blimpie is not required to approve your site for co-branding. Each co-brand partner also has the right to approve or reject your franchised location. Approval of your location by Blimpie for a co-brand opportunity does not mean that Blimpie recommends it or is expressing any opinion or projection concerning the potential profitability of your investment in a co-brand program.

Properties, Inc., 1999 B.A. Leasing Corp., 2000 B.A. Leasing Corp, 2000 B.A. Realty, Inc., 2001 B.A. Leasing Corp., 2001 B.A. Realty, Inc, 2002 B.A. Leasing Corp., 2002 B.A. Realty, Inc., 2003 B.A. Leasing Corp., 2003 B.A. Realty, Inc., 2004 B.A. Realty, Inc., 2004 B.A. Leasing Corp. and B.A. MEDCO Properties, Ltd..  None of the corporate designees have offered franchises in any line of business.  The principal business address of each affiliate is:  Seven Penn Plaza, New York, New York 10001.

In addition, Blimpie is affiliated with Metropolitan Blimpie, Inc., a management company, which furnishes management services to Blimpie, consisting of marketing and sales support, real estate consulting services and general administrative functions.  The principal business address for Metropolitan Blimpie, Inc. is Seven Penn Plaza, New York, New York 10001.

None of the affiliates of Blimpie has conducted a business of the type to be operated by the franchisee.

**ITEM 2**
**BUSINESS EXPERIENCE**

**Nicholas Lagano, Jr.**
**President/Director**

Mr. Lagano is the President, and sole director of Blimpie. He became Vice-President, Secretary and a director of Blimpie in April, 1992. Mr. Lagano is also the President of Metropolitan Blimpie, Inc., the licensor of Franchisor. His affiliation with Metropolitan Blimpie, Inc. began in 1985. He is the President and owner of B.A.L. Equipment Sales, Inc., a vendor of various items of equipment to Blimpie franchisees. Mr. Lagano has been involved in all facets of the Blimpie "System" in his capacity as operations manager of Metropolitan Blimpie, Inc., and in his current capacity as President of Blimpie.

**Joseph A. D'Ambrosio**
**Director of Operations**

Mr. D'Ambrosio has been affiliated with Metropolitan Blimpie, Inc., the licensor of Blimpie, since 1975, and with Blimpie, since its inception supervising such aspects of the Blimpie "System" as initial construction and renovation construction of stores, product selection and evaluation, development and implementation of training programs, and general operations, including, but not limited to, financial operations. Mr. D'Ambrosio has successfully owned and operated three Blimpie restaurants, and has general business background related to the restaurant industry.

**Joel R. Schweidel**
**Director of Legal Affairs and General Counsel**

Mr. Schweidel, Blimpie's Director of Legal Affairs and General Counsel since late 1999, is responsible for the oversight and administration of all of the legal affairs of Blimpie. Mr. Schweidel negotiates franchise and subfranchise agreements, leases and subleases for Blimpie franchises, Manufacturer Agreements and other contracts relating to the Company's regulatory, trademark and contractual activities. Mr. Schweidel, a member of the New York Bar and the bar of various Federal courts for over thirty (30) years, is directly responsible for the supervision of the prosecution or defense of all litigation matters affecting Blimpie.

Mr. Schweidel is a 1971 graduate of Brooklyn Law School from which he was awarded the Juris Doctor degree. He attended the Pennsylvania State University, from which he received a Bachelor of Arts degree in pre-law in 1968. Mr. Schweidel's professional experience includes the representation of a vast array of small and medium businesses, many involved in franchising, as well as a broad spectrum of corporate matters representing both privately held and public corporations, domestic and international. For ten (10) years prior to his appointment, as principal outside counsel to the Company, Mr. Schweidel coordinated Blimpie's regulatory program and was responsible for most litigation in which the Company was involved. Mr. Schweidel has been a presenter on franchise topics at forums sponsored by the American Bar Association and has authored articles on topics of general interest to the franchising bar.

**Michael Hourigan**
**Controller**

Michael Hourigan is Blimpie's Controller and manages Blimpie's Accounting Department. Mr. Hourigan received a B.S. in Accounting from Rutgers University in 1986, and is certified as a CPA in New York State. From 1988 through 1994, Mr. Hourigan was affiliated with a private accounting firm, Weidenbaum Ryder & Co., whose successor firm, JH Cohn, LLP, currently serves as Blimpie's auditors.

**Aaron Feigenbaum**
**Marketing Director**

Mr. Feigenbaum currently devises and implements marketing and promotional programs for Blimpie. He is a graduate of Rockland Community College, A.A., 1968 and trained at Brooks Institute, Santa Barbara California in photo technology during 1969-71. Mr. Feigenbaum was a professional photographer from 1972-75, and thereafter, partner and owner of Mainstream Advertising (1975-77), Knollwood Advertising (1977-83) MBS Advertising (1983-93), in which he specialized in retail and industrial advertising and media buying. Mr. Feigenbaum's past corporate accounts include Sterling Optical, J & R Music World, Strawberry Stores, Willoughby Camera, Rent-a-Wreck, American International Rent-a-Car; Rand Rental Station (a division of Servicestar Corp.) Sleepy's Kleinsleep, and Thoro Systems (a division of ICI). In addition to Blimpie marketing, Mr. Feigenbaum is a Blimpie franchisee and has owned of four Blimpie franchises in New York City. Mr. Feigenbaum owns Pow Zap & Shazaam (PZ&S), a marketing/advertising agency which performs services for Blimpie Marketing Productions, Inc. (defined herein) and Blimpie. Mr. Feigenbaum derives income from the activities of PZ&S.

**Craig DeCarlo**
**Training Co-Director**

Mr. DeCarlo, serves as a Co-Director of Blimpie classroom training in New York City. He has in the past served as Blimpie's liaison to Blimpie Subfranchisors and Blimpie franchisees in subfranchise regions. Mr. DeCarlo has been a franchisee of the Blimpie System since 1985, and has owned and operated three (3) Blimpie units. He has extensive experience and expertise in all facets of retail management and Blimpie restaurant construction and equipment. Currently, Mr. DeCarlo owns and operates two (2) Blimpie franchises in New Jersey. He also is a shareholder, officer and director of CAT Consulting Group, Ltd. a company which furnishes management consulting services to Blimpie.

**Peter DeCarlo, Jr.**
**Co-Director of Operations**

Mr. DeCarlo, as Co-Director of Operations coordinates store openings, in-store-training and construction. He has been affiliated with the Blimpie system for fifteen years, and currently is the owner/operator of a Blimpie restaurant in New Jersey. He is also a shareholder, officer and director CAT Consulting Group, Ltd., a company which furnishes management consulting services to Blimpie.

**Louis Gioia**
**Director of Franchise Sales**

Mr. Gioia, appointed to his current position in April, 1999 was Director of Marketing with BBB Sports Marketing Company from January, 1993 to December, 1999. Prior to that he successfully owned and operated many Blimpie restaurants throughout the New York Tri-State Area. Mr. Gioia formerly owned a Blimpie restaurant in New York City. Mr. Gioia also coordinates franchisee's construction of Blimpie restaurants.

**John Eucalitto**
**Director of System Operations**

Mr. Eucalitto has served as our Director of System Operations since September 2003. Since March 1991, Mr. Eucalitto has been an Area Developer and Franchisee of Blimpie International, Inc. in the State of Connecticut. From January 2002 to September 2003, he was a partner in Select Franchise Development, LLC, the Area Developer for us in Westchester and Rockland Counties, New York.

**Franchise Sales Persons**

Franchise sales persons are individuals who are involved as franchise sales persons on our behalf. They are not our agents nor are they authorized to enter into any contracts, agreements, understandings or modifications of any agreement between you and us or on behalf of any subsidiary, affiliate or other entity associated with us. With respect to the franchise sales process, franchise sales persons are not authorized, nor is there any intention to grant any apparent or actual authority, to do anything other than sell franchises for us in accordance with applicable laws, rules and regulations.

If a Subfranchisor is offering franchises under the laws of your state, the Subfranchisor may be required to be registered with the state, deliver an approved offering circular to you at least 10 business days before any franchise sale, and comply with the requirements of state laws. Subfranchisors, their officers, directors and employees are not our agents and may not contractually obligate unless we authorize them to do so in writing. Subfranchisors do not offer franchises for sale in their territories but instead their officers and sales employees operate as salespersons for us, and in those circumstances an offering circular is not filed by the Subfranchisor. Instead, each salesperson delivers a salesman disclosure form along with this offering circular to each prospective franchisee. Exhibit "M" contains the names and backgrounds of Blimpie's Subfranchisors as of December 31, 2003.

# ITEM 3
# LITIGATION

Neither Blimpie nor any person identified in Item 2 of this Offering Circular, nor any affiliate of Blimpie offering franchises under Blimpie's principal trademark, has pending any administrative, criminal or material civil action (or a significant number of civil actions irrespective of materiality) alleging a violation of any franchise law, securities law, fraud, embezzlement, fraudulent conversion, restraint of trade, unfair or deceptive practices, misappropriation of property or comparable allegations, except as set forth below.

Neither Blimpie nor any person identified in Item 2 of this Offering Circular, nor any affiliate of Blimpie offering franchises under Blimpie's principal trademark, has been convicted of a felony or pleaded <u>nolo contendere</u> to a felony charge or, within the ten (10) year period immediately preceding the date of this offering circular, been convicted of a misdemeanor or pleaded <u>nolo contendere</u> to a misdemeanor charge, or been held liable in a civil action by final judgment or been the subject of a material complaint or other legal proceeding if such felony or misdemeanor conviction or charge or civil action, complaint or other legal proceeding involved violation of any franchise law, securities law, fraud, embezzlement, fraudulent conversion, restraint of trade, unfair or deceptive practices, misappropriation of property or comparable allegations, except as set forth below:

<u>Sutphin Hero Sandwich, Inc. and Pascual Valencia v. Blimpie Associates, Ltd. And Walter Izurieta</u> (Supreme Court of the State of New York, Queens County, Index No. 9837/01). In April 2001, Plaintiff Pascual Valencia, an individual unknown to Blimpie, filed this action against us, and Walter Izurieta, principal of Sutphin Hero Sandwich, Inc. a former Blimpie franchisee. Mr. Valencia claims that he is a half owner of the stock of Sutphin. In the Complaint Mr. Valencia alleges various acts of fraud and violations of the New York Franchise Act and seeks an accounting and the recovery of money damages. Blimpie denies that is has committed any inappropriate acts alleged by Mr. Valencia and denies that it has committed any violation of the New York State Franchise Sales Act. We have filed an answer to the Plaintiff's complaint denying all of its charges, and have asserted a cross-complaint against co-defendant, Walter Izurieta. Since the inception of the lawsuit it has been dormant.

Furthermore, neither Blimpie nor any person identified in Item 2 of this offering circular is subject to any injunctive or restrictive order or decree relating to franchises or under any Federal, State or Canadian franchise, securities, antitrust, trade regulation or trade practice law as a result of a concluded or pending action or proceeding brought by a public agency, except as follows:

In May 1992, Blimpie and Mr. Dornbush (formerly the President of Blimpie), in response to a claim by the New York Department of Law that we had sold franchises during a period of time when our prospectus had not been updated by amendment, and without the admission of any wrongdoing, consented to the entry of an order in which Blimpie and Mr. Dornbush agreed (i) to entry of a judgment enjoining them from further violations of the New York Franchise Sales

Act, and (ii) to pay the sum of $18,000 to the State of New York as an additional allowance.   Upon execution of the consent judgment which was entered on August 25, 1992 and payment of $18,000.00 (which occurred in May, 1992), the charges of the State were resolved.

Other than the above two (2) actions, no litigation is required to be disclosed in this offering circular.

## ITEM 4
## BANKRUPTCY

During the ten year period before the date of this offering circular, neither Blimpie, nor any predecessors, affiliates, officers, or general partners of Blimpie have been adjudicated bankrupt or reorganized due to insolvency or been a principal officer in a company, or a general partner of a partnership, at or within one year of the time that such company or partnership was adjudicated bankrupt, reorganized due to insolvency, or subject to any such prior or pending bankruptcy or reorganization proceeding.

## ITEM 5
## FRANCHISEE'S INITIAL FRANCHISE FEE

TRADITIONAL LOCATIONS

Upon execution of a Traditional Location Franchise Agreement, for a Traditional Blimpie Restaurant, you must pay to Blimpie $18,000 as the initial franchise fee. The initial franchise fee, whether paid for one Traditional Location Franchise Agreement or additional Traditional Location Franchise Agreements, is fully earned and non-refundable in consideration of the trademark grant, administrative and other expenses incurred by Blimpie in entering into the Franchise Agreement and for Blimpie's lost or deferred opportunity to enter into the Franchise Agreement with others.

Existing Blimpie franchisees who are in full compliance with the terms of their franchise agreement(s), including payment of their Continuing Royalties and additional rentals due under their existing franchise agreement(s) and sub-lease(s) for the Blimpie franchises operated by them, will pay an initial franchise fee of $10,000 for the purchase of additional Traditional Blimpie franchises. *See Note A below.*

*MULTI-UNIT PURCHASES*

In limited circumstances, Blimpie will offer Multi-Unit licenses for three (3), four (4) or five (5) franchise licenses purchased simultaneously; at initial aggregate fees of $28,000, $32,000, and $35,000, respectively. If offered, the Initial Franchise Fees are non-refundable, and the Franchisee will agree to an accelerated, mandatory development schedule, as well as, other conditions. A purchaser of a Multi-Unit license will be required to sign the Multi-Unit Addendum upon execution of the Franchise Agreements. *See Note A below.*

NON-TRADITIONAL LOCATIONS

Upon execution of a Traditional Location Franchise Agreement and Non-Traditional Rider, for a Non-Traditional Blimpie Restaurant, you must pay to Blimpie as the initial franchise fee for purchase of the Franchise Agreement $1.00, $1,500, $2,500, $5,000 or $10,000 (which initial franchise fee is dependent upon the number of Franchise Agreements for Non-Traditional Blimpie Restaurants executed or to be executed by you simultaneously, arrangements which Blimpie may have with national/regional co-brand entities, the marketing area and type of the proposed Non-Traditional Blimpie Restaurant(s), and other subjective concerns that are within the sole and absolute discretion of Blimpie). This initial franchise fee, whether paid for one Non-Traditional Blimpie Restaurant Franchise Agreement or additional Non-Traditional Blimpie Restaurant

Franchise Agreements, is fully earned and non-refundable in consideration of the trademark grant, administrative and other expenses incurred by Blimpie in entering into the Franchise Agreement and for Blimpie's lost or deferred opportunity to enter into the Franchise Agreement with others.

Where discounted initial franchise fees are granted to you because of simultaneous multiple purchases of Blimpie Franchise Agreements, you shall be required to open your Blimpie Restaurants within a limited period of time (usually one year). Your failure to open your Blimpie Restaurants timely shall result in the termination of your Blimpie Franchise Agreement(s), and no refund shall be made of your initial franchise fee(s). Your decision to purchase multiple simultaneous Franchise Agreements should be realistically considered.

*SUBFRANCHISES*

Upon execution of a Subfranchise Agreement for a Blimpie Subfranchise, you must pay an initial subfranchise fee, which ranges from $10,000 to $500,000, and will be determined by negotiation between Blimpie and you. Although the subfranchise fee is not a fixed sum, it is determined (i) by calculation of $.10 multiplied by the population of the subfranchise territory, or (ii) by multiplying the number of Blimpie restaurants that can be opened in your territory by $10,000 (if the population and possible development do not reasonably correlate). Blimpie determines, at its discretion, the number of restaurants that can be opened based upon the most recent population data available and other relevant demographic factors.

In addition to the initial subfranchise fee payable to Blimpie, as a subfranchisor you will be required to file a State Sales Agent Statement for the state in which sales activities occur, and will be required to pay a fee to such state.

All of these fees are payable at the time of the signing of the Subfranchise Agreement, and are not refundable under any foreseeable circumstances.

| Number of Franchise Agreements Purchased | Traditional | Non-Traditional |
| --- | --- | --- |
| 1 | $18,000 | $10,000 |
| 2 or more | $18,000 for the first, $10,000 for each additional. | $10,000 for the first, $5,000 for the second; $2,500 for each additional. |

**Note A**:  A Franchisee purchasing three (3), four (4), or five (5) Traditional licenses <u>simultaneously</u> will pay reduced fees of $28,000, $32,000 and $35,000 respectively for the Multi-Unit purchases. These Multi-Unit transactions will be subject to special terms including the obligation that the Franchisee opens all units for business within two (2) years. Any license for a unit not opened within two (2) years will be automatically terminated. No portion of the Multi-Unit fee is refundable for any reason whatsoever.

UFOC 2004

* * * * *

During the past fiscal year, Blimpie did not finance any initial franchise fees.

There may be occasions when these fees will be modified due to the inability of Blimpie to locate either a Traditional or Non-Traditional Blimpie Restaurant in a particular region, and in those instances the initial fee may be reduced to induce the proposed Traditional or Non-Traditional Blimpie Restaurant franchisee to purchase a franchise agreement and install a restaurant in these markets. During the last fiscal year, the initial fee for the purchase of Franchise Agreements ranged from $1.00 to $18,000.

Blimpie reserves the right, in its sole discretion, to issue Blimpie Restaurant Franchise Agreements to its Subfranchisors, or designees of its Subfranchisors, for an initial fee of $1.00 in order to facilitate development of Blimpie Restaurants in certain territories, to be paid by good check at the time of execution of the Franchise Agreement, which initial fee is non-refundable.

Blimpie reserves the right to finance any part of the initial franchise fees and subfranchise fees. If we agree to finance all or part of the initial franchise or subfranchise fees, we will negotiate the amount, interest rate and term of repayment with you. The specifics of this financing will depend upon your amount of available capital, and will be available only at the sole discretion of Blimpie.

UFOC 2004

# ITEM 6
# OTHER FEES

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Continuing Royalty Fee[i] | 6% of gross revenues | Weekly | Gross Revenues include all revenue from the franchise location, but do not include sales taxes, refunds or credits. |
| Advertising Fees - Franchisees | 3% of gross revenues<br><br>[4% if national advertising program is initiated] | Weekly | Reduced advertising fees of 1% of gross revenues in certain hospital locations. |
| Cooperative Advertising[i] | Not to exceed 3% [or 4%] of gross revenues payable in lieu of advertising fees.[ii] | Weekly | Company-owned stores, if any, have no vote in these cooperatives.[iii] |
| Additional Training[i] | $1,500 per person | Upon commencement of training | Blimpie trains 2 persons free - see Item 11 |
| Assignment Fee[i] | Greater of (i) 5% of purchase price, or (ii) $5,000.00 | Upon transfer | Fee of $1,500 for non-sale management transfer |
| Audit | Cost of audit plus underpayment with interest on underpayment at up to 15% per annum[iv] | 30 days after billing | Payable only if audit shows an understatement of at least 5% of gross revenues for any month. |
| Fees to Leasehold Corporation | Aggregate of 9% [or 10%] of gross revenues[v] | Weekly | Not payable by Non-Traditional franchisees who lease their space directly from their landlord. |
| Renewal Fee[i] | Blimpie's then-current franchise fee | Upon execution of renewal agreement | |
| Uniforms | Per Item Required | Prior to Opening | Varies based upon number of employees |

# ITEM 6
# FOOTNOTES

[i] All fees are imposed by and payable to Blimpie. Where an Advertising Cooperative has been formed, all or a portion of your Advertising Fees will be contributed by Blimpie to the Advertising Cooperative. All fees are non-refundable.

[ii] Existing advertising cooperatives may assess fixed weekly fees to be paid by franchisee/members, as may be determined by the governing board of each cooperative and membership, but cannot exceed the amount of the Advertising Fee. Special assessments by supermajority vote are possible.

[iii] Advertising Cooperatives are groups of franchisees located in a particular geographic area who, together with a Blimpie-designated representative and a representative of the Subfranchisor for the area, if any, administer the advertising needs and costs for franchisees in the area.

[iv] Interest begins from the date of the underpayment.

[v] These fees are the same as the aggregate of the Continuing Royalty and Advertising Fees payable to Blimpie and/or an advertising cooperative, pursuant to the terms of the Franchise Agreement and are deemed satisfied by such payment.

**ITEM 7**
**YOUR ESTIMATED INITIAL INVESTMENT[†]**
**(Traditional Restaurant Location)**

|  | Amount | When Due | Method of Payment | To Whom Payment is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee | $18,000[i] | Upon signing of Franchise Agreement | Lump Sum | Blimpie |
| Grand Opening Advertising Fee | $2,000 | 90 days surrounding Opening | As Incurred | Media &/or Vendors |
| Grand Opening Kit | $600 | Upon signing of Franchise Agreement | Lump Sum | Blimpie |
| Opening Inventory | $2,500 - $5,000 | Prior to Opening | Lump Sum | Purveyors |
| Business Premises[ii] | $5,000 - $35,000[iii] | Upon execution of Sublease | As Incurred | Landlord |
| Construction | $50,000 - $150,000[iv] | Installments | As Incurred | Contractor |
| Equipment | $25,000 - $58,200[ii&v] | Installments | As Incurred | Vendors |
| Security Deposits [non-real estate] | $1,000 - $3,000 | Upon opening of utility accounts | Lump Sum | Utility Companies |
| Additional Funds | $3,000 - $5,000[vi] | During initial six (6) months of operations | As Incurred | Employees, Suppliers, Utilities |
| Insurance | $4,150 - $15,200[vii] | Installments | As Incurred | Insurance Co. / Broker |

**TOTAL**     **$113,250 - $298,000**

[†] **In formulating the estimates set forth, the Franchisor has relied upon its experience since 1989 in the sale of franchises and the operations of a growing chain of franchised restaurants of the type described in this offering circular. Franchisor through its officers and affiliates identified in Item 2 continually researches and monitors the market for the various construction, real estate and business services required to establish and open a franchised restaurant and has reflected in the following chart its estimate of the reasonable range of expenses for each item set forth.**

## YOUR ESTIMATED INITIAL INVESTMENT[‡]
### (Non-Traditional Franchise)

| | Amount | When Due | Method of Payment | To Whom Payment is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee | $1.00 - $10,000[i] | Upon signing of Franchise Agreement | Lump Sum | Blimpie |
| Grand Opening Advertising | $2,000 | 90 Days Surrounding Opening | As incurred | Media &/or Vendors |
| Grand Opening Kit | $600 | Upon signing of Franchise Agreement | Lump Sum | Blimpie |
| Opening Inventory | $2,500 - $5,000 | Prior to Opening | Lump Sum | Purveyors |
| Construction | $15,000 - $65,000[iv] | Installments | As Incurred | Contractor |
| Equipment | $15,000 - $48,200[ii&v] | Installments | As Incurred | Vendors |
| Additional Funds | $3,000 - $5,000[vi] | During Initial Six (6) Months of Operations | As Incurred | Employees, Suppliers, Utilities |
| Insurance | $4,150 - $12,300[vii] | Installments | As Incurred | Insurance Company / Broker |

**TOTAL    $42,251 - $153,100**

---

[‡] **In formulating the estimates set forth, the Franchisor has relied upon its experience since 1989 in the sale of franchises and the operations of a growing chain of franchised restaurants of the type described in this offering circular. Franchisor through its officers and affiliates identified in Item 2 continually researches and monitors the market for the various construction, real estate and business services required to establish and open a franchised restaurant and has reflected in the following chart its estimate of the reasonable range of expenses for each item set forth.**

UFOC 2004

## YOUR ESTIMATED INITIAL INVESTMENT[§]
### (Subfranchise)

| | Amount | Method of Payment | To Whom Payment is to be Made |
|---|---|---|---|
| Subfranchise Fee | $10,000 to $500,000 | Lump Sum or Financed[viii] | Blimpie |
| Optional Office Equipment & Fixtures | $7,500 to $20,000 | Lump Sum | Landlord/ Equipment Vendor |
| Lease Security | $0 to $10,000 | Lump Sum | Landlord |
| Working Capital | $5,000 | Lump Sum | As needed |
| Advertising | $1,200 to $6,000 | Equal Monthly Payments | Media |
| Construction | Not Required[ix] | | |
| Insurance | Variable[x] | | |
| Deposits | Not Required[vii] | | |

**TOTAL    $24,700 to $542,000[xi]**

## ITEM 7
## FOOTNOTES

[i] Blimpie does not finance any fee, but reserves the right to do so. See Item 10.

[ii] All figures for traditional restaurant locations are based on 1,200 square foot premises. It is not practical to project initial costs for restaurants in excess of 1,200 square feet due to the fact that the costs for the restaurants do not necessarily increase in direct proportion to their size, and such projection would not, in Franchisor's opinion, be a reliable indication. A typical Non-Traditional Blimpie Restaurant is located in a portion of an existing store location, dining room, student union or other type of premises which size may vary from as low as 300 square feet to as high as 2,000 square feet. There probably will not be any lease security deposit and if so it is paid directly to the landlord of the premises who will not be Blimpie. If the store premises is to be constructed it will be constructed at your sole expense subject to the layout and design specifications of Blimpie. Although it is anticipated that you will lease commercial space for your Blimpie Restaurant, if you buy unimproved property and construct the premises, the cost may be from $50,000 to $500,000.

[§] **In formulating the estimates set forth, the Franchisor has relied upon its experience since 1989 in the sale of franchises and subfranchises of the type described in this offering circular. Franchisor through its officers and affiliates identified in Item 2 continually researches and monitors the market for the various real estate business services and other costs required to establish and open a subfranchise business and has reflected in the following chart its estimate of the reasonable range of expenses for each item set forth.**

iii Your initial expenditure for your business premises will include, in most cases, the payment of rental security and one month's rent. These costs vary considerably depending upon geographic area, location, size and the competitive forces existing in the marketplace. The lease security usually equals two to six months' rent, which you will pay directly to the landlord upon signing the lease. It is estimated that the minimum space required is 750 square feet and that a typical restaurant is 1,200 square feet. There is no maximum; however, space in excess of 4,000 square feet should not be necessary. The cost of rental security and one month's pre-paid rent is estimated to range from $5,000 to $35,000, but can be greater, especially in urban areas.

iv Construction costs may vary, based upon the condition of the selected location, your selection of decor items from approved decor packages, geographic factors, requirements of unions, and other demographic factors. These costs include, but are not limited to, such items as architectural fees, if required, and building department and other required municipal department filing fees. Additionally in mall locations costs may vary as a result of the participation of a landlord in the build out of the store premises.

v Except for the items specified in Item 8 of this Offering Circular as required to be purchased from Blimpie or designated manufacturers due to their proprietary nature and special formulation, you may purchase equipment and fixtures from sources of your own choosing, provided the same conform to our standards and specifications. The initial expenditure for these items will vary from restaurant to restaurant because of the competitive factors in the market at the time of purchase and because many specifications relate to items of decoration that can be complied with over a varied cost range. A Non-Traditional franchise may not require expenses related to seating, as necessary in a traditional restaurant, or may have existing refrigeration equipment in place which makes new purchase avoidable. Franchises located outside of the New York/New Jersey area shall be required to purchase an oven for the baking of the Blimpie style of bread, which represents an additional cost of approximately $5,500. Franchises which elect to sell French fries as part of the Blimpie menu shall be required to purchase an auto-fry unit and special signage which represents an additional cost of approximately $8,200.

vi You must have sufficient working capital for start-up expenses and to continue to purchase inventory to promote the growth of your business while paying all of the other overhead costs, including debt service, if any. These figures are estimates and Blimpie cannot guarantee that you will not have additional expenses starting the business. Your costs will depend upon factors including how well you follow Blimpie's methods and procedures; the level of your management skills, business acumen and experience; local economic conditions; the prevailing local wage rate; competition; and the sales level achieved during the initial period of operations.

vii You are obligated to obtain and maintain insurance, including coverage for business interruption, public liability (including product liability), personal property, fire and extended coverage insuring improvements and your Restaurant, auto (if delivery by auto is to be part of your business) and workers compensation. These costs will vary depending upon the type and extent of coverage, and the geographic area in which your business is located. Blimpie's insurance requirements may be less than the requirements of the landlord of your business premises, in which case, the landlord's limits of coverage shall control.

Blimpie does not know of any circumstances in which these fees are refundable, in whole or in part. However, the refund policies of vendors, suppliers and utilities vary. You should contact each party to ascertain their refund policy.

As reflected in the preceding charts, some costs are estimated to be lower in connection with the establishment of a Non-Traditional franchise.

viii Blimpie reserves the right to finance all or part of the Subfranchise Fee. See Item 10.

ix These expenses will not normally be incurred by you, and are not required by Blimpie.

x You should consult with your insurance broker and legal advisor to determine your insurance needs.

[xi] With the exception of the Initial Subfranchise Fee and the costs of advertising, all other costs of operation of a Subfranchised Business are optional and will be incurred by you at such times as your needs dictate.  The extent of these costs to you will depend on such factors as your decision to open an office and expend monies for such administrative services as you determine necessary, in your sole discretion.

# ITEM 8
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

Real Estate

In order to maintain continuity over the real estate wherein each Blimpie Restaurant is located because of Blimpie brand good will and trademark concerns, and to insure compliance with the authorized product line and use control limitations of each approved location, and to collect and enforce your obligations to Blimpie, each approved Traditional Blimpie Restaurant location is leased by a corporate designee of Blimpie and thereafter, subleased, in accordance with the Blimpie sublease to you. Since the sublease between the corporate designee of Blimpie and you grants to you a sublease for the entire demised term, less one (1) day, and is executed in conjunction with the lease for the approved premises, all security, guarantees and other assurances required by the Landlord of the approved premises will be provided by you. This sublease incorporates, as additional rent, the payment of the 6% Continuing Royalties and 3% [or 4%] Advertising Fees due and owing in accordance with the terms of your Blimpie Restaurant Franchise Agreement.

With respect to a Non-Traditional Blimpie Restaurant franchisee, since a Blimpie Restaurant is being installed within an existing primary business, there will generally be no leasing relationship, and consequently no sublease executed.

Pursuant to an agreement with IHE, LLC, a company wholly owned by Patrick G. Meglio, a principal of DCBG, Inc., Blimpie's Subfranchisor for the District of Columbia, portions of Maryland and Virginia, certain approved hospital locations will be leased or subcontracted by IHE, LLC directly from the hospital, or from the food service organization which has a master contract with the hospital to furnish food services to the hospital facility. Thereafter, the premises will be sublet, or subcontracted by IHE, LLC to you. The sublease or subcontract will grant to you the right to operate within the hospital facility for the entire term of the IHE, LLC lease or subcontract. All security, assurances or other guarantees required by the terms of the IHE, LLC sublease or subcontract will be provided by you. Pursuant to the agreement, IHE, LLC may impose a charge in the sublease or subcontract in an amount not to exceed two (2%) per cent of the gross revenues of your Blimpie Restaurant (in excess of the rental or contract fees charged to IHE, LLC by the hospital or food service organization) such amount will be paid directly to IHE, LLC.

There are significant potential risks inherent in these hospital locations. In a typical hospital deal, your right to occupy the premises within which your Blimpie restaurant will be located can be terminated, as specified in the Subcontract Agreement with the hospital or food service organization, at any time upon sixty (60) days prior written notice. No cause for termination is required.

Furthermore the term of the underlying agreement with the food service organization servicing the hospital generally expires significantly earlier than the expiration of the twenty (20) year term of the Blimpie Franchise Agreement. Blimpie cannot give any assurance that the term of the underlying agreement will be extended, and if not, your occupancy will be terminated. In the event of such termination, you would generally not be reimbursed for any of your investment, construction or equipment costs.

Equipment & Fixtures

You must purchase and install, at your expense, all fixtures, furnishings, equipment (including point of sale recording systems and computer software), decor, and signs as Blimpie may direct from time to time in its Manuals; and must refrain from installing or permitting to be installed on or about your Blimpie Restaurant, without Blimpie's prior written consent, any fixtures, furnishings, equipment, decor, signs, or other items not previously approved as meeting Blimpie's standards and specifications. You may purchase any or all of these items from Paramount Restaurant Supply Corp. or any other manufacturers or distributor designated by Blimpie, and with respect to non-proprietary items designated by manufacturer and model, from any other vendor. Currently, the only items of equipment which must be purchased from Paramount or other distributor designated by Blimpie are the Blimpie Bread Oven [for non-New York/New Jersey units which are not serviced by Blimpie's authorized bakery(ies)], the Blimpie sneeze guard (proprietary design), and one form of exterior/interior sign package (Traditional or Non-Traditional format). For all other items, there is no requirement to purchase from a particular vendor, but you must use specific brands and models of equipment which we specify. The list and prices of the equipment offered for sale by Paramount Restaurant Supply Corp. is described in Exhibit "K" attached to this Offering Circular.

Goods, Supplies, Inventory and Services

We negotiate purchase arrangements with distributors and manufacturers, including price terms, for the benefit of franchisees of the entire Blimpie restaurant system. You are required to purchase all of the goods, supplies and inventory for your Blimpie restaurant, which include all of your printed paper goods, employee uniforms, inventory, meats, cheeses, bread, frozen dough and/or freeze/thaw frozen and prepared bakery products, and other product line items, from our approved manufacturers and distributors. You must follow all of our specifications and formulas for contents, weight and quality of product served. You may select and use any operational service providers such as exterminators, refrigeration service companies, refuse removal companies, etc.

Our specifications are issued to all franchisees, subfranchisors and approved suppliers by written Operations Manual amendments and other written notices we send, from time to time. You are required to adhere to such amendments and notices.

Required Purchases and Operation

The following items must be purchased from the approved manufacturers and distributors we designate and are not subject to alternate manufacturers:

(i)    All frozen dough raw materials, which materials must be baked only in approved Blimpie deck ovens. We reserve the right to authorize exceptions as circumstances warrant. [Note: Blimpie does not require baking of bread in the NY/NJ Metropolitan Area, where bread is supplied by authorized bakeries.]

(ii)    All branded products that bear the Blimpie trademark. In conjunction with Blimpie International, Inc., we have a long-term strategic plan to eventually create another profit center for each of our franchisees and franchisor through the sale of Blimpie branded products in Blimpie restaurants, and in supermarkets, grocery stores, etc. To accomplish this goal, we intend to develop

these branded products. You must purchase, display and sell all branded products we authorize for sale. Manufacturers of branded products shall pay a licensing fee to Metropolitan Blimpie, Inc. and Blimpie International, Inc., the co-owners of the Blimpie trademarks.

(iii)    In 1992 we entered into a 7-year agreement with the Coca-Cola Company to be the only approved fountain service beverage supplier to the Blimpie restaurant system. We have extended the agreement to 2003 and currently are negotiating a ten year renewal with Coca-Cola. You must use the fountain service COCA-COLA® products we authorize.

Co-Brand Sales

In certain cases the sale of co-brand products will be considered authorized products of Blimpie and subject to your payment of Continuing Royalties and Advertising Fees under the Franchise Agreement.

In other cases, your sales will not be subject to the payment of Continuing Royalties and Advertising Fees to Blimpie, but rather Blimpie will receive payments directly from its co-brand partners.

Other than as set forth, Blimpie will derive no revenue from the sale of co-brand products within your Blimpie franchised restaurant.

Approval Process

All products sold or offered for sale at your Blimpie Restaurant must meet Blimpie's then-current standards and specifications, as established in Blimpie's Manuals, or otherwise in writing. You must purchase all the products solely from suppliers who demonstrate to Blimpie's continuing satisfaction the ability to meet Blimpie's standards and specifications, who possess adequate quality controls and capacity to supply your needs promptly and reliably, and who have been approved by Blimpie in the Operations Manual or otherwise in writing.

If you desire to purchase products from an unapproved distributor, whom you desire to become an authorized distributor, you must submit a written request in duplicate to Blimpie. Blimpie will have the right to require that the proposed distributor provide reasonable financial, operational and economic information regarding its business and that Blimpie representatives be permitted to inspect the proposed distributor's facilities and establish economic terms, delivery, service, and other requirements consistent with the other distribution relationships for system restaurants. The proposed distributor shall pay Blimpie in advance the reasonable costs of Blimpie's review of the application of the distributor related to inspection, initial and ongoing. Blimpie may revoke its approval at any time upon the distributor's failure to continue to meet Blimpie's criteria for approval. Blimpie is not required to approve any proposed distributor. Upon Blimpie's receipt of your request, Blimpie will notify you of its decision within ninety (90) days thereof.

You must not sell or offer for sale any products of the proposed distributor until Blimpie's written approval of the proposed distributor is received. Blimpie may from time to time revoke its approval of particular products or distributors when Blimpie determines, in its sole discretion, that the products or distributors no longer meet Blimpie's standards. Upon receipt of written notice of

such revocation, you must cease to sell any disapproved products and cease to purchase from any disapproved distributor.

As to the modification of specifications of the product line items in Blimpie Restaurants, the specifications are established after analysis of the cost structure and quality of each item, the contents, and the yield of each category of product. There may be a modification of the quality standards of the approved products or, a modification of the contents of the products, due to inflationary pressures, supply and demand problems, or the development of new and better products.

<u>Categories of Goods and Services for Which We or Our Affiliates are Approved Suppliers or the Only Approved Supplier</u>

We are not the only approved supplier of any goods or services.

<u>Precise Basis by Which We or Our Affiliates Will or May Derive Revenue or Other Material Consideration as a Result of Required Purchases or Leases</u>

(i)    B.A.L. Equipment Sales, Inc., a company wholly owned by Nicholas Lagano, Jr., Blimpie's President, or any affiliate, may derive revenue from the sale of various items of equipment to you, directly, or through a designated distributor. With the exception of proprietary items, you may purchase the equipment from any supplier you choose. Our markup, or that of any affiliate or designated distributor, is based on actual costs plus fixed and variable costs with allowance for reasonable profit determined at the sole discretion of Blimpie.

(ii)    During Blimpie's last fiscal year, Blimpie had revenues of $3,217,859. Of this amount $2,269,193 (approximately 71%) consisted of revenues from Continuing Royalties. Blimpie's affiliate, B.A.L. Equipment Sales, Inc., had revenues of $36,882 from the sale of equipment to Blimpie franchises. This amount (approximately 1.1% of total revenues of Blimpie) consists of receipts of two (2%) percent of the invoice amount for equipment purchased by franchisees from Blimpie's designated equipment distributor and payments from the direct sale of menu boards to franchisees. See Blimpie's financial statement referred to in Item 21 and attached as Exhibit "H" of this Offering Circular.

Blimpie, or any affiliate, may derive revenue from the sale of various non-proprietary equipment to you at prices which incorporate a profit. You may solicit other offers from independent third parties and upon comparison of Blimpie's or its designated distributor's offering price against the third parties offering price, may elect to purchase from whom you wish. The markup of Blimpie, any affiliate or designated distributor, is based upon actual costs, plus fixed and variable costs with allowance for reasonable profit determined at the sole discretion of Blimpie.

The magnitude of the required purchases and leases in relation to all purchases and leases made by you in the establishment or operation of the franchised business is:

•    It is estimated that the purchase of equipment by you will represent approximately 20% to 25% of the cost to establish the franchised business for a Traditional Blimpie Restaurant, and 30% to 35% of the cost to establish the franchised business for a Non-Traditional Blimpie Restaurant.

**Magnitude of Required Purchases and Leases in
Relation to All Purchases and Leases in the
Establishment of the Blimpie Restaurant**

|  | Estimated Costs | Aggregate Cost of Blimpie Restaurant Installation |
|---|---|---|
| Equipment: | $25,000 - $58,200 | $113,250 - $298,000 (Traditional) |
|  | $15,000 - $48,200 | $42,251 - $153,100 (Non-Traditional) |
| Lease Security & Initial Rentals: | $15,000 - $48,200 | $113,250 - $298,000 (Traditional) |
|  | $0 | $42,251 - $153,100 (Non-Traditional) |

**Magnitude of Required Purchases and Leases in
Relation to All Purchases and Leases in the
Operation of the Blimpie Restaurant**

You are required to purchase and/or lease approximately seventy five (75%) percent of all purchases or leases made by you for goods and services in establishing and operating your business from Blimpie, its designees and/or authorized suppliers and distributors.

UFOC 2004

**ITEM 9**
**FRANCHISEE'S OBLIGATIONS**

THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE FRANCHISE AND OTHER AGREEMENTS.  IT WILL HELP YOU FIND MORE DETAILED INFORMATION ABOUT YOUR OBLIGATIONS IN THESE AGREEMENTS AND IN OTHER ITEMS OF THIS OFFERING CIRCULAR.

| Obligation | Section In Agreement | Item in Offering Circular |
|---|---|---|
| (a) Site Selection and acquisition/lease | Article 1 of the Traditional Franchise Agreement; Non-Traditional Rider | Items 7 and 11 |
| (b) Pre-Opening purchases/Leases | Article 2 of the Traditional Franchise Agreement; Non-Traditional Rider | Items 5, 7 and 8 |
| (c) Site development and other pre-opening requirements | Articles 1,2,3 and 6 of the Traditional Franchise Agreement; Non-Traditional Rider | Items 8 and 11 |
| (d) Initial and Ongoing Training | Articles 3 and 18 of the Traditional Franchise Agreement; Article VI of the Subfranchise Agreement | Item 11 |
| (e) Opening | Articles 1,2,3 and 6 of the Traditional Franchise Agreement | Items 7 and 11 |
| (f) Fees | Articles 1,6 and 9 of the Traditional Franchise Agreement; Article III of the Subfranchise Agreement; Paragraph 16 of the Sublease | Items 5, 6 and 7 |
| (g) Compliance with Standards and Policies/Operating Manual | Articles 4,5 and 8 of the Traditional Franchise Agreement; Non-Traditional Rider; Article VII of the Subfranchise Agreement | Items 11, 14, 16 |
| (h) Trademarks and Proprietary Information | Article 7 of the Traditional Franchise Agreement; Article XI of the Subfranchise Agreement | Items 13 and 14 |
| (i) Restrictions on products/services offered | Article 8 of the Traditional Franchise Agreement; Non-traditional Rider | Item 16 |
| (j) Warranty and customer service requirements | Article 4 of the Traditional Franchise Agreement | Item 8 |
| (k) Territorial development and sales quotas | Article VII of the Subfranchise Agreement | None |

UFOC 2004

| | Obligation | Section In Agreement | Item in Offering Circular |
|---|---|---|---|
| (l) | Ongoing product/service purchases | Article 8 of the Traditional Franchise Agreement; | Item 8 |
| (m) | Maintenance appearance and remodeling requirements | Article 4 of the Traditional Franchise Agreement | Item 11 |
| (n) | Insurance | Article 17 of the Traditional Franchise Agreement; Article VII of the Subfranchise Agreement; Paragraph 2 of the Sublease | Item 7 |
| (o) | Advertising | Article 6 of the Traditional Franchise Agreement; Article VIII of the Subfranchise Agreement | Items 6 and 11 |
| (p) | Indemnification | Article 20 of the Traditional Franchise Agreement; Article VII of the Subfranchise Agreement | None |
| (q) | Owner's participation/ management/ staffing | Not required, however, see Article 3 of the Traditional Franchise Agreement | Item 15 |
| (r) | Records/Reports | Articles 9 and 19 of the Traditional Franchise Agreement; Article VII of the Subfranchise Agreement; Paragraph 16 of the Sublease | None |
| (s) | Inspections/audits | Articles 5 and 9 of the Traditional Franchise Agreement; Paragraph 16 of the Sublease | Items 6 and 11 |
| (t) | Transfer | Article 14 of the Traditional Franchise Agreement; Article XIV of the Subfranchise Agreement; Paragraph 5 of the Sublease | Item 17 |
| (u) | Renewal | Article 15 of the Traditional Franchise Agreement | Item 17 |
| (v) | Post-termination obligations | Article 16 of the Traditional Franchise Agreement; Article XIV of the Subfranchise Agreement | Item 17 |
| (w) | Non-competition covenants | Article 10 of the Traditional Franchise Agreement; Non-Traditional Rider; Article XIII of the Subfranchise Agreement | Item 17 |
| (x) | Dispute Resolution | Article 21 of the Traditional Franchise Agreement; Article XXIII of the Subfranchise Agreement | Item 17 |

# ITEM 10
# FINANCING

Except as described below, Blimpie will not offer, directly or indirectly, any arrangements for financing your initial investment. Any financing provided by Blimpie will be offered at Blimpie's sole and absolute discretion. Blimpie is unable to estimate whether you will be able to obtain financing for all or any part of your investment and, if you are able to obtain financing, Blimpie cannot predict the terms of the financing. Blimpie does not receive payment from any person or persons for obtaining or placing financing. Blimpie does not guarantee your obligations to third parties.

Blimpie may offer financing to you for the payment of all or a part of the initial subfranchise fee, but under no circumstances will Blimpie finance any portion of the initial franchise fee. The amount financed would vary based upon the cost of the subfranchise you are purchasing. The term of financing is 3-5 years, at an interest rate of 10% per annum, with monthly payments commencing thirty (30) days after execution of the Subfranchise Agreement. The specifics of such financing will be dependent upon the amount of your available capital. Debt may be prepaid without penalty. The note will be secured by the assets of your business. Overdue amounts will bear interest, on a monthly basis at a rate which is the lesser of 18% per annum or the highest amount permitted by law, calculated from the date the amount of principal or interest becomes due. However, upon default, Blimpie retains the right to foreclose on the collateral.

In certain circumstances B.A.L. Equipment Sales, Inc. may offer financing to you for the payment of all or any part of the equipment purchased by you. The terms of financing will be similar to those offered by Blimpie for subfranchise purchases. The equipment financed will be collateral for repayment of the loan.

Blimpie does not have any past or present practice or intent to transfer, assign, discount, or sell to a third party, in whole or in part, any note, contract, or other instrument executed by any subfranchisor; but Blimpie reserves the right to do so in the future.

The premises where your Blimpie Restaurant is to be located will be leased by a corporate designee of Blimpie and then subleased to you. The sublease grants to you a sublease for the entire demised term less one (1) day and is simultaneously executed in conjunction with the lease for the premises in which your Blimpie Restaurant is located. If security, guarantees and other assurances are required by the owner of the leased premises, these will be provided by you. The sublease provides that you waive and agree not to introduce any defense or counterclaim except the defense of payment in any eviction action instituted by Blimpie or its corporate designee. You, however, have the right to litigate such claim in a separate independent action which cannot be joined or consolidated with any eviction action. In addition, you waive trial by jury in any action proceeding or counterclaim brought under the sublease. In the event of a default of the sublease, Blimpie's corporate designee shall have the right to recover immediate possession of the leased premises.

UFOC 2004

## ITEM 11
## FRANCHISOR'S OBLIGATIONS

Blimpie may in its sole discretion, volunteer its services, except as to the following, which are required services to be performed by Blimpie:

Pre-Opening Obligations

Prior to the opening of the Blimpie Restaurant to the public, Blimpie (or its designees) are required by the Franchise Agreement to provide the following assistance and services to you:

1.     Site selection is your sole responsibility.  Although it is your responsibility to locate the premises for the establishment of your Blimpie Restaurant, Blimpie will approve the proposed location whether found by you, or another person or entity, provided such proposed location meets Blimpie's standards.  (This obligation is found in Articles 1 and 18 of the attached Traditional Blimpie Restaurant Franchise Agreement.)  In the case of a Non-Traditional Blimpie Restaurant, Blimpie will usually approve the location prior to the execution of the Franchise Agreement, as the Franchise Agreement will specify the location of the Non-Traditional Blimpie Restaurant to be developed.  The premises containing your Blimpie Restaurant will be subleased by you from a Blimpie corporate designee, which corporate designee will be leasing the location from the owner of the premises, except in the case of Non-Traditional locations which are already owned or leased by the franchisee for other purposes.

2.     Blimpie will provide standard decor and layout plans and specifications to you, to be modified and conformed to the approved location by your architect or contractor, and shall thereafter approve the initial decor and layout of your restaurant.  You are responsible for the cost of construction and remodeling.  (These obligations are found in Articles 4 and 18 of the attached Traditional Blimpie Restaurant Franchise Agreement).

3.     Blimpie will instruct and train you and your manager.  Blimpie does not charge for this training or service, but you must pay the travel and living expenses for you and your manager.  Training occurs at Blimpie's Corporate Headquarters located at Seven Penn Plaza in New York City and at a certified existing Blimpie Restaurant designated by Blimpie for training purposes, located in an area as close in proximity to the area where your restaurant shall be located as is possible.  Blimpie reserves the right to conduct all on site restaurant training at a certified existing restaurant designated by Blimpie for training purposes in New York City.  If Blimpie elects to do so, you will incur additional living expense for you and your manager for the duration of such training period.  (This obligation is found in Article 3 of the attached Traditional Blimpie Restaurant Franchise Agreement.)

4.     Blimpie will provide you, on loan, one copy of the Operations Manual.  (This obligation is found in Article 18 of the attached Traditional Blimpie Restaurant Franchise Agreement.)

5.     Blimpie will provide representatives to reasonably assist on-site pre-opening and opening supervision.  (This obligation is found in Article 18 of the attached Traditional Blimpie Restaurant Franchise Agreement.)

6.    Blimpie will reasonably assist you in arranging for the initial financing of your restaurant if feasible and necessary (Blimpie is not directly or indirectly responsible for the failure of your application to meet the qualifying standards of any independent financing source.)

Blimpie is not obligated by the Franchise Agreement or any other agreement, to provide any other supervision, assistance, or services prior to the opening of your Blimpie Restaurant.

<u>Continuing Obligations</u>

During the ongoing operation of the Blimpie Restaurant, Blimpie (or its designee) is required by the Franchise Agreement to provide the following assistance and services to you:

1.    Blimpie will reasonably assist you in any operational problem encountered by you, after notice in writing to Blimpie.  This obligation of Blimpie shall not be considered in any respect to mean anything other than Blimpie shall act as a business consultant and advisor to you after the opening of your Blimpie Restaurant, at its offices, at a time to be determined by Blimpie.  At no time shall reasonable assistance be interpreted to require Blimpie to pay any money to you.  (This obligation can be found in Article 18 of the attached Traditional Franchise Agreement.)

2.    Blimpie shall reasonably administer the advertising program, with the advice of advertising and marketing professionals.  At times, advertising funds will be aggregated until sufficient revenues are accumulated to commence or complete an advertising or marketing program. Blimpie shall in good faith attempt to utilize the advertising funds in accordance with the advice and suggestions of advertising or marketing staff or outside advertising and/or marketing companies, consultants or other entities retained for such purpose.

Blimpie shall direct all advertising and marketing programs and shall have sole discretion with respect to the adoption of the concepts, materials and media used in such programs, as well as the placement and allocation of all advertisements whether or not an advertising cooperative is formed (See Article 6 of the Traditional Franchise Agreement).

3.    As required by Article 18 of the attached Traditional Blimpie Restaurant Franchise Agreement, Blimpie will loan you copies of its two Operations Manuals; the Operations Manual and the Franchise Operations Manual which contain mandatory and suggested specifications, standards and procedures.  You will need these Manuals to conduct your daily business operations and will be permitted to keep them in your possession throughout the duration of your business relationship with Blimpie.  These Manuals contain confidential material and remain the property of Blimpie.  You will be required to return both Manuals upon termination of your business relationship with Blimpie.

The table of contents for the Operations Manual is as follows:  I. Operations, 9 pages; II. Products, 40 text pages & 6 colored graphic pages; III. Customer Service, 8 pages; IV. Equipment And Cleaning, 8 pages; V. Operating Procedures, 26 pages; VI. Catering, 12 pages; VII. Bread Baking; 10 pages.  The table of contents for the Franchise Operations Manual is as follows:  i. Introduction, 10 pages; I. Pricing, 6 pages; II. Before Opening Regulations, 4 pages; III. Accounting, 16 pages; IV. Personnel, 12 pages; V. In Store Training Manual, 16 pages; VI. Employee Handbook, 24 pages; VII. Appendix, 22 pages (contains business forms for copying).

Blimpie is not obligated by the Franchise Agreement or any other agreement to provide any other supervision, assistance, or services in connection with the ongoing operation of the Blimpie Restaurant.

Any duty or obligation imposed on Blimpie by the Franchise Agreement may be performed by any of Blimpie's designees, employees, or agents as Blimpie may direct.

<u>Site Selection</u>

If, at the time the Franchise Agreement is executed, you have not located and Blimpie has not approved a site for your Blimpie Restaurant, you must locate a suitable site, subject to Blimpie's approval. (This obligation is contained in Article 1 of the Traditional Location Franchise Agreement.)

You must submit to Blimpie, in the form specified by Blimpie, a completed site review form, any information or materials as Blimpie reasonably requires. Blimpie will have 30 days, or any longer time period that may be reasonably required, after receipt of the information and materials from you to approve or disapprove, in Blimpie's sole discretion, the site as a location for the Blimpie Restaurant.

It is solely your obligation to locate the approved Blimpie Restaurant site. Blimpie will approve the site for your Blimpie Restaurant after an analysis of the site, taking into consideration the proposed rental, population mixture, geographic area, including climate and applicable business hours, and any other facet of the particular location which would affect the possibilities of success or failure. Approval of your location by Blimpie shall not be interpreted as our guarantee of success. Your ultimate decision as to acceptance or rejection of any site is your business risk.

The approved site is generally subleased to you by a corporate designee of Blimpie, which leases the approved location from the landlord of the site. Your signing of the sublease (or the signing by a principle stockholder) for the location shall constitute your approval of the location and the terms of the major lease.

Except for Multi-Unit franchise licenses which generally require all units to open for business within two (2) years, there is no time limit in which you must locate an acceptable site. The Franchise Agreement will remain in effect until you locate an acceptable site for your Blimpie Restaurant.

Blimpie estimates that the typical length of time between the signing of the Franchise Agreement and the opening of a Traditional Blimpie Restaurant to be approximately 3 to 6 months, assuming that a location can be obtained and leased within forty-five days after execution of the Agreement. The procurement of an approved site cannot be estimated as the time period can vary due to the particular financial or real estate needs, and availability of suitable sites in the desired market. Accordingly, the procurement of an approved site can take twelve months or longer to obtain. Blimpie estimates that the typical length of time between the signing of the Franchise Agreement and the opening of the Non-Traditional Blimpie Restaurant to be approximately eight (8) to twelve (12) weeks, since the site is already obtained and generally no lease is required. Delays may occur if permitting or zoning problems are

encountered however.

It generally takes a minimum of two (2) to three (3) months to construct and open a Traditional or Non-Traditional Blimpie Restaurant after completion of the lease for the premises, delivery of possession to you, and the issuance of the necessary licenses from the local governmental authorities. This time period may however be subject to change, due to zoning and local ordinances, weather conditions, shortages, or delayed installation of equipment, fixtures or signs.

In the event of the purchase of more than one Blimpie Traditional or Non-Traditional Franchise Agreement, the above stated time periods may change as multiple approved real estate sites must be obtained, and because of the operational difficulties encountered when you intend to develop more than one Blimpie Restaurant.

Your 6% royalties and 3% advertising payments based upon gross revenues will be due and owing weekly, in arrears (based upon the prior week's gross revenues) commencing on the second week after your Blimpie Restaurant opens for business.

<u>Training Programs</u>

Prior to the opening of your Blimpie Restaurant, you (or if you are a corporation or partnership, your principal, shareholder or partner) and your manager, must attend and complete to Blimpie's satisfaction the initial training program for franchisees offered by Blimpie. You will be totally responsible for you and your employees' travel and living expenses during the training program, but will not be charged in any respect for the training program. Blimpie will attempt to schedule the training so as not to inconvenience you; however, the availability of the training instructors, and the schedule of the Blimpie training school will provide classes no less frequently than once monthly. (This obligation is contained in Article 3 of the attached Traditional Blimpie Restaurant Franchise Agreement).

The training program is comprised of one period of five (5) business days of classroom instruction held at Blimpie's corporate office in New York City, and approximately 80 hours of on-the-job training in an existing certified Blimpie Restaurant in an area as close in proximity to the area in which your restaurant will be located as is possible. Blimpie does, however, reserve the right to require you to attend all or part of the required 80 hours of on-the-job training at a certified Blimpie restaurant in New York City. The training program is primarily involved in teaching the operational and statistical methods of operating a Blimpie Restaurant, actual operational training and manual labor, where you become proficient in the slicing and production of Blimpie sandwiches and other food products, along with the application of all of the specific statistical controls used in Blimpie Restaurant management. The instructional materials include: the Blimpie Operations Manual, local restaurant Marketing Manual, operations videos, handouts and presentations by department heads.

Blimpie reserves the right to require you to attend the training program at Blimpie University in Atlanta, Georgia conducted under the direction of Blimpie International, Inc., in lieu of the five (5) business day classroom instruction at Blimpie's corporate office in New York City. This training program lasts approximately 10 days. The current syllabus at Blimpie

UFOC 2004

University is as follows:

| Subject | Hours of Classroom Training |
|---|---|
| Marketing Techniques | 16 |
| Fundamentals of running a Business | 8 |
| Customer Service Techniques | 8 |
| Personnel | 4 |
| Cost Controls | 8 |
| Interpersonal Skills | 4 |
| Operations | 8 |
| Food Safety | 8 |
| Advanced Business Concepts | 8 |
| Franchisor Information | 8 |
| **TOTAL** | 80 |

The principal instructors of the training program in New York City will be either operational employees of Blimpie, subfranchisors, or restaurant fast food consultants trained by Blimpie to conduct the training classes. Currently, the training classes are conducted by Craig DeCarlo and Aaron Feigenbaum whose relevant employment history is described in Item 2. The principal instructors at the Blimpie University in Atlanta, Georgia will be determined by Blimpie International, Inc.

The training program is also mandatory if there is an ownership change pursuant to a sale of your Blimpie Restaurant, or a management change in your business. Additional training programs may be available at your request and expense. Your attendance at further training programs is not mandatory unless regional additional training programs are sponsored in your region of franchise, and if so, your participation in the regional additional training programs will be required.

In any area in which Blimpie has sold a subfranchise, the subfranchisor is obligated to Blimpie to provide certain operational servicing and other services to the franchisees in that area. Accordingly, the subfranchisor may be providing services to you pursuant to the authorization of Blimpie. If those services are not provided by the subfranchisor, Blimpie will provide the services upon notice by you to Blimpie of the deficiency.

The subjects covered in the initial training program are described below.

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location | How Often Held |
|---|---|---|---|---|
| Blimpie History and Standards | 2 Hours | 0 Hours | Corporate Office | As Needed |
| Assembly Line Operations | 2 Hours | 20 Hours | Corporate Office and at certified Blimpie restaurant | As Needed |

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location | How Often Held |
|---|---|---|---|---|
| Food Preparation Techniques | 2 Hours | 10 Hours | Corporate Office and at certified Blimpie restaurant | As Needed |
| Restaurant Operations | 3 Hours | 10 Hours | Corporate Office and at certified Blimpie restaurant | As Needed |
| Personnel Management | 2 Hours | 5 Hours | Corporate Office | As Needed |
| Customer Service Techniques | 2 Hours | 1 Hour | Corporate Office and at certified Blimpie restaurant | As Needed |
| Safety and Security | 1 Hour | 3 Hours | Corporate Office | As Needed |
| Setting up the Restaurant | 2 Hours | 5 Hours | Corporate Office | As Needed |
| Equipment Maintenance | 3 Hour | 5 Hour | Corporate Office and at certified Blimpie restaurant | As Needed |
| Blimpie Paperwork | 3 Hours | 5 Hours | Corporate Office | As Needed |
| Legal | 2 Hours | 0 Hours | Corporate Office | As Needed |
| Financial Controls | 2 Hour | 5 Hours | Corporate Office | As Needed |
| Marketing Techniques | 6 Hours | 10 Hours | Corporate Office | As Needed |
| Discussion | 4 Hours | 2 Hours | Corporate Office | As Needed |
| Review | 4 Hours | 0 Hours | Corporate Office | As Needed |

The On-the-Job Training is comprised of the following topics:  Portion Control, Slicer Operation, Dressing, Wrapping, Prepping Procedure, Basics of Register, Inventory, and Cash Register Operation.  Forty (40) hours of the On-The-Job training occurs prior to your attendance of the classroom instruction.  The remaining forty (40) hours of On-The-Job Training occurs after your completion of the classroom instruction.

<u>Electronic Point of Sale and Computer Systems</u>

Blimpie has approved the following electronic cash register for use:  The Sharp ER750.  Although the Point of Sale ("POS") recording system is not currently in use, the approved

electronic cash register will be able to perform the point of sale and software functions when Blimpie's electronic point of sale system becomes operational.

Blimpie may require at a future date that you use an electronic POS recording system which meets Blimpie's specifications. The system will permit Blimpie to instantly receive information concerning sales and inventory of your Blimpie Restaurant; to assist you in the operation of your restaurant in accordance with the System; enable Blimpie to maintain chainwide statistics which may improve bulk purchasing; assist Blimpie in the development of new authorized products and removal of existing unsuccessful products; generally improve chainwide understanding of the System; and obtain new types of information. The POS system will also be capable of running the computer software and control systems that we specify. There is no contractual limitation on Blimpie's right to receive information through the electronic POS recording system.

Blimpie may revise its specifications, from time to time. Consequently, you may be required to upgrade or update your electronic POS system. There is no contractual limitation on the frequency and cost of this obligation.

<u>Advertising and Promotion</u>

As provided in Item 6 of this offering circular, you will pay 3% of your gross sales [or 4% if Blimpie initiates a national advertising campaign] for each and every week of operation of your Blimpie Restaurant to Blimpie, which funds will then be deposited at Blimpie's sole discretion into a segregated advertising account (with other advertising collections) controlled by Blimpie or remitted by Blimpie to a regional advertising cooperative (as described below). Aggregated Advertising Fees will then be spent for advertising to benefit the franchisees at the time and in the manner determined by Blimpie. Blimpie may authorize payment of the advertising collections for media time, production of media materials, whether they be for radio, television, newspapers or store level materials such as flyers, posters, etc., or for any type of advertising use. You must also purchase a Grand Opening Kit (approximately $600) and document the expenditure of a minimum of $2,000 for your "Grand Opening" promotion during the ninety (90) days surrounding the opening of your Blimpie business. Blimpie is not, under any circumstances, obligated to contribute to any national or local advertising fund, program, cooperative, or other organization any advertising fees or contributions. (This obligation can be found in Article 6 of the attached Traditional Blimpie Restaurant Franchise Agreement.)

Blimpie reserves the right to reduce the advertising fees payable by franchisees in hospital locations leased or subcontracted from IHE, LLC to one (1%) per cent.

Blimpie encourages the formation and operation of voluntary franchisee Regional Cooperative Advertising Associations (the "Association"). Each Association shall function for the purpose of creating a cohesive team to coordinate advertising and marketing efforts and programs and maximizing the efficient utilization of local advertising media. No promotional or advertising plans or materials may be used by an Association or furnished to its members without Blimpie's prior approval. If an Association is formed for your region of franchise, you shall participate in the Association or lose your right to vote as to decisions regarding advertising and marketing efforts and programs. Any franchisee who has an open and operating Blimpie

Restaurant can join in their regional Association.  Blimpie has the right, in its sole discretion, to designate any geographic area for purposes of establishing an Association, and to determine whether an Association is applicable to the Blimpie Restaurant.  Each association will have the right to require its members to make contributions to the Association in such amounts as are determined by the Association.  Each Association must operate from written governing documents, which are available for your review.  Each Association must prepare quarterly financial statements and an annual audited financial statement, which statements are available for your review.  Blimpie has the power to require an Association to be changed, dissolved, or merged.  If requested, Blimpie will assist in the establishment of the Association.  In the event of a non-functioning Association or if an impasse occurs owing to the inability or failure of the Association members to resolve within 7 days any issue affecting the establishment or effective functioning of an individual Association or the approval of any advertising program, Blimpie will then exercise sole decision-making power.  Blimpie reserves the right to establish general standards concerning the operation of all Associations, advertising agencies retained by the Associations, and advertising programs conducted by the Associations.

No design, advertisement, sign, or form of publicity, including form, color, number, location, and size shall be used by you or any Association unless the proposed advertising shall have been first submitted to Blimpie and approved in writing by Blimpie (except with respect to prices).  Any request by you for approval shall be addressed to Blimpie, and Blimpie shall respond within 30 days of its receipt of your written request.  Whenever you elect to utilize, in the form supplied, advertising supplied by Blimpie or a promotional item specifically approved by Blimpie, no further approval for use of such material is required. Upon written notice from Blimpie, you shall discontinue and/or remove any objectionable advertising materials.

You may obtain a report of the income and expenditures of the advertising fund by written request directed to Blimpie at its offices located at 7 Penn Plaza, 17th Floor, New York, New York  10001.

Blimpie has formed an independent entity, Blimpie Marketing Productions, Inc. ("BMPI") which is authorized to receive marketing allowances and payments from Blimpie distributors, manufacturers, and other entities that are associated in business directly or indirectly with Blimpie or the Blimpie System.  The activities of BMPI are controlled by representatives of Blimpie.  The funds received by BMPI are expended only for advertising and marketing purposes, including but not limited to, marketing and advertising personnel, management fees, advertising agencies, operating expenses, matching fund programs, research and development, administrative expenses, production of educational or training materials, production of commercials, focus groups or other studies, and the purchase of television or radio or other media time, print advertising and such other marketing and advertising uses as may be authorized by Blimpie.  No sums are expended for purposes related to the sale of Blimpie franchises, but rather, shall be dedicated to the promotion of increased in-store sales and improved information concerning products and operations at the System Restaurant level.  By signing the Franchise Agreement, you consent to the receipt of these funds by BMPI, or its successors, and the expenditures of these funds for advertising and marketing uses as set forth above.

You may obtain a report of BMPI's income and expenditures by written request directed

to Blimpie at its offices located at 7 Penn Plaza, 17th Floor, New York, New York 10001.

Obligations to Subfranchisors:

(i)     Blimpie shall permit a Subfranchisor to use, solely in connection with the Subfranchise and License granted to the Subfranchisor and in strict compliance with the Blimpie System and the Subfranchise Agreement, the Proprietary Marks, the Trade Names and the Copyrighted Materials, its logotypes, and any other trademarks or service marks which Blimpie may authorize and designate for use by the Subfranchisor, in connection with the operation of the Subfranchise Business.

(ii)    Blimpie shall, in connection with a Subfranchisor's training, lend to each Subfranchisor one (1) copy each, of Blimpie's "Operations Manual", Franchise Operations Manual" and "Construction Manual" (sometimes hereinafter jointly referred to as the "Manuals"), and any subsequent changes or amendments thereto.

(iii)   Blimpie shall supply to each Subfranchisor one (1) complete sample set of all sales materials and forms, including the Offering Circular, to be delivered to each prospective franchisee in the Territory, at the first meeting or ten business days prior to the execution of a Franchise Agreement and to be used by the Subfranchisor, in connection with the sale of each individual franchise.

(iv)    Blimpie will make available to each Subfranchisor its management personnel, during normal business hours, to consult with the Subfranchisor in person, at Blimpie's office or by telephone, about problems relating to the sale, construction, opening and operation of Blimpie Restaurants, in the Territory, and the operation of the Subfranchise Business.  Nothing contained in this paragraph shall be interpreted as Blimpie's obligation to expend any funds on behalf of the Subfranchisor.

Upon the execution of the Subfranchise Agreement, Blimpie will offer and each Subfranchisor shall agree to complete the Training Program described above for Blimpie franchisees.

## ITEM 12
## TERRITORY

A purchaser of a franchise will not be granted territorial exclusivity. The Franchise Agreement grants you the right to operate the Blimpie Restaurant only at the Approved Location. You may relocate the Blimpie Restaurant only with Blimpie's prior written approval. Blimpie's approval will be based upon a variety of factors, including the viability of the then-current location and demographics including number of households, household income, number of licensed drivers, and number of businesses relating to the proposed location, and other franchisees of the Blimpie System.

Blimpie may authorize or establish another franchise who will be permitted to use Blimpie's name or trademark at any location anywhere. Blimpie may establish a company-owned outlet using Blimpie's name or trademark at any location anywhere. Blimpie or its affiliate may establish other franchises or company-owned outlets selling or licensing similar products or services anywhere. Blimpie may sell or distribute, directly or indirectly, or license others to sell or distribute, any product or services under any proprietary marks at any location (notwithstanding its proximity to any Blimpie Restaurant).

Blimpie has no past practice of establishing company-owned outlets using Blimpie's name or trademark in the marketing area of Blimpie Restaurant franchisees, or of allowing the establishment of another Blimpie Restaurant franchise in the marketing area of an already existing Blimpie Restaurant franchisee, or of establishing other franchises or company-owned outlets selling or licensing similar products or services in the marketing area of an already existing Blimpie franchisee, nor does Blimpie presently have any intention to institute these practices, provided however, that no notice to or consent of the franchisee shall be required for such development. Blimpie may apply differing standards depending upon the Blimpie Restaurant concepts within which the existing and proposed Blimpie Restaurants operate. For example, Blimpie may permit a Non-Traditional Blimpie Restaurant to be located in close proximity to an existing Traditional Blimpie Restaurant even though, under the particular circumstances, Blimpie might not have permitted two Traditional Blimpie Restaurants to be so closely situated.

Unless specifically provided, the Franchise Agreement does not provide you with any options, rights of first refusal or similar right to acquire additional franchises.

Neither Blimpie nor any parent or affiliate has established, or presently intends to establish, other franchises or company-owned restaurants which provide similar products or services under a different trade name or trademark, but Blimpie reserves the right to do so.

If you purchase a Subfranchise, the Subfranchise should encompass an "exclusive territory" comprised of a specifically defined geographic area. However, Blimpie retains the right to promote, develop, or otherwise establish franchises within the Subfranchise territory, subject to your right as a Subfranchisor to earn and collect a portion of the revenues from the territory. No other subfranchise will be sold in the "exclusive" territory.

The territory granted to the Subfranchisor is determined by negotiations between the

UFOC 2004

Franchisor and Subfranchisor at the time of execution of the Subfranchise Agreement. The territory will consist of a geographic area, in most cases the boundaries of which will be identified as one or more political subdivisions, i.e. counties, cities or states, or by other natural geographic boundaries, such as rivers or mountains.

# ITEM 13
# <u>TRADEMARKS</u>

Pursuant to the Franchise Agreement and Subfranchise Agreement, Blimpie grants you a non-exclusive license to use and display Blimpie's Proprietary Marks and trade names solely in connection with the operation of the Franchised Business.

"Blimpie" and the design depicted on this Offering Prospectus are trademarks registered in the Principal Register of the United States Patent and Trademark Office (Reg. Nos. 1,221,085 and 1,256,296, filed on December 21, 1982 and November 1, 1983, respectively). All required affidavits have been filed.

There are no presently effective determinations of the United States Patent and Trademark Office, the Trademark Administrator of any State, or any Court; nor is there any pending interference, opposition or cancellation proceeding or any pending material litigation involving the above-referenced Proprietary Marks which is relevant to their use in this State or any state in which the Franchised Business may be located.

Blimpie acquired the right to use, license and sub-license the above-mentioned Proprietary Marks under a license dated June 30, 1989 from Metropolitan Blimpie, Inc. In the license agreement Metropolitan Blimpie, Inc. granted to Blimpie for a term of fifty (50) years, a non-exclusive license to use and display the Proprietary Marks including the right to grant sublicenses to third parties to establish Blimpie restaurant facilities throughout the territory covered by the license agreement.

The non-exclusive license granted to you by Blimpie does not grant any right, title or interest, at law or in equity, in or to any of Blimpie's Proprietary Marks or trade names except as provided by said license. Further, such license applies only to such Proprietary Marks and trade names, which have been, or may be, designated in writing by Blimpie for use by in conjunction with the operation of the Franchised Business. You may not represent to others, or conduct your business in any manner that might indicate to others that you possess any other legal or equitable rights in Blimpie's Proprietary Marks or trade names by virtue of the license granted in the Franchise Agreement or Subfranchise Agreement.

Blimpie may take such action as we deem necessary to protect against any claim, suit or demand that has or may be asserted involving any alleged infringement, unfair competition or similar matter relating to use of the Proprietary Marks. Blimpie has the sole right to defend, compromise or settle any such actual or potential claim, using attorneys of its choosing, and you are obligated to cooperate fully with us in connection with the defense of any such claim. Blimpie will protect, defend and indemnify each franchisee and/or sub-franchisor in connection with such claim unless the claim, suit or demand arises out of or relates to a franchisee's and/or subfranchisor's use of the Proprietary Marks and trade names in violation of the Franchise Agreement, the Manual or otherwise.

Blimpie reserves the right to modify or discontinue the use of any mark, name, symbol or other corporate identification. In such event, you will be required to conform your use of same as directed by Blimpie. Our sole obligation in the event of such modification or discontinuation

UFOC 2004

shall be to reimburse you for your documented tangible costs of changing signs, letterhead, etc. You waive any other claim arising or relating to any such modification or discontinuation.

Blimpie is authorized to license the Proprietary Marks in the following territories: Delaware, Maryland, District of Columbia, Virginia, Pennsylvania (from the eastern border westward, to and including Harrisburg), the counties of New York, Queens, Kings, Richmond, Rockland, Bronx and Westchester in the State of New York and the State of New Jersey, (excluding the City of Hoboken, and the counties of Morris, Warren, Sussex, Bergen, Passaic and Essex, including however, in such counties the Cities of Alpine, Belleville, Cliffside Park, Closter, Cresskill, Demarest, Dumont, East Paterson, East Rutherford, Edgewater, Englewood, East Cliffs, Fairview, Fort Lee, Hackensack, Harrington Park, Haworth, Old Tappan, Northvale, Nutley, Norwood, Palisades Park, Rockleigh, Rutherford, South Hackensack and Tenafly).

## ITEM 14
## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

You do not receive the right to use an item covered by a patent or copyright, but you can use the proprietary information in Blimpie's Operations and Construction Manuals (the "Manuals").

You must operate the Blimpie Restaurant in accordance with the standards, methods, policies, and procedures specified in the Manuals, one complete copy of which you will receive on loan from Blimpie for the term of the Franchise Agreement, before (Construction/Decor) or upon completion by you or your manager of Blimpie's initial training program to Blimpie's satisfaction (Operations and Marketing).

You must treat the Operations and Construction Manuals, any other manuals created for or approved for use in the operation of the Blimpie Restaurant, and the information contained in them, as confidential, and must use all reasonable efforts to maintain this information as secret and confidential. You must not copy, duplicate, record, or otherwise make them available to any unauthorized person. The Operations and Construction Manuals will remain Blimpie's sole property and must be kept in a secure place in the Blimpie Restaurant.

Blimpie may from time to time revise the contents of the Operations or Construction Manuals, and you must comply with each new or changed standard. You must ensure that the Operations and Construction Manuals are kept current at all times. In the event of any dispute as to the contents of either the Operations or Construction Manuals, the terms of the master copy maintained by Blimpie at its home office will be controlling.

You must not, during the term of the Franchise Agreement or after the term of the Franchise Agreement, communicate, divulge, or use for the benefit of any other person, partnership, association, or corporation any confidential information, knowledge, or know-how concerning the methods of operation of the Blimpie Restaurant which may be communicated to you or of which you may be apprised by virtue of your operation under the terms of the Franchise Agreement (including information, knowledge, or know-how concerning Blimpie Restaurant processes, techniques, and equipment). You may divulge this confidential information only to those of your employees as must have access to it in order to operate the Blimpie Restaurant. Any and all information, knowledge, know-how, techniques, and other data which Blimpie designates as confidential will be deemed confidential for purposes of the Franchise Agreement.

At Blimpie's request, you must require your manager, and any other personnel having access to any of Blimpie's confidential information to execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by you at the Blimpie Restaurant. The covenant must be in a form satisfactory to Blimpie, including specific identification of Blimpie as a third party beneficiary of the covenants with the independent right to enforce them.

UFOC 2004

## ITEM 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL
## OPERATION OF THE FRANCHISE BUSINESS

Blimpie does not require that you personally supervise the Blimpie restaurant; however, if you are an individual, Blimpie recommends that you be the fully-trained manager.  The restaurant must be directly supervised, "on-premises", by a manager who has successfully completed Blimpie's training program.  Blimpie does not have the right to approve the manager. The manager need not have an ownership interest in a corporate or partnership franchisee.  You must also maintain a competent, conscientious, trained staff.  Both you and the manager may, at Blimpie's option, have to sign a written agreement to maintain confidentiality of the trade secrets obtained in the course of employment, and enter into an agreement not to compete while working under the Blimpie System and for five years thereafter.

If you do not manage your Blimpie restaurant on a day-to-day basis, in the event your designated manager resigns or is terminated, you must arrange to have the successor manager begin to train in Blimpie's training course within 45 days of first assuming managerial duties, and successfully complete the course.  Re-training of new management personnel shall carry a training fee of $1,500.

If you are a corporation, partnership, limited liability company, or other legal entity, you must have all your principal owners guaranty your obligations to Blimpie by executing the Guaranty attached to the Franchise Agreement.  See as Exhibit "B" to this Offering Circular.

## ITEM 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must conduct your restaurant in accordance with the standards established by Blimpie, including standards of quality, cleanliness, and service for all food, beverages, furnishings, interior and exterior decor, supplies, fixtures and equipment, set forth in the System Manuals, the Franchise Agreement, and the sublease of the business premises. Changes in the menu or the standards, specifications, or procedures may become necessary from time to time, and you shall be required to accept as reasonable all modifications set by Blimpie.  The sale of any product or service at a Blimpie System restaurant without Blimpie's prior written approval shall be a material violation of your Franchise Agreement.

You must sell or offer for sale only such services and products as have been expressly approved and authorized for sale in writing by Blimpie; must sell or offer for sale all types of services and products specified by Blimpie (except for Non-Traditional Blimpie Restaurants, which may offer a limited menu); must refrain from any deviation from Blimpie's standards and specifications without Blimpie's prior written consent; and must discontinue selling and offering for sale any services or products which Blimpie may, in its discretion, disapprove in writing at any time.  Blimpie has the right to change the types of authorized goods and services, and there are no limits on Blimpie's right to make changes.

You may only serve the approved product line items specified by Blimpie in the Franchise Agreement and Manuals, and must follow all specifications and formulas of Blimpie

as to contents, weight, and quality of products served to the customers of your restaurant.

You must keep the Blimpie Restaurant open and in normal operation for such minimum hours and days as Blimpie shall specify (ordinarily 7:00 a.m. to 10:00 p.m.) or such modified hours as Blimpie may in its sole discretion permit based upon the specific market in which the System restaurant operates).

You must operate the Blimpie restaurant in strict conformity with all applicable Federal, state, and local laws, ordinances, and regulations. Such laws, ordinances, and regulations vary from jurisdiction to jurisdiction and are amendable or may be implemented or interpreted in a different manner from time to time. It is your sole responsibility to apprise yourself of the existence and requirements of all laws, ordinances, and regulations applicable to the Blimpie Restaurant, and to adhere to them and to the then-current implementation or interpretation of them.

For a description of your restrictions on some purchases, see Item 8 of this offering circular.

The authorized product line may be supplemented, improved, and otherwise modified from time to time by Blimpie. You must comply with all of Blimpie's reasonable requirements in that regard, including offering and selling new or different products or services as specified by Blimpie, and purchasing any additional equipment as may be specified by Blimpie which complies with all of Blimpie's reasonable specifications and requirements in that regard.

Except as described above, you are not restricted with respect to the goods or services which you may offer, or with respect to the customers whom you may solicit.

**ITEM 17**
**RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this Offering Circular.

**Traditional Franchise Agreement**

| | Provision | Section in Traditional Franchise Agreement | Summary |
|---|---|---|---|
| (a) | Term of the Franchise | Article 15 | 20 years, or any longer period coterminous with the term of the location lease |
| (b) | Renewal or Extension of the term | Article 15 | Four renewal terms of five years each, provided you are in good standing |
| (c) | Requirements for you to renew or extend | Article 15 | Notice, renovation of premises, compliance with franchise agreement, not in default of any required payments |
| (d) | Termination by you | None | The franchisee may terminate upon any grounds available to him by law |
| (e) | Termination by Blimpie without cause | None | |
| (f) | Termination by Blimpie with cause | Article 15 | Blimpie can terminate only if you default; See Article 15 |
| (g) | "Cause" defined – defaults which can be cured | Article 15 | Breach of Franchise Agreement and other grounds; See Article 15 |
| (h) | "Cause" defined – defaults which cannot be cured | Article 15 | Non-curable defaults: conviction of a felony, repeated defaults even if cured, trademark misuse, public health danger, filing of false reports, or disclosure of confidential or proprietary information |
| (i) | Your obligations on termination/non-renewal | Article 16 | Obligations include complete de-identification and payment of amounts due; See Article 16 |
| (j) | Assignment of Contract by Blimpie | Article 14 | No restriction on right to transfer |
| (k) | "Transfer" by you – definition | Article 14 | Includes transfer of Franchise Agreement, Franchise, or all of substantially all of the assets of your business; See Article 14 |

UFOC 2004

| | Provision | Section in Traditional Franchise Agreement | Summary |
|---|---|---|---|
| (l) | Blimpie's approval of transfer by franchisee | Article 14 | Blimpie must approve all transfers |
| (m) | Conditions for Blimpie approval of transfer | Article 14 | Execute estoppel agreement, offer Blimpie right of first refusal; you are in full compliance with Franchise Agreement, general release, transferee qualifications, pay administrative transfer fee |
| (n) | Blimpie's right of first refusal to acquire your business | Article 14 | Blimpie can match any offer less 5% [no transfer fee charged] |
| (o) | Blimpie's option to purchase your business | None | |
| (p) | Your death or disability | Article 14 | Heirs may continue business if they train to Blimpie standards and assume Franchise Agreement |
| (q) | Non-competition covenants during the term of the franchise | Article 10 | Includes prohibition of owning or operating other submarine sandwich business |
| (r) | Non-competition covenants after the franchise is terminated or expires | Article 10 | No competing business for a period of 60 months within 5 miles of your location or 5 miles of any other Blimpie Restaurant |
| (s) | Modification of the agreement | Article 23 | Except as specifically provided, must be in writing by both parties |
| (t) | Integration/merger Clause | Article 23 | Only the terms of the Franchise Agreement are binding (subject to state law). Any other promises may not be enforceable |
| (u) | Dispute resolution by arbitration or mediation | None | |
| (v) | Choice of forum | Article 21 | New York, New York |
| (w) | Choice of law | Article 21 | New York |

**Sub-Franchise Agreement**

| | Provision | Section in Sub-Franchise Agreement | Summary |
|---|---|---|---|
| (a) | Term of the Franchise | Article V | 50 years |
| (b) | Renewal or Extension of the Term | None | There is no renewal term; modification of rights to maintain revenue but terminate exclusivity and participation in future development activities |
| (c) | Requirements for you to renew or extend | None | None |
| (d) | Termination by you | Article XV | Blimpie must fail to cure default following notice and 60 days cure period |
| (e) | Termination by Blimpie without cause | None | |
| (f) | Termination by Blimpie with cause | Article XV | Blimpie can terminate only if you default and do not cure within specified time periods. See Paragraphs 13 and 15 |
| (g) | "Cause" defined – defaults which can be cured | Article XV | Breach of Subfranchise Agreement and other grounds; See Paragraph 15 |
| (h) | "Cause" defined – defaults which cannot be cured | Article XV | Non-curable defaults: conviction of a felony, repeated defaults even if cured, trademark misuse, bankruptcy, filing of false reports, or disclosure of confidential or proprietary information |
| (i) | Your obligations on termination/non-renewal | Article XVI | Obligations include complete de-identification and payment of amounts due; See Article XVI |
| (j) | Assignment of Contract by Blimpie | Article XIV | No restriction on right to transfer |
| (k) | "Transfer" by you – definition | Article XIV | Includes transfer of Subfranchise Agreement; See Article XIV |
| (l) | Blimpie's approval of transfer by Subfranchisor | Article XIV | Blimpie must approve all transfers |
| (m) | Conditions for Blimpie | Article XIV | Execute estoppel agreement, offer Blimpie |

| Provision | Section in Sub-Franchise Agreement | Summary |
|---|---|---|
| approval of transfer | | right of first refusal, you are in full compliance with Subfranchise Agreement, general release, transferee qualifications, pay administrative transfer fee |
| (n) Blimpie's right of first refusal to acquire your business | Article XIV | Blimpie can match any offer |
| (o) Blimpie's option to purchase your business | Article XVI | Option occurs following termination or expiration |
| (p) Your death or disability | Article XIV0 | Heirs may continue business if they train to Blimpie standards and assume Franchise Agreement |
| (q) Non-competition covenants during the term of the subfranchise | Article XIII | Includes prohibition of owning or operating business which sells similar services anywhere in U.S. |
| (r) Non-competition covenants after the subfranchise is terminated or expires | Article XIII | No competing business for a period of 24 months within 10 miles of your location or 10 miles of any other Blimpie Restaurant |
| (s) Modification of the agreement | Article XXI | Except as specifically provided, must be in writing by both parties |
| (t) Integration/merger Clause | Article XXI | Only the terms of the Subfranchise Agreement are binding (subject to state law). Any other promises may not be enforceable |
| (u) Dispute resolution by arbitration or mediation | Article XXIII | None |
| (v) Choice of forum | Article XXIII | New York, New York |
| (w) Choice of law | Article XXIII | New York |

These states have statutes, which may supersede the franchise agreement in your relationship with Blimpie, including the areas of termination and renewal of your franchise: NEW JERSEY (Stat. Section 56:10-1), VIRGINIA (Code 13.1-557-574-13.1-564), Maryland Franchise Registration and Disclosure Law. These and other states may have court decisions which may supersede the Franchise Agreement in your relationship with Blimpie, including the areas of

UFOC 2004

termination and renewal of your franchise.

**ITEM 18**
**PUBLIC FIGURES**

Blimpie does not use any public figure to promote its franchise, nor is there any public figure involved in any respect with the actual management or control of Blimpie. There is no investment in any respect of any public figure of Blimpie.

You are not prohibited by the Franchise Agreement from using the name of a public figure or celebrity in your promotional efforts or advertising; however, all advertising requires Blimpie's approval. Additionally, Blimpie will not be responsible for any expenses, costs or charges for such use.

**ITEM 19**
**EARNINGS CLAIMS**

No representations or statements of actual projected or forecasted sales, profits, or earnings are made to franchisees with respect to franchises. Blimpie does not furnish or authorize its salespersons or subfranchisors to furnish any oral or written information concerning the actual, average, projected, forecasted, or potential sales, costs, income or profits of a franchise.

Blimpie specifically instructs its sales personnel, subfranchisors, agents, employees, and officers that they are not permitted to make such claims or statements as to the earnings, sales or profits or prospects or chances of success, nor are they authorized to represent or estimate dollar figures as to a franchisee's operation.

Actual results vary from franchise to franchise, and Blimpie cannot estimate the results of a particular franchise. Blimpie recommends that prospective franchisees make their own independent investigation to determine whether or not the franchise may be profitable, and consult with an attorney and other advisors prior to executing the Franchise Agreement.

**ITEM 20**
**LIST OF OUTLETS**
**FRANCHISED STORE STATUS SUMMARY FOR YEARS 2003/2002/2001**

| State | Transfers | | | Sales | | | Opened | | | Canceled or Terminated | | | Not Renewed | | | Reacquired by Franchisor | | | Otherwise Left the System | | | Total Closings (a) | | | Franchisees Operating at Year End (b) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | `03 | `02 | `01 | `03 | `02 | `01 | `03 | `02 | `01 | `03 | `02 | `01 | `03 | `02 | `01 | `03 | `02 | `01 | `03 | `02 | `01 | `03 | `02 | `01 | `03 | `02 | `01 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| District of Columbia | 1 | 0 | 1 | 3 | 4 | 2 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 3 | 2 |
| Maryland | 5 | 5 | 7 | 1 | 3 | 6 | 3 | 2 | 3 | 0 | 1 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 1 | 1 | 6 | 7 | 53 | 51 | 55 |
| New Jersey | 7 | 4 | 10 | 15 | 15 | 4 | 10 | 8 | 8 | 0 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 2 | 2 | 4 | 5 | 81 | 73 | 69 |
| New York | 9 | 2 | 4 | 21 | 22 | 17 | 23 | 14 | 13 | 1 | 6 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 4 | 2 | 11 | 10 | 7 | 125 | 113 | 109 |
| Pennsylvania | 0 | 0 | 0 | 1 | 6 | 33 | 1 | 28 | 7 | 0 | 1 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 6 | 63 | 62 | 35 |
| Virginia | 5 | 4 | 4 | 13 | 14 | 9 | 11 | 9 | 3 | 1 | 3 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 4 | 0 | 7 | 7 | 6 | 86 | 82 | 80 |
| TOTALS | 27 | 15 | 26 | 54 | 64 | 71 | 51 | 62 | 34 | 2 | 13 | 26 | 0 | 0 | 0 | 0 | 0 | 0 | 19 | 15 | 5 | 21 | 28 | 31 | 415 | 385 | 351 |

(a)  Does not include outlets transferred during fiscal year.

(b)  Total operating at end of fiscal year determined from the number operating at end of prior fiscal year, and adding stores opened during subsequent fiscal year and subtracting total closings during subsequent fiscal year.

UFOC 2004

**ITEM 20**
**Continued**

## FRANCHISES NOT YET OPERATIONAL

| STATE | 2003 | 2002 | 2001 |
|-------|------|------|------|
| Delaware | 0 | 0 | 0 |
| District of Columbia | 3 | 4 | 1 |
| Maryland | 6 | 5 | 16 |
| New Jersey | 12 | 10 | 10 |
| New York | 8 | 16 | 9 |
| Pennsylvania | 5 | 5 | 22 |
| Virginia | 13 | 11 | 16 |
| DISTRICT OF COLUMBIA / VIRGINIA/MARYLAND REGIONS | 45* | 42* | ----- |
| NEW YORK / NEW JERSEY REGIONS | 10* | 5* | ----- |
| **TOTAL** | **102** | **98** | **74** |

*Includes Franchise Agreements as to which no locations have been selected, and therefore are not identified by a specific State, but are listed under the "region" category in which the Franchise Agreements are sold.

### NOTES TO ITEM 20

1.    All numbers are as of September 30 for each year.
2.    Blimpie does not operate company owned stores.
3.    The Franchises not yet operational as of 9/30/03 include franchises not operational at the end of the prior fiscal years.

UFOC 2004

## Item 20
continued
### FRANCHISEES NOT YET OPERATIONAL

| B/A#: | Franchisee: | Address: | City: | State: | Zip: | Phone Number: |
|---|---|---|---|---|---|---|
| 143 | 580 Ninth Ave. Food Associates | 580 Ninth Avenue | New York | NY | 10036 | (609) 275-4810 |
| 144 | 580 Ninth Avenue Food Associates | 580 Ninth Avenue | New York | NY | 10036 | (609) 275-4810 |
| 172 | BK Foods, LLC | 6320 Augusta Drive  Suite 1200 | Springfield | VA | 22150 | (703) 912-9002 |
| 173 | BK Foods, LLC | 6320 Augusta Drive Suite 1200 | Springfield | VA | 22150 | (703) 912-9002 |
| 174 | BK Foods, LLC | 6320 Augusta Drive  Suite 1200 | Springfield | VA | 22150 | (703) 912-9002 |
| 175 | BK Foods, LLC | 6320 Augusta Drive Suite 1200 | Springfield | VA | 22150 | (703) 912-9002 |
| 176 | BK Foods, LLC | 6320 Augusta Drive  Suite 1200 | Springfield | VA | 22150 | (703) 912-9002 |
| 221 | Edward Chua | 41 Mountain Blvd. | Warren | NJ | 07059 | (908) 647-7457 |
| 240 | Adnohr Management, Inc. | 4801 Woodshire Garth | Ellicott City | MD | 21043 | (410) 747-8757 |
| 251 | Earle Arnold | 40 West Mini Mart  1000 West Patrick Street | Frederick | MD | 21073 | |
| 292 | Exxon Mobile Corp. | Rte. 70 & Hartford Rd. | Medford | NJ | 08055 | (703) 846-3000 |
| 304 | Timbocs Service Station, Inc. | 148-12 Rockaway Blvd. | South Ozone Park | NY | 11436 | (718) 659-7776 |
| 316 | Rylyns Enterprises, Inc. | 1215 E. Gude Drive | Rockville | MD | 20850 | (301) 431-1204 |
| 320 | Amerada Hess Corporation | Hess Mart #30201/Route 35 Northbound | Oakhurst | NJ | 07755 | (732) 750-6013 |
| 321 | Amerada Hess Corporation | Hess Mart #30320/Route 22 Westbound | Boundbrook | NJ | 08805 | (732) 750-6013 |
| 366 | SQN, Inc. Tacketts Mills Exxon | 12700 Minnieville Road | Woodbridge | VA | 22192 | (301) 292-8060 |
| 418 | Muhamad Davis Hatmi | Donut/Donut  8671 Sudley Road  Cantebury Village | Manassas | VA | 20110 | |
| 470 | Halima Ahmed | 3611 South 18th Street | Arlington | VA | 22204 | (703) 979-4343 |
| 471 | Halima Ahmed | 3611 South 18th Street | Arlington | VA | 22204 | |
| 472 | Halima Ahmed | 3611 South 18th Street | Arlington | VA | 22204 | |
| 473 | Halima Ahmed | 3611 South 18th Street | Arlington | VA | 22204 | |
| 474 | Halima Ahmed | 3611 South 18th Street | Arlington | VA | 22204 | |
| 454 | Harminder Sabharwal | 8407 Eureka Court | Engleside | VA | 22309 | (703) 582-8979 |
| 455 | Harminder Sabharwal | 8407 Eureka Court | Engleside | VA | 22309 | (703) 582-8979 |
| 456 | Harminder Sabharwal | 8407 Eureka Court | Engleside | VA | 22309 | (703) 582-8979 |
| 457 | Harminder Sabharwal | 8407 Eureka Court | Engleside | VA | 22309 | (703) 582-8979 |
| 497 | Don M. Siyamblapitya | 5 East Main Street  P.O. Box 698 | Middletown | MD | 21769 | |
| 498 | Don M. Siyamblapitya | 5 East Main Street  P.O. Box 698 | Middletown | MD | 21769 | |
| 499 | Don M. Siyamblapitya | 5 East Main Street  P.O. Box 698 | Middletown | MD | 21769 | |
| 500 | Don M. Siyamblapitya | 5 East Main Street  P.O. Box 698 | Middletown | MD | 21769 | |
| 506 | Munni Enterprises, Inc. | 8th & H Street N.E. | Washington | DC | 20005 | (703) 522-4127 |
| 507 | Munni Enterprises, Inc. | 4404 N. Henderson Road #3 | Arlington | VA | 22203 | |
| 508 | Munni Enterprises, Inc. | 4404 N. Henderson Road #3 | Arlington | VA | 22203 | |
| 509 | Munni Enterprises, Inc. | 4404 N. Henderson Road #3 | Arlington | VA | 22203 | |
| 476 | Amerada Hess Corp. | 520 South Lehigh Avenue | Frackville | PA | 17931 | |

UFOC 2004

| B/A#: | Franchisee: | Address: | City: | State: | Zip: | Phone Number: |
|---|---|---|---|---|---|---|
| 477 | Amerada Hess Corp. | Rd 1 Box 1967 | Jonestown | PA | 17038 | |
| 488 | Amerada Hess Corporation | Rts 501 & 897 | Schaefferstown | PA | 17088 | |
| 523 | K Steaks, Inc. | 14 West Pampano Drive | Brick | NJ | 08723 | (732) 477-5465 |
| 520 | Jalaram Foods, LLC | 310 West Union Avenue | Boundbrook | NJ | 08805 | (732) 549-5153 |
| 516 | SNN, Inc. | 5008 Vauxhall Ct. | Richmond | VA | 23234-4252 | (804) 743-3367 |
| 517 | SNN, Inc. | 5008 Vauxhall Ct. | Richmond | VA | 23234-4252 | (804) 743-3367 |
| 518 | SNN, Inc. | 5008 Vauxhall Ct. | Richmond | VA | 23234-4252 | (804) 743-3367 |
| 519 | SSN, Inc. | 5008 Vauxhall Ct. | Richmond | VA | 23234-4252 | (804) 743-3367 |
| 526 | Nnenna Ukoh | 11017 Clara Barton Drive | Fairfax | VA | 22039 | (703) 503-9789 |
| 546 | CML Foods, Inc. | 5 Banbury Road | Richmond | VA | 23221 | (804) 307-4338 |
| 547 | CML Foods, Inc. | 5 Banbury Road | Richmond | VA | 23221 | (804) 307-4338 |
| 549 | Al F. Mirza | 2632-34 Georgia Avenue, N.W. | Washington | DC | 20001 | (703) 768-6403 |
| 550 | Al F. Mirza | 6908 Stonebridge Court | Alexandria | VA | 22306 | (703) 768-6403 |
| 551 | Al F. Mirza | 6908 Stonebridge Court | Alexandria | VA | 22306 | (703) 768-6403 |
| 552 | Al F. Mirza | 6908 Stonebridge Court | Alexandria | VA | 22306 | (703) 768-6403 |
| 556 | Al F. Mirza | 6908 Stonebridge Court | Alexandria | VA | 22306 | (703) 768-6403 |
| 557 | Al F. Mirza | 6908 Stonebridge Court | Alexandria | VA | 22306 | (703) 768-6403 |
| 558 | Al F. Mirza | 6908 Stonebridge Court | Alexandria | VA | 22306 | (703) 768-6403 |
| 559 | Al F. Mirza | 6908 Stonebridge Court | Alexandria | VA | 22306 | (703) 768-6403 |
| 560 | Al F. Mirza | 6908 Stonebridge Court | Alexandria | VA | 22306 | (703) 768-0403 |
| 580 | Sujwala Puttagunta | Dulles Expo Center | Chantilly | VA | 20151 | (703) 502-8574 |
| 583 | Cheng Bin Su & Su Chen | 35-74 162nd Street | Flushing | NY | 11358 | (718) 321-3661 |
| 585 | Castiglia Foods, LLC | Nanuet Mall - 75 West Route 59 | Nanuet | NY | 10954 | (203) 325-4438 |
| 596 | Mr. Muneerul I. Choudhury | 850 N. Randolph Road | Arlington | VA | 22203 | (703) 812-3330 |
| 597 | Mr. Muneerul I. Choudhury | 850 N. Randolph Road | Arlington | VA | 22203 | (703) 812-3330 |
| 598 | Muneerul I. Choudhury | 850 N. Randolph Road | Arlington | VA | 22203 | (703) 812-3330 |
| 587 | Nico & Jesse Brothers Corp. | Redwood Mall, 3728 Route 9 South, Space # 8 | Howell | NJ | 07731 | |
| 620 | Mohammed A. Ghani | Westgate Plaza Shopping Center | Manassas | VA | 20108 | (703) 723-8890 |
| 608 | Hess Mart, Inc. | 307 South Center Street | Tamaqua | PA | 18252 | (732) 750-6102 |
| 610 | Hess Mart, Inc. | Route 3 West | Secaucus | NJ | 07094 | (732) 750-6102 |
| 618 | Abdul L. Joher | 20-34 Eastman Street | Cranford | NJ | 07016-2109 | (201) 659-1621 |
| 630 | Vakratund Corp. | Kennedy Mall, 2770 Hooper Ave., | Bricktown | NJ | 08723-4108 | (201) 869-4732 |
| 631 | Vakratund Corp. | 114 Kamp Place | North Bergen | NJ | 07047 | |
| 632 | Vakratund Corp. | 114 Kamp Place | North Bergen | NJ | 07047 | |
| 634 | Fahla, Inc. | 1057 Second Avenue, Ground Floor | New York | NY | 10022 | (718) 833-4167 |
| 635 | Nicholas Gomes | South Valley Shopping Center, Route 1, Richmond Highway | Alexandria | VA | 22306 | (301) 424-1615 |
| 636 | RP Corporation | 2488 Windbreak Drive | Alexandria | VA | 22306 | (703) 521-0565 |
| 637 | Seema Laxmi Corp. | 87-15 Jamaica Avenue | Woodhaven | NY | 11421-2037 | (516) 629-6138 |
| 652 | High-Up Oil, Inc. | 12730 Patrick Henry Highway | Amelia | VA | 23002 | |
| 640 | SOKA, Inc. | 1605 West Third Street | Farmville | VA | 23901-2650 | (804) 739-8717 |

UFOC 2004

| B/A#: | Franchisee: | Address: | City: | State: | Zip: | Phone Number: |
|---|---|---|---|---|---|---|
| 641 | SOKA, Inc. | Sun Chases Center | Farmville | VA | | (804) 739-8717 |
| 642 | SOKA, Inc. | 6000 Moss Creek Road | Midlothian | VA | 23112 | (804) 739-8717 |
| 649 | Vipul M. Pawani | 12110 Elm Forest Way, Apt. #F | Fairfax | VA | 22030 | (703) 803-7867 |
| 646 | Jenshell Management of Freehold Incorporated | 5 South Street | Freehold | NJ | 07728 | (732) 332-1352 |
| 616 | ILD, LLC | The Medical College of Virginia - 403 North 13th Street | Richmond | VA | 23298 | (804) 389-8856 |
| 655 | 23-02 Deli Corp. | 23-02 31st Street | Astoria | NY | 11102 | (718) 793-8757 |
| 589 | P & M Sub Corp. | 525 Avenel Street | Avenel | NJ | 07001-1149 | (732) 382-4978 |
| 591 | Martin Enterprises, LLC | 209 Cannonball Way | Odenton | MD | 21113 | (410) 519-0982 |
| 406 | JYOTI II | Shell/Blimpie, 501 Quince Orchard Dr. | Gaithersburg | MD | 20878 | (703) 690-9808 |

UFOC 2004

**ITEM 20**

Continued

Projected Openings as of September 30, 2003

| State | Franchise Agreements Signed but Store Not Yet Open | Projected Franchised New Stores in the Next Fiscal Year | Projected Company Owned Openings in Next Fiscal Year |
|---|---|---|---|
| Delaware | 0 | 0 | 0 |
| Dist. Of Columbia | 4 | 6 | 0 |
| Maryland | 13 | 2 | 0 |
| New Jersey | 17 | 4 | 0 |
| New York | 19 | 7 | 0 |
| Pennsylvania | 8 | 4 | 0 |
| Virginia | 28 | 6 | 0 |
| Maryland/Virginia/ Dist. Of Columbia Region | 47* | 9 | 0 |
| New York/New Jersey Region | 22* | 6 | 0 |
| **TOTALS** | **158** | **44** | **0** |

\* \* \* \* \*

The names, addresses, and telephone numbers of the franchisees and their outlets are attached as Exhibit "I" to this Offering Circular.

The name and last known address and telephone number of every franchisee who has had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under their franchise agreement during the most recently completed fiscal year or who has not communicated with Blimpie within 10 weeks of the application date are attached to the Offering Circular as Exhibit "J".

\*Includes Franchise Agreements as to which no locations have been selected, and therefore are not identified by a specific State, but are listed under the "region" category in which the Franchise Agreements are sold.

**ITEM 21**
**FINANCIAL STATEMENTS**

The financial statements listed below are attached to this Offering Circular as Exhibit "H" in the following order:

1.      Unaudited financial statements for the three months ended December 31, 2003.

2.      Audited balance sheet of the Franchisor as of September 30, 2003 and related statements of operations, shareholders equity and cash flows for the year then ended.

3.      Audited balance sheet of the Franchisor as of September 30, 2002 and related statements of operations, shareholders equity and cash flows for the year then ended.

4.      Audited balance sheet of the Franchisor as of September 30, 2001 and related statements of operations, shareholders equity and cash flows for the year then ended.

5.      Financial statements for equipment sales and leasing companies.

**ITEM 22**
**CONTRACTS**

The following contracts are attached to this offering circular in the following order:

1.      Traditional Blimpie Restaurant Franchise Agreement (as Exhibit A)

2.      Guaranty (as Exhibit B)

3.      Non-Traditional Rider to Franchise Agreement (as Exhibit C)

4.      Multi-Unit License Addendum (as Exhibit D)

5.      Subfranchise Agreement (as Exhibit E)

6.      Sublease (as Exhibit F)

7.      Promissory Note (as Exhibit G)

8.      General Release (as Exhibit L)

**ITEM 23**
**RECEIPT**

Two copies of an acknowledgment of your receipt of this offering circular appear as Exhibit "O".  Please return one copy to Blimpie and retain the other for your records.

**ADDENDUM TO THE
BLIMPIE ASSOCIATES, LTD.
OFFERING CIRCULAR FOR
USE IN THE STATE OF MARYLAND**

\*  \*  \*  \*

To the extent this Addendum is inconsistent with the within Offering Circular, the terms of this Addenda shall govern:

## ITEM 3

Neither the franchisor nor any person identified in Item 2 of the Offering Circular, has pending against him any material arbitration proceeding, or has during the ten (10) year period immediately preceding the date of this Offering Circular been a party to concluded material arbitration proceedings that are material in nature.

## ITEM 6

**Advertising Fees - Franchisees**

Franchisor shall, within one hundred twenty (120) days following the close of its fiscal year, prepare and distribute to all Franchisees an unaudited statement detailing fund income and expenses for the fiscal year then ended.

## ITEM 17

The Franchise Agreement does not require the parties to resolve disputes through binding arbitration.

The Franchise Agreement provides for termination upon the bankruptcy of the franchisee. This provision may not be enforceable under Federal bankruptcy law (11 U.S.C. Section 101 et seq.).

**Termination by Franchisee or Subfranchisor**

Neither Franchisee nor Subfranchisor may unilaterally terminate the Franchise or Subfranchise Agreement.

**General Release**

The General Release required as a condition of renewal and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Regulation and Disclosure Law.

**Choice of Forum**

A franchisee may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

UFOC 2004

# ADDENDUM TO FRANCHISE AGREEMENT OF
# BLIMPIE ASSOCIATES LTD.
# FOR USE IN THE STATE OF MARYLAND

Article 14 of the Franchise Agreement is hereby amended by adding the following:

The General Release required as a condition of renewal and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Regulation and Disclosure Law.

Article 21 of the Franchise Agreement is hereby amended by adding the following:

Notwithstanding anything to the contrary contained in this Article 21, Franchisee may bring an action or proceeding against Franchisor in any court of competent jurisdiction located in the State of Maryland, arising out of or in connection with the sale of this franchise, or out of the alleged violation of the laws of the State of Maryland relating to the registration, exemption from registration, or sale of franchises in the State of Maryland.

The Rider to the Franchise Agreement is hereby amended by adding the following:

The foregoing representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

**Dated:**                          **, 20**

**BLIMPIE ASSOCIATES, LTD.**

**By:**_____

_____
**FRANCHISEE**

UFOC 2004

**ADDENDUM TO SUB-FRANCHISE AGREEMENT OF
BLIMPIE ASSOCIATES LTD.
<u>FOR USE IN THE STATE OF MARYLAND</u>**

Articles 3.03 and 14.02 of the Sub-Franchise Agreement is hereby amended by adding the following:

The General Release required as a condition of renewal and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Regulation and Disclosure Law.

Article 23.01 of the Sub-Franchise Agreement is hereby amended by adding the following:

(e)    Notwithstanding anything to the contrary contained in this Article 23.01, Sub-Franchisor may bring an action or proceeding against Franchisor in any court of competent jurisdiction located in the State of Maryland, arising out of or in connection with the sale of this sub-franchise, or out of the alleged violation of the laws of the State of Maryland relating to the registration, exemption from registration, or sale of franchises in the State of Maryland.

Article 25 of the Subfranchise Agreement is hereby amended by adding the following:

The foregoing representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

**Dated:**                    **, 20**



**BLIMPIE ASSOCIATES, LTD.**


**By:** _____


_____
**SUBFRANCHISOR**

UFOC 2004