BA-506

# ORIGINAL

### RETAIL LEASE AGREEMENT

between

H STREET COMMUNITY DEVELOPMENT CORPORATION, INC.
(Landlord)

and

2001 B.A. REALTY INC.
d/b/a BLIMPIE
(Tenant)

Retail Center
8th and H Streets, N.E.
Washington, DC

# REFERENCE PAGES

Retail Center: The "Building" (hereinafter defined) and related improvements and facilities to be constructed and located at 8th and H Streets, N.E., Washington, DC.

Landlord: H Street Community Development Corporation, Inc.

Tenant: 2001 B.A. Realty Inc., a New York corporation.

Trade Name of Tenant: Blimpie.

Premises: The retail space designated as Tenant's premises at the Retail Center and containing approximately one thousand seven hundred (1,798) rentable square feet of floor area, as outlined on the floor plan attached to this Lease as Exhibit "A". The foregoing is subject to §§3.09 and 3.10 of this Lease.

Building: The one (1) story building, containing approximately 6,298 square feet, to be constructed and located at the southwest corner of the intersection at 8th and Streets, N.E. in Washington, DC within which the Premises is located.

Term: The period of fifteen (15) Years, beginning on the Commencement Date, subject to §1.01 of this Lease.

Commencement Date: Subject to Article V of this Lease, the date that is the earlier of (a) ninety (90) days from the date Landlord (i) gives Tenant written notice that the Landlord's Work improvements to the Premises described in Article V of this Lease is substantially complete (i.e., sufficient for Tenant to commence construction of the Space Improvements without material interference by the completion of the Landlord's Work) and (ii) tenders vacant possession of the Premises to Tenant, or (b) the date Tenant actually moves into occupancy of the Premises and conducts business with the public therein.

Target Date: September 1, 2002.

Permitted Use: Solely for the following purposes, subject to the other provisions of this Lease: a typical Blimpie submarine sandwich restaurant with related Blimpie restaurant food sales, including Blimpie authorized pizza Co-Brand, cookies and Boardwalk Fries, and no other purpose.

Prohibited Uses: Tenant shall not use the Premises for any purpose otherwise prohibited or restricted by the terms of any lease of any other tenant in the Retail Center existing as of the date of this Lease or the date of Tenant's proposed change in use of the Premises, as the case may be.

Minimum Hours: 10:00 a.m. to 9:00 p.m. on Monday through Saturday, and 12:00 p.m. to 5:00 p.m. on Sunday, each week during the Term.

Minimum Rent During the Initial Term:

| Year | Per Square Foot | Annual Amount | Monthly Amount |
|---|---|---|---|
| 1 | $30.00 | $53,940.00 | $4,495.00 |
| 2 | $30.90 | $55,558.20 | $4,629.85 |
| 3 | $31.82 | $57,212.36 | $4,767.70 |
| 4 | $32.78 | $58,938.44 | $4,911.54 |
| 5 | $33.76 | $60,700.48 | $5,058.37 |
| 6 | $34.77 | $62,516.46 | $5,209.71 |
| 7 | $35.81 | $64,386.38 | $5,365.53 |
| 8 | $36.88 | $66,310.24 | $5,525.85 |
| 9 | $37.99 | $68,306.02 | $5,692.17 |
| 10 | $39.13 | $70,355.74 | $5,862.98 |
| 11 | $40.30 | $72,459.40 | $6,038.28 |
| 12 | $41.51 | $74,634.98 | $6,219.58 |
| 13 | $42.76 | $76,882.48 | $6,406.87 |
| 14 | $44.04 | $79,183.92 | $6,598.66 |
| 15 | $45.36 | $81,557.28 | $6,796.44 |

Minimum Rent During the First Extension Period:

| Year | Per Square Foot | Annual Amount | Monthly Amount |
|---|---|---|---|
| 16 | $46.72 | $84,002.56 | $7,000.21 |
| 17 | $48.12 | $86,519.76 | $7,209.98 |
| 18 | $49.56 | $89,108.88 | $7,425.74 |
| 19 | $51.05 | $91,787.90 | $7,648.99 |
| 20 | $52.58 | $94,538.84 | $7,878.24 |

Minimum Rent During the Second Extension Period:

| Year | Per Square Foot | Annual Amount | Monthly Amount |
|---|---|---|---|
| 21 | $54.16 | $ 97,379.68 | $8,114.97 |
| 22 | $55.78 | $100,292.44 | $8,357.70 |
| 23 | $57.45 | $103,295.10 | $8,607.93 |
| 24 | $59.17 | $106,387.66 | $8,865.64 |
| 25 | $60.95 | $109,588.10 | $9,132.34 |

Percentage Rent Fraction/Percentage: 4%.

Breakpoint (Natural): A designated number for any respective period during the Term reached by dividing the Minimum Rent applicable pro-rata to such period by the Percentage Rent Fraction.

Proportionate Share: 28.55% (i.e., 1,798 divided by 6,298 leasable square feet).

Security Deposit: ~~$17,980.00~~ *$8,990.00* [handwritten]

Initiation Fee (for Merchant's Association): Not applicable.

Monthly Dues (to Merchant's Association): Not applicable.

Improvement Allowance: Not applicable.

Notice Address (for Landlord): H Street Community Development Corporation, Inc., 501 H Street, N.E., Washington, DC 20002, Attention: William Barrow, Executive Director.

Notice Address (for Tenant): B.A. Realty, Corp., 17th Floor, New York, N.Y. 10001, Attention: Joel R. Schweidel, Esquire; and after delivery of possession of the Premises to Tenant, the Premises.

Broker(s) of Record: H&R Retail, Landlord's broker, and Grub & Ellis, Tenant's broker.

Construction of the Space Improvements: The Space Improvements are to be constructed by Tenant, at its sole cost and expense.

Lease Guaranty: Nizam M. Ali, an unmarried individual, who is (or will be) the sole franchisee of Tenant's business operation at the Premises, whose address is set forth in the "Guaranty" (hereinafter defined) (the "Guarantor"), shall guarantee the obligations of the Tenant under this Lease accruing during the entire Term of this Lease, including any and all Extension Periods. Simultaneous with the execution and delivery of this Lease by Tenant, the Guarantor shall execute and deliver to Landlord the Guaranty in the form attached hereto and made a part hereof as Exhibit "C" (the "Guaranty").

## EXHIBITS TO THIS LEASE:

Exhibit "A"   Floor Plan of the Retail Center
Exhibit "B"   Space Plan of the Premises
Exhibit "C"   Form of Guaranty
Exhibit "D"   Approved Specifications and Criteria for Tenant's Signs and Awning

[END OF REFERENCE PAGES]

# RETAIL LEASE AGREEMENT

THIS RETAIL LEASE AGREEMENT (this "Lease") is made this 26th day of August, 2002, by and between the **H STREET COMMUNITY DEVELOPMENT CORPORATION, INC.** ("Landlord"), and **2001 B.A. REALTY INC.**, a New York corporation ("Tenant").

For and in consideration of the rents, covenants, agreements and conditions herein contained on the part of Tenant to be paid, kept, observed and performed, Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, subject to (a) all the terms and conditions set forth in this Lease, and (b) all liens, encumbrances, Mortgages, easements, restrictions, and covenants, and all zoning and other land use laws and regulations, now or hereafter affecting or governing the Premises or the rest of the Retail Center.

## ARTICLE I - TERM

§1.01 **Length**. Tenant's lease of the Premises shall be for the Term, which begins on the Commencement Date. If Tenant enters into occupancy of the Premises prior to the Commencement Date for the purpose of constructing improvements or installing fixtures therein (and without conducting business therein), then all terms and conditions of this Lease (except those regarding the payment of Minimum Rent, Real Estate Taxes, and Common Area Expenses) shall apply to such occupancy. "Year" means a consecutive period of twelve (12) months which begins on the Commencement Date or on an anniversary of the Commencement Date. However, if the Commencement Date is not the first day of a calendar month, then, notwithstanding anything contained in this Lease to the contrary (a) the first Year shall be extended to be the period from the Commencement Date until the end of the first twelve (12) full calendar months thereafter, (b) the Minimum Rent for the first Year shall be increased on a per diem basis to include that extension period, (c) each succeeding Year shall begin at the expiration of the previous Year, and (d) the Term shall be extended to include that extension period.

§1.02 **Confirmation**. After the Commencement Date, Landlord may submit to Tenant an estoppel certificate specifying the actual Commencement Date and the actual expiration date of the Term. Within ten (10) days after such submission, Tenant shall execute that certificate, and return it to Landlord, with any corrections that are necessary.

§1.03 **Surrender**. At the expiration of the Term or any earlier termination of this Lease, Tenant shall (a) promptly surrender to Landlord possession of the Premises, including (i) any and all fixtures and other improvements that were paid for by Landlord, all in good order, condition and repair (ordinary wear and tear excepted), and (ii) all other fixtures, built-in furniture and equipment, wires, pipes and other conduits that Landlord shall have notified Tenant are to remain in the Premises; (b) remove, from the Premises, Tenant's signs, goods and trade fixtures and such of Tenant's furniture, fixtures and equipment that are not to remain in the Premises under clause (a) of this Section; (c) repair any and all damage to the Premises and the Retail Center caused by such removal; (d) surrender to Landlord all keys to or for the Premises; and (e) give Landlord the combination of any and all locks, safes and vaults in the Premises. Tenant understands that Landlord's dam-

ages on account of any breach of Tenant's obligations under the foregoing provisions may include those arising from the claims of any successor occupant on account of any resulting delay. In addition to the foregoing damages, any property of Tenant not removed as required above shall irrevocably be deemed abandoned and may be removed, kept or disposed of by Landlord as Landlord deems appropriate, in Landlord's sole and absolute discretion.

§1.04  Holding Over. If Tenant continues to occupy the Premises beyond the expiration of the Term or any earlier termination of this Lease, Tenant shall be deemed to be occupying the Premises as a tenant from month-to-month and such occupancy shall be subject to all of the same terms and conditions as are contained in this Lease, as adjusted for a month-to-month tenancy, except that the Minimum Rent payable during the period of such occupancy shall be equal to two times the greater of (a) the Minimum Rent that was last in effect during the Term, or (b) the then current market rent for the Premises (as determined by a licensed broker or other professional designated by Landlord). However, the foregoing shall not be deemed in any way to limit or impair Landlord's right to evict Tenant immediately or to exercise any of Landlord's other rights and remedies under the provisions of this Lease or applicable law on account of such continued occupancy of the Premises. Also notwithstanding the foregoing, Tenant shall be liable for any and all damages and expenses that Landlord may sustain by virtue of Tenant's holding over, including, but not limited to, Landlord's reasonable attorneys' fees and any amount for which Landlord may be liable under, or as a result of, any other lease entered into by Landlord for the term beginning at or after the expiration of the Term of this Lease.

§1.05  Option to Extend the Term of the Lease. Under the following terms and conditions, Tenant shall have the option to extend the initial Term of this Lease for two (2) additional consecutive terms of five (5) years (each such additional term being hereinafter referred to as an "Extension Period"). In each instance, such option shall be null and void unless (a) Tenant notifies Landlord, of Tenant's election to exercise that option, at least six (6) months prior to the date this Lease would otherwise expire; and (b) at the time of such exercise and at all times thereafter prior to the commencement of the applicable Extension Period, this Lease is in full force and effect, Tenant is in actual occupancy of the Premises, and Tenant is not in default of any of its obligations under this Lease. Such Extension Periods shall be upon the same terms and conditions as apply with respect to the initial Term, except (a) Tenant shall have no right to extend the Term beyond the Extension Periods referred to above, and (b) the Minimum Rent for the Extension Periods shall be as set forth in the Reference Pages above. "Term" shall include any and all Extension Periods for which the foregoing extension option shall be effective and shall have been duly exercised hereunder.

**[END OF ARTICLE I – TERM]**

## ARTICLE II - RENT

§2.01 <u>Minimum Rent</u>. Tenant shall pay to Landlord the respective amount(s) of Minimum Rent set forth on the Reference Pages.

§2.02 <u>Percentage Rent</u>. In addition to the Minimum Rent, Tenant shall pay to Landlord "Percentage Rent" throughout the Term as follows:

(a) Percentage Rent shall be paid quarterly as described in §2.06 hereof. The Percentage Rent for each quarter (or part quarter) shall be equal to the Percentage Rent Fraction times the amount by which the Gross Receipts for the applicable period exceeds the Breakpoint for that period.

(b) The term "Gross Receipts" means all receipts and revenues from all business conducted at, upon or from the Premises by Tenant, subtenants, assignees or others (whether such Gross Receipts are evidenced by cash, check, credit, charge account, exchange or otherwise). Such Gross Receipts include, but are not limited to, amounts received from the sale of merchandise, for services performed, from vending or other machines, from the sale of lottery tickets, and from orders for merchandise or services taken at the Premises (whether such orders are filled from the Premises or elsewhere). Gross Receipts shall not include (1) the amount of any sales or other tax imposed by any governmental authority directly on sales at the retail level and collected from customers, provided that the amount thereof is added to the selling price and paid by Tenant to such governmental authority; or (2) transfers of merchandise between different stores of Tenant, provided such transfers are not made to avoid liability for Percentage Rent. Except as provided above, no income or other tax or other item of expense whatsoever shall be deducted from the amount of Gross Receipts which is used to calculate Percentage Rent hereunder. Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) therefor.

(c) For the purpose of ascertaining the amount payable as Percentage Rent, Tenant agrees to prepare and keep on the Premises, for each Year or part Year during the Term, accurate records which shall show inventories and receipts of all merchandise at the Premises and the Gross Receipts from the Premises on a daily basis. Tenant shall record, at the time of each sale and in the presence of the customer, all receipts from sales and other transactions, whether for cash or credit, in cash registers having a cumulative total. Such registers shall be sealed in a manner, and shall have such other features, as are reasonably acceptable to Landlord. Landlord hereby acknowledges approval of the cash register system currently mandated by the Blimpie franchisor, the features and specifications of which have been provided, in writing, to Landlord by Tenant prior to the execution and delivery of this Lease. Tenant further agrees to keep on the Premises, for each Year during the Term, the gross income, sales and occupational tax returns with respect to the Premises for such Years, as well as all pertinent original sales records. Pertinent original sales records include (1) cash register tapes, including tapes from temporary registers, (2) serially numbered sales slips, (3) the originals of all mail orders at and to the Premises, (4) the original records of all

telephone orders at and to the Premises, (5) settlement report sheets of transactions with subtenants, assignees and licensees, (6) the original records showing that merchandise returned by customers was purchased at the Premises by such customers, (7) such other sales records, if any, which would normally be examined by an independent accountant pursuant to accepted auditing standards in performing an audit of the Gross Receipts, and (8) the records specified in clauses (1) through (7) of this ¶(c) with respect to subtenants, assignees and licensees.

(d) Tenant shall submit to Landlord, on or before the thirtieth (30th) day following the end of each calendar month that occurs in whole or in part during the Term hereof [including the thirtieth (30th) day of the month following the end of the Term], a written statement signed by Tenant, certified by it to be true and complete, and showing the amount of Gross Receipts for that preceding month. Tenant shall also submit to Landlord, on or before the thirtieth (30th) day following the end of each calendar year that occurs in whole or in part during the Term hereof [except that the statement for the last such calendar year shall be due on or before the thirtieth (30th) day following the end of the Term], a written statement signed by Tenant, certified by it to be true and complete, and showing the amount of Gross Receipts for that preceding calendar year. The statements referred to in this paragraph shall be in such form and style, and contain such details and breakdown, as Landlord may reasonably require.

(e) Landlord and Landlord's authorized representative shall have the right to examine all of the records described in ¶(c) of this Section, and all other records of Tenant related to the Premises, during regular business hours. When and as Landlord may reasonably require, Tenant shall also furnish Landlord with copies of all other sales and income tax reports and returns that separately show financial data for the Premises, and other data, statements and records Tenant may have evidencing Gross Receipts. In addition, and at its option, Landlord may at any reasonable time upon forty-eight (48) hours prior written notice to Tenant cause a complete audit to be made of Tenant's entire business affairs and records relating to the Premises for the period covered by any statement submitted by Tenant under ¶(d) of this Section. If such audit shall disclose that the actual Gross Receipts were more than two percent (2%) greater than the amount of Gross Receipts reported by Tenant, then (i) Tenant shall, within five (5) days after demand therefor, pay to Landlord the costs of said audit, the deficiency in Percentage Rent, plus interest on that deficiency at the rate of eighteen percent (18%) from the date such Percentage Rent was originally due hereunder until the date such payment is actually received by Landlord (such payment to be in addition to, and not be deemed to limit or waive, any of Landlord's other rights and remedies at law or in equity on account of Tenant's original failure to pay the total amount of Percentage Rent when and as due); and (ii) all statements thereafter submitted by Tenant under ¶(d) of this Section shall, without any further request or demand by Landlord, be audited statements, audited at Tenant's expense by an independent certified public accountant using generally accepted auditing standards. In addition, Landlord may at its option terminate this Lease upon five (5) days' notice to Tenant if any such audit by Landlord discloses willful or substantial inaccuracies in Tenant's reporting of Gross Receipts or, in any case, discrepancies of greater than five percent (5%).

§2.03 <u>Real Estate Taxes</u>. Tenant shall pay, to Landlord, Tenant's Proportionate Share of the Real Estate Taxes applicable to the Retail Center for the Term of this Lease, subject to §2.05

7

hereof. "Real Estate Taxes" means all real estate taxes and assessments, general and special, ordinary and extraordinary, foreseen and unforeseen, including, without limitation, real property taxes, assessments, sewer rents and connection charges, ad valorem charges, water rents and connection charges, front foot benefit charges, all other government impositions in the nature of any of the foregoing, and all costs and expenses (including reasonable attorneys' fees and costs of court and administrative proceedings) incurred in contesting such taxes and assessments. If, due to a future change in the method of taxation or in the taxing authority, a franchise, gross receipts, transit, rent or other tax or other governmental imposition, however designated, shall be levied against Landlord in substitution (in whole or in part) for, or in addition to, said Real Estate Taxes, then such franchise, gross receipts, transit, rent or other tax or governmental imposition shall be included within said definition of "Real Estate Taxes". Landlord may institute any proceedings with respect to the assessed valuation of the Retail Center or any part thereof, and Tenant shall, if and as requested by Landlord, cooperate with, and participate in, such proceedings. If, after Tenant shall have made the required payment of Real Estate Taxes hereunder, Landlord shall receive a refund of any portion thereof, then, provided that Tenant is not then in default of any of its obligations under this Lease, Landlord shall, within thirty (30) days after Landlord's receipt of such refund, pay to Tenant Tenant's Proportionate Share of the difference between that refund, less one hundred fifteen percent (115%) of all costs and expenses (including, but not limited to, reasonable attorneys' and appraisers' fees) expended or incurred in obtaining that refund [the additional fifteen percent (15%) being intended to compensate Landlord for its overhead in relation thereto]. Tenant may not institute any proceedings with respect to the assessed valuation of the Retail Center or any part thereof.

§2.04  Common Area Expenses. In addition to the foregoing, Tenant shall pay, to Landlord, for each Year (or part Year) of the Term a Proportionate Share of the Common Area Expenses for such Year. "Common Area Expenses" means all expenses and costs incurred in connection with the ownership, management, maintenance, repair, replacement and operation of all improvements and Common Areas of the Retail Center, including but not limited to the following: (1) costs of all wages and salaries of all employees engaged in the operation and maintenance of those improvements and Common Areas, including but not limited to payroll taxes, insurance and benefits; (2) costs of all supplies and materials used in the operation, maintenance and repair of those improvements and Common Areas; (3) costs of all utilities (including surcharges), including but not limited to water, sewer, electricity and gas for the Common Areas of the Retail Center; (4) costs incurred under all maintenance and service agreements for the Retail Center, including but not limited to security, trash removal, snow removal and landscaping; (5) costs of any and all insurance relating to the Retail Center, including but not limited to the costs of casualty and liability insurance; (6) costs of all repairs, replacements and general maintenance to those improvements and Common Areas, provided that any capital expenditures shall be amortized on a straight line basis over the useful life of the improvement for which the expenditure is made; (7) all property management fees and expenses; (8) costs of all audit and accounting services; (9) costs of any and all improvements required or made necessary by law or changes in law, including, without limitation, the Americans with Disabilities Act of 1990, the regulations issued thereunder, and the Accessibility Guidelines issued pursuant thereto, as the same may be modified, amended or supplemented (the "ADA"); (10) costs of any and all service agreements for maintenance of any HVAC systems, roofs or other facilities or equipment; (11) the costs of any and all licenses and permits required by any public author-

8

ity; and (12) a management and overhead administrative cost allowance in the amount of fifteen percent (15%) of the total Common Area Expenses. However, "Common Area Expenses" do not include principal, interest or other debt service payments or other financing or refinancing costs.

Notwithstanding anything contained in this Lease the contrary, Landlord's cost for purpose of computing Common Area Expenses under this Lease shall expressly exclude: (i) wages, salaries, fees, and fringe benefits paid to executive personnel of Landlord; (ii) any charge for Landlord's income, inheritance or franchise taxes; (iii) leasing commissions or legal expenses relating to activities for the solicitation, execution or enforcement of leases for other spaces in the Retail Center; (iv) the cost of correcting defects in the original construction of the Retail Center; (v) the cost of any repair made by Landlord due to the total or partial destruction of the Retail Center by fire or other casualty subsequent to the date of original construction or the exercise of the right of eminent domain; (vi) the cost of any alterations, additions, changes, replacements or other items which under generally accepted accounting principles are properly classified as capital expenditures to the extent the same upgrade or improve the Retail Center as opposed to replace existing items that have been worn out, unless any such upgrade or improvement shall result in a savings in annual Common Area Expenses, in which event such costs may be amortized and included in Common Area Expenses in the manner hereinbelow provided for capital replacement costs; and (vii) the cost of remedial action for Hazardous Material from the Retail Center.

Further, notwithstanding anything in this Lease to the contrary, but subject to the exclusion from Common Area Expenses listed in item (vi) of the immediately preceding paragraph of this Section 2.04, to the extent that the cost of the replacement of any portion of the Retail Center is a capital expenditure, then Tenant shall pay as part of Common Area Expenses on an annual basis its Proportionate Share of the annual amortized portion of such capital expenditure. Landlord shall amortize such capital replacement cost/expenditure using the median useful life permitted under the Internal Revenue Code, but in no event shall the useful life be greater than fifteen (15) years. Landlord may include such annual amortized amount in Common Area Expenses commencing in the Year that any such capital improvement is completed.

§2.05 Adjustment. Notwithstanding anything in this Lease to the contrary, for purposes of determining Tenant's Proportionate Share of Real Estate Taxes and Common Area Expenses, any or all of the following adjustments may, at Landlord's option, be made, from time to time, to the fraction used as Tenant's Proportionate Share:

(a) To the extent that any portion of the Building contains both office and retail space, then (1) with respect to those Common Area Expenses that relate to the office space, Tenant's Proportionate Share may be adjusted to reflect that fraction of all office space that is represented by the Premises; and (2) with respect to those Common Area Expenses that relate to the retail space, Tenant's Proportionate Share may be adjusted to reflect that fraction of all retail space that is represented by the Premises.

(b) To the extent that any item of Real Estate Taxes or Common Area Expenses relates to less than the entire Retail Center, then the denominator used in determining Tenant's

9

Proportionate Share with respect to such particular item of Real Estate Taxes or Common Area Expenses may be changed to be the rentable square footage of the building(s) and other property to which the particular item of Real Estate Taxes or Common Area Expenses relates.

 (c) [Intentionally deleted].

§2.06 <u>When Due and Payable</u>.

 (a) All rent, charges, expenses and other sums payable by Tenant under this Lease, except Minimum Rent, are also rental obligations and shall be referred to hereinafter as "Additional Rent". All Minimum Rent and Additional Rent are sometimes hereinafter together referred to as "Rent".

 (b) The Minimum Rent for each Year during the Term shall be due and payable in twelve (12) consecutive, equal monthly installments, in advance, on the first day of each calendar month during the Term. However, the installment of Minimum Rent for the first full calendar month of the Term shall be due and payable upon execution of this Lease. Furthermore, if the Commencement Date is not the first day of a calendar month, then the Minimum Rent for the period commencing with and including the Commencement Date until and including the last day of the first full calendar month thereafter shall be pro-rated on the basis of the actual number of days in such period and shall be due and payable on the Commencement Date.

 (c) Tenant shall pay installments of Percentage Rent in arrears on each of January 1, April 1, July 1 and October 1 in each Year during the Term for the quarter then-ending. Tenant shall pay all other Additional Rent within thirty (30) days after being billed therefor by Landlord. However, notwithstanding the foregoing, Landlord may at its discretion by giving notice thereof to Tenant (1) make, from time to time during the Term, a reasonable estimate of the amount of Additional Rent that may become due for any Year (including, at the option of Landlord, estimates of Percentage Rent); (2) require Tenant to pay to Landlord such Additional Rent in equal installments at the time and in the manner that Tenant is required hereunder to pay monthly installments of Minimum Rent; and (3) increase or decrease, from time to time during such Year, the amount initially estimated for such Year. In such event, Tenant or Landlord shall, within thirty (30) days after the actual amount of Additional Rent is known or submitted, pay to the other the amount of any deficiency or overpayment, whichever the case may be.

 (d) Tenant shall pay Additional Rent within thirty (30) days after being billed therefor by Landlord. However, notwithstanding the foregoing, Landlord may at its discretion by giving notice thereof to Tenant (1) make, from time to time during the Term, a reasonable estimate of the amount of Additional Rent that may become due for any Year; (2) require Tenant to pay to Landlord such Additional Rent in equal installments at the time and in the manner that Tenant is required hereunder to pay monthly installments of Minimum Rent; and (3) increase or decrease, from time to time during such Year, the amount initially estimated for such Year. In such event, Tenant or Landlord shall, within thirty (30) days after the actual amount of Additional Rent is known or submitted, pay to the other the amount of any deficiency or overpayment, whichever the case may

be.

(e) Tenant's Proportionate Share of the Real Estate Taxes and the Common Area Expenses due hereunder shall be payable, in advance, in equal monthly installments, subject to change from time to time by Landlord based upon Landlord's estimates of the actual amounts thereof to be due under §§2.03 and 2.04 hereof and subject to adjustment each year within thirty (30) days after Landlord notifies Tenant of the actual amounts due under those Sections.

§2.07 <u>Proration</u>. All items of Rent shall be prorated for any month or quarter during the Term which is not a full calendar month or quarter or in which two different rental rates are applicable. If only part of any calendar year falls within the Term, the amount computed as Additional Rent for such calendar year under the foregoing provisions of this Article shall be appropriately prorated, but the expiration of the Term before the end of a calendar year shall not limit Tenant's obligation hereunder to pay the prorated portion of Additional Rent applicable to that portion of such calendar year falling within the Term.

§2.08 <u>Late Penalties</u>. Each payment of Rent shall be made promptly when due (without any demand, deduction, recoupment or setoff whatsoever), in legal currency of the United States, and at the place directed by Landlord. Any payment of Rent not made when due shall, at Landlord's sole option, bear interest at the rate of eighteen percent (18%) per annum from and after the sixth (6th) day after the due date until paid. Additionally, any payment of Rent not paid within ten (10) days of when due shall be subject to a late payment charge of five percent (5%) of the amount due. This late payment charge shall be in addition to the interest provided for above and shall be due and payable with the next succeeding Rent payment.

§2.09 <u>Security Deposit</u>. Upon signing this Lease, Tenant shall pay to Landlord the Security Deposit, which shall be retained by Landlord as security for Tenant's payment of Rent and performance of all of its other obligations under this Lease. On the occurrence of an Event of Default, Landlord shall be entitled, at its sole discretion, to apply any or all of such sum in payment of any Rent then due and unpaid, any expense incurred by Landlord in curing any such default, and/or any damages incurred by Landlord by reason of such default (including but not limited to Landlord's reasonable attorneys' fees), in which event Tenant shall restore to Landlord the amount of the Security Deposit so applied. However, the foregoing shall not serve to limit Landlord's rights or remedies under Article XIV or any other provision of this Lease on account of Tenant's default. On the termination of this Lease, any of the Security Deposit that is not so applied or retained shall be returned to Tenant. The Security Deposit shall not bear interest while being held by Landlord hereunder. Furthermore, the Security Deposit need not be held in an escrow or other separate account; rather, it may be commingled with Landlord's other funds.

## ARTICLE III - USE OF PREMISES

§3.01 <u>Use and Operations</u>. Continuously throughout the Term, Tenant shall use and occupy the Premises only for the Permitted Use and only under the Trade Name of Tenant. Tenant

11

may not use the Premises for any other purpose or under any other trade name. At all times during the Term, such business shall be a high-quality establishment and shall be open for business to the public, and fully staffed and stocked with merchandise, during the Minimum Hours. Notwithstanding the provisions of the first sentence of this Section 3.01 to the contrary, and after Tenant initially opens the Premises for business as required by this Lease, the Premises will not be deemed to be closed in violation of this Section 3.01 under any of the following circumstances: (i) such closure is caused by fire or other casualty and continues during the making of repairs or restorations to the Premises; (ii) such closure is caused by "Condemnation" (hereinafter defined) and continues during the restoration of the Premises to a complete unit; (iii) such closure is due to Tenant making permitted or approved alterations, additions and/or improvements to the Premises pursuant to Section 5.04 of this Lease, provided any closure for such purposes does not exceed thirty (30) consecutive days or thirty (30) days in the aggregate during any twenty-four (24)-month period; or (iv) such closure is due to the abandonment of the Premises by any subtenant of Tenant or Tenant's repossession of the Premises from any subtenant Tenant, provided any closure caused by any such event shall not exceed thirty (30) consecutive days or thirty (30) days in the aggregate during any twenty-four (24)-month period. Tenant shall not make any material change in its merchandise or operations that affects the character or style of Tenant's business at the Premises, nor shall Tenant hold or advertise any going out of business, bankruptcy, deep discount or fire sale at the Premises, without Landlord's prior written approval. All receiving and delivery of goods and merchandise at or to the Premises, and all removal of merchandise, supplies, equipment, trash and garbage from the Premises, shall be made at the rear of the Premises and during any special hours established by Landlord. Tenant shall not allow any odors or noise to emanate from the Premises, nor shall Tenant permit any conduct therein which is objectionable to other tenants at the Retail Center or their customers. For so long as Tenant is not in default under this Lease beyond any applicable notice and cure period, and provided Tenant is in actual occupancy of the Premises and conducting the Permitted Use therein, Landlord agrees that it will not lease any other space in the Building to a tenant whose **primary** use of such space is for the sale of submarine type sandwiches made on French or Italian type bread. Should Landlord breach the foregoing covenant, Tenant's sole and exclusive remedy shall be to seek injunctive relief and/or the remedy of specific performance in accordance with the provisions of Section 19.03 hereof.

§3.02  Compliance with Laws and Matters of Title. Tenant shall comply with any and all laws and regulations, including but not limited to zoning laws and the ADA, applicable to the Premises, to Tenant's use of the Premises, or to Tenant's use of the Common Areas. Tenant shall make any and all changes or improvements to the Premises required thereby, subject to §5.04 hereof. Tenant shall hire, supervise and manage all persons appropriate or necessary for the operation of Tenant's business, which persons shall all be employees of Tenant and not Landlord; and Tenant shall pay all taxes and other amounts, and carry all workers' compensation insurance, with respect to such employees as is required by law. Tenant may not violate any covenant, declaration, restriction or other title matter that affects the Retail Center and is of record as of the date hereof.

§3.03  Insurance - Compliance and Rate. Tenant shall, at its own cost and expense, comply with all requirements of Landlord's insurance carrier (if any) and those of Tenant's insurance carrier and with all of the orders, rules and regulations of the applicable insurance rating organization(s)

12

having jurisdiction and any similar bodies. Tenant shall not do or permit to be done any act or thing upon the Premises that would invalidate or be in conflict with any fire insurance or other policy or coverage referred to in this Lease. If, as a result of any failure by Tenant to comply with the terms of the foregoing sentences of this Section, any act or omission of Tenant, its employees, agents, contractors or licensees, or the use to which the Premises are put (whether or not such use may be for the purposes hereinbefore permitted or may have been consented to by Landlord), the fire, extended coverage, or other insurance rate(s) applicable to the Premises or any other portion of the Retail Center shall be higher than would otherwise be applicable, then, in addition to all other remedies Landlord has under the terms of this Lease, Tenant shall pay to Landlord, on demand and as Additional Rent, such portion of the premiums as shall be attributable to such higher rate(s). If Tenant installs any electrical equipment that overloads any line in the Premises or the Building, Tenant shall, at its own cost and expense, promptly make whatever changes are necessary to remedy such condition and to comply with all requirements of the Landlord and the Board of Fire Insurance Underwriters, any similar body, and any governmental authority having jurisdiction thereof. For the purposes of this Section, any finding or schedule of the applicable insurance rating organization having jurisdiction shall be conclusive.

§3.04  **Business Methods**. Tenant may not engage in any unfair method of competition or unfair or deceptive act or trade practice of the type prohibited by applicable consumer protection laws or regulations of the jurisdiction in which the Retail Center is located. Committing such an act or practice shall be an Event of Default, whether or not action is taken by the appropriate governmental authority with respect thereto.

§3.05  **Common Areas**. Landlord hereby grants to Tenant a non-exclusive license to use all sidewalks, parking areas (if any) and access drives within the Retail Center which, by their nature, are manifestly designed and intended for common use by all the tenants at the Retail Center and their employees and customers (collectively, the "Common Areas"). However, Tenant may use those sidewalks and drives only for ingress and egress and those parking areas (if any) only for customer and, subject to the following terms, employee parking. The foregoing license shall be in common with Landlord and other tenants and their respective employees and customers and in accordance with the Rules and Regulations. Without limiting the foregoing, Tenant may not place any merchandise, sign or equipment upon the Common Areas or otherwise conduct any business thereon. Tenant shall direct all of its employees to use the employee parking areas(if any) as otherwise designated by Landlord, and not to park upon the customer parking areas (if any) of the Retail Center. Tenant shall park all of its own vehicles in those designated employee parking areas if any); Tenant shall not park any of its vehicles in those designated customer parking areas (if any). At all times, Landlord shall have the right to rearrange, improve, repair, replace and reduce the Common Areas. Landlord shall also have the right to close portions of the Common Areas, or to restrict access thereto, to the extent necessary (a) in the opinion of Landlord's counsel, to prevent a dedication thereof or the accrual of any rights of any person or the public therein; (b) to discourage use thereof by persons or entities who or which are not customers or employees of the Retail Center; or (c) to make repairs, alterations or additional improvements to the Retail Center.

§3.06  [Intentionally deleted].

13

§3.07   [Intentionally deleted].

§3.08   [Intentionally deleted].

§3.09   [Intentionally deleted].

§3.10   <u>Limitations of the Premises</u>.  The provisions of this Section shall apply notwithstanding anything contained in the Reference Pages or any other portion of this Lease and regardless of the method of measurement set forth in this Lease. Tenant may not impair any structural element of the Premises, and may not use or impair the roof of the Premises, the foundation of the Premises, the land beneath the Premises, or the exterior surface of any exterior wall of the Premises (said structural elements, roof, etc. being hereinafter referred to, collectively, as the "Structural Elements"). Landlord reserves the Structural Elements and the right to install, maintain, use, repair and replace pipes, ducts, conduits, wires and structural supports in the Premises to serve the Premises and/or other parts of the Retail Center.

## ARTICLE IV - INSURANCE / INDEMNIFICATION

§4.01   <u>Landlord's Insurance</u>.  Landlord may, at its option, obtain or maintain all-risk property insurance upon the Retail Center, rental income insurance, and commercial general liability insurance (in addition to, and not in lieu of, insurance required to be maintained by Tenant hereunder). The premiums for such insurance shall be Common Area Expenses. Landlord may elect to self-insure for the coverages provided for in this Section. Landlord shall not be obligated to insure any furniture, equipment, trade fixtures, machinery, goods or supplies which Tenant may keep or maintain in the Premises or any alteration, addition or improvement which Tenant may make upon the Premises.  Tenant shall not be named as an additional insured on any policy of liability insurance maintained by Landlord. If the annual cost to Landlord for such property or rental income insurance exceeds the standard rates because of the nature of Tenant's operations, Tenant shall, upon receipt of appropriate invoices, reimburse Landlord for such increased cost.

§4.02   <u>Tenant's Insurance</u>.   Tenant shall procure and maintain, at its expense and throughout the Term, the following insurance policies:

(a)   All-risk property insurance policy covering all of Tenant's fixtures and personal property in the Premises, and on any alterations, additions, or improvements made by Tenant upon the Premises all for the full replacement cost thereof. Tenant shall use the proceeds from such insurance for the replacement of fixtures and personal property and for the restoration of Tenant's improvements, alterations and additions to the Premises. Landlord shall be named as loss payee with respect to such alterations, additions or improvements.

(b)   Worker's compensation insurance in statutory limits shall be provided for all employees. Employers liability insurance shall also be obtained and shall afford limits not less than

14

five hundred thousand dollars ($500,000) per accident, not less than five hundred thousand dollars ($500,000) per employee for bodily injury by disease, and not less than five hundred thousand dollars ($500,000) for bodily injury by disease;

(c) Commercial general liability insurance which insures against claims for bodily injury, personal injury, advertising injury and property damage based upon, involving, or arising out of the use, occupancy, or maintenance of the Premises and the Retail Center. Such insurance shall afford, at a minimum, the following limits: (1) one million dollars ($1,000,000) per occurrence, (2) two million dollars ($2,000,000) for the general aggregate, (3) two million dollars ($2,000,000) for the products and completed operations aggregate, (4) one million dollars ($1,000,000) for personal and advertising injury liability, (5) fifty thousand dollars ($50,000) for fire damage legal liability, and (6) five thousand dollars ($5,000) for medical payments. Any general aggregate limit shall apply on a per location basis. Such insurance shall name Landlord and its leasing and property manager, and any and all mortgagees as additional insureds. This coverage shall include blanket contractual liability, broad form property damage liability, and shall contain an exception to any pollution exclusion which insures damage or injury arising out of heat, smoke, or fumes from a hostile fire. Such insurance shall be written on an occurrence basis and contain a standard separation of insureds provision;

(d) Business auto liability insurance policy which insures against bodily injury and property damage claims arising out of the ownership, use or maintenance of any automobile, with a combined single limit per accident of not less than one million dollars ($1,000,000); and

(e) Umbrella excess liability insurance, on an occurrence basis, that applies excess of required commercial general liability, business automobile liability and employer's liability insurance policies, which insures against bodily injury, property damage, personal injury and advertising injury claims with limits of not less than two million dollars ($2,000,000) per occurrence and not less than two million dollars ($2,000,000) for the annual aggregate. These limits shall be in addition to and not including those stated for underlying commercial general liability, business automobile liability, and employers liability insurance. Such policy shall name Landlord and its trustees, officers, directors, agents and employees, Landlord's leasing and property manager, and any and all mortgagees as additional insureds.

(f) Business income and extra expense insurance policy with limits of at least Five Hundred Thousand Dollars ($500,000).

(g) All policies required to be carried by Tenant hereunder shall be issued by and binding upon insurers licensed to do business in the state in which the Retail Center is located with a rating of at least "A-VIII" or better as set forth in the most current issue of Best's Key Rating Guide (unless otherwise approved by Landlord). Tenant shall not do or permit anything to be done that would invalidate the insurance policies required. Liability insurance maintained by Tenant shall be primary coverage without right of contribution by any similar insurance that may be maintained by Landlord.

15

(h) Certificates of insurance, acceptable to Landlord, evidencing the existence and amount of each liability insurance policy required herein and Evidence of Property Insurance Form, Acord 27, evidencing property insurance as required shall be delivered to Landlord prior to delivery or possession of the Premises and ten (10) days prior to each renewal date. Certificates of insurance shall include an endorsement for each policy showing that Landlord and its trustees, officers, directors, agents and employees, and any and all mortgagees are included as additional insureds on the liability policies referred to in Sections 4.02(c), (d) and (e). The Evidence of Property Insurance Form shall name Landlord as loss payee for property insurance with respect to Landlord's interest in improvements and betterments. Further, the certificates must include an endorsement for each policy whereby the insurer agrees not to cancel, non-renew, or materially alter the policy without at least thirty (30) days' prior written notice to Landlord. In the event that Tenant fails to provide evidence of insurance required to be provided by Tenant hereunder, prior to commencement of the Term of this Lease and thereafter during the Term of this Lease, within ten (10) days following Landlord's request thereof, and thirty (30) days prior to the expiration date of any such coverage, Landlord shall be authorized (but not required) to procure such coverage in the amount stated with all costs thereof to be chargeable to Tenant and payable upon written invoice thereof. The limits of insurance required herein, or as carried by Tenant, shall not limit the liability of Tenant or relieve Tenant of any obligation hereunder, except to the extent provided for with respect to the waiver of subrogation in Section 4.03 below. Any deductibles selected by Tenant shall be the sole responsibility of Tenant. Landlord may, at its sole discretion, change the insurance policy limits and forms which are required to be provided by Tenant. Such changes will be made to conform with common insurance requirements obtained for similar properties in similar geographic locations. Landlord will not change required insurance limits or forms more often than once per calendar year.

§4.03 Waiver of Subrogation. Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each waives all rights of recovery, claim, action, or cause of action against the other, its agents (including partners, both general and limited), trustees, officers, directors and employees, for any loss or damage that may occur to the Premises, or any improvements thereto, or the Retail Center or any personal property of such party therein, by reason of any peril required to be insured against under this Lease, regardless of cause of origin, including negligence of the other party. Tenant and Landlord covenant that, to the fullest extent permitted by law, no insurer shall hold any right of subrogation against the other. The foregoing waiver of subrogation shall be included in both Landlord's and Tenant's insurance policies.

§4.04 Indemnification. Tenant shall defend, indemnify and hold harmless Landlord (and Landlord's officers, directors, shareholders, partners, beneficiaries, employees and agents, Mortgagees, and any master lessor of all or part of the Retail Center) from and against any and all claims, demands, actions, suits, judgments, damages, losses, liability, costs and expenses (including reasonable attorneys' fees) that arise, directly or indirectly, in connection with (a) any injury to person or property, loss of life, or other act or omission that occurs on or about the Premises at any time between the date Landlord delivers possession thereof to Tenant and the termination of this Lease; or (b) any act or omission of Tenant or Tenant's agents, employees, contractors, licensees or

16

invitees upon the Premises, the Retail Center or otherwise. Tenant's liability hereunder covers any and all reasonable attorneys' fees Landlord, or any of the parties indemnified hereunder, may incur in hiring separate counsel, or in intervening in any litigation, to protect its, his or her interest in such manner as it, he or she deems appropriate. The liability of Tenant to indemnify Landlord shall not extend to any matter against which Landlord shall be effectively protected by the net proceeds collected by Landlord (after payment of all reasonable attorneys' fees and other costs of collection) under an insurance policy actually obtained hereunder; however, if any such liability exceeds the amount of such proceeds, then said liability of Tenant shall apply to such excess. Without limiting the foregoing, if a lien is filed against any portion of the Retail Center by reason of any of the matters covered by the foregoing indemnity, then Tenant shall, within ten (10) days after such filing, discharge the same by payment, bonding or otherwise.

### ARTICLE V - IMPROVEMENTS TO PREMISES

§5.01   Initial Improvements.

(a)   Certain improvements shall be constructed in the Premises according to the space plan attached hereto as Exhibit "B" (collectively, the "Space Improvements") for the purpose of initially preparing the Premises for occupancy by Tenant and shall be paid for as provided in ¶(b) of this Section. Such Space Improvements shall be constructed by Tenant, as provided in the Reference Pages above, and in accordance with the following procedures:

(1)   Tenant shall, promptly after execution of this Lease, engage an architect to prepare plans and specifications of the Space Improvements for Landlord's review and approval. Such plans and specifications shall be submitted to Landlord within ten (10) days after the date hereof. Landlord shall review those plans and specifications, and either approve them or notify Tenant of proposed changes thereto, within seven (7) days after receiving them. Tenant shall, within three (3) Business Days in each instance, make any changes to such plans reasonably requested by Landlord or necessary to make the plans and specifications conform to Exhibit "B" hereof. "Business Days" are everyday except (i) Saturdays, (ii) Sundays, and (iii) days recognized as legal holidays by the United States Government or the state in which the Retail Center is located. Notwithstanding the foregoing to the contrary, Landlord does hereby agree to approve plans and specifications submitted by Tenant that provide for Tenant's installation in the Premises of such designs, interior decorations and trade fixtures as are customary in connection with the operation of a typical Blimpie restaurant, provided the same are permitted by applicable laws and regulations.

(2)   Promptly after the plans and specifications have been finalized, Tenant shall solicit bids and/or negotiate with contractors for construction of the Space Improvements and enter into written contracts with a contractor or contractors for the construction of such improvements and with other professionals for appropriate services in connection therewith. The contractor(s) and professional(s) so engaged by Tenant, and the respective contracts between such parties and Tenant, shall be subject to Landlord's prior written approval, which shall not be unreasonably withheld. Additionally, each of Tenant's contract(s) with contractor(s) shall provide for, at a minimum, a retainage or holdback of ten percent (10%) of the total cost of the contract until

17

completion of the work and for payment and performance bonds satisfactory to Landlord. All such construction shall be done at Tenant's risk, in a first-class workmanlike manner, and in accordance with the approved plans and specifications and all applicable laws and regulations. Prior to commencing construction, Tenant shall obtain all building and other permits or licenses required by law for the work; and, promptly after completion of such work, Tenant shall procure a certificate of occupancy for the Premises from the applicable governmental authorities and provide a copy thereof to Landlord. Landlord hereby agrees, upon its receipt of written request from Tenant, and solely in its capacity as owner of the Building and the Premises, to execute and deliver such applications as may be properly prepared and completed by Tenant, at Tenant's sole cost and expense, and required by any applicable governmental authority having jurisdiction over the Building and the Premises in connection with Tenant's efforts to obtain any and all building and similar approvals and permits necessary for the construction of the Space Improvements in accordance with the plans and specifications approved by Landlord pursuant to Section 5.01(a)(1) above. Tenant shall indemnify Landlord for any and all costs and expenses and liability (including, without limitation, reasonable attorneys' fees) incurred by Landlord in executing, delivering and/or submitting any such applications. All such construction shall be overseen by Landlord through its construction manager. Tenant shall permit Landlord and Landlord's construction manager to inspect the Premises and Tenant's work at all times during construction. Subject to §1.01 hereof, Tenant and its agents and contractors shall have the right to enter the Premises prior to the Commencement Date for such construction purposes, provided that, inter alia, prior to any such entry, Tenant shall have obtained the insurance required under Article IV hereof, and its contractors shall have obtained such liability, workers' compensation and other insurance as is reasonably acceptable to Landlord.

(b) Any and all costs and expenses of designing and constructing the Space Improvements, including but not limited to all fees, costs and expenses paid under construction contracts and subcontracts, the costs and expenses of materials, supplies, permits and other items, and any other out-of-pocket expenditures incurred in any connection with such construction, shall be paid by Tenant.

(c) If the Space Improvements are to be constructed by Tenant, then Landlord shall use commercially reasonable efforts to complete "Landlord's Work" on or before the Target Date set forth on the Reference Pages hereto, subject to delays necessarily caused by "Force Majeure", ready for Tenant to commence construction of the Space Improvements. As used herein, the term "Landlord's Work" shall mean the construction, installation and/or performance of the following standard store finishes to the Premises, which shall be at Landlord's sole cost and expense: drywall taped and spackled, smooth and ready for covering; concrete floor ready for floor covering; acoustical tile ceiling using Blimpie standard ceiling tiles; lay-in fluorescent lighting; one (1) restroom (or such minimum number of restrooms as shall be required by applicable building code for fast food restaurant use) to applicable building code standard, which restroom(s) shall be "ADA" (herein defined) compliant; one (1) six (6)-ton heating, ventilating and air-conditioning system for normal retail use; basic storefront finish ready to accept standard Blimpie signage; rear service door with exterior doorbell and 180-degree peephole; sprinkler system if required by applicable building code; 850 MBTU's gas service; and 120/208V 3 Phase 400 amp total electrical

18

service. Landlord's Work shall be performed in a good and workmanlike manner and in compliance with all applicable laws, regulations and building codes, including ADA. As used herein, the term "Force Majeure" means a strike or other labor trouble, governmental restriction, failure or shortage of utility service, national or local emergency, accident, flood, fire or other casualty, adverse weather condition, other act of God, inability to obtain a building permit or a certificate of occupancy, or any other cause beyond the reasonable control of the party required to perform. Notwithstanding any language in this Lease to the contrary, if Landlord's delivery of the Premises to Tenant with the Landlord's Work substantially complete does not occur on or before February 1, 2003, this Lease shall automatically terminate and neither party shall have any further liability to the other.

(d) Upon Landlord's delivery of possession of the Premises to Tenant as provided in the immediately preceding subsection, Tenant shall immediately commence and diligently pursue to completion construction of the Space Improvements, subject to delays necessarily caused by Force Majeure.

§5.02 Signs. Tenant shall at its own expense erect a sign at the front of the Premises, which sign shall (a) conform to any guidelines or sign criteria adopted by Landlord with respect to the Retail Center, (b) conform to all applicable laws and regulations, and (c) be otherwise subject to Landlord's prior written approval. Also, Tenant shall, at its own cost and expense, install under the canopy at the Retail Center a sign with Tenant's Trade Name in lettering standard to all similar signs for other tenants at the Retail Center; provided, however, that Landlord hereby agrees that, subject to Tenant complying with all governmental requirements and obtaining all necessary governmental permits and licenses, Tenant may install standard Blimpie signs on the exterior portion of the Building above the Premises. Tenant shall not install or erect any other signs, advertisements or other visual displays at, on or in the Premises which are visible from the exterior thereof without the prior written approval of Landlord. Any window signs or displays which are approved by Landlord shall be made with artist's lettering and otherwise with a professional appearance. Landlord may remove, at Tenant's cost and expense, any signs or displays that are objectionable to Landlord or to other tenants at the Retail Center or their customers. Notwithstanding the foregoing to the contrary, Landlord hereby approves Tenant's (a) logos, (b) colors, (c) neon signage for windows and (d) awing, and Tenant's criteria for exterior and neon signage and an exterior awning to the Premises, all as specifically set forth in Exhibit "D" attached hereto and made part hereof.

§5.03 Condition. Except for the Landlord's Work to be constructed by Landlord hereunder, Tenant acknowledges that the Premises are leased hereunder "AS-IS, WHERE-IS", without warranty as to condition, suitability for a particular purpose or any other matter whatsoever.

§5.04 Tenant's Alterations. Except for non-structural, cosmetic renovations costing less than Five Thousand Dollars ($5,000.00), Tenant shall not make any alteration, addition or improvement to the Premises, whether structural or nonstructural, without Landlord's prior written consent. Tenant shall provide such drawings, plans and specifications as are requested by Landlord in reviewing any such proposed improvements. If Landlord consents to any such proposed alteration, addition or improvement, it shall be made at Tenant's sole cost and expense and at such

19