# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

CHANDAR RATNAM, *et ux, et al.*

        Plaintiffs,

v.

BLIMPIE ASSOCIATES, LTD., *et al.*,

        Defendants.

CIVIL ACTION NO.
1:06-cv-00372-JR

## MOTION OF DEFENDANT DCBG, INC. FOR SUMMARY JUDGMENT

Defendant DCBG, Inc., by its attorney and pursuant to Rule 56, Fed.R.Civ.P, respectfully moves the Court for entry of summary judgment in its favor as to all Counts of the Complaint and states in support thereof that:

1.    There is no genuine dispute as to any material fact; and

2.    It is entitled to judgment as a matter of law.

The attention of the Court is respectfully invited to the accompanying Memorandum of Points and Authorities in support of this Motion, the Statement of Material Facts, and the Declaration of Tarrant H. Lomax in support hereof.

**[signature on following page]**

*Tarrant H. Lomax*

Tarrant H. Lomax (961409)
Tarrant H. Lomax, Esq., P.C.
1819 Bay Ridge Avenue, Suite 220
Annapolis, MD 21403
Phone: 202.253.8923
Fax: 707.313.7020
Email: tarrantlomax@abanet.org

## LOCAL RULE 7(m) CERTIFICATION

I, Tarrant H. Lomax, hereby certify that on July 18, 2006, I conferred by e-mail with counsel for all other parties, who assented to the issues presented in this motion.

Dated:    July 17, 2006          *Tarrant H. Lomax*

Tarrant H. Lomax

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of July, 2006, I served a copy of the "Motion of Defendant DCBG, Inc. For Summary Judgment", the "Memorandum of Points and Authorities in Support of DCBG, Inc.'s Motion for Summary Judgment", the "Statement of Material Facts in Support of the Motion of DCBG, Inc. for Summary Judgment" and the "Declaration of Tarrant H. Lomax in Support of the Motion of DCBG, Inc. for Summary Judgment" pleading by electronic transmission, "PDF" format, on:

         Joseph Horn, Esq.
         HORN LEGAL, PLLC
         1730 Rhode Island Avenue, Suite 1208

Washington, D.C. 20036
joseph@josephhorn.com


Scott Korzenowski, Esq.
William S. Fulton, Jr., Esq.
DADY & GARNER, P.A.
4000 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
sekorzenowski@dadygarner.com
wfulton@dadygarner.com


Arthur Pressman, Esq.
Gregg Rubenstein, Esq.
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
apressman@nixonpeabody.com
grubenstein@nixonpeabody.com


Christopher Wallace, Esq.
NIXON PEABODY LLP
401 9th Street, N.W., Suite 900
Washington, DC 20004
cwallace@nixonpeabody.com


Paul J. Kiernan, Esq.
Roxan A. Kerr, Esq.
HOLLAND & KNIGHT LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006
paul.kiernan@hklaw.com
roxan.kerr@hklaw.com


*Tarrant H. Lomax*
_____
Tarrant H. Lomax


H:\THL\Client Files\DCBG\Chans Foods Litigation\Court Pleadings\DCBG Summary Judgment\DCBJ SJ Motion.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

CHANDAR RATNAM, *et ux, et al.*

        Plaintiffs,

v.

BLIMPIE ASSOCIATES, LTD., *et al.*,

        Defendants.

CIVIL ACTION NO.
1:06-cv-00372-JR

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## DCBG INC.'S MOTION FOR SUMMARY JUDGMENT

This memorandum of points and authorities is submitted by DCBG, Inc. ("DCBG") in support of its Motion for Summary Judgment. The undisputed facts show that each of the Plaintiffs' claims against DCBG must be dismissed because:

1.    There was no "consumer" transaction between Plaintiffs and DCBG upon which relief could be granted under the District of Columbia Consumer Protection Procedures Act (Count I).

2.    The allegations fail to establish that DCBG committed a common law fraud against Plaintiffs (Count Two).

3.    The allegations fail to establish that DCBG made any negligent misrepresentations to the Plaintiffs (Count Three).

4.    There was no contractual privity between Plaintiffs and DCBG and thus no basis for a claim for breach of contract or implied covenant of good faith and fair dealing (Count Four).

5.    DCBG was not unjustly enriched by any loss suffered by
the Plaintiffs (Count Five).

Accordingly, summary judgment, in the form of a dismissal
of Plaintiffs' claims with prejudice, must be entered all or in
part in favor of Defendant DCBG.

The attention of the Court is respectfully invited to the
following points and authorities in support of the motion.

<u>FACTUAL BACKGROUND</u>

DCBG is a sub-franchisor authorized to market franchises
for co-Defendant Blimpie Associates, Ltd. ("Blimpie") within
certain territorial limits, including the District of Columbia.
In addition, DCBG assists in the re-sale of established
franchises to new franchisees within DCBG's territory.  It is
the latter transaction that occurred in this case.  DCBG-SOF, at
#2[1]

On or about August 26, 2002, co-Defendant 2001 B.A. Realty,
Inc. ("2001") entered into a lease ("Master Lease") with co-
Defendant H Street Community Development Corporation, Inc.
("HSCDC") for premises at the "southwest corner of 8th and H
Streets, NW" (variously referred to as 717 or 775 H Street, NW)
(Location) for use as

"a typical Blimpie submarine sandwich <u>restaurant</u> with
related Blimpie <u>restaurant</u> food sales, including

---

[1]    Reference to the Statement of Facts DCBG will be made in this manner.

>       Blimpie authorized pizza Co-Brand, cookies and
>       Boardwalk Frues, and no other purpose".

Rubenstein Exhibit F[2], Master Lease, at Page 1, "Permitted Uses".

Emphasis added.

On or about August 17, 2002, Blimpie entered into a

Franchise Agreement and Sublease with Munni Enterprises, Inc.

(Munni) for the operation of a Blimpie's franchise at the

Location.  The terms of the Master Lease were incorporated into

the Munni sublease and Nizam M. Ali (Munni's principal) (Ali)

provided a personal guaranty to the Master Lease, which personal

guarantee has not been extinguished.  DCBG-SOF, at #3.

On or about March 9, 2004, Ali and Plaintiff Chandar

Ratnam, principal of Chans Foods, Inc. (Chans) entered into a

agreement for the sale of Munni's franchise to Ratnam and the

assignment of the sublease to the same.[3]  Rubenstein Exhibit D;

BA-SOF[4], at #13.  Pursuant to that agreement, *inter alia*:

---

2    Reference to the Exhibits authenticated by the Declaration of Gregg A.
     Rubenstein in support of the Motion for Summary Judgment of Blimpie and
     2001 will be made in this manner.

3    Although inartfully drafted as a contract between Ali and Ratnam, the
     real parties in interest were Munni, the legal owner of the franchise
     and the sub-lessee, and Chans, warranted by Ratnam at Paragraph 8 of the
     contract to be on the closing date "a corporation in good standing in
     the State of Virginia".  Subsequently, Ratnam incorpated Chans in the
     District of Columbia and the new franchise and sublease were between
     Chans and Blimpie (franchise) and 2001 (sublease).

4    Reference to the Statement of Facts of Blimpie Associates will be made
     in this manner.

1. Ali/Munni sold to Ratnam/Chans and Ratnam/Chans purchased from Ali/Munni, "Seller's interest in the Business [the right to operate, as a franchisee, a Blimpie Subs and Salad at the Location] including the License Agreement to occupy the [Location], the Blimpie Franchise Agreement, and the Chattels".

2. Ratnam/Chans agreed to pay Ali/Munni the sum of $35,000 for the purchase.

3. The assignment of Ali/Munni's rights "in and to the Blimpie Franchise Agreement" were expressly "conditioned upon, among other things, the execution by Purchaser of a Blimpie Franchise Agreement in its current form.

4. Ali/Munni warranted and represented that "there are no actions, suits, proceedings or violations known to Seller which are pending or threatened against or affecting the Business or the [Location], which might prevent this transaction".

5. Paragraph 15 of the Ali - Ratnam contract explicitly provides that "<u>Purchaser [Ratnam/Chans] has not relied upon or been induced by any statements or representations, **other than those expressly set forth in this Agreement, or of any person** in respect of the property, income, expenses, profit or loss, from the operation of the Business at the Premises [Location]</u>".

Emphasis added.

In short, Ratnam/Chans entered into an arms-length transaction, outside of Blimpie, 2001, and/or DCBG, for the purchase of the rights to the franchise at the Location, subject to the subsequent execution of a new franchise agreement "in its present form" and a new sublease. On April 28, 2004, Chans entered into the following agreements in furtherance of its purchase from Munni:

1.   Assignment and Assumption of Franchise Agreement.  BA-
     SOF, at #14; Rubenstein Exhibit E.

2.   Sublease with 2001.  BA-SOF, at #28; Exhibit B to
     Complaint.

3.   Blimpie Traditional Location Franchise Agreement, with
     Rider and Guaranty by Ratnam and Asha Chandar.  BA-SOF,
     at #15; Exhibit C to Complaint.

In addition to the foregoing documents, at the first meeting with

the agent for Ali/Munni, the sales agent "provided the Plaintiffs

with a copy of a [then-current] Blimpie "Uniform Franchise

Offering Circular" (UFOC).  Complaint, at Paragraph 27.

Thereafter on February 25, 2006, the Plaintiffs acknowledged in

writing the receipt of a 2004 Blimpie UFOC, which had not been

issued until after the first meeting with the Munni sales agent.[5]

Rubenstein Exhibit B; BA-SOF, at #10.

     DCBG is not a party or signatory to any of the foregoing

agreements and the final contractual relationships of the parties

is set forth on Lomax Exhibit 1[6].

     In addition to the provisions set forth above that were

contained in the Ali/Munni - Ratnam/Chans contract, the UFOC, the

---

5    The UFOC is updated and reissued each year based on the previous year-
     end information.  The effective date of the 2004 UFOC is set forth in
     the receipt, Rubenstein Exhibit B; it was effective February 10, 2004.
     Accordingly, the 2004 UFOC was also provided to the Plaintiffs.

6    Reference to the Exhibits authenticated by the Declaration of Tarrant H.
     Lomax will be made in this manner.

Franchise Agreement and the sublease all contain additional, express provisions relative to the Plaintiffs' allegations.

**A.    The UFOC**

The UFOC, Rubenstein Exhibit 4, provided <u>detailed</u> disclosure to the Plaintiffs regarding the franchise that they were purchasing from Ali/Munni and offered a number of admonitions, warnings and recommendations.  These included:

Introductory Page:

> INFORMATION FOR PROSPECTIVE FRANCHISEES
> REQUIRED BY THE FEDERAL TRADE COMMISSION
>
> TO PROTECT YOU, WE'VE REQUIRED YOUR FRANCHISOR TO GIVE YOU THIS INFORMATION.  <u>WE HAVEN'T CHECKED IT, AND DON'T KNOW IF IT'S CORRECT</u>.  IT SHOULD HELP YOU MAKE UP YOUR MIND.  STUDY IT CAREFULLY.  WHILE IT INCLUDES SOME INFORMATION ABOUT YOUR CONTRACT, **DON'T RELY ON IT ALONE TO UNDERSTAND YOUR CONTRACT.** READ ALL OF YOUR CONTRACT CAREFULLY.  BUYING A FRANCHISE IS A COMPLICATED INVESTMENT.  **TAKE YOUR TIME TO DECIDE.  IF POSSIBLE, SHOW YOUR CONTRACT AND THIS INFORMATION TO AN ADVISOR LIKE A LAWYER OR AN ACCOUNTANT.**  IF YOU FIND ANYTHING THAT'S BEEN LEFT OUT, YOU SHOULD LET US KNOW ABOUT IT. IT MAY BE AGAINST THE LAW.

Emphasis in bold added; Emphasis in underline in original.

Item 9: Franchise's Obligations:

> THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE FRANCHISE AND OTHER AGREEMENTS.  IT WILL HELP YOU FIND MORE DETAILED INFORMATION ABOUT YOUR OBLIGATIONS IN THESE AGREEMENTS AND IN OTHER ITEMS OF THIS OFFERING CIRCULAR.

Among those obligations of the Franchisee are:

(a) Site Selection and acquisition/lease.

      (c) Site development and other pre-opening requirements.

Item 19: Earnings Claims.

      No representations or statements of actual projected or forecasted sales, profits, or earnings are made to franchisees with respect to franchises.  Blimpie does not furnish or authorize its salespersons or subfranchisors to furnish any oral or written information concerning the actual, average, projected, forecasted, or potential sales, costs, income or profits of a franchise.

      Blimpie specifically instructs its sale personnel, subfranchisors, agents, employees, and officers that they are not permitted to make such claims or statements as to the earnings, sales, or profits or prospects or chances of success, nor are they authorized to represent or estimate dollar figures to a franchisee's operation.

      Actual results may vary from franchise to franchise, and Blimpie cannot estimate the results of a particular franchise.  Blimpie recommends that prospective franchisees make their own independent investigation to determine whether or not the franchise may be profitable, and consult with an attorney or other advisors prior to executing the Franchise Agreement.

Contrary to the FTC's recommendation, the Plaintiffs did not engage a lawyer for review and advice.

**B.**    <u>**The Franchise Agreement**</u>

The Franchise Agreement, Complaint, Exhibit C, granted Chans Foods the right and obligation to open and operate a Blimpie restaurant at the Location.  The Franchise Agreement contains, among others, the following provisions relevant to Plaintiffs' allegations *viz a viz* DCBG:

Page -7-

1.    At Paragraph 23.3: That "there is no other agreement, representation or warranty made by Franchisor <u>or any other entity or person associated with Franchisor</u> other than contained in this Agreement.  This Agreement is not subject to or conditioned upon obtaining of a Locations for Operator's System Restaurant."  Emphasis added.

3.    At the Rider (p. 33),

        4.    Operator acknowledges that it has exercised due diligence in investigating Blimpie Restaurants located in the area, and that it has contacted or had an opportunity to contact other Blimpie Restaurant franchisees and sought from them or had the opportunity to seek from them information regarding (i) their financial condition; (ii) status; and (iii) any other relevant fact that a diligent examination would determine.

        6.    Because Operator did not execute this agreement at Franchisor's office, Franchisor requires certain assurances that the Agreement has been sold in accordance with all applicable laws, rules and regulations.  Accordingly, in order to induce Franchisor to execute this Agreement, Operator acknowledges and [sic] as follows:

                6.1 Operator has been represented by independent counsel who has reviewed the UFOC and this Blimpie Restaurant franchise agreement. [Plaintiff initially circled "YES", the struck that answer and circled "NO" and initialed; the handwritten explanation of Chandar Ratnam on the next page, Page 35, states: "6.1 Chose not to have an independent consel [sic]]"

                6.3  Operator has only had contact, negotiations and/or discussions with the Salesperson(s) identified in Paragraph 1 of this Rider regarding this franchise sale or the offer and acceptance of this agreement. [Plaintiff circled "YES" and initialed; the only salesperson identified is Leslie Gardner, Munni's agent for the sale from Munni to Chans.]

6.5  Operator acknowledges that Franchisor, Salesman, Subfranchisor, or any of their agents, salesmen, directors, officers, employees or any other salesman, person or entity have not made, and Operator has not relied on any representations, warranties, inducements, pro formas, forecasts, estimates or any other inducement or statement regarding financing, net profits, gross profits, net sales, gross sales, costs or expenses of Blimpie restaurants generally or of any specific Blimpie restaurant or any other matter not stated here. [Plaintiff circled "YES" and initialed.]

6.7 Operator understands that in entering into this Agreement, Franchisor is relying upon Operator's acknowledgments, representations and commitments as stated in this Section. {Plaintiff circled "YES" and initialed)

**B.    <u>The Sublease</u>**

In conjunction with executing the Franchise Agreement, Chans Foods also entered into a sublease with 2001 for the Location, dated April 28, 2004 ("Sublease").  Complaint, Exhibit B.  In addition to its own terms, the Sublease incorporates the terms of the 2002 Master Lease for the Location.  The Sublease contains, among others, the following provisions:

1.    Paragraph 2: Acknowledgement that "each and every term of the Major Lease is hereby incorporated into this Sublease with like effect as if herein set forth in full, except to the extent inconsistent with the terms of this Sublease, and as so incorporated the words "landlord" and "tenant" contained in the Major Lease shall be deemed to apply to Landlord and Tenant under this Sublease.

2.    Paragraph 3: "Tenant may only use and occupy the Premises as a franchised Blimpie sandwich <u>restaurant</u> and for no other purpose." [Emphasis added]

3.    Paragraph 11:  An acknowledgment by Chans Foods "that it has read and is fully familiar with the Major Lease."

4.    The incorporation from the Master Lease, at Paragraph 3.02, that "[t]enant shall comply with any and all laws and regulations, including but not limited to zoning laws . . . ."  [Emphasis added]

5.    The incorporation from the Master Lease, at Paragraph 5.03, that "the Premises are leased hereunder 'AS-IS, WHERE-IS', without warranty as to condition, suitability for a particular purpose or any other matter whatsoever."

Although Plaintiffs took no steps to determine whether the Location was zoned for use as a Blimpie restaurant - fast food or otherwise - before entering into the Sublease, the Plaintiffs proceeded with the build-out of the restaurant, and, on or about May 19, 2004, Chans Foods was issued a Certificate of Occupancy by the Zoning Administrator of the Department of Consumer and Regulatory Affairs for a "restaurant" at the Location. Complaint, Exhibit E, at Page 1; BA-SOF, at #41.  Chans opened for business on May 24, 2004.  Complaint, at Paragraph 35; BA-SOF, at #42.

On July 13, 2004, a local Advisory Neighborhood Council appealed the issuance of the Certificate of Occupancy to the D.C. Board of Zoning Appeals. BA-SOF, at #43.  A hearing was held on October 12, 2004 at which the Plaintiffs appeared - once again *pro se*, despite the financial investment at stake.  DCBG-SOF, at #4.  The issue of the distinction between a restaurant and a fast food restaurant were discussed during the course of the hearing.

At the conclusion of the hearing on October 12, 2004, the BZA invited the parties - including specifically the Plaintiffs - to submit additional evidence regarding the calculation as a restaurant. DCBG-SOF, at #5.

> Chairperson Griffis: . . . . This is what I would like to do. I think it's very clear what we have to decide and the basis which we need to make that clarity into a decision is wanting. So what I would like to do is have submissions by the Zoning Administrator, also the parties and the lessee if they so choose, and that's it. We need calculations. I want the total square footage of the floor that is calculated, the total square footage of the area that is accessible to the public; and then I need a calculation of what goes to the 10 percent. So if it comes in a diagram and all that, great. Just make sure it's clear in the diagram, in the hatched areas, of what is what, that we have the square footage in there, and then we will be able to cross that with the regulation itself, all the information that we have had provided, and we will be able to do something with it.

Lomax Exhibit 2. Emphasis added.

The ANC responded to the BZA's request and submitted a post-hearing calculation based on the original configuration of the floor area. Yet, the Plaintiffs did nothing - no competing calculation, no competing argument, no reconfiguration of the floor area itself to meet the requirement of a restaurant - despite the BZA's specific offer to receive additional input from the Plaintiffs. DCBG-SOF, at #6.

In the face of the inaction by the Plaintiffs, and the pro-active stance by the ANC, the BZA on November 2, 2004, orally on

the record indicated its decision to order revocation of the
Certificate of Occupancy; however the order doing so did not
issue until June 13, 2005, and the formal revocation took place
on July 27, 2005.  DCBG-SOF, at #7; BA-SOF, at #45.  The
Plaintiffs finally ceased operations on August 6, 2004.
Complaint, at Paragraph 39.

The Plaintiffs took no steps in the 13 months prior to and
after the ANC's filing of its appeal to ensure that its franchise
would meet the definition of a "restaurant", and not that of a
"fast food restaurant", 11 DCMR 199.1, a copy of which is
attached as Exhibit A to the BASOF.  DCBG-SOF, at #8.  These
simple steps - reconfiguring its floor space, less than 60% pre-
prepared or packaged foods, and use of containers and tableware
that are not primarily disposable  - would have resulted in the
classification as a restaurant and the rejection of the appeal.

Plaintiffs also took no steps to apply for a special
exception or to appeal the decision of the BZA or otherwise
challenge the BZA's determination that Chans Foods operated a
fast food restaurant.  BA-SOF, at #48 and 49.  Instead,
Plaintiffs "closed their doors" on or about August 6, 2005, and
ceased operating the Blimpie restaurant.   On or about December
1, 2005, plaintiffs surrendered possession of the Location.
Complaint, at Paragraph 40.

**ARGUMENT**

A.    Introduction

DCBG is in the unique position in this litigation in that it has no contractual relationship with Chans or with Asha Chandar or Chandar Ratnam (collectively "Ratnams").  As set forth in the "flow chart" of the contractual relationships, Lomax Exhibit 1, DCBG's sole contractual relationship is as a sub-franchisor to Blimpie Associates, Inc. (Blimpie).  The franchise agreement, the sublease, and the guaranty at issue in this litigation were solely by and/or among HSCDC, Blimpie, 2001, Chans and/or the Ratnams.

The gravamen of the case against DCBG is that it made fraudulent or negligent misrepresentations or omissions regarding the Location.  In particular, the inference from the allegations of the Complaint is that the Defendants, collectively or separately, failed to disclose that the Location could not be used for a "fast food restaurant" as defined in the District of Columbia Code.[7]  DCBG strongly disagrees with that premise, contends that it did not make any such misrepresentations, and submits that the Location in fact could have been configured very easily to meet the definition of a restaurant (less than 10% floor area for queuing for carry out, less than 60% prepared or

---

7    The Plaintiffs acknowledge that the Location can be used for a "restaurant" as that term is defined.

packaged foods, and containers and tableware that are not
primarily disposable[8] - if the Plaintiffs had wanted to do so.

Notwithstanding the Plaintiffs' allegations, what really is
at issue in this case is the Plaintiffs' total failure:

1) to undertake any reasonable due diligence through the
date of their execution of the Franchise Agreement - even in the
face of repetitive contractual requirements to verify the
adequacy of the Location;

2) to take any reasonable action to protect itself during
the hearings at the BZA - obtaining an attorney or even
submitting the calculations as requested by the BZA; and

3) to pursue viable alternative avenues available to them -
reconfiguring the floor area, utilizing containers and tableware
that are primarily non-disposable, seeking a special exception
(that has been successfully pursued at other locations -
Affidavit of                    ).
Given the Plaintiffs' own clear failings in the three foregoing
areas, the question is WHY?

---

8    As set forth in the Statement of Facts, the substantive focus at the
     hearing before the Board of Zoning Appeals that resulted in the
     revocation of the Certificate of Occupancy was the computation of the
     floor area for queuing for carry-out.  A simple reconfiguration of the
     Location would have met the requirement for a restaurant - less than 10%
     queue area for carry-out.

One need only to turn to the sequence of events and the Plaintiffs own allegations of the Complaint to answer that question.

| | |
|---|---|
| May 19, **2004** | Certificate of Occupancy issued for Chans Foods. |
| May 22, **2004** | Chans Foods opens for business. |
| August 6, **2005** | Plaintiffs close business. |

For **15 months**, the Plaintiffs operated the business exactly as envisioned from the day they bought the franchise from Munni - not reduced in size, not reconfigured, and not otherwise affected by the appeal of the issuance of the Certificate of Occupancy. Yet, by the Plaintiffs own allegations in their Complaint, they clearly were incapable of operating a profitable business even without a zoning issue:

> 42.    In the time that they operated their Blimpie restaurant, Plaintiffs experienced <u>operating</u> losses of over one hundred seventy thousand dollars ($170,000); these losses were separate from, and in addition to, the amounts Plaintiffs invested in building out the Leased Premises.

Emphasis added.  Plaintiffs lack of due diligence in understanding the financial aspects of the franchise that they undertook is borne out by their counsel's own observation.  In an August 23, 2005, email from the Plaintiffs' counsel, Joseph Horn, Esq., to Joel Schweidel, Esq. (Blimpie in-house counsel), Mr. Horn noted:

> Also, as a [*sic*] FYI, the rent is way too high.  It's about $6,000 a
> year [month] including cam charges.  This location is in an economic
> revitalization zone, that is, a transitional area bested by liquor
> stores with window bars.  I closed a deal a few months ago for a fast
> food eatery in the high-end business district and the rent was only
> $4,000.  The landlord still has another unit vacant in the building.

A complete copy of the email is attached hereto as Lomax Exhibit
3.  Even had Plaintiffs rent been reduced to $0.00  per month -
thus saving $90,000 over 15 months, the Plaintiffs would still
have lost $80,000 by their own allegation.

Clearly, the underlying reason for Plaintiffs' lawsuit is a
desperate attempt to extricate themselves from a bad business
deal that they made - a deal not in the first instance with
Blimpie or DCBG, but with Munni - which sold them the existing
franchise.  It was not a result borne of fraud or
misrepresentation by DCBG or the other Defendants, but rather one
of the Plaintiffs' own inattention to due diligence at the
outset, their lack of attention to the BZA and appeal process,
and their inability to operate a restaurant business.  And, the
law does not support their claims for relief.

Although styled as an action in five counts, Plaintiffs'
claims in this action are all based on a single factual question:
Did DCBG do anything wrong by not telling Plaintiffs that a
resident group had objected to fast food restaurants in their
neighborhood two years prior to Chans' purchase of a Blimpie
franchise from Munni?  The answer is a resounding: No.

Plaintiffs assert that Blimpie's failure to warn them about such previous opposition was a violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 et seq. ("Act") (Count One), constituted fraud (Count Two), constituted a negligent misrepresentation (Count Three), was a breach of contract and the covenant of good faith and fair dealing (Count Four) and an unjust enrichment to the Defendants (Count Five). As demonstrated below, Plaintiffs' claim under the Act fails because there is no "consumer" transaction involved in this action, merely a business-to-business transaction. Plaintiffs' contractual claims against Blimpie fail for the lack of any contractual privity. Plaintiffs' common law fraud, negligent misrepresentation and unjust enrichment claims also fail because the terms of the lease and franchise agreement specifically place the risk of any potential zoning or operational problems squarely on the Plaintiffs. Moreover, recent developments demonstrate that Plaintiffs' problems with keeping the certificate of occupancy issued for their location were curable if they had taken steps to do so. Accordingly, Plaintiffs have no one but themselves to blame for any damages they nay have suffered.

B.     Applicable Standard of Law

Fed. R. Civ. P. 56(c) provides that summary judgment should be granted when there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law.  See Sparks v. Fidelity National Title Ins. Co, 294 F.3d 259, 265 (1st Cir. 2002).  The Supreme Court has ruled that "[s]ummary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial."  Cleveland v. Policy Mgmt Sys. Corp., 526 U.S. 795, 805-06 (1999) (internal quotation marks and citation omitted).  In deciding a motion for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side over the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Since Plaintiffs bear the burden of proof for each of their claims and, as demonstrated below, such claims fail as a matter of law, DCBG is entitled to summary judgment dismissing all claims against it.  Broderick v. Donaldson, 437 F.3d 1226, 1231 (D.C. Cir. 2006).

C.    Count One - Consumer Protection Procedures Act

Plaintiffs' claim under the Consumer Protection Act fails as a matter of law because the purchase and operation of a restaurant franchise is not a "consumer" transaction *viz a viz* DCBG.  Plaintiffs' claim also fails because the Consumer Protection Act does not permit claims, like the one asserted here, between non-consumers.  Accordingly, Plaintiffs' Consumer Protection Act claim must be dismissed.

1.    The DC Consumer Protection Procedures Act.

"The [Consumer Protection Procedures Act] was adopted by the D.C. Council to protect local <u>consumers</u> from improper and fraudulent trade practices." <u>Williams v. Purdue Pharm. Co.</u>, 297 F. Supp. 2d 171, 174 (D.D.C. 2003) (citation omitted; emphasis added).  Although the Act was "intended to be a far-reaching consumer protection law," its scope is limited to prohibiting those acts which negatively affect "consumer goods or services." Howard v. Riggs Nat'l Bank, 432 A.2d 701, 710 (D.C. 1981).  Under the Consumer Protection Act, a person may assert a claim "seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia . . . ." D.C. Code § 28-3905(k)(1).  A "trade practice" is defined "as any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly,

solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services." D.C. Code § 28-3901(a)(6). Eemphasis added. "Consumer," when used in the Consumer Protection Act as an adjective, "describes anything, without exception, which is primarily for personal, household, or family use." D.C. Code § 28-3901(a)(2); Emphasis added. Accordingly, relief is available under the Act for unlawful acts affecting the sale, lease or transfer of personal, household or family use goods or services.

> 2.    Blimpie's Failure to Tell Plaintiffs About Past
>        Neighborhood Resistance Did Not Affect a Consumer
>        Good or Service.

Plaintiffs' claim under the Act fails as a matter of law because the allegedly unlawful act affected Chans' operability and profitability, not a consumer good or service. Chans is a for-profit corporation formed for the purpose of "carrying on of a profitable business." Rubenstein Exhibit A; emphasis added. Chans entered into the Franchise Agreement and Sublease to enable it to conduct a "profitable business" (emphasis added) that it bought from Munni, not to obtain something for personal, household or family use. Where, as here, there is no sale, lease or transfer of a "consumer good or service," there can be no violation of the Act.

Numerous cases addressing claims under the Act have recognized and applied these principles to deny relief for allegedly unlawful actions that do not affect "consumer goods or services."  For example, in Barlow v. McLeod, 666 F. Supp. 222 (D.D.C. 1986), the court rejected a Consumer Protection Procedures Act claim brought by a plaintiff who lent money to the defendant in exchange for the promise of a job.  Id. at 224.  "The Consumer Protection Act is designed to prohibit certain frauds against persons who purchase, lease, or receive goods or services that are primarily for personal, household, or family use."  Id. at 228.  Granting defendant's motion for summary judgment, the court held that "[u]nder no stretch of the imagination could the transaction in this case be considered a purchase, lease, or receipt of consumer goods."  Id.  The same is true here; under no stretch of the imagination could the purchase of an existing Blimpie franchise from another franchisee for the purpose of selling meals to the public at a profit be considered a purchase for personal, household or family use.  Accordingly, the result here should follow the result in Barlow.[9]

---

[9]    The Barlow Court also held that plaintiff's assertion of Consumer Protection Procedures Act claims based upon an alleged unfulfilled promise of a job was so devoid of merit as to help justify imposition of Rule 11 sanctions.  Barlow, 666 F. Supp. at 230 ("It is clear that the only reason these statutory claims were alleged was because they contain treble damages provisions.").

The same result was reached in Clifton Terrace Associates, Ltd. v. United Technologies Corp., 728 F. Supp. 24 (D.D.C. 1990), aff'd, 929 F.2d 714 (D.C. Cir. 1991). Clifton involved claims by the owner of an apartment complex against Otis Elevator Company. Id. at 25. The apartment owner alleged that Otis violated the Consumer Protection Act by refusing to repair elevators in the complex based on the residents being predominately black, handicapped or elderly. Id. at 26. The Clifton Court dismissed the claim pursuant to Fed. R. Civ. P. 12(b)(6), recognizing that "[t]his Court has held that the legislative history of the CPPA, along with a consistent reading of its provisions, unequivocally indicates that the CPPA was intended to protect consumers only, and not corporations." Id. at 34 (emphasis added). "Since plaintiff is not a consumer within the meaning of the CPPA, its claims thereunder are properly dismissed." Id. Here, as in Clifton, plaintiffs are not "consumers," but rather a for-profit business corporation, and here, as in Clifton, their Consumer Protection Procedures Act claims must be dismissed as a matter of law.

In addition to Barlow and Clifton, several other decisions have held that the Consumer Protection Procedures Act does not apply to non-consumer claims. See e.g., Kopff v. Battaglia, C.A. No. 05-798, 2006 U.S. Dist. LEXIS 13638, *46-48 (D.D.C. Mar. 29,

2006) (holding that recipients of unsolicited faxes failed to state a claim under Consumer Protection Procedures Act against third-party forwarder of faxes because "there is no consumer-merchant relationship within the meaning of the statute . . . ."); Slaby v. Fairbridge, 3 F. Supp. 2d 22, 27-28 (D.D.C. 1998) (dismissing claims based on defendant rejecting plaintiff's manuscript because there was no alleged consumer-merchant relationship); Mazanderan v. Independent Taxi Owners' Assoc., Inc., 700 F. Supp. 588, 591 (D.D.C. 1988) (dismissing claim by owner of taxicab based on alleged unfair gasoline purchase requirement because "the contested purchases of gasoline and supplies are made in connection with his role as an independent businessman."); Howard v. Riggs Nat'l Bank, 432 A.2d 701, 708-10 (D.C. 1981) (holding that an individual's negligent recommen-dation of a merchant was not a violation of the Act because there was no consumer transaction).

3.    The Sole Case Plaintiffs' Have Identified in Support of their Consumer Protection Procedures Act Claim Supports Dismissal of Their Claim.

The only case plaintiffs have to date identified in support of their Consumer Protection Procedures Act claim, Adam A. Weschler & Son, Inc. v. Klank, 561 A.2d 1003 (D.C. 1989), only lends further support for dismissal of their claim. Weschler concerns a claim by an auction house to collect the high bid made

Page -23-

by Klank for an antique blanket chest.  Id. at 1003. Klank

refused to honor his bid based on alleged misrepresentations by

plaintiff concerning the chest.  Id.  Weschler filed suit seeking

payment; Klank responded by filing a Consumer Protection

Procedures Act claim and moved to dismiss the claim against him

based on the alleged violation of the Consumer Protection Act.

Id.

Affirming the trial court's decision dismissing Weschler's

claim, the Weschler Court focused its analysis on whether Klank

was a "consumer" entitled to protection under the Consumer

Protection Act or a "merchant" not entitled to protection.  Id.

at 1004-05.  Based on the absence of any facts substantiating the

auctioneer's claim that Klank purchased the chest either to

resell it or display it in a museum, the Weschler Court held that

Klank qualified as a "consumer" who "intended to make personal

use of this antique chest."  Id. at 1004.  The court further held

that:

> Transactions along the distribution chain that do not
> involve the ultimate retail customer are not "consumer
> transactions" that the Act seeks to reach.  Rather, it
> is the ultimate retail transaction between the final
> distributor and the individual member of the consuming
> public that the Act covers.  Accordingly, it is not the
> use to which the purchaser ultimately puts the goods or
> services, but rather the nature of the purchaser that
> determines the nature of the transaction.

Id. at 1005 (emphasis added).

Here, there can be no reasonable dispute that "the nature of the purchaser" is not a consumer buying something for personal, household or family use, but rather a for-profit corporation purchasing a business and entering into a lease to allow it to make sales to third-party consumers.  Weschler, like each of the cases cited above, demonstrates that Plaintiffs' Consumer Protection Procedures Act claims must be dismissed because there is no "consumer transaction" here.  Rather, Plaintiffs' relation with Blimpie (there was no transaction with DCBG) is simply an out-growth of a  business (Munni)-to-business (Chans) asset sale and purchase.  See id. ("[The Consumer Protection Procedures Act] is not intended to supply merchants with a private cause of action against other merchants.")  Accordingly, plaintiffs' Consumer Protection Procedures Act claim against DCBG should and must be dismissed.

> D.    Counts Two and Three - Fraud and
>       Negligent Misrepresentation

Counts Two and Three of Plaintiffs' complaint - for fraud and negligent misrepresentation - fail as a matter of law and should be dismissed.  Again, Plaintiffs' claims are based solely on Blimpie's failure to tell them in 2004, when Chans purchased the franchise, about the ANC's 2002 opposition to fast food restaurants at the Location.  Plaintiffs' claims fail because Blimpie nor DCBG had any duty to disclose the ANC's 2002

opposition to fast food restaurants and because Blimpie's belief,

albeit inaccurate, that the ANC would not challenge a Blimpie

restaurant opening at the Location was a prediction of future

events that cannot be the basis of a fraud or negligent

misrepresentation claim.  In addition, any damages Plaintiffs

have suffered were not proximately caused by Blimpie or DCBG, but

rather by their own refusal to ensure that their franchise was

not classified as a "fast food restaurant" and their own

operational failures.  Plaintiffs' claims for fraud and negligent

misrepresentation should, therefore, be dismissed.

>    1.    DCBG Did Not Owe Plaintiffs A Duty to Disclose the
>          ANC's 2002 Opposition to Fast Food Restaurants at
>          the Location.

To state a fraud or negligent misrepresentation claim based

on an omission of a material fact, there must be a duty to

disclose the material fact.[10]  See Ahern v. Scholz, 85 F.3d 774,

793 (1st Cir. 1996) ("[T]he party claiming fraudulent concealment

must demonstrate that the opposing party had a duty to disclose

the material information in question and demonstrate each element

_____

10    Because it is unclear whether New York law (pursuant to the Franchise
      Agreement) or District of Columbia law governs plaintiffs' common law
      claims against Blimpie, citations are provided for both jurisdictions.
      A choice of law analysis is not required because the substantive law of
      the two jurisdictions concerning the common law claims is equivalent.
      See Greaves v. State Farm Ins. Co., 984 F. Supp. 12, 14 (D.D.C. 1997)
      ("A false conflict exists when the laws of different states are: 1) the
      same; 2) different but would produce the same outcome under the facts of
      the case; or 3) when the policies of one state would be furthered by the
      application of its laws while the policy of the other state would not be
      advanced by the application of its laws.").

of the claim by clear and convincing evidence.") (applying NY law); <u>Ideal Elec. Sec. Co. v. Scientech</u>, Inc., C.A. No. 97-2098 (TFH), 1998 U.S. Dist. LEXIS 11484, *4 (D.D.C. Jul. 15, 1998) ("Failure to disclose a fact constitutes fraud where one party owes the other a duty to disclose the fact.") (citation omitted). To avoid dismissal, Plaintiffs must demonstrate that DCBG had a duty to tell them of possible problems securing a Certificate of Occupancy for the Location <u>and</u> that such disclosure was material. Because DCBG had no duty to tell Plaintiffs about the ANC's position in 2002, Plaintiffs' claims for fraud and negligent misrepresentation fail as a matter of law.[11]

Where, as here, parties contractually agree that the lessor of the Location will be responsible for permitting issues, claims for fraud and misrepresentation will not lie under applicable New York law.  See <u>Oneida City Sch. Dist. v. Seiden & Sons, Inc.</u>, 576 N.Y.S.2d 442 (N.Y. App. Div. 1991).  In <u>Oneida</u>, the defendant made an offer to purchase certain land upon which it intended to develop, construct and manage senior citizen housing.  Id. at 444.  Oneida knew of defendant's intended use of the property and that "a prior prospective purchaser's proposal to convert the building into senior citizen housing had been turned down by the local Zoning Board of Appeals."  Id.  Despite this, the Oneida

---

11    Cases addressing a duty to disclose where a "special" or fiduciary relationship exits between parties are inapposite given the parties' express disclaimer of any such relationship.

Court held that the seller had no duty to warn the purchaser of

the potential problem with its planned use of the land because

there was no special relationship between them.  Id.  ("In the

absence of a special relationship between two parties to a

contract, no duty to disclose exists.") (internal quotation marks

and citation omitted).  The Oneida Court went on to hold:

> There is no allegation that plaintiff had exclusive
> knowledge of the alleged undisclosed fact.  Nor is
> there any allegation that defendant made any effort,
> even as little as a telephone call to the local zoning
> officer, to ascertain, prior to making its bid, the
> feasibility of obtaining zoning approval for the
> project.  A party will not be heard to complain that he
> has been defrauded when it is his own evident lack of
> due care which is responsible for his predicament.

Id. (internal quotation marks and citation omitted).  See, also,

Kosher Konvenience, Inc. v. Ferguson Realty Corp., 567 N.Y.S.2d

131, 132 (N.Y. App. Div. 1991) (dismissing claim to void

commercial lease based on inability to obtain a certificate of

occupancy where "lease specifically provided that the plaintiff

would procure a certificate of occupancy at its own expense in

the event one was required by any governmental authority.");

Jordache Enters., Inc. v. Gettinger Assocs., 575 N.Y.S.2d 58, 59

(N.Y. App. Div. 1991) (plaintiff's reliance on the defendant's

alleged representation regarding the existence of a certificate

of occupancy was not reasonable because "the terms of the

certificate of occupancy, a public record, were not within the

exclusive knowledge of the defendant."); see also Villa Marin Chevrolet v. GM Corp., Civil Action No. 98-CV-6167 (JG), 1999 U.S. Dist. LEXIS 17972, at *14-15 (S.D.N.Y. Nov. 18, 1999) ("It is unreasonable, as a matter of law, for a party to claim that it was fraudulently induced to enter into a contract by a prior representation when reliance on that representation is specifically disclaimed in the contract [by an integration clause].") (citation omitted).

In the instant case, the existence of the ANC opposition was public record; in fact, the Plaintiffs in their complaint rely on the public reports of the ANC opposition. See, Paragraphs numbered 17, 18, 19, and 20. Further, a simple call to the local ANC or the DC zoning department before signing a contract with Munni for the Location would have been the diligent and prudent step to take - a step the Plaintiffs did not take in their consistent "blind-eye" approach to due diligence.[12]

Plaintiffs' claims for fraud and negligent misrepresentation also do not lie under District of Columbia law. See, Kapiloff v. Abington Plaza Corp., 59 A.2d 516 (D.C. 1948.). In Kapiloff, the plaintiff entered into a contract to purchase certain real property and paid a $2,000 deposit towards purchase. Id. at 517.

---

12    Perhaps Munni, the seller to Chans, had a duty to disclose. But Munni is a notably absent party to this litigation, and DCBG, as neither seller nor franchisor, had no duty to disclose the ANC opposition to the Plaintiffs.

Plaintiff subsequently discovered a statute authorizing the
United States Government to acquire by condemnation the land he
sought to purchase and refused to close the purchase.  Id.
Plaintiff then sought return of his deposit based on the seller's
failure to warn him of the statute.  Id.

The Kapiloff Court rejected plaintiff's claim for return of
his deposit.  "There is, of course, no question that mere silence
does not constitute fraud unless there is a duty to speak.  Here,
on the undisputed evidence there was no such duty."  Id.
Likewise, there was "no duty to speak" here because both the
Franchise Agreement and the Sublease placed the burden of
investigating zoning laws and obtaining necessary permits
squarely on Chans.  Moreover, the information about zoning
requirements was readily available to Chans if it had bothered to
inquire.  See, Kapiloff, 59 A.2d at 517 ("The Act of Congress on
which he relied as a ground of voiding the purchase was as
readily available to him as it was to the vendor."); see, also,
One-O-One Enters., Inc. v. Caruso, 848 F.2d 1283, 1287 (D.C. Cir.
1988) ("Were we to permit plaintiffs' use of the defendants'
prior representations (and defendants' nondisclosure of
negotiations inconsistent with those representations) to defeat
the clear words and purpose of the Final Agreement's integration
clause, contracts would not be worth the paper on which they are

written.") (internal quotation marks and citations omitted).

Because DCBG had no duty to tell Plaintiffs about possible zoning

concerns, Plaintiffs' fraud and misrepresentation claims fail as

a matter of law.

> 2.    DCBG Did Not Owe Plaintiffs A Duty to Disclose
>        The ANC's Speculative Future Actions.

Plaintiffs' fraud and misrepresentation claims also fail

because DCBG had no duty to predict or speculate on the ANC's

future actions.  The gist of Plaintiffs' claim is that if they

had known about the ANC's opposition to fast food restaurants in

2002, Chans would not have purchased a Blimpie franchise in 2004.

Their claim fails because the ANC's 2002 statements are, at best,

only an indicator of how the organization acted two years

earlier, no how the organization <u>may</u> act three years later and

therefore cannot be the basis of a fraud or misrepresentation

claim.  See <u>Hydro Investors, Inc. v. Trafalgar Power, Inc.</u>, 227

F.3d 8, 20-21 (2d Cir. 2000) (rejecting misrepresentation claim

under New York law because "the alleged misrepresentation must be

factual in nature and not promissory or relating to future events

that might never come to fruition."); <u>Day v. Avery</u>, 548 F.2d

1018, 1025-26 (D.C. Cir. 1976) ("[A] statement that one would or

would not be worse off in the future - whether characterized as a

prediction, opinion or promise - ordinarily would not be a

sufficient predicate for such an action as between parties truly

Page  -31-

dealing at arms' length."). In addition, at the time Chans purchased the franchise from Munni, DCBG had no more knowledge about the ANC's current position then was available to the Plaintiffs; in fact a Certificate of Occupancy was issued for the franchise. Accordingly, any statement by DCBG in 2004 as to how the ANC would respond to Chans' franchise based on the ANC's position of two years earlier, would have been mere speculation and could even have been construed by Munni as an interference with the contract between Chans and Munni. Regardless, such speculation about a third party's future intent cannot be the basis of a fraud or misrepresentation claim.

3.   Plaintiffs Are Solely Responsible For
     Any Damages That They Have Suffered.

Plaintiffs claims also fail because they are solely responsible for any damages they have suffered. Pursuant to the applicable D.C. zoning regulations, Chans could operate a "restaurant" at the Location as a matter of right. By definition, a "restaurant" is not a "fast food restaurant." Accordingly, so long as Chans' franchise did not meet the definition of a "fast food restaurant" it would be deemed a "restaurant" and permitted to continue operating.

A "fast food restaurant" is defined as a restaurant where:

the floor space allocated and used for customer queuing
for self-service for carry out and on-premises
consumption is greater than ten percent (10%) of the

total floor space on any one (1) floor that is
accessible to the public and it exhibits one (1) of the
two (2) following characteristics:

    (a)  At least sixty percent (60%) of the food
            items are already prepared or packaged before
            the customer places an order; and/or

    (b)  The establishment primarily serves its food
            and beverages in disposable containers and
            provides disposable tableware.

11 DCMR § 199.1.  Exhibit A to BA-SOF #44.

Here, there is no dispute that less than 60% of the food
items served at Chans franchise were already prepared or packaged
before customers placed orders.  (Complaint Exhibit E, at page 3,
¶ 10.)  Accordingly, so long as Chans took appropriate steps to
keep its carry-out queuing area to less than 10%, and to serve
its food and beverages primarily (but not exclusively) in non-
disposable containers and/or primarily (but not exclusively)
provided non-disposable tableware, it would not meet the
definition of a "fast food restaurant."

The availability and effectiveness of this simple remedy,
using non-disposable container, was recently proven by another
franchise restaurant near the Location, Cluck-U-Chicken.  There,
as here, the ANC challenged the Certificate of Occupancy issued
to Cluck-U-Chicken based on Cluck-U-Chicken's alleged "fast food
restaurant" status.  BA-SOF #50- 53.  As the transcript from the
BZA hearing on the Cluck-U-Chicken certificate of occupancy

demonstrates, Cluck-U-Chicken successfully defeated the ANC's objection by simply using primarily non-disposable containers and/or primarily non-disposable tableware at its franchise and kept its carry-out queuing area below 10%. Rubenstein Exhibit 9; BA-SOF #54.

The other option open to Chans was to seek a special exception. Although lengthier in terms of time to accomplish, it was not pursued by Chans. Yet, a year later, another Blimpie franchisee successfully pursued a special exception and received a Certificate of Occupancy at another C2A-zoned location. Lomax Exhibit 3.

For whatever reason, Chans did not avail itself of either of these options to keep operating at the Location. Plaintiffs, not DCBG or Blimpie or HSCDC, is therefore responsible for any losses Plaintiffs have suffered.

    E.    Count Four - Plaintiffs' Breach Of Contract/Breach Of Implied Covenant Of Good Faith Claim Fails As A Matter Of Law.

Plaintiffs' breach of contract and the breach of a covenant of good faith and fair dealing claim fails because there has been no breach of any contract with DCBG; there is no contract with DCBG and none has been alleged.

Even assuming, *arguendo*, that there existed some contractual duty of DCBG, as sub-franchisor, to perform under the Franchise

Agreement,[13] the only alleged breach of contract is "Blimpie's failure to not perform a site selection analysis of the [Location], or, considering Defendants' knowledge of the facts regarding the [Location], perform its obligation to perform a site selection analysis in a reasonable manner." (Complaint, at Paragraph 48; Emphasis added.)  There is no allegation that DCBG was involved in such breach.

Pursuant to the Franchise Agreement, Blimpie's (and thus, arguably DCBG's) only obligation with respect to site selection was to "approve the Location of the Operator."  The Franchise Agreement further provides that Blimpie's approval is granted when it signs a sublease for the proposed location.  Turning to the facts of this case, it is without dispute that Chans bought the franchise at an existing Location from Munni pursuant to a contract some 6 weeks prior to the execution of the Franchise Agreement, Sublease and Guaranty.  Second, there is no dispute that 2001 entered into the Sublease with Chans, thereby re-approving the Location first selected by Munni.  (Complaint,

---

13    Unlike plaintiffs' claims for fraud, negligent misrepresentation and unjust enrichment, because the claim for breach of contract and the covenant of good faith and fair dealing necessarily is based on the Franchise Agreement, it is governed exclusively by New York law.  Godbey v. Frank E. Basil, Inc., 603 F. Supp. 775, 776 (D.D.C 1985) ("Unless the parties' choice of law is that of a state lacking a substantial relationship to the parties or the transaction, or unless the chosen law would contradict a fundamental policy of the District of Columbia, a District of Columbia court would enforce the contract provision, and this Court, sitting in diversity, must do likewise."); (SOF ¶¶ __ __) (New York choice of law provision based on Blimpie's principal place of business in New York).

Exhibit B.)  There was, therefore, no breach of a contract between Chans and Blimpie, much less between Chans and DCBG.  See also Fesseha v. TD Waterhouse Investor Servs., 761 N.Y.S.2d 22, 23 (N.Y. App. Div. 2003) ("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights.") (citations omitted).

There was also no breach based on any provisions of the UFOC.  Assuming, *arguendo*, that Blimpie (and thus arguably DCBG) was required to perform an analysis of the Location prior to entering into the Sublease (Complaint, Paragraph 29), the complaint contains no allegations that Blimpie or DCBG did not do so.  Indeed, there are no allegations in the Complaint that Blimpie or DCBG did not consider the proposed rent, population mixture, geographic area and business hours of the Location.  Because Plaintiffs have failed to demonstrate, let alone allege, that Blimpie or DCBG failed to meet a contractual obligation, Plaintiffs' breach of contract and the covenant of good faith and fair dealing claims must be dismissed as failing to state a claim upon which relief can be granted.

F.    Count Five - Plaintiffs' Unjust Enrichment
      Claim Fails As A Matter Of Law.

On the one hand, Plaintiffs' claims for unjust enrichment
fail as to DCBG if there is an express contract between the
Plaintiffs and DCBG.  On the other hand, and in the absence of an
express contract, to state a claim for unjust enrichment,
Plaintiffs must demonstrate that: "(1) the plaintiff conferred a
benefit upon the defendant; (2) the defendant accepted and
retained the benefit; and (3) it would be unjust for the
defendant not to pay the plaintiff the value of the benefit."
Rapaport v. United States Dep't of the Treasury, Office of Thrift
Supervision, 59 F.3d 212, 217 (D.C. Cir. 1995); Kaye v. Grossman,
202 F.3d 611, 616 (2d Cir. 2000) (same under NY law).

In the instant case, the only arguable "unjust enrichment"
Plaintiffs allege that DCBG received was receipt of franchise
fees (Complaint, Paragraph 74) and that allegation is non-
specific as to DCBG.  Furthermore, such fees were paid to
Blimpie, not DCBG, and pursuant to a valid, enforceable agreement
- the Franchise Agreement.  See Albrecht v. Committee on Employee
Benefits of the Fed. Reserve Employee Benefits Sys., 357 F.3d 62,
69 (D.C. Cir. 2004) ("[T]here can be no claim for unjust
enrichment when an express contract exists between the parties.")
(internal quotation marks omitted) (citing Schiff v. AARP, 697
A.2d 1193, 1194 (D.C. 1997)); MacDraw, Inc. v. CIT Group Equip.

Page  -37-

<u>Fin.</u>, 157 F.3d 956, 964 (2d Cir. 1998) ("[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract [i.e., unjust enrichment] for events arising out of the same subject matter.") (internal quotation marks and citations omitted) (applying NY law).

There is nothing in the allegations directed to the receipt by DCBG of franchise fees, or any other fee, from the Plaintiffs. And, there being no allegation that Plaintiffs paid DCBG franchise fees, or any other fee or remuneration for that matter, Plaintiffs' unjust enrichment claim must be dismissed as failing to state a claim upon which relief can be granted.

CONCLUSION

For the foregoing reasons, Defendant DCBG, Inc. respectfully request that the Court grant its motion for summary judgment and dismiss Plaintiffs' claims against it.

Respectfully submitted,

DCBG, INC.,

*Tarrant H. Lomax*

Tarrant H. Lomax

Dated: July 26, 2006

H:\THL\Client Files\DCBG\Chans Foods Litigation\Court Pleadings\DCBG Summary Judgment\DCBG SJ MemorandumFinal.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

CHANDAR RATNAM, *et ux, et al.*

        Plaintiffs,

v.

BLIMPIE ASSOCIATES, LTD., *et al.*,

        Defendants.

CIVIL ACTION NO.
1:06-cv-00372-JR

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF THE MOTION OF DCBG, INC. FOR SUMMARY JUDGMENT

DCBG, Inc., by its attorney and pursuant to Local Civil Rule 7(h), sets forth the following concise statement of the material facts as to which DCBG contends that there is no material dispute.

In setting forth these facts, DCBG does not concede all such facts to be true for purposes of trial; for purposes of its motion, DCBG does accept these facts to be true.

1.  DCBG incorporates by reference as though fully set forth herein the statement of material facts submitted on behalf of Blimpie Associates, Ltd. and 2001 B.A. Realty, Inc. in support of their motion for summary judgment filed herein.

2.  DCBG is a sub-franchisor authorized to market franchises for co-Defendant Blimpie Associates, Ltd. ("Blimpie")

Page -1-

within certain territorial limits, including the District of Columbia.  In addition, DCBG assists in the re-sale of established Blimpie franchises to new franchisees within DCBG's territory.

3.  On or about August 17, 2001, Blimpie entered into a Franchise Agreement and Sublease with Munni Enterprises, Inc. (Munni) for the operation of a Blimpie's franchise at 8th and H Streets, NW, Washington, DC.  The terms of the Master Lease were incorporated into the Munni sublease and Nizam M. Ali (Munni's principal) provided a personal guaranty to the Master Lease, which personal guarantee has not been extinguished.

4.  A hearing was held before the D.C. Board of Zoning Appeals (BZA) on October 12, 2004, at which the Plaintiffs appeared *pro se*.

5.  At the conclusion of the hearing on October 12, 2004, the BZA invited the parties - including specifically the Plaintiffs - to submit additional evidence regarding the calculation of the floor area of the premises as a restaurant.

6.  The Appellant Advisory Neighborhood Council responded to the BZA's request and submitted a post-hearing calculation based on the original configuration of the floor area.  The Plaintiffs did not submit a response.

7.   On November 2, 2004, the BZA orally on the record stated its decision to order revocation of the Certificate of Occupancy.

8.   The Plaintiffs took no steps between June 13, 2004 and June 27, 2005, to ensure that its franchise would meet the definition of a "restaurant", and not that of a "fast food restaurant".

*Tarrant H. Lomax*

Tarrant H. Lomax (961409)
Tarrant H. Lomax, Esq., P.C.
1819 Bay Ridge Avenue, Suite 220
Annapolis, MD 21403
Phone: 202.253.8923
Fax: 707.313.7020
Email: tarrantlomax@abanet.org

H:\THL\Client Files\DCBG\Chans Foods Litigation\Court Pleadings\DCBG Summary Judgment\Statement of Material Facts.wpd